IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>TOWN SPORTS INTERNATIONAL LLC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-12168 (CSS)<br><br>(Joint Administration Requested) |

**DECLARATION OF PHILLIP JUHAN IN SUPPORT
OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Phillip Juhan, hereby declare under penalty of perjury that the following is true and correct:

1. I am the Chief Financial Officer of Town Sports International LLC ("**TSI**") and certain of its subsidiaries and affiliates that have filed voluntary petitions before this Court (each a "**Debtor**" and, collectively, the "**Debtors**"). I served in multiple roles including as Vice President of Business Operations for the Debtors since August 13, 2018. From 2002 to 2014, I worked in the Investment Banking Divisions of Prudential Financial and the Bank of Montreal, where I led consumer focused research within the Financial Services (Real Estate, Gaming and Lodging) and Consumer (Broadlines Retail and Restaurants) sectors. Since 2014, I served as Founder and President of B.L.K. LLC, a restaurant operating company, and as Founder and General Partner of Simple PropCo LLC, a Georgia-based real estate holding company.

---

[1] The last four digits of Town Sports International, LLC's federal tax identification number are 7365. The mailing address for Town Sports International, LLC is 399 Executive Boulevard, Elmsford, New York 10523. Due to the large number of debtors in these cases, for which the Debtors have requested joint administration, a complete list of the Debtors, the last four digits of their federal tax identification numbers, and their addresses are not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at http://dm.epiq11.com/TownSports, or by contacting the proposed undersigned counsel for the Debtors.

26980965.8

2. On the date hereof (the "**Petition Date**"), the Debtors filed voluntary petitions with the Court for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"). The Debtors intend to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3. Each of the Debtors are direct or indirect subsidiaries of Town Sports International Holdings, Inc. ("**Holdings Inc.**"), which is publicly-traded holding company. The Debtors in these cases are a subset of the Company that collectively are referred to as the "restricted entities" – as their assets have been pledged as collateral to the Prepetition Lenders under the Prepetition Credit Agreement (as defined herein).[2] The remainder of the subsidiaries of Holdings Inc., which include eight fitness centers, three real estate holding companies, as well as a laundry facility located in Elmsford, New York (collectively, the "**Unrestricted Group**") are not obligors or guarantors under the Prepetition Credit Agreement. Neither Holdings Inc. nor any member of the Unrestricted Group are Debtors in these cases, nor is it anticipated that they will be filing bankruptcy petitions. Holdings Inc. and all of its Debtor and non-debtor subsidiaries, collectively, are defined herein as the "**Company**."

4. I submit this declaration (this "**Declaration**") to assist the Court and parties-in-interest in gaining an understanding of the circumstances that led to the commencement of these chapter 11 cases (collectively, the "**Chapter 11 Cases**"), and in support of the Debtors' petitions and motions requesting various forms of "first day" relief (collectively, the "**First Day Motions**"),

---

[2] Debtor Town Sports International, Inc. owns a wholly-owned subsidiary, Town Sports AG ("**TS AG**"), through which the Company operates three New York Sports Clubs located in Switzerland. The assets of TS AG are not pledged to the Prepetition Lenders, and TS AG is not a Debtor, but Town Sports International, Inc.'s equity interest in TS AG is pledged to the Prepetition Lenders. Additionally, TSI owns 60% of the outstanding units in a joint venture, TSI-TOH Holdco, LLC ("**TSI-TOH**"), which joint venture operated two clubs located in New York prior to the Petition Date. The assets of TSI-TOH are not pledged to the Prepetition Lenders, and TSI-TOH and its subsidiaries are not Debtors, but TSI's membership interest in TSI-TOH is pledged to the Prepetition Lenders.

26980965.8

which have been filed to minimize the adverse effects of filing for chapter 11 protection and enhance the Debtors' ability to maximize value for the benefit of their estates and creditors.

5. If called as a witness, I could and would competently testify to the matters set forth herein based on my personal knowledge. In my capacity with the Debtors, I am familiar with the Debtors' day-to-day operations, business affairs, financial condition, and books and records. The facts set forth in this Declaration are based on my service with the Debtors, my review of the Debtors' books and records and other relevant documents, and my review of information compiled and communicated to me by other employees of the Debtors and the Debtors' professional advisors.

6. Prior to the commencement of the Chapter 11 Cases I, among other things, (i) reviewed and discussed the Debtors' strategy regarding the development of potential restructuring and sale alternatives; (ii) supervised the preparation of the documentation needed to implement the restructuring initiatives contemplated during the Chapter 11 Cases; and (iii) consulted on a regular basis with the Debtors' other senior management members and outside advisors with respect to the foregoing.

7. This Declaration provides an overview of the Company's business and corporate history, as well as a discussion of the events that compelled the commencement of the Chapter 11 Cases, a description of the Company's capital structure, its strategy to maximize the value of the business, and the efforts to obtain debtor-in-possession financing. The Declaration also affirms and incorporates the facts that support the relief requested in the First Day Motions.

A. **Introduction**

8. As explained in detail below, as a result of the COVID-19 pandemic, all of the Debtors' clubs were forced to close in March 2020. The COVID-19 pandemic put an

26980965.8

immediate halt to the Debtors' business, leaving the Debtors without a source of revenue to fund operations. COVID-19 has hit the health club industry particularly hard, and the industry has seen many closures and bankruptcy filings, including of some the largest national health clubs.

9. With most clubs closed for the past four to five months, the Debtors remained cautiously optimistic for a reopening strategy. However, with recent "spikes" in COVID cases, many states have delayed the Company's ability to reopen clubs and our reopening plan has taken longer than anticipated. Similarly, members are justifiably adhering to social distancing guidelines, and many remain cautious about and re-entering health clubs. The Debtors have focused on identifying the steps necessary to transform their business in light of these unprecedented challenges.

10. These measures include, first and foremost, measures to ensure the Debtors' clubs meet all health and safety guidelines and are safe for the Company's members and employees. The Company prepared and is executing upon a comprehensive COVID-19 Exposure Control Plan (the "**COVID Plan**") in connection with its ongoing operations. The COVID Plan outlines specific guidelines and mitigating measures including, but not limited to, health and safety procedures regarding strict physical social distancing, personal protective equipment, increased cleaning and disinfecting safeguards in accordance with the guidelines of OSHA, the CDC, and state and local public health agencies. Additional measures include modifying activities, restricting programs, adjusting hours of operation, travel restrictions, telecommuting opportunities and virtual communication platforms. In order to implement the COVID Plan, the Company has incurred and will continue to incur significant costs related to increased training, more comprehensive cleaning, disinfecting, and health screening protocols, and enhanced facilities maintenance. As the circumstances of this global health pandemic continue to evolve, the

Company continues to evaluate the COVID Plan to ensure that it meets the health and safety needs of members and employees.

11. In addition, the Debtors have taken necessary actions to right-size their balance sheet and, with the assistance of real estate advisors, re-assess their real estate and club footprint as part of their overall strategic plan. It is the Debtors' goal to use the tools of the Bankruptcy Code to restructure financially, a process that is necessary to reflect the new reality and headwinds that face health clubs generally, such as those that the Company operates, and to place the company on strong footing to safely and successfully resume business consistent with the COVID Plan and the mandates of state and local governments. As the focus on exercise and overall healthy lifestyles continue to impact the health club industry, the Company believes that it is well positioned to benefit from these dynamics as a large operator with recognized brand names, leading regional market shares and an established operating history.

12. At the same time, with limited revenues for several months, the Debtors' liquidity is severely limited. The Debtors, therefore, have been in close communications and discussions with an ad hoc group of senior term loan lenders (the "Term Lender Group"). The Debtors intend to utilize the chapter 11 process to enhance liquidity through debtor-in-possession financing to allow for a successful re-opening and restructuring process.

13. As of the Petition Date, the Debtors have reopened approximately 95 of their facilities. As the Debtors continue the reopening process, they believe these chapter 11 cases are critical in our reopening plans. Access to DIP financing and further liquidity will allow for continued compliance with the COVID Plan and public health guidelines so members and employees can remain safe and confident as they return to the Debtors' clubs.

B. **Overview of the Company**

  i. *Company History and Corporate Structure*

14. The Company is a leading owner and operator of fitness clubs in the United States, particularly in the Northeast and Mid-Atlantic regions. As of December 31, 2019, the Company, through its subsidiaries,[3] operated 186 fitness clubs under various brand names, collectively serving approximately 605,000 members as of December 31, 2019.

15. The Company's clubs and brands, as of December 31, 2019, are as listed below:

| Brand | Count |
|---|---|
| New York Sports Clubs | 99 |
| Boston Sports Clubs | 31 |
| Washington Sports Clubs | 9 |
| Philadelphia Sports Clubs | 5 |
| Lucille Roberts | 16 |
| Total Woman Gym and Spa | 11 |
| Palm Beach Sports Clubs | 3 |
| Christi's Fitness | 1 |
| Around the Clock Fitness | 6 |
| LIV Fitness | 2 |
| New York Sports Clubs – Switzerland | 3 |
| | 186 |

16. Prior to the termination of all non-executive employees as a result of the closure of the Debtors' clubs in mid-March, 2020, which is discussed in further detail below, the Debtors employed, in the aggregate, approximately 9,200 employees. Approximately 1,900 employees worked on a full-time basis, while the remainder work on a part-time basis. A subset of executive employees have continued to work for the Debtors throughout the year. The Debtors' employees are not covered by a collective bargaining agreement.

---

[3] A chart detailing the organizational structure of the Debtors as of the Petition Date is attached hereto as <u>Exhibit A</u>.

26980965.8

17.     Since incorporating in 1973, the Company has developed and refined its club formats, which has allowed the Company to cost-effectively construct and efficiently operate fitness clubs in the different real estate environments in which it operates. The Company operates clubs under localized brand names that seek to create an image and atmosphere consistent with the local community and to foster recognition as a local network of quality fitness clubs rather than a national chain. Clubs are located in urban or suburban areas, and are opened in clusters close to transportation hubs or office or retail centers, for maximum convenience to the Company's customers by offering target members the convenience of multiple locations close to where they live and work, reciprocal use privileges, and standardized facilities and services. The Company's members include a wide age demographic covering the student market to the active mature market.

18.     Clubs typically have an open fitness area to accommodate cardiovascular and strength-training equipment, as well as special purpose rooms for group fitness classes and other exercise programs. The Company seeks to provide a broad array of high-quality exercise programs and equipment that are popular and effective, promoting a quality exercise experience for members. When developing clubs, the Company carefully examines the potential membership base and the likely demand for supplemental, multi-recreational offerings such as swimming, basketball, children's programs, tennis or squash and, provided suitable real estate is available, will add one or more of these offerings to the fitness-only format. For example, a multi-recreational club in a family market may include Sports Clubs for Kids programs, which can include swim lessons and sports camps for children. The Company's fitness-only clubs average approximately 19,000 square feet, while multi-recreational clubs average approximately 40,000 square feet.

C.    **The Prepetition Capital Structure**

19.    On November 15, 2013, TSI and TSI Holdings II, LLC ("**Holdings II**") entered into that certain credit agreement with Deutsche Bank AG New York Branch ("**DB**") as administrative agent, Keybank National Association, as syndication agent, and the other participating lenders thereunder (the "**Prepetition Lenders**" and such agreement, the "**Prepetition Credit Agreement**"). The Prepetition Credit Agreement provided the Debtors with a $370 million senior secured credit facility (the "**Senior Credit Facility**"). The Senior Credit Facility consists of a $325 million term loan facility, maturing on November 15, 2020 (the "**Term Loan Facility**") and a $15 million revolving loan facility that matured on August 14, 2020 (the "**Revolving Loan Facility**"). The borrowings under the Senior Credit Facility are guaranteed and secured by assets and pledges of capital stock by Holdings II, TSI, and, subject to certain customary exceptions, the wholly-owned domestic subsidiaries of TSI (collectively, the "**Collateral**").

20.    As of the Petition Date, the outstanding balances owed to the Prepetition Lenders under the Prepetition Credit Agreement was approximately $167.5 million, inclusive of accrued and unpaid interest (all such amounts, the "**Prepetition Loan Obligations**").

21.    As a fitness club operator, the Debtors have certain obligations in respect of their leased facilities. In addition, the Debtors' books and records list approximately $74 million in outstanding trade liabilities and other unsecured obligations.

22.    In the ordinary course of business, the Debtors engage in routine business relationships with each other (the "**Intercompany Transactions**") related to, *inter alia*, the collection of membership revenues and other credit card receivables and payment of expenses, which may result in intercompany receivables and payables (the "**Intercompany Balances**"). At any given time there may be Intercompany Balances owing by one Debtor to another Debtor. Such

Intercompany Transactions are typically conducted pursuant to intercompany trade arrangements and joint use of certain shared service platforms, among others. The structure of the Cash Management System routes most ordinary course payments through Debtor Town Sports International, LLC, which remits payments on behalf of its affiliates. Debtors Town Sports International, LLC and TSI Cash Management, LLC are entitled to reimbursement from its various subsidiaries pursuant to the terms of that certain Amended and Restated Management and Treasury Services Agreement, dated as of January 1, 2018 (the "**Services Agreement**"). Under the Services Agreement, Town Sports International, LLC and TSI Cash Management, LLC provide various treasury, management, legal, tax, billing and payment, advertising, and purchasing services, among other services as enumerated in the Services Agreement, to the various other Debtor subsidiaries. In exchange for the services provided under the Services Agreement, TSI is entitled to receive reimbursement of the costs of services provided, plus an annual fee of 3% of the various subsidiaries' gross revenue.

23. The Debtors provide treasury, management, legal, tax, billing and payment, advertising, and purchasing services to the Unrestricted Group pursuant to that certain Amended and Restated Management Services Agreement dated as of May 25, 2017 (the "**Unrestricted Group Services Agreement**"). Pursuant to the Unrestricted Group Services Agreement, in consideration for the services they receive, the members of the Unrestricted Group reimburse the Debtors for all costs of services rendered on an annual basis, plus all expenses incurred on behalf of the Unrestricted Group. The Debtors believe that the Unrestricted Group has satisfied its obligations for the costs of services rendered through December 31, 2019.

**D.    Circumstances Leading to the Commencement of The Chapter 11 Cases**

  i.    *The COVID-19 Pandemic*

24.    On March 16, 2020, the Company was required to close approximately 95% of its clubs pursuant to the exercise of emergency executive authority invoked by state and local governments in order to combat the spread of the COVID-19 pandemic. By the end of March, the Company's remaining clubs in Florida were mandated to close as well.

25.    As of the end of March, substantially all of Debtors' operations were hibernated, and monthly membership revenues were suspended effective May 1, 2020, notwithstanding the temporary closure provisions set forth in the Debtors' various membership agreements. In short, the Debtors have not generated any material operating revenues for nearly five months, and have only begun to generate operating revenues as of September 1 in connection with the reopening of the majority of their facilities.

26.    As the Debtors' operations ceased and monthly membership revenues were suspended, the Debtors took immediate steps to reduce operating costs and to conserve cash. On March 13, 2020, the Debtors borrowed $12.5 million from the 2013 Revolving Loan Facility and have continued to actively manage cash flow on a daily basis. Upon closure of the clubs, the Company informed all non-executive employees working at clubs that their employment with the Company had been terminated with immediate effect. Additionally, with the assistance of their advisors, the Debtors engaged in conversations with landlords to discuss rent relief during this challenging period.

  ii.    *Prepetition Restructuring Efforts*

27.    In light of the unprecedented economic circumstances in which the Debtors found themselves, the liquidity challenges as well as the impending maturity of the Prepetition

Loan Obligations, the Company has spent a significant amount of time engaged in a process of soliciting interest in a refinancing of the Company's secured indebtedness or a sale of substantially all of the Company's assets, and in fact, notwithstanding the current environment, the Debtors have generated interest in a going-concern sale for their businesses from two separate groups of Prepetition Lenders.

28.     The first proposal is an $80 million debtor-in-possession facility (the "**KLIM DIP**") from Kennedy Lewis Investment Management, LLC and/or one or more of its designated affiliates and/or related funds or accounts ("**KLIM**").  KLIM owns over 45% of the total amount of debt owed by the Debtors under the Prepetition Credit Agreement, making it the largest individual holder of prepetition secured debt.   The Debtors believe that the KLIM DIP provides sufficient, up-front capital to satisfy administrative expenses through a marketing process for the sale of the Debtors' assets under section 363, as well as certain cure costs related to the closing of such sale.  The KLIM DIP, however, is conditioned on a consensual priming of the Debtors' prepetition secured debt, which requires consent from a majority of the holders (the "**Required Lenders**") of debt owed by the Debtors under the Prepetition Credit Agreement.  The KLIM DIP does not currently have support by the Required Lenders and, as a result, is not actionable.

29.     The second proposal is for a $17.5 million debtor-in-possession facility tied to a credit bid that provides for an additional $47.5 million of financing for the business post-exit (the "**Tacit/Ad Hoc Group Proposal**") and was submitted jointly with third party Tacit Capital ("**Tacit**") via an ad hoc group of certain Prepetition Lenders (the "**Ad Hoc Lender Group**") who have indicated they own over a majority of the total amount owed by the Debtors under the Prepetition Credit Agreement.  The Tacit/Ad Hoc Group Proposal is similarly premised on a

priming of the Debtors' Prepetition Lenders as well as a commitment by the Required Lenders to credit bid their debt. The Ad Hoc Lender Group submits that the Tacit/Ad Hoc Group Proposal is supported by the Required Lenders.

30. The Debtors recognize that securing financing together with a fully committed stalking horse bid from its Prepetition Lenders to acquire substantially all of the Debtors' assets is a crucial step in ensuring the ultimate success of these cases and providing benefit to the Debtors' members, employees, and other stakeholders. A stalking horse bid from either group would come via credit bid, which must be directed by Required Lenders under the terms of the Prepetition Credit Agreement. The Debtors believe that the KLIM proposal is in the best interest of the Debtors, employees, members and other stakeholders, as it will provide the Debtors with more substantial and immediate liquidity to administer these cases, recover, rehabilitate, and grow stronger in the shadow of the COVID-19 pandemic, if the Debtors can obtain Required Lender consent. Notably, the KLIM proposal provides for the potential assumption and assignment of 94 of the Debtors' prepetition leases (depending on the results of negotiations of lease concessions with the applicable landlords), a greater number than what is currently contemplated by the Tacit/Ad Hoc Group Proposal, and as such would benefit a larger number of the Debtors' landlord creditors and employees. The KLIM proposal, however, does not provide for a recovery acceptable to the Ad Hoc Group, which prefers the Tacit/Ad Hoc Group Proposal. The Debtors believe the Tacit/Ad Hoc Group Proposal may be actionable, subject to proof of adequate financing, but are concerned the "headline" price associated with the credit bid condition could discourage participation in an active bidding process.

31. Since receiving the financing proposals, the Debtors have encouraged discussions between the parties in an effort to drive to consensus on a DIP and sale process

structure. And while the Debtors are encouraged by the positive sign of having two suitors willing to invest in the Debtors on a going-concern basis, the Debtors need the Required Lender consent for a consensual priming DIP.

32. Given the financial pressures on the Debtors' operations and diminishing liquidity, the Debtors determined it necessary to initiate the chapter 11 process while discussions regarding the DIP funding and stalking horse terms remain ongoing. In the meantime, the Debtors propose to use Cash Collateral at the outset of these cases for purposes of satisfying only their most urgent postpetition obligations to creditors. Although the Debtors have not yet obtained consent of the Required Lenders for the use of Cash Collateral, they believe that the use of Cash Collateral is essential to bridge to a hearing on approval of an acceptable DIP financing facility, and will continue to negotiate prior to a hearing on this motion.

33. To ensure to all participants that these discussions will proceed fairly and in a manner that ensures the best interest of the estates remain paramount, the Debtors have established a special committee of the board, appointed two new, independent directors, and delegated to them the power and authority to, among other things, review, evaluate and negotiate the terms of financing transactions or strategic alternatives for the Debtors. The Debtors expect that given the board members' substantial experience in this area, they will be able to act quickly and decisively and help drive a resolution here that will clear the path for an efficient and value-maximizing marketing and auction process.

E. **Objectives for Chapter 11**

34. Unfortunately, due to the challenges discussed herein, the Company has been unable to service its senior secured debt obligations in the ordinary course and is facing near-term liquidity issues. The Debtors have generated effectively no material revenue since the spring

of 2020, but will need the influx of capital to maintain operations and transition back to normal operations as clubs have only recently been permitted by the various state and local municipalities to reopen. To address these challenges, and in an effort to maximize value for the benefit of their creditors and other stakeholders, the Company and their professional advisors, after considering all available strategic options, determined that the best course to maximize value was to initiate the Chapter 11 Cases with the goal of (i) preserving the Debtors' assets through the consummation of an asset-maximizing transaction and (ii) minimizing estate obligations to the extent possible.

35. In addition to negotiating the DIP Facility to provide a source of critical operating funds, to avoid incurring any unnecessary administrative expenses with respect to certain facilities where the Debtors are no longer operating and retain no assets of value, the Debtors have sought to reject such leases effective to the Petition Date. The Debtors will also take a number of steps to reduce their expenses moving forward, including filing additional contract and lease rejection motions, pursuant to which the Debtors will seek to reject facility leases and contracts that the Debtors and their advisors have determined are unlikely to be assumed and assigned and will no longer be necessary to the Debtors' business operations.

36. Finally, as the Chapter 11 Cases progress, the Debtors will continue to analyze their asset portfolio and available disposition alternatives with respect to all available assets to preserve and maximize estate value.

**F.     Support for Relief Requested in First Day Motions**

37. Concurrently with the filing of their chapter 11 petitions, the Debtors filed a number of First Day Motions seeking relief that the Debtors believe is necessary to enable them to maximize the value of their estates while the Chapter 11 Cases are pending. The facts set forth in the First Day Motions are incorporated herein in their entirety.

38. I am familiar with the contents of each First Day Motion (including the exhibits to such motions) and believe that the relief sought in each First Day Motion: (i) will enable the Debtors to transition into chapter 11; (ii) is critical to the Debtors' efforts to maximize value through the Chapter 11 Cases and minimize expense; and (iii) best serves the interests of the Debtors' creditors and other stakeholders. It is my further belief that the relief sought in the First Day Motions is, in each case, narrowly tailored and necessary to achieve the goals identified above.

39. The Debtors are seeking approval of the First Day Motions to ensure that value is preserved during the transition into chapter 11.

40. To this end, the Debtors have filed the following First Day Motions:

   i. *Debtors' Motion for Entry of an Order Authorizing the Joint Administration of the Debtors' Chapter 11 Cases;*

   ii. *Debtors' Application for an Order Appointing Epiq Corporate Restructuring, LLC as Claims and Noticing Agent Effective as of the Petition Date*

   iii. *Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Continue Operating Existing Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, and (II) Granting Related Relief;*

   iv. *Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(a) and 366 of the Bankruptcy Code, (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Payment, (III) Establishing Procedures for Determining Additional Adequate Assurance of Payment, and (IV) Setting a Final Hearing Related Thereto;*

   v. *Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(a), 363(b), 507(a)(8), 541, 1107(a) and 1108 of the Bankruptcy Code, (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees and Related Obligations, (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto, and (III) Scheduling a Final Hearing*

> vi. *Debtors' Motion for Entry of Interim and Final Orders, Pursuant to Sections 105(a), 363(b), 507(a)(4) and 507(a)(5) of the Bankruptcy Code, (A) Authorizing (I) Payment of Prepetition Employee Wages, Salaries and Other Compensation; (II) Payment of Prepetition Employee Business Expenses; (III) Contributions to Prepetition Employee Benefit Programs and Continuation of Such Programs in the Ordinary Course; (IV) Payment of Workers' Compensation Obligations; (V) Payments for Which Prepetition Payroll Deductions Were Made; (VI) Payment of All Costs and Expenses Incident to the Foregoing Payments and Contributions; and (VII) Payment to Third Parties of All Amounts Incident to the Foregoing Payments and Contributions; and (B) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto;*
>
> vii. *Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(a) and 363 of the Bankruptcy Code, (I) Authorizing Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with Insurance Programs, Including Payment of Policy Premiums and Broker Fees; (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto, and (III) Scheduling a Final Hearing;* and
>
> viii. *Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief.*

41. I have reviewed each of the First Day Motions, and the facts stated therein are true and correct to the best of my belief with appropriate reliance on corporate officers and advisors. It is my belief that the relief sought in each of the First Day Motions constitutes a critical element in the successful implementation of the Debtors' efforts to maximize creditor recoveries, is necessary for a smooth transition into Chapter 11 and will help to preserve the value of the Debtors' estates. It is my further belief that, with respect to those First Day Motions requesting the authority to pay specific prepetition claims or continue selected prepetition programs, *i.e.*, the First Day Motions seeking relief related to the Debtors' obligations to their employees, taxing authorities, vendors, service providers, customers, banks, and insurers, the relief requested is necessary to avoid immediate and irreparable harm to the Debtors' estates.

42. The success of the Chapter 11 Cases depends upon the Debtors' ability to successfully implement the value-maximizing transactions described herein. The relief requested in the First Day Motions is a critical component of maintaining business operations and the confidence of key constituencies necessary to implement a successful chapter 11 process.

## CONCLUSION

43. I believe approval of the relief requested in the First Day Motions is in the best interests of all stakeholders and respectfully request that the Court grant all relief requested in the First Day Motions and such other relief as may be just.

Dated: September 14, 2020         */s/ Phillip Juhan*
                                  Phillip Juhan
                                  Chief Financial Officer

# EXHIBIT A

**Organizational Chart**

26980965.8





# TSI Holdings II, LLC

## Town Sports International, LLC [NY]

- TSI 1231 3rd Avenue, LLC
- TSI 217 Broadway, LLC
- TSI 30 Broad Street, LLC
- TSI 555 6th Avenue, LLC
- TSI Astor Place, LLC
- TSI Astoria, LLC
- TSI Avenue A, LLC
- TSI Bay Ridge 86th Street, LLC
- TSI Bayridge, LLC
- TSI Broadway, LLC
- TSI Brooklyn Belt, LLC
- TSI Carmel, LLC
- TSI Cash Management LLC
- TSI Cobble Hill, LLC
- TSI Commack, LLC
- TSI Court Street, LLC
- TSI Croton, LLC
- TSI Deer Park, LLC
- TSI Dobbs Ferry, LLC
- TSI East 23, LLC
- TSI East 36, LLC
- TSI East 41, LLC
- TSI East 48, LLC
- TSI East 51, LLC
- TSI East 59, LLC
- TSI East 76, LLC
- TSI East 86, LLC
- TSI East 91, LLC
- TSI East Meadow, LLC
- TSI First Avenue, LLC
- TSI Forest Hills, LLC
- TSI Garden City, LLC
- TSI Garnerville, LLC
- TSI Glendale, LLC
- TSI Grand Central, LLC
- TSI Great Neck, LLC
- TSI Greenpoint, LLC
- TSI Hartsdale, LLC
- TSI Hawthorne, LLC
- TSI Hicksville, LLC
- TSI Huntington, LLC

- TSI Irving Place, LLC
- TSI Larchmont, LLC
- TSI Lincoln, LLC
- TSI Long Beach, LLC
- TSI Mamaroneck, LLC
- TSI Massapequa, LLC
- TSI Mercer Street LLC
- TSI Midwood, LLC
- TSI Morris Park, LLC
- TSI Murray Hill, LLC
- TSI New Rochelle LLC
- TSI Oceanside, LLC
- TSI Pine Street, LLC
- TSI Rego Park, LLC
- TSI Scarsdale, LLC
- TSI Sheridan, LLC
- TSI Smithtown, LLC
- TSI Somers, LLC
- TSI South Park Slope LLC
- TSI Staten Island, LLC
- TSI Sunnyside, LLC
- TSI Syosset, LLC
- TSI Varick Street, LLC
- TSI West 115th Street LLC
- TSI West 125, LLC
- TSI West 145th Street LLC
- TSI West 16, LLC
- TSI West 23, LLC
- TSI West 38, LLC
- TSI West 41, LLC
- TSI West 48, LLC
- TSI West 73, LLC
- TSI West 80, LLC
- TSI West 94, LLC
- TSI West End, LLC
- TSI West Nyack, LLC
- TSI White Plains City Center, LLC
- TSI White Plains, LLC
- TSI Whitestone, LLC
- TSI Woodmere, LLC

Subsidiaries Operating in Rhode Island
- TSI Providence Eastside, LLC

Subsidiaries Operating in Connecticut
- TSI Greenwich, LLC
- TSI Stamford Post, LLC
- TSI West Hartford, LLC

- TSI Giftco, LLC [PA]

- TSI Holdings (CIP), LLC

Subsidiaries Operating in Pennsylvania
- TSI - Lucille 38th Avenue LLC
- TSI - Lucille 42nd Street, LLC
- TSI - Lucille 89th Street, LLC
- TSI - Lucille Astoria, LLC
- TSI - Lucille Austin Street LLC
- TSI - Lucille Bayshore, LLC
- TSI - Lucille Bronx, LLC
- TSI - Lucille Commack LLC
- TSI - Lucille Holbrook, LLC
- TSI - Lucille Kings Highway LLC
- TSI - Lucille Ralph Avenue LLC
- TSI - Lucille Rockville Centre, LLC
- TSI - Lucille St. Nicholas Avenue, LLC
- TSI - Lucille Valley Stream LLC

- TSI-ATC Holdco, LLC
  - TSI-ATC Alico Mission, LLC
  - TSI-ATC Ben Pratt, LLC
  - TSI-ATC Beneva Road, LLC
  - TSI-ATC Boyscout, LLC
  - TSI-ATC Cape Coral, LLC
  - TSI-ATC Tamiami Trail, LLC

- TSI-HR 13th Street, LLC
- TSI-HR 45th Street, LLC
- TSI-HR 76th Street, LLC
- TSI-HR Whitehall Street, LLC

- TSI Stoked, LLC

- TSI-TOH Holdco, LLC (TSI Owns 60%)
  - TSI-TOH 32nd Street, LLC
  - TSI-TOH 106th Street, LLC

- TSI Total Woman Holdco, LLC [CA]
  - TSI – Alameda, LLC [CA]
  - TSI – Cal. Glendale, LLC [CA]
  - TSI – Irvine, LLC [CA]
  - TSI – Northridge, LLC [CA]
  - TSI – Placentia, LLC [CA]
  - TSI – San Jose, LLC [CA]
  - TSI – Studio City, LLC [CA]
  - TSI – Topanga, LLC [CA]
  - TSI – Torrance, LLC [CA]
  - TSI – Valencia, LLC [CA]
  - TSI – Westlake, LLC [CA]

- TSI Insurance, Inc. [NY]
  - TSI Holdings (IP), LLC

- TSI Holdings (DC), LLC
  - TSI Columbia Heights, LLC
  - TSI Connecticut Avenue, LLC
  - TSI Dupont Circle, Inc.
  - TSI Dupont II, Inc.
  - TSI Gallery Place, LLC
  - TSI Georgetown, LLC
  - TSI Glover, LLC
  - TSI University Management, LLC
  - TSI Washington, Inc.

- TSI International, Inc.
  - Town Sports AG [Switz]

- TSI Holdings (MA), LLC
  - TSI Allston, LLC
  - TSI Back Bay, LLC
  - TSI Beacon Street, LLC
  - TSI Boylston, LLC
  - TSI Bradford, LLC
  - TSI Bulfinch, LLC
  - TSI Canton, LLC
  - TSI Central Square, LLC
  - TSI Davis Square, LLC
  - TSI Dorchester, LLC
  - TSI Downtown Crossing, LLC
  - TSI Elite Back Bay, LLC (f/k/a BFX Back Bay, LLC)
  - TSI Fenway, LLC
  - TSI Lexington (MA), LLC
  - TSI Lynnfield, LLC
  - TSI Methuen, LLC
  - TSI Newbury Street, LLC
  - TSI Newton, LLC
  - TSI Peabody, LLC
  - TSI Salisbury, LLC
  - TSI South End, LLC
  - TSI South Station, LLC
  - TSI Summer Street, LLC
  - TSI Waltham, LLC
  - TSI Watertown, LLC
  - TSI Wayland, LLC
  - TSI Wellesley, LLC
  - TSI Wellington Circle, LLC
  - TSI Westboro Tennis, LLC
  - TSI West Newton, LLC
  - TSI Westborough, LLC
  - TSI Woburn, LLC

Continued on Next Page

TSI Holdings II, LLC
Town Sports International, LLC [NY]
TSI Holdings (MD), LLC
TSI Holdings (NJ), LLC
TSI Holdings (PA), LLC
TSI Holdings (VA), LLC
TSI North Bethesda, LLC
TSI Silver Spring, LLC
TSI South Bethesda, LLC
TSI Highpoint, LLC
TSI Market Street, LLC
TSI Radnor, LLC
TSI Rodin Place, LLC
TSI Society Hill, LLC
TSI Bayonne, LLC
TSI Butler, LLC
TSI Clifton, LLC
TSI Colonia, LLC
TSI East Brunswick, LLC
TSI Englewood, LLC
TSI Hoboken, LLC
TSI Hoboken North, LLC
TSI Jersey City, LLC
TSI Livingston, LLC
TSI - Lucille Clifton, LLC
TSI - Lucille Jersey City, LLC
TSI Marlboro, LLC
TSI Matawan, LLC
TSI Montclair, LLC
TSI Newark, LLC
TSI Princeton, LLC
TSI Ramsey, LLC
TSI Ridgewood, LLC
TSI Springfield, LLC
TSI Westwood, LLC
TSI Clarendon, LLC

26980965.8