## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| TOWN SPORTS INTERNATIONAL, LLC, *et al.*,[1] | ) Case No. 20-12168 (CSS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**DEBTORS' MOTION FOR ENTRY
OF AN ORDER (I) APPROVING BIDDING PROCEDURES
IN CONNECTION WITH THE SALE OF SUBSTANTIALLY
ALL OF THE DEBTORS' ASSETS, (II) APPROVING THE FORM AND
MANNER OF NOTICE THEREOF, (III) SCHEDULING AN AUCTION AND
SALE HEARING, (IV) APPROVING PROCEDURES FOR THE ASSUMPTION
AND ASSIGNMENT OF CONTRACTS, (V) APPROVING THE SALE OF THE
DEBTORS' ASSETS FREE AND CLEAR, AND (VI) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")[2]

respectfully state the following in support of this motion:

### Relief Requested

1.    The Debtors hereby seek entry of an order, substantially in the form attached hereto

(the "Bidding Procedures Order"):

    a.    authorizing and approving the proposed bidding procedures, attached to the
Bidding Procedures Order as **Exhibit 1** (the "Bidding Procedures"),[3] to be used in
connection with the sale free and clear of all liens, claims, interests, and

---

[1]    The last four digits of Town Sports International, LLC's federal tax identification number are 7365. The mailing
address for Town Sports International, LLC is 399 Executive Boulevard, Elmsford, New York 10523. A complete
list of all the Debtors in these jointly administered cases, including the last four digits of their federal tax
identification numbers and addresses, may be obtained on the website of the Debtors' claims and noticing agent
at http://dm.epiq11.com/TownSports.

[2]    A detailed description of the Debtors and their business and the facts and circumstances supporting this motion
and the Debtors' chapter 11 cases is set forth in greater detail in the *Declaration of Phillip Juhan in Support of
Chapter 11 Petitions and First Day Motions* [Docket No. 12] (the "First Day Declaration").

[3]    Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the First Day
Declaration or the Bidding Procedures, as applicable.

encumbrances (the "Sale") of all or substantially all of the Debtors' assets (the "Assets");[4]

b.  establishing certain dates and deadlines in connection with the Bidding Procedures, including the Bid Deadline, Auction Date, and Sale Hearing (each as defined below);

c.  authorizing the Debtors to enter into that certain asset purchase agreement with an entity designated by Tacit Capital LLC ("Tacit") and the Ad Hoc Lender Group (as defined below) (the "Stalking Horse Bidder," and the asset purchase agreement, as amended, supplemented or otherwise modified by the parties thereto, and including the disclosure schedules and exhibits attached thereto, the "Stalking Horse Purchase Agreement");[5]

d.  approving the form and manner of the notice of an auction (the "Auction"), if any, and Sale and notice procedures related thereto (the "Sale Notice"), attached to the Bidding Procedures Order as **Exhibit 2**;

e.  approving procedures for the assumption and assignment of certain Executory Contracts and Unexpired Leases (as defined herein) in connection with the Sale (the "Assumption and Assignment Procedures"), and approving the form and manner of the notice thereof (the "Cure Notice"), attached to the Bidding Procedures Order as **Exhibit 3**; and

f.  granting related relief.

2.      The Debtors also intend to seek entry of an order (the "Sale Order") (a) authorizing and approving the Sale and entry into a definitive purchase agreement substantially in the form that shall be attached to the Sale Order (the "Definitive Purchase Agreement"), (b) authorizing and approving the assumption and assignment of certain Executory Contracts and Unexpired Leases, and (c) granting related relief.  The Debtors will file a proposed form of Sale Order and the Definitive Purchase Agreement in advance of the Sale Hearing.

---

[4]   The Debtors will consider offers for any and all of their Assets but the primary focus of the Sale contemplated hereby will be the going-concern sale of their Assets as contemplated by the Stalking Horse Purchase Agreement (as described herein).

[5]   For the avoidance of doubt, the Debtors are not seeking to pay any break-up fee or similar bid protections.

**Jurisdiction and Venue**

3.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The bases for the relief requested herein are sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 2002, 6004, and 6006(a), and Local Rules 2002-1, 6004-1, and 9006-1.

**Preliminary Statement**

6.      The Debtors commenced these chapter 11 cases to implement a value-maximizing going-concern sale of their core operating assets, which will, among other benefits, preserve jobs for employees, tenants for landlords, and a go-forward trade partner for vendors.  As described in the motion seeking postpetition financing filed contemporaneously herewith, Tacit[6] is providing

---

[6]   An affiliate of Tacit will be providing debtor-in-possession financing, as more fully described in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lenders, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* filed contemporaneously herewith.

the Debtors with postpetition debtor-in-possession financing (the "DIP Financing") to fund these chapter 11 cases, including the sale process contemplated by this motion. In connection with the DIP Financing, Tacit is working with an ad hoc group of the Debtors' prepetition term lenders (the "Ad Hoc Lender Group") to submit the Stalking Horse Bid, which is a going-concern bid for the Debtors' operations. The Stalking Horse Bid is a credit bid of the amounts outstanding under the Prepetition Facility, which credit bid the Ad Hoc Lender Group has agreed to cap at $80 million.[7]  Additionally, the Stalking Horse Bidder retains the right to credit bid amounts outstanding under the DIP Financing facility.

7.    Given the limited available liquidity and the market and regulatory challenges resulting from the COVID-19 pandemic, the Debtors believe it is critical that the sale process be consummated on the timeline set forth herein to avoid a value destructive liquidation of the Debtors' business. Completion of the sale process on the contemplated timeline will also allow the Debtors to satisfy sale milestones in their DIP Financing facility. The sale timeline was specifically designed to balance the dual goals of (a) running a robust marketing process and (b) minimizing (to the extent possible) continued business deterioration resulting from COVID-19 related regulations and changing customer habits.

8.    The Debtors are proposing the following key dates for the auction process:

- **October 26, 2020**:  Bid Deadline

- **October 28, 2020**:  Auction Date (if necessary)

- **November 2, 2020**:  Sale Hearing

---

[7]    Any third-party bidder will need to exceed the Purchase Price (as described herein) and pay the DIP obligations in full.

9.      In order to develop as competitive an auction process as possible, the Debtors, with the assistance of their investment banker, Houlihan Lokey Capital, Inc. ("Houlihan"), will continue to field inbound inquiries from interested parties, as well as solicit interest by distributing promotional materials to prospective buyers.  All parties that elect to execute a nondisclosure agreement will be given access to a confidential information memorandum and virtual data room containing detailed information regarding the assets in which the respective party expresses interest.

10.     As set forth in further detail below, the Stalking Horse Purchase Agreement, the Bidding Procedures, and the related relief requested in this motion are in the best interests of the Debtors' estates and will maximize value for all of their stakeholders.  Accordingly, the Debtors respectfully request that the Court approve the relief requested in this motion.

## Sale Process Overview

### I.      Marketing Efforts.

11.     The Debtors are seeking approval of the Bidding Procedures to establish a clear and open process for the solicitation, receipt, and evaluation of bids on a timeline that allows the Debtors to consummate a sale of the Assets prior to confirmation of a chapter 11 plan.  As more fully described in the First Day Declaration, the operational halt of the Debtors' business due to COVID-19 put significant pressure on their balance sheet.  Prior to the Petition Date, the Debtors, with the assistance of Houlihan, conducted an evaluation of the Debtors' liquidity position and considered various solutions to the Debtors' need for an immediate and long-term capital infusion to fund the company through a sale process and fund a go-forward business.  The Debtors engaged with certain of their prepetition lenders on the potential terms of DIP Financing and an overall restructuring transaction.  In connection with these conversations, the Debtors had interest from two groups of their prepetition lenders regarding potential financing proposals.

12.     On August 20, 2020, Tacit, in collaboration with the Ad Hoc Lender Group, provided the Debtors with a purchase offer proposal that included a $5 million DIP facility.  After the Debtors relayed that the proposed DIP sizing would not be sufficient to satisfy their liquidity needs, Tacit responded with an increase of the DIP size to $15 million.  On September 8, 2020, after further negotiation between the Debtors and Tacit, submitted a proposal for a $17.5 million DIP facility, which DIP facility was subsequently increased to $30 million and then ultimately increased to $32 million, coupled with a going-concern credit bid of substantially all of the Debtors' assets.  That bid formed the basis for the Debtors' DIP Financing and the Stalking Horse Bid.

13.     Since the Petition Date, the Debtors have been actively pursuing a going-concern sale with all interested parties.  The Debtors have contacted over 40 potential bidders with written marketing materials, including 17 strategic companies in the fitness space and a range of distressed and private equity investors focused on multi-location concepts, health and wellness, or other concepts related the Debtors' business.  Some of the contacted entities have either not shown interest in the Debtors' assets or have otherwise indicated that they are not in a financial position to move forward with the sale process at this time.  Moreover, the Debtors have received various additional inbound inquiries postpetition from potential going-concern buyers.  In aggregate to date, the Debtors have had various levels of contact and attendant discussions with nearly 50 potential bidders.

14.     The Debtors, with the support of their advisors, intend to continue fully marketing the Debtors' assets to determine whether there are any financially more advantageous alternatives to the Stalking Horse Bid, recognizing the Debtors precarious liquidity position and the market challenges facing the fitness industry.

## II.     The Sale Schedule.

15.     The Bidding Procedures propose the following key dates and deadlines regarding the Sale (as may be modified by the Debtors pursuant to the Bidding Procedures, the "Sale Schedule") to establish a clean and open process for the solicitation, receipt, and evaluation of third-party bids and consummation of the Sale.

| Event | Date | Description |
|---|---|---|
| Bidding Procedures Objection Deadline | October 9, 2020 at 1:00 p.m., prevailing Eastern Time | Deadline by which objections to the Bidding Procedures must be filed with the Court and served so as to be ***actually received*** by the Debtors and the Notice Parties (the "Bidding Procedures Objection Deadline") |
| Bidding Procedures Hearing | October 9, 2020 at 1:00 p.m., prevailing Eastern Time | Date for the hearing (the "Bidding Procedures Hearing") to consider the approval of the Bidding Procedures |
| Bid Deadline | October 26, 2020 at 5:00 p.m. prevailing Eastern Time | Deadline for when the Debtors must ***actually receive*** binding Bids from Acceptable Bidders (the "Bid Deadline") |
| Auction (if necessary) | October 28, 2020 at 10:00 a.m., prevailing Eastern Time | Date for when an Auction for the Assets will be conducted, if necessary (the "Auction Date"), via remote video, or such later time or other place as the Debtors determine is proper |
| Sale Objection Deadline | October 23, 2020 at 4:00 p.m., prevailing Eastern Time | Deadline by which objections to the Sale must be filed with the Court and served so as to be ***actually received*** by the Debtors and the Notice Parties (the "Sale Objection Deadline") |

| Event | Date | Description |
|---|---|---|
| Post-Auction Objection Deadline | October 30, 2020 at 12:00 p.m., prevailing Eastern Time | Deadline by which all objections to (i) the manner of and conduct at the Auction (if applicable) and (ii) identity/adequate assurance information of the Successful Bidder or Backup Bidder (other than the Stalking Horse Bidder) must be filed with the Court and served so as to be ***actually received*** by the Debtors and the Notice Parties |
| Sale Hearing | November 2, 2020 | Date for a hearing (the "<u>Sale Hearing</u>") at which the Court will consider approving the Sale of the Assets to one or more prospective purchasers, pursuant to the Sale Order or a chapter 11 plan |

16.     The Debtors believe that the Sale Schedule will maximize the prospect of receiving a higher or otherwise better offer without unduly prejudicing these chapter 11 estates. Significantly, as described above, the Debtors are wasting no time—they are already engaging with interested parties to garner interest in the Assets. Accordingly, the Debtors believe the relief requested in this motion is in the best interests of their creditors, their other stakeholders, and all other parties in interest, and should be approved.

**III.     Summary of the Key Terms of the Stalking Horse Purchase Agreement.**

17.     Pursuant to the Local Rules, the key terms and conditions of the Stalking Horse Purchase Agreement are listed below.[8]

| Agreement Provision | Summary Description |
|---|---|
| **Parties** | <u>Sellers</u>: the Debtors<br><u>Buyer</u>: an entity designated by Tacit and the Ad Hoc Lender Group |
| **Purchase Price** | Total consideration consisting of (i) the assumption of the Assumed Liabilities, (ii) the credit bid in an amount then-outstanding under the Prepetition Senior |

---

[8]     This summary is provided for the convenience of the Court and parties in interest. To the extent there is any conflict between this summary and the Stalking Horse Purchase Agreement, the latter governs in all respects. Capitalized terms used but not otherwise defined in this summary shall have the meanings set forth in the Stalking Horse Purchase Agreement.

| Agreement Provision | Summary Description |
|---|---|
| | Secured Debt, in an amount equal to $80 million (the "Credit Bid"), and (iii) the amount, paid in cash, equal to $1 million payable to general unsecured creditors; (iv) an amount, paid in cash (in an amount not to exceed $3,712,000), equal to the Cash Shortage to be used solely in connection with the Wind-Down (together, the "Purchase Price"); *provided, however,* that Buyer reserves the right to increase the Purchase Price, subject to the Bidding Procedures Order and applicable Law.<br><br>*See* Stalking Horse Purchase Agreement, at § 2.3. |
| **Acquired Assets** | Each Seller shall sell, transfer, assign, convey and deliver to the Buyer, and the Buyer shall purchase, acquire and accept from each Seller, on the Closing Date, the Purchased Assets, including the following assets, properties, rights and interests of such Seller free and clear of all Liens:<br><br>• to the extent transferable, all Intellectual Property related to the Business, including all intellectual property rights arising from or relating to: all algorithms, APIs, designs, net lists, data, databases, data collections, diagrams, inventions (whether or not patentable), know how, methods, processes, proprietary information, protocols, schematics, specifications, tools, systems, servers, hardware, computers, point of sale equipment, inventory management equipment, software, software code (in any form, including source code and executable or object code), subroutines, techniques, user interfaces, URLs, web sites, works of authorship and other similar materials, including all documentation related to any of the foregoing, including instruction manuals, laboratory notebooks, prototypes, samples, studies and summaries, whether or not embodied in any tangible form and whether or not specifically listed herein, and all related technology, that are used in, incorporated in, embodied in, displayed by or relate to, or are used in connection with the foregoing;<br><br>• all tangible assets owned or leased by Sellers related to the Business or Gym Locations, including all gym and exercise equipment and machinery, fixtures, trade fixtures, chairs, supplies, shelving, refrigeration equipment, computers, point-of-sale systems and other computer systems, branding, signs and signage located at the Gym Locations, warehouses, any corporate offices or any other real property; *provided* that with respect to any such leased asset, the underlying lease is a Designated Contract;<br><br>• all rights under the Assumed Leases and Designated Contracts, including, for the avoidance of doubt, any and all credits, refunds, allowances, or other accommodations associated with, related to, or provided pursuant to, any such Assumed Lease or Designated Contract, regardless of whether attributable to the period prior to, or following, the Closing Date;<br><br>• all Inventory and Merchandise, whether at any Gym Locations, any warehouse(s) or in transit to the Gym Locations;<br><br>• all member, customer and end-user data and information, including information related to membership, customer purchases or services provided to members or customers at the Gym Locations, in each case, to the extent permitted to be assigned by Sellers under Sellers' privacy policies and applicable Laws;<br><br>• credit card receivables and any cash related thereto held by third parties;<br><br>• all trade receivables, whether current or non-current, and all other accounts receivable, including payment processor receivables, for sales made prior |

| Agreement Provision | Summary Description |
|---|---|
|  | to the Closing; |

- any Permit, to the extent transferable;

- any and all books, records and other data relating to the Business, including customer lists and customer and end-user information and data, supplier lists, mailing lists, accounting records, documentation or records, catalogs and printed materials relating thereto to the extent available, in each case, to the extent permitted to be assigned by Sellers under Sellers' privacy policies and applicable Laws;

- all prepaid expenses, credits, advance payments, claims, security, refunds, rights of recovery, rights of set-off, rights of recoupment, deposits, charges, sums and fees (including any such item relating to the payment of Taxes) other than the Excluded Tax Assets;

- any promotional materials, displays, media content and other property or equipment used in or related to the existing Business;

- to the extent transferable, all Intellectual Property Licenses, including the licenses set forth on Schedule A of the Stalking Horse Purchase Agreement;

- financial, marketing and business data, pricing and cost information, business and marketing plans and other information, files, correspondence, records, data, plans, reports and recorded knowledge, historical trademark files, prosecution files of Sellers in whatever media retained or stored, including computer programs and disks, including files in the possession of Sellers;

- all goodwill associated with the Business or the Acquired Assets;

- to the extent transferable, all right of publicity and all similar rights, including all commercial merchandising rights;

- product designs, product names, trade names, design rights, tech packs, artwork, archival materials and advertising materials, copy, commercials, images and artwork;

- royalty payments and licensing receivables generated by the Business and attributable to the period from and/or after the Closing;

- all Sellers' telephone, fax numbers and email addresses;

- any avoidance actions under chapter 5 of the Bankruptcy Code relating to any Designated Contract or trade vendor that any Buyer will conduct business with, following the Closing (the "Acquired Avoidance Actions");

- all of Seller's rights under warranties, indemnities and all similar rights against third parties to the extent related to any Acquired Assets;

- all insurance benefits (other in relation to any Company Benefit Plan), including rights and proceeds, arising from or relating to the Business, the Acquired Assets or the Assumed Liabilities;

- all cash, including the Gym Locations Cash Amount, in excess of the Wind-Down Amount; *provided, however*, that the Excluded Cash shall be an Excluded Asset;

- any Tax refunds, rebates, or credits of any Seller (including any rights Sellers may have with respect to any Tax refunds, rebates, or credits of any

| Agreement Provision | Summary Description |
|---|---|
| | Restricted Affiliate, and any owner of any Seller)  with respect to Taxes, including any Periodic Taxes attributable to the portion of the Straddle Period beginning after the Closing Date (as determined pursuant to <u>Section 6.5</u> of the Stalking Horse Purchase Agreement); and<br><br>• any insurance claims, and related proceeds, related to an Acquired Asset;<br><br>*provided, however*, notwithstanding anything to the contrary set forth in this definition, the Acquired Assets shall not include any Excluded Assets.<br><br>*See* Stalking Horse Purchase Agreement, at § 1.1 "Acquired Assets". |
| **Excluded Assets** | Notwithstanding anything to the contrary in the Stalking Horse Purchase Agreement or any of the ancillary agreements, in no event shall any Seller be deemed to sell, transfer, assign, convey or deliver, and each Seller shall retain all right, title and interest to, in and under, the following Excluded Assets:<br><br>• all files, books, records, and documents prepared in connection with the Stalking Horse Purchase Agreement or the transactions contemplated hereby or primarily relating to the Bankruptcy Cases, all minute books, corporate records (such as stock registers) and organizational documents of Sellers, Tax Returns, other Tax work papers and Tax information, and all other files, books, records, and documents (i) that any Seller is required by Law to retain; or (ii) constituting personal data or information that are governed by any applicable Law prohibiting such sale, transfer, assignment or conveyance; provided that to the extent not prohibited by applicable Law, Buyer shall have the right to make copies of any portions thereof;<br><br>• all files, books, records and documents constituting work product of Sellers' legal counsel;<br><br>• all files, books, data, records and documents the disclosure or transfer of which is prohibited by third party agreement, a privacy policy of Seller, or applicable Laws;<br><br>• any Contract that is not a Designated Contract;<br><br>• any Lease that is not an Assumed Lease;<br><br>•  (i) any Tax refunds, net operating losses, rebates or credits of Unrestricted Affiliates of Sellers and the owners of the Sellers with respect to Taxes, including any Periodic Taxes attributable to the portion of the Straddle Period ending on the Closing Date (as determined pursuant to <u>Section 6.5</u> of the Stalking Horse Purchase Agreement) (collectively, the "<u>Excluded Tax Assets</u>");<br><br>• prepaid insurance;<br><br>• all avoidance actions under chapter 5 of the Bankruptcy Code or any Causes of Action that are not an Acquired Asset;<br><br>• all insurance policies and binders, all claims, refunds and credits from insurance claims, insurance policies or binders due or to become due with respect to such policies or binders and all rights to proceeds thereof;<br><br>• all equipment, tools or assets belonging to employees or independent contractors of the Sellers;<br><br>• all cash on hand, including the Gym Locations Cash Amount, up to the |

| Agreement Provision | Summary Description |
|---|---|
| | Wind-Down Amount (the "Excluded Cash"); *provided, however,* that such Excluded Cash shall be used solely in connection with the Wind-Down and all cash remaining in the Debtors' estates following the Wind-Down and all cash in excess of the Wind-Down Amount shall be an Acquired Asset delivered to the Buyers following the Wind-Down;<br><br>• all shares of capital stock or other equity interests of any Seller and all securities convertible into or exchangeable or exercisable for shares of capital stock or other equity interests of any Seller or any other Person;<br><br>• [all Company Benefit Plans (including all assets, trusts, insurance policies and proceeds, and administration service contracts related thereto)]; and<br><br>• all assets, properties, rights, interests, and Claims of every kind and description of any Sellers which (A) are not Acquired Assets, (B) are not related to, used, or held for use in, the Business, (C) are owned or used by the Unrestricted Affiliates, or (D) are described on Schedule B to the Stalking Horse Purchase Agreement.<br><br>*See* Stalking Horse Purchase Agreement, at § 1.1 "Excluded Assets". |
| **Assumed Liabilities** | On the terms and subject to the conditions set forth in the Stalking Horse Purchase Agreement and the Sale Order, on the Closing Date, the Purchaser shall assume only the following Assumed Liabilities:<br><br>• all Liabilities under the Acquired Assets to the extent such Liabilities arise from and after the Closing Date;<br><br>• all Liabilities to pay for goods or services ordered (and not paid by Sellers), prior to the Closing in the Ordinary Course of Business;<br><br>• all (i) shop or customer credits, sales promotions, rebates, coupons, gift cards and certificates or (ii) returns of Merchandise, customer prepayments and overpayments, customer refunds, credits, reimbursements and related adjustments with respect to Merchandise;<br><br>• (i) all accrued and unused vacation and sick time of the Transferred Employees (including any such vacation or sick time that, notwithstanding such Transferred Employees being Transferred Employees, is required under applicable Law to be paid in cash in connection with the Closing); (ii) all accrued payroll and related employer Taxes with respect to the Transferred Employees that remains unpaid as of the Closing; (iii) "IBNR" Liabilities with respect to the Company Benefit Plans; and (iv) any other Liabilities described as being assumed or fulfilled by Buyer in Section 6.9 of the Stalking Horse Purchase Agreement;<br><br>• Success Fees in an amount not to exceed five million, two hundred and seventy-five thousand Dollars ($5,275,000.00), which, for the avoidance of doubt, shall be paid by Buyer in cash at the Closing; *provided* that Buyer shall consider, in good faith and depending on the progress and outcome of the Bankruptcy Case, the transactions contemplated by the Stalking Horse Purchase Agreement, and the resources of the Debtors, a further amount to be payable to Huron Consulting Group in respect of its work related to the foregoing, which amount, if approved by Buyer in its sole discretion, shall increase the amount contemplated by this clause only to the extent so approved and such amount to be payable only to Huron Consulting Group; and |

| Agreement Provision | Summary Description |
|---|---|
| | • (i) all Cure Costs related solely to the Designed Contracts and Assumed Leases and (ii) any unpaid rent with respect to the portion of the month of September 2020 from and after the Petition Date with respect to the Assumed Leases; <br><br> *provided* that the Assumed Liabilities will not include (x) any Liabilities arising from or related to any Litigation against or involving any Seller or any of its assets or Liabilities (including Litigation related to fraud, breach of fiduciary duty, misfeasance or under any other theory relating to conduct, performance or non-performance of the Company, or any of its Affiliates, directors, officers, employees or other Representatives) or (y) any Liabilities related to or affecting the Acquired Assets or the Assumed Liabilities with respect to: (i) any breaches, defaults, torts, violations of Law, infringements, indemnities, guaranties, or penalties existing, occurring, or accruing prior to the Closing, or (ii) successor liability claims or claims owed to or assessed by, Governmental Authorities or other Persons. <br><br> Notwithstanding anything to the contrary, the Purchaser's assumption of the Assumed Liabilities shall not include any Excluded Liabilities. <br><br> *See* Stalking Horse Purchase Agreement, at § 1.1 "Assumed Liabilities". |
| **Excluded Liabilities** | Except for the Assumed Liabilities expressly set forth in the Stalking Horse Purchase Agreement, the Purchaser shall not assume, or become liable for the payment or performance of, the Excluded Liabilities, including the following Liabilities, all of which shall remain Liabilities of the Sellers for which the Sellers shall remain solely and exclusively liable: <br><br> • any Liability not relating to or arising out of the Business or the Acquired Assets, including any Liability exclusively relating to or primarily arising out of the Excluded Assets; <br><br> • any Liability of Sellers for Taxes (except as provided for in Section 2.9 and Section 6.4 of the Stalking Horse Purchase Agreement); <br><br> • all Liabilities of Sellers under the Stalking Horse Purchase Agreement or any Related Agreement and the transactions contemplated hereby or thereby; <br><br> • any Liability associated with any and all indebtedness including any guarantees of third party obligations and reimbursement obligations to guarantors of Sellers' obligations or under letters of credit of any Seller; <br><br> • any Liabilities in respect of any Contracts or Leases that are not Designated Contracts or Assumed Leases, respectively; <br><br> • all Liabilities for fees, costs and expenses that have been incurred or that are incurred or owed by Sellers in connection with the Stalking Horse Purchase Agreement or the administration of the Bankruptcy Cases (including all fees and expenses of professionals engaged by Sellers) and administrative expenses and priority claims accrued through the Closing Date and specified post-closing administrative wind-down expenses of the bankrupt estates pursuant to the Bankruptcy Code (which such amounts shall be paid by Sellers from the proceeds collected in connection with the Excluded Assets) and all costs and expenses incurred in connection with (i) the negotiation, execution and consummation of the transactions contemplated under the Stalking Horse Purchase Agreement and each of the other documents delivered in connection herewith, (ii) the negotiation, execution and consummation of the DIP Financing Agreement, and (iii) the consummation of the transactions contemplated by the Stalking |

| Agreement Provision | Summary Description |
|---|---|
| | Horse Purchase Agreement, including any retention bonuses, "success" fees (other than the Success Fees), change of control payments and any other payment obligations of Sellers payable as a result of the consummation of the transactions contemplated by the Stalking Horse Purchase Agreement and the documents delivered in connection herewith; |
| | • all Liabilities (i) related to WARN Act, to the extent applicable, with respect to the termination of Sellers' employees by a Seller, (ii) for any action resulting from Sellers' employees' separation of employment from Seller (the "Company Severance Payments"), and (iii) for vacation, sick leave, parental leave, and other paid time accrued by Sellers' employees who are not Transferred Employees  (the "Company PTO Payments"); |
| | • all Liabilities relating to claims for workers compensation for acts that occurred prior to the Petition Date, including any claims under outstanding letters of credit; |
| | • all Liabilities with respect to the termination of employment of the Company "insiders" (as such term is defined under the Bankruptcy Code); |
| | • all Company Benefit Plans (including all trusts, insurance policies and administration service contracts, and liabilities related thereto); |
| | • all Liabilities with respect to any terminated employees with respect to COBRA; |
| | • all Liabilities of Sellers to its equity holders respecting dividends, distributions in liquidation, redemptions of interests, option payments or otherwise, and any liability of Sellers pursuant to any Affiliate Agreement; |
| | • all Liabilities arising out of or relating to any business or property formerly owned or operated by any of Sellers, any Affiliate or predecessor thereof, but not presently owned and operated by any of Sellers; |
| | • all Liabilities relating to Litigation, claims, actions, suits, arbitrations, litigation matters, proceedings or investigations (in each case whether involving private parties, Governmental Authorities, or otherwise) involving, against, or affecting any Acquired Asset, the Business, the Company or any assets or properties of Sellers, commenced, filed, initiated or threatened before the Closing and relating to facts, events or circumstances arising or occurring before the Closing; |
| | • all Liabilities arising under Environmental Laws relating to facts, events or circumstances arising or occurring before the Closing; |
| | • all accounts payable of the Sellers or of any of their predecessors, including all professional fees of the Sellers; |
| | • all Liabilities of the Unrestricted Affiliates; |
| | • Liabilities to any employees arising prior to the Closing, except for vacation, sick leave, parental leave and other paid time accrued by Sellers' employees who are Transferred Employees or as otherwise described as being assumed or fulfilled by Buyer in Section 6.3 of the Stalking Horse Purchase Agreement; and |
| | • all Liabilities of Sellers or its predecessors arising out of any contract, agreement, Permit, franchise or claim that is not transferred to a Buyer as part of the Acquired Assets or is not transferred to a Buyer because of any failure to obtain any third-party or governmental consent required for such transfer; |
| | *provided* that in the event of any conflict between the terms set forth in this |

| Agreement Provision | Summary Description |
|---|---|
| | definition and the terms set forth in the definition of "Assumed Liabilities", the terms set forth in the definition of "Assumed Liabilities" will control.<br><br>*See* Stalking Horse Purchase Agreement, at § 1.1 "Excluded Liabilitie". |
| Employee Matters | Buyer, or one of the other Buyers, shall offer employment to the Covered Employees who work at any Gym Location that is subject to an Assumed Lease and may offer employment to any or all of the other Covered Employees (including, in each case and for the avoidance of doubt, Inactive Employees).<br><br>At least two (2) Business Days prior to the Auction, Buyer shall provide Sellers a list of any such other Covered Employees that Buyer, or one of the other Buyers, would like to make an offer of employment; *provided, however*, that Buyers shall provide Sellers with advance notice to allow Sellers to comply with the WARN Act in the event that Buyers or Buyer fail to offer employment to a sufficient number of Covered Employees on sufficient enough terms and conditions such that Sellers would have an obligation to provide notice under the WARN Act.<br><br>Any such offer of employment will be effective as of the Closing Date and contingent upon the Closing.  Each Covered Employee who accepts such offer of employment shall be deemed a "<u>Transferred Employee</u>"; *provided* that any Covered Employee who has been furloughed or is on an approved leave of absence as of the Closing (an "<u>Inactive Employee</u>") shall not be considered a Transferred Employee unless and until such Inactive Employee returns to active status in accordance with <u>Section 6.3(a)</u> of the Stalking Horse Agreement, and notwithstanding anything herein to the contrary, no Buyer or their respective Affiliates shall be responsible for Liabilities relating to such Inactive Employee prior to the date such Inactive Employee becomes a Transferred Employee.<br><br>Each Transferred Employee who becomes employed by a Buyer in connection with the transactions contemplated by the Stalking Horse Purchase Agreement shall be eligible to receive the salary and benefits (excluding, severance and equity compensation) maintained for employees of Buyer on substantially similar terms and conditions in the aggregate as are provided to such Transferred Employees prior to the Closing.<br><br>The employment of any Inactive Employee with Buyer or one of its Affiliates, as applicable, shall be effective upon his or her return to active work; *provided* that the Inactive Employee reports to work with Buyer or one of its Affiliates, as applicable, within five (5) Business Days after the end of any such approved leave and, to the extent permitted by applicable Law, in no event later than six (6) months following the later of (i) the Closing Date or (ii) repeal of the applicable Shelter-in-Place Laws, and, as of such date, such Inactive Employee shall be a Transferred Employee.  Buyer, in its sole discretion shall also be permitted to offer employment to any Covered Employee that is not employed at a Gym Location and any such Covered Employee that accepts such offer of employment shall be a Transferred Employee.<br><br>Sellers will reasonably cooperate with any reasonable requests by Buyer in order to facilitate the offers of employment and the delivery of such offers.<br><br>*See* Stalking Horse Purchase Agreement, at § 6.3(a). |

| Agreement Provision | Summary Description |
|---|---|
| **Conditions Precedent to Obligations of Purchaser** | The obligations of the Purchaser to consummate the Closing are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by the Purchaser, in whole or in part, to the extent permitted by applicable law and the Stalking Horse Purchase Agreement): <br><br> • the representations and warranties set forth in Article III of the Stalking Horse Purchase Agreement shall have been true and correct on the date hereof and as of the Closing (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date), except where the failure of such representations and warranties to be so true and correct has not resulted in a Material Adverse Effect; <br><br> • Sellers shall have performed and complied with its covenants and agreements hereunder that are required to be performed prior to the Closing in all material respects; <br><br> • the Bankruptcy Court shall have entered the Bidding Procedures Order pursuant to the terms and conditions of Section 5.3 of the Stalking Horse Purchase Agreement; <br><br> • the Bankruptcy Court shall have entered the Sale Order, and no Decree staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date; <br><br> • no material Decree shall be in effect that prohibits consummation of the transactions contemplated by the Stalking Horse Purchase Agreement; and <br><br> • each delivery contemplated by Section 2.5(a) of the Stalking Horse Purchase Agreement to be delivered to a Buyer shall have been delivered. <br><br> *See* Stalking Horse Purchase Agreement, at § 7.1. |
| **Conditions Precedent to Obligations of Sellers** | The obligations of the Sellers to consummate the Closing are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by the Sellers, in whole or in part, to the extent permitted by applicable law and the Stalking Horse Purchase Agreement): <br><br> • the representations and warranties set forth in Article IV of the Stalking Horse Purchase Agreement shall have been true and correct in all material respects on the date hereof and as of the Closing (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date); <br><br> • each Buyer shall have performed and complied with its covenants and agreements hereunder that are required to be performed prior to the Closing in all material respects; <br><br> • the Bankruptcy Court shall have entered the Sale Order, and no Decree staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date; <br><br> • no material Decree shall be in effect that prohibits consummation of any of the transactions contemplated by the Stalking Horse Purchase Agreement; and <br><br> • each payment contemplated by Section 2.5(b) of the Stalking Horse Purchase Agreement to be made to Sellers shall have been made, and each |

| Agreement Provision | Summary Description |
|---|---|
| | delivery contemplated by <u>Section 2.5(b)</u> of the Stalking Horse Purchase Agreement to be delivered to Sellers shall have been delivered.<br><br>*See* Stalking Horse Purchase Agreement, at § 7.2. |
| **Representations and Warranties of Sellers** | The Stalking Horse Purchase Agreement contains customary representations and warranties, including, but not limited to, representations of Seller regarding: (a) organization and qualification; (b) authority relative to the Stalking Horse Purchase Agreement; (c) conflicts, consents, and Government approvals; (d) title to assets; (e) the Designated Contracts; (f) real property; (g) litigation; (h) labor matters; (i) brokers' fees; (j) tax returns; taxes; (k) data privacy (l) employee benefits; (m) Intellectual Property; (n) compliance with laws and permits; (o) environmental matters; (p) related third-party transactions; (q) financial statements; (r) inventory; and (3) sufficiency of assets.<br><br>*See* Stalking Horse Purchase Agreement, at Article III. |
| **Representations and Warranties of Purchaser** | The Stalking Horse Purchase Agreement contains customary representations and warranties by the Purchaser, including representations of Purchaser regarding: (a) organization and qualification; (b) authority relative to the Stalking Horse Purchase Agreement; (c) noncontravention; (d) litigation; (e) brokers' fees; (f) financing and adequate assurance; and (g) certain contract arrangements.<br><br>*See* Stalking Horse Purchase Agreement, at Article IV. |
| **Other Covenants** | The Stalking Horse Purchase Agreement requires, among other things, Sellers to conduct Sellers' Business in the ordinary course of business and use commercially reasonable efforts to consummate the Transactions.<br><br>The Stalking Horse Purchase Agreement also contains customary provisions regarding, among other things, access, publicity, responsibility for tax liability, commercially reasonable efforts, preservation of rights, delivery of certain financial information, and confidential information.<br><br>*See* Stalking Horse Purchase Agreement, at Articles V, VI. |

## II.    The Bidding Procedures.

18.    The Bidding Procedures are designed to permit a fair, efficient, competitive, and value-maximizing auction process for the Assets, consistent with the timeline of these chapter 11 cases.  The Bidding Procedures will allow the Debtors to determine if the Stalking Horse Bid is the best offer by setting out a process to identify any alternative bid that is higher or otherwise better.  In addition, the Bidding Procedures will provide Potential Bidders with sufficient notice and time to conduct thorough due diligence to submit binding Bids in advance of the Auction.  The

Bidding Procedures are designed to encourage all prospective bidders to submit their best bid in order to enable the Debtors to move forward with a process that will provide the highest or otherwise best available recoveries to the Debtors' stakeholders.

19.    The following is a summary of the Bidding Procedures and discloses certain information required pursuant to Local Rule 6004-1:[9]

(a)    **Bid Requirements (Local Bankr. R. 6004-1(c)(i)(A), (B)).**    An Acceptable Bidder (other than the Stalking Horse Bidder) must deliver to the Debtors and their advisors a written, irrevocable, and binding offer for the purchase of the Assets and satisfy the following conditions, in each case to the satisfaction of the Debtors:

(i)    *Purchased Assets and Assumed Liabilities*.  Each Bid must clearly state which of the Assets the Acceptable Bidder seeks to acquire and which liabilities of the applicable Debtor the Acceptable Bidder agrees to assume.

(ii)    *Good Faith Deposit*.  Each Bid, other than the Stalking Horse Bid, must be accompanied by a cash deposit in the amount of 10 percent of the proposed purchase price, submitted by wire transfer of immediately available funds to an escrow account to be identified and established by the Debtors pursuant to a customary and reasonable escrow agreement (the "Good Faith Deposit").  To the extent a Qualified Bid (other than the Stalking Horse Bid) is modified before, during, or after the Auction in any manner that increases the purchase price contemplated by such Qualified Bid, the Debtors reserve the right to require that such Qualified Bidder increase its Good Faith Deposit so that it equals 10 percent of the Acceptable Bidder's proposed Purchase Price.

(iii)    *Purchase Price*.  Each Bid must clearly set forth the purchase price to be paid, including cash and non-cash components, if any, including any assumption of liabilities (the "Purchase Price").  The Purchase Price should be a single point value in U.S. dollars for the total enterprise value of the Assets on a cash-free, debt-free basis.

(iv)    *Minimum Bid*.  At a minimum, each Bid must have a Purchase Price that, in the Debtors' reasonable business judgment (a) has a value

---

[9]    This summary is qualified in its entirety by the Bidding Procedures attached as Schedule 1 to the Bidding Procedures Order.  All capitalized terms that are used in this summary but not otherwise defined herein shall have the meanings given to such terms in the Bidding Procedures.  To the extent there are any conflicts between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern.

equal to or greater than the aggregate cash consideration, assumed liabilities, and other non-cash consideration contemplated by the Stalking Horse Bid *and* (b) includes cash or cash equivalents equal to no less than the Initial Minimum Overbid Amount.  "Initial Minimum Overbid Amount" means an amount equal to the sum of (i) one million dollars ($1,000,000.00) over and above the aggregate Purchase Price (as defined in the Stalking Horse Purchase Agreement) *plus* (ii) the DIP Obligations outstanding.  The Debtors and their advisors, in consultation with the Consultation Parties, will determine, in their reasonable business judgment, the value of any assumed liabilities that differ from those included in the Stalking Horse Bid.

(v)     ***Markup of the Purchase Agreement.***  Each Acceptable Bidder must provide an executed purchase agreement as well as a redline of such agreement marked to reflect the amendments and modifications made to the form of the Stalking Horse Purchase Agreement, which amendments and modifications may not be materially more burdensome than the Stalking Horse Purchase Agreement or otherwise inconsistent with the Bidding Procedures.  The Debtors, in their reasonable business judgement and in consultation with the Consultation Parties, will determine whether any such amendments and modifications are materially more burdensome.  Significant alterations to the Stalking Horse Purchase Agreement are discouraged and may negatively impact a Bid.  Each Acceptable Bidder should state in its Bid that it is prepared to promptly execute these agreements in the form submitted in its Bid.

(vi)    ***Same or Better Terms; Bid Documents.***  Except as otherwise provided in the Bidding Procedures, each Bid must be, in the Debtors' reasonable business judgment, substantially on the same or better terms than the terms of the Stalking Horse Purchase Agreement.  Each Bid must include duly executed ancillary transaction documents necessary to effectuate the transactions contemplated in such Bid (such documents, the "Bid Documents").

(vii)   ***Employee Obligations.***  Each Bid must indicate whether the Acceptable Bidder intends to hire all employees who are primarily employed in connection with the Assets included in such Bid.

(viii)  ***Committed Financing.***  Each Bid must include committed financing, documented to the Debtors' reasonable satisfaction, in consultation with the Consultation Parties, that demonstrates the Acceptable Bidder has received sufficient debt or equity funding commitments, as applicable, to satisfy such Acceptable Bidder's Purchase Price and other obligations under its Bid, including the identity and contact information of the specific person(s) or entity(s)

19

responsible for such committed financing whom Houlihan and Kirkland & Ellis LLP ("Kirkland") should contact regarding such committed financing. Such funding commitment shall not be subject to any internal approval, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions reasonably acceptable to the Debtors, in consultation with the Consultation Parties.

(ix)    ***Pro Forma Capital Structure.***  Each Bid must include a description of the Acceptable Bidder's pro forma capital structure.

(x)    ***Contingencies; No Financing or Diligence Outs.***  Any Bid shall not be conditioned on the obtaining or the sufficiency of financing, any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of the specified representations and warranties or the satisfaction at the closing of specified conditions, which shall not be more burdensome, in the Debtors' reasonable business judgment than those contemplated by the Stalking Horse Bid. The Acceptable Bidders are expected to have completed all of their due diligence by the Bid Deadline, including all business, legal, accounting, and other confirmatory diligence. The extent and nature of any remaining due diligence should be set forth in a specific list attached to each Bid.

(xi)    ***Identity***.  Each Bid must fully disclose the identity of each entity and each entity's shareholders, partners, investors, and ultimate controlling entities that will be bidding for or purchasing the applicable Assets or otherwise participating in connection with such Bid, and the complete terms of any such participation, along with sufficient evidence that the Acceptable Bidder is legally empowered to complete the transactions on the terms contemplated by the parties. Each Bid must also include contact information for the specific person(s) whom Houlihan and Kirkland should contact regarding such Bid.

(xii)    ***As-Is, Where-Is.***  Each Bid must include a written acknowledgement and representation that the Acceptable Bidder: (a) has had an opportunity to conduct any and all due diligence prior to making its offer; (b) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the assets in making its Bid; and (c) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the completeness of any information provided in connection therewith, except as expressly stated in the Acceptable Bidder's proposed purchase agreement.

(xiii)  ***Authorization***.  Each Bid must contain evidence that the Acceptable Bidder has obtained all necessary authorizations or approvals from its shareholders and/or its board of managers or directors, or any other internal and other approvals, as applicable, with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.  Any required regulatory or other third-party approvals, consents, or other proposed conditions to the consummation of the Sale must be clearly specified with an explanation of the estimated timing and process and any other relevant information that might impact the ability to consummate the Sale.

(xiv)  ***Executory Contracts and Leases***.  Each Bid must identify with particularity each and every condition to closing, including the Executory Contracts and Unexpired Leases for which assumption or assumption and assignment is required.

(xv)  ***Adequate Assurance of Future Performance***.  Each Bid (other than the Stalking Horse Bid) must (a) identify the Executory Contracts and Unexpired Leases to be assumed or assumed and assigned in connection with the proposed Sale, (b) provide for the payment of all Cure Amounts (as defined herein) related to such executory contracts and unexpired leases by the Acceptable Bidder, and (c) demonstrate, in the Debtors' reasonable business judgment that the Acceptable Bidder can provide adequate assurance of future performance under all such Executory Contracts and Unexpired Leases.

(xvi)  ***Government Approvals***.  Each Bid must include a description of all governmental, licensing, regulatory, or other approvals or consents that are required to close the proposed Sale, together with evidence satisfactory to the Debtors of the ability to obtain such consents or approvals in a timely manner, as well as a description of any material contingencies or other conditions that may be imposed upon, or that will otherwise apply to, the obtainment or effectiveness of any such consents or approvals.

(xvii)  ***Government Approvals Timeframe***.  Each Bid must set forth (a) an estimated timeframe for obtaining any required governmental, licensing, regulatory, or other approvals or consents for consummating any proposed Sale, and (b) the basis for such estimate.

(xviii)  ***Compliance with Bankruptcy Code and Non-Bankruptcy Law; Acknowledgment***.  Each Bid must comply in all respects with the Bankruptcy Code and any applicable non-bankruptcy law.  Each Bid must also include a written acknowledgment that the Acceptable

Bidder agrees to all of the terms of the Sale set forth in these Bidding Procedures.

(xix) **_Irrevocable_**.  Each Bid must state that in the event a Bid is chosen as the Backup Bid, it shall remain irrevocable until the Debtors and the Successful Bidder consummate the applicable Sale; _provided_ that if the Stalking Horse Bid is selected as the Backup Bid, the Stalking Horse Bid must remain irrevocable until the Outside Back-up Date (as defined in the Stalking Horse Purchase Agreement), or as otherwise agreed to by the Debtors and the Stalking Horse Bidder in accordance with the Stalking Horse Purchase Agreement.

(xx) **_Backup Bid_**:  Each Bid shall provide that the Acceptable Bidder will serve as a backup bidder if the Acceptable Bidder's bid is the next highest or otherwise best bid.

(xxi) **_Letters of Credit_**.  Each Bid must provide that the Acceptable Bidder agrees that the obligations of any non-Debtor affiliate of the Debtors with regard to any letters of credit issued on behalf of any Debtor with respect to the applicable purchased Assets will either be assumed, replaced, or continued, as applicable.

(xxii) **_Expected Closing Date_**.  Each Bid must state the Acceptable Bidder's expected date of closing of the Sale.

(xxiii) **_Time Frame for Closing_**.  A Bid by an Acceptable Bidder must be reasonably likely to be consummated, if selected as the Successful Bid, within a time frame reasonably acceptable to the Debtors (in consultation with the Consultation Parties).  The Acceptable Bidder must commit to closing the proposed sale(s) contemplated by the Bid as soon as practicable and provide perspective on any potential regulatory issues that may arise in connection with such Acceptable Bidder's acquisition of the Assets including timing for resolution thereof.

(xxiv) **_Adherence to Bid Procedures_**.  Each Bid must include (a) a statement that the Acceptable Bidder has acted in good faith consistent with section 363(m) of the Bankruptcy Code and (b) that the Bid constitutes a bona fide offer to consummate the proposed transactions, and agrees to be bound by these Bidding Procedures.

(xxv) **_No Collusion_**.  Each Bid must acknowledge in writing that (a) in connection with submitting its Bid, it has not engaged in any collusion that would be subject to section 363(n) of the Bankruptcy Code with respect to any Bids or the Sale, specifying that it did not agree with any Acceptable Bidders or Qualified Bidders to control

price and (b) it agrees not to engage in any collusion that would be subject to section 363(n) of the Bankruptcy Code with respect to any Bids, the Auction, or the Sale.

(xxvi) ***DIP Order***.  Nothing in the Bidding Procedures Order shall amend, modify, or impair any provision of the interim or final order, as applicable, or any related documents governing the DIP Facility.

(xxvii) ***Other Information***.  The Bid must contain such other information as may be reasonably requested by the Debtors, in consultation with the Consultation Parties, with such requests made through the Debtors.

(b)     **Right to Credit Bid.**  Any and all bids, other than the bid submitted by the Stalking Horse Bidder, shall be in cash.

(c)     **Bidding Increments (Local Bankr. R. 6004-1(c)(i)(C)).**  Any Overbid following the Initial Minimum Overbid Amount or following any subsequent prevailing highest Bid shall be in increments of at least one million dollars ($1,000,000.00).

(d)     **Back-Up Bidder (Local Bankr. R. 6004-1(c)(i)(E)).**  The Qualified Bidder with the second highest or otherwise best bid or combination of bids (the "<u>Backup Bid</u>") to purchase any or all of the applicable assets (the "<u>Backup Bidder</u>") will be determined by the Debtors at the conclusion of the Auction and will be announced at that time to all the Qualified Bidders participating in the Auction.  The Debtors' selection of a Backup Bid shall be deemed final and the Debtors shall not accept any further bids or offers to submit a bid after such selection.  Except as otherwise provided in the Stalking Horse Purchase Agreement, the Good Faith Deposit of any Qualified Bidders that are not Successful Bidders or Backup Bidders will be returned within five business days after the Auction or upon the permanent withdrawal of the proposed Sale, and the Good Faith Deposit of any Backup Bidders will be returned within five business days after the consummation of any Sale or upon the permanent withdrawal of the proposed Sale.

(e)     **Closing with Backup Bidder.**  If for any reason a Successful Bidder fails to consummate the purchase of such assets within the time permitted after the entry of the Sale Order, then the Backup Bidder will automatically be deemed to have submitted the Successful Bid for such assets, and the Backup Bidder shall be deemed a Successful Bidder for such assets and shall be required to consummate any Sale with the Debtors as soon as is reasonably practicable without further order of the Court; *provided* that the Debtors shall file a notice with the Court.

(f)     **Highest or Otherwise Best Bid.**  When determining the highest or otherwise best Qualified Bid, as compared to other Qualified Bids, the Debtors may consider the following factors in addition to any other factors that the Debtors deem appropriate:  (i) the amount and nature of the total consideration; (ii) the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof; (iii) the net economic effect of any changes to the value to be received by each of the Debtors' estates from the transaction contemplated by the Bid Documents; and (iv) the tax consequences of such Qualified Bid.

(g)     **Reservation of Rights (Local Bankr. R. 6004-1(c)(i)(D)).**  The Debtors reserve their rights to modify these Bidding Procedures in good faith and in their reasonable business judgment and in a manner consistent with the exercise of their fiduciary duties in any manner that, in good faith, will best promote the goals of the bidding process, or impose, at or before the Auction, additional customary terms and conditions on the sale of the Assets, including, without limitation: (i) extending the deadlines set forth in these Bidding Procedures; (ii) adjourning the Auction without further notice; (iii) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (iv) canceling the Auction; (v) rejecting any or all Bids or Qualified Bids; and (vi) adjusting the applicable minimum overbid increment, including by requesting that Qualified Bidders submit last or final bids on a "blind" basis; *provided* that no such modification to these Bidding Procedures shall be disproportionately adverse to the Stalking Horse Bidder as compared to any other Qualified Bidder.

20.     Importantly, the Bidding Procedures recognize and comply with the Debtors' fiduciary obligations to maximize sale value and, as such, do not impair the Debtors' ability to consider all Qualified Bids made at or prior to the Auction, and, as noted, preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for the Debtors' estates.

21.     Following the conclusion of the Auction, if any, and the selection of a Successful Bidder, the Debtors shall present the results of the Auction at the Sale Hearing and shall seek entry of the Sale Order.  The Sale Order shall authorize the Debtors to enter into and perform under the Definitive Purchase Agreement and deem the Debtors' selection of the Successful Bid final.

Subject to the designation of any Backup Bid, the Debtors shall not solicit and/or accept any further bids or offers to submit a bid after such selection.

**III.    Form and Manner of Sale Notice.**

22.    As soon as practicably after entry of the Bidding Procedures Order, the Debtors will cause the Sale Notice to be served on the following parties or their respective counsel, if known: (a) the United States Trustee for the District of Delaware (the "U.S. Trustee"); (b) counsel to the official committee of unsecured creditors; (c) counsel for Tacit; (d) counsel for the Ad Hoc Lender Group; and (e) any party that has requested notice pursuant to Bankruptcy Rule 2002 (the "Notice Parties"). In addition, the Debtors will also publish an abbreviated version of the Sale Notice on their restructuring website, http://dm.epiq11.com/TownSports (the "Case Website").

23.    The Debtors respectfully submit that the Sale Notice provides all interested parties with timely and proper notice of the proposed Sale, including: (a) the date, time, and place of the Auction (if one is held); (b) the Bidding Procedures; (c) the deadline for filing objections to the Sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing; (d) instructions for promptly obtaining a copy of the Stalking Horse Purchase Agreement; (e) a description of the Sale as being free and clear of liens, claims, interests, and other encumbrances, with all such liens, claims, interests, and other encumbrances attaching with the same validity and priority to the Sale proceeds; and (f) notice of the proposed assumption and assignment of the Executory Contracts and Unexpired Leases to the Stalking Horse Bidder pursuant to the Stalking Horse Purchase Agreement (or to another Successful Bidder arising from the Auction, if any).

24.    The Debtors further submit that notice of this motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Sale Notice and the Cure Notice (where applicable), as provided for herein, constitutes good and adequate notice of

the Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the

applicable requirements of Bankruptcy Rule 2002.  The Debtors propose that no other or further

notice of the Sale shall be required.  Accordingly, the Debtors request that this Court approve the

form and manner of the Sale Notice.

**IV.     Summary of the Assumption and Assignment Procedures.**

25.     The Debtors are also seeking approval of the Assumption and Assignment

Procedures set forth below to facilitate the fair and orderly assumption, assumption and

assignment, or rejection of certain of the Debtors' executory contracts and unexpired leases

(each, as applicable, an "<u>Executory Contract</u>" or "<u>Unexpired Lease</u>," and, collectively,

the "<u>Executory Contracts and Unexpired Leases</u>"), in connection with the Sale.  The proposed

Assumption and Assignment Procedures are as follows:

a.     **<u>Cure Notice</u>**. As soon as practicable after entry of the Bidding Procedures Order, the Debtors shall file with the Court and serve via first class mail, electronic mail, or overnight delivery, the Cure Notice, attached as **<u>Exhibit 3</u>** to the proposed Bidding Procedures Order, on all non-Debtor contract counterparties to the Executory Contracts and Unexpired Leases (collectively, the "<u>Contract Counterparties</u>," and each, a "<u>Contract Counterparty</u>"), and post the Cure Notice to the Case Website.

b.     **<u>Content of Cure Notice</u>**. The Cure Notice shall notify the applicable Contract Counterparties that the Executory Contracts and Unexpired Leases *may* be subject to assumption or assumption and assignment in connection with the Sale, and contain the following information: (i) identification of the applicable Executory Contracts and Unexpired Leases; (ii) the applicable Contract Counterparties; (iii) the Debtors' good faith estimates of the corresponding Cure Amounts required to cure all monetary defaults under the Executory Contracts and Unexpired Leases; and (iv) the deadline by which any Contract Counterparty must file an objection to the proposed assumption, assignment, cure, and/or adequate assurance and the procedures relating thereto; *provided* that service of a Cure Notice does not constitute an admission that such assigned contract is an executory contract or unexpired lease or that such assigned contract will be assumed at any point by the Debtors or assumed and assigned pursuant to any Successful Bid.

c.      **Cure Objections**.  Objections, if any, to a Cure Notice (each, a "Cure Objection") must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, the Local Rules, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection and, if the Cure Objection pertains to the proposed cure amount (the "Cure Amount"), state the cure amount alleged to be owed to the objecting Contract Counterparty, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with the Court and served so as to be ***actually received*** by the Debtors and the U.S. Trustee no later than **October 23, 2020 at 4:00 p.m. (prevailing Eastern Time)**; *provided* that the Debtors may modify the Cure Objection deadline by filing a notice of such modification on the Court's docket.

d.      **Effects of Filing a Cure Objection**.  A properly filed Cure Objection will reserve such objecting Contract Counterparty's rights against the Debtors only with respect to the assumption or assumption and assignment of the Executory Contracts and Unexpired Leases at issue, and/or objection to the accompanying Cure Amount, as set forth in the Cure Objection, but will not constitute an objection to the remaining relief requested in this motion.

e.      **Dispute Resolution**.  Any Cure Objection to the proposed assumption or assumption and assignment of an Executory Contracts and Unexpired Leases or Cure Amount that remains unresolved after the Sale Hearing, shall be heard at such later date as may be agreed upon by the parties or fixed by the Court.  To the extent that any Cure Objection cannot be resolved by the parties, such Executory Contracts and Unexpired Leases shall be assumed and assigned only upon satisfactory resolution of the Cure Objection, to be determined in the Successful Bidder's reasonable discretion.  To the extent a Cure Objection remains unresolved, the Executory Contract or Unexpired Lease may be conditionally assumed and assigned, subject to the consent of the Successful Bidder, pending a resolution of the Cure Objection after notice and a hearing.  If a Cure Objection is not satisfactorily resolved, the Successful Bidder may determine that such Executory Contracts and Unexpired Leases should be rejected and not assigned, in which case the Successful Bidder will not be responsible for any Cure Amount in respect of such contract.

f.      **Supplemental Cure Notice**.  If the Debtors discover Executory Contracts and Unexpired Leases inadvertently omitted from the Cure Notice or the Successful Bidder identifies other Executory Contracts and Unexpired Leases that it desires to assume or assume and assign in connection with the Sale, the Debtors may, after consultation with the Successful Bidder, at any time before the closing of the Sale supplement the Cure Notice with previously omitted Executory Contracts and Unexpired Leases or modify a previously filed Cure Notice, including modifying the previously stated Cure Amount associated with any Contracts (the "Supplemental Cure

Notice").

g.    **Objection to the Supplemental Cure Notice**.  Any Contract Counterparty listed on the Supplemental Cure Notice may file an objection (a "Supplemental Cure Objection") only if such objection is to the proposed assumption or assumption and assignment of the applicable Executory Contracts and Unexpired Leases or the proposed Cure Amount, if any.  All Supplemental Cure Objections must: (i) state, with specificity, the legal and factual basis for the objection as well as what Cure Amount are required, if any; (ii) include appropriate documentation in support thereof; and (iii) be filed no later than 4:00 p.m. (prevailing Eastern Time) on the date that is 14 days following the date of service of such Supplemental Cure Notice, which date will be set forth in the Supplemental Cure Notice.

h.    **Dispute Resolution of Supplemental Cure Objection**.  If a Contract Counterparty files a Supplemental Cure Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute, the Debtors shall seek an expedited hearing before the Court to determine the Cure Amount, if any, and approve the assumption and/or assignment of the relevant Executory Contracts and Unexpired Leases.  If there is no such objection, then the Debtors shall obtain an order of this Court fixing the Cure Amount and approving the assumption and/or assignment of any Executory Contracts and Unexpired Leases listed on a Supplemental Cure Notice.

i.    **No Cure Objections**.  If there are no Cure Objections or Supplemental Cure Objections, or if a Contract Counterparty does not file a Cure Objection or a Supplemental Cure Notice in a manner that is consistent with the requirements set forth above, and absent a subsequent order of the Court establishing an alternative Cure Amount, (i) the Cure Amount, if any, set forth in the Cure Notice (or Supplemental Cure Notice) shall be controlling, notwithstanding anything to the contrary in any Executory Contracts and Unexpired Leases or any other document, and (ii) the Contract Counterparty will be deemed to have consented to the assumption or assumption and assignment of the Executory Contracts and Unexpired Leases and the Cure Amount, if any, and will be forever barred from objecting to the assumption or assumption and assignment of such Executory Contracts and Unexpired Leases and rights thereunder, including the Cure Amount, if any, and from asserting any other claims related to such Executory Contract or Unexpired Lease against the Debtors or the Successful Bidder, or the property of any of them.

**Basis for Relief**

I.    **The Relief Sought in the Bidding Procedures Order Is in the Best Interests of the Debtors' Estates and Should Be Approved.**

26.    A debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets.  *See, e.g., In re Culp*, 550 .R. 683, 697 (D. Del. 2015) ("In determining whether to authorize use, sale or lease of property of the estate under Section 363, courts require the [Debtor] to show that a sound business purpose justifies such actions.  If the [Debtor's] decision evidences a sound business purpose, then the [b]ankruptcy [c]ourt should approve the sale.") (quoting *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999));  *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification'" (internal citations omitted)); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (quoting *In re Schipper*); *see also In re Integrated Resources, Inc.*, 147 B.R. 650, 656–7 (S.D.N.Y. 1992) (noting that bidding procedures that have been negotiated by a trustee are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").

27.    The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See In re Adams Res. Expl. Corp.*, No. 17-10866 (KG), at 12 (Bankr. D. Del. 2017) ("The relief requested in the Sale Motion is a necessary and appropriate step toward enabling the Debtor to maximize the value of its bankruptcy estate, and it is in the best interests of the Debtor, its estate and its creditors."); *In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir 2004) (debtor-in-possession "had a fiduciary duty to protect and maximize the estate's assets"); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the

estate."); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564–65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the [Bankruptcy Code] [is] to enhance the value of the estate at hand"); *In re Integrated Resources Inc.*, 147 B.R. at 659 ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (internal citations omitted).

28.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy transactions.  *See, e.g.*, *In re Dura Auto, Sys.,* 379 B.R. 257, 263 (Bankr. D. Del. 2007); *In re Integrated Resources*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

29.     Here, the Bidding Procedures will promote active bidding from interested parties and will elicit the highest or otherwise best offers available for the Assets.  The Bidding Procedures are designed to facilitate orderly yet competitive bidding to maximize the value realized by these estates from the Sale.  Specifically, the Bidding Procedures contemplate an open auction process with minimum barriers to entry that encourage competitive bidding.

30.     At the same time, the Bidding Procedures provide the Debtors with a robust opportunity to consider competing bids and select the highest or otherwise best offer for the execution of the Sale.  Entering into the Stalking Horse Purchase Agreement with the Stalking Horse Bidder ensures that the Debtors obtain fair market value by setting a minimum purchase

price for the Assets that will be tested in the marketplace.  As such, creditors of the Debtors' estates

can be assured that the consideration obtained will be fair and reasonable and at or above market.

31.     The Debtors submit that the proposed Bidding Procedures will encourage

competitive bidding, are appropriate under the relevant standards governing auction proceedings

and bidding incentives in bankruptcy proceedings, and are consistent with other procedures

previously approved by this district and others.  *See e.g.*, *In re Bluestem Brands, Inc.*, No. 20-10566

(MFW) (Bankr. D. Del. June 3, 2020) (finding that the Bidding Procedures were fair, reasonable,

appropriate and designed to maximize creditor recoveries); *In re Forever 21, Inc.*, No. 19-12122

(MFW) (Bankr. D. Del. Feb. 4, 2020) (same); *In re Dura Auto, Sys.*, No. 19-12378 (KBO) (Bankr.

D. Del. Nov. 19, 2019) (finding that "[t]he [b]id [p]rocedures are reasonably designed to enable

the Debtors to receive bids for the Assets and represent the best method for maximizing the

realizable value of the Assets and serve to maximize the value of the Debtors' estates for the benefit

of all of the Debtors' stakeholders and parties in interest.") *In re Destination Maternity Corp.*,

No. 19-12256 (BLS) (Bankr. D. Del. Nov. 14, 2019) (same); *In re PES Holdings, LLC*,

No. 19-11626 (KG) (Bankr. D. Del. Nov. 14, 2019) (same).[10]

32.     Accordingly, for all of the foregoing reasons, the Debtors believe that the Stalking

Horse Purchase Agreement and the Bidding Procedures:  (a) will encourage robust bidding for the

assets; (b) are consistent with other procedures previously approved by courts in this district; and

(c) are appropriate under the relevant standards governing auction proceedings and bidding

incentives in bankruptcy proceedings and should be approved.

---

[10]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion.
Copies of these orders are available upon request of the Debtors' counsel.

**II.      The Form and Manner of the Sale Notice Should Be Approved.**

33.      Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with 21-days' notice of a hearing where the Debtors will seek to use, lease, or sell property of the estate outside the ordinary course of business.  Bankruptcy Rule 2002(c) requires any such notice to include the time and place of the auction and the hearing and the deadline for filing any objections to the relief requested herein.  As required under Bankruptcy Rule 2002(b), the Debtors seek approval of the Sale Notice as proper notice of the Auction.

34.      As noted above, upon entry of the Bidding Procedures Order, or as soon as reasonably practicable thereafter, the Debtors will serve the Sale Notice upon the Notice Parties or their respective counsel, if known.  The Debtors shall also publish an abbreviated version of the Sale Notice on the Case Website.

35.      The Debtors submit that notice of this motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Sale Notice as provided for herein, constitutes good and adequate notice of the Auction and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.  Accordingly, the Debtors request that this Court approve the form and manner of the Sale Notice.

**III.     The Court Should Approve the Debtors' Entry into the Stalking Horse Purchase Agreement Because the Sale Is a Sound Exercise of Business Judgment.**

36.      Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  A sale of the debtor's assets should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business purpose exists for the proposed transaction. *See, e.g., In re Martin*, 91 F.3d 389, 395 (3d. Cir. 1996) ("Under Section 363, the debtor in possession can sell

property of the estate . . . if he has an 'articulated business justification' . . . ."); *see also In re Schipper*, 933 F.2d, at 515 (same); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 150 (3rd Cir. 1986) (finding that a bankruptcy court may authorize a sale of assets pursuant to 363(b)(1) upon a showing of "good faith" of purchaser); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) ("a bankruptcy court can authorize a sale of all a Chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action."); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983) (finding that "there must be some articulated business justification, other than appeasement of major creditors, for using, selling or leasing property out of the ordinary course of business before the bankruptcy judge may order such disposition under section 363(b)."); *In re Telesphere Commc's, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999) (holding that the standard to be applied in approving a disposition of assets under 363(b) requires an "articulated business justification.") (internal citations omitted); *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 176 (D. Del. 1991) ("where a trustee wishes to conduct a pre-confirmation sale of substantially all of the debtor's assets, the Second and Sixth Circuit Courts of Appeal require that the trustee show there is a sound business purpose for conducting the sale prior to confirmation of a plan."). The *Delaware & Hudson Railway* court rejected the pre-Code "emergency" or "compelling circumstances" standard, finding the "sound business purpose" standard applicable and, discussing the requirements of that test under *McClung* and *Lionel*, observing:

> A non-exhaustive list of factors to consider in determining if there is a sound business purpose for the sale include: the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the likelihood that a plan of reorganization will be proposed and confirmed in the near future; the effect of the proposed disposition of the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised

values of the Property; and whether the asset is decreasing or increasing in value.

124 B.R. at 176.

37.     The *Delaware & Hudson Railway* court further held that "[o]nce a court is satisfied there is a sound business reason or an emergency justifying the pre-confirmation sale, the court must also determine that the trustee has provided the interested parties with adequate and reasonable notice, that the sale price is fair and reasonable and that the Buyer is proceeding in good faith." *Id*.

38.     Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith,' and in the honest belief that the action was in the best interests of the company." *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill 1995) (citations omitted); *In re Filene's Basement, LLC*, 11-13511 (KJC), 2014 WL 1713416, at \*12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate") (citations omitted); *Integrated Res.*, 147 B.R. at 656; *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a debtor's management decisions."). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

39.     Based on this rationale, courts have authorized a debtor's sale of assets as a sound exercise of business judgment under section 363 of the Bankruptcy Code.

**A.     A Sound Business Purpose Exists For the Sale.**

40.     The Debtors have a sound business justification for selling the Assets.  As a result of the operational and financial constraints caused by the COVID-19 pandemic, the Debtors, with

the assistance of their advisors, determined that selling all or substantially all of their assets would create maximizing value for the Debtors' stakeholders and preserve the Debtors' operations as a going concern.  Further, the Stalking Horse Purchase Agreement, which represents a floor bid for the sale of the Assets, is the product of good-faith, arm's-length negotiations between the Debtors and the Stalking Horse Bidder.

41.     The Stalking Horse Bidder and Stalking Horse Purchase Agreement will be subject to competing bids, enhancing the Debtors' ability to receive the highest or otherwise best value for the Assets.  Consequently, the ultimately successful bid, after being subject to a further "market check" in the form of the Auction, will constitute, in the Debtors' reasonable business judgment, the highest or otherwise best offer for the Assets and will provide a greater recovery for their estates than any known or practicably available alternative.  *See, e.g.*, *In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure . . . the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

42.     Thus, the Definitive Purchase Agreement of the Successful Bidder, will constitute the highest or otherwise best offer for the Assets and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative.  As such, the Debtors' determination to sell the Assets through an Auction process and to enter into the Definitive Purchase Agreement with the Successful Bidder will be a valid and sound exercise of the Debtors' business judgment.  Therefore, the Debtors request that the Court authorize the proposed Sale as a proper exercise of the Debtors' business judgment.

**B.** **The Sale Should be Approved "Free and Clear" Under Section 363(f) of the Bankruptcy Code.**

43.     Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if: (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest.  *See* 11 U.S.C. § 363(f).

44.     Section 363(f) of the Bankruptcy Code is drafted in the disjunctive.  Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the sale of the Assets free and clear of all liens, security interests, pledges, charges, defects, or similar encumbrances (collectively, "Encumbrances"), except with respect to any Encumbrances that may be assumed Encumbrances under the Definitive Purchase Agreement of the Successful Bidder. *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

45.     Any Encumbrance that will not be an assumed liability satisfies or will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code, and any such Encumbrance will be adequately protected by either being paid in full at the time of closing, or by having it attach to the net proceeds of the Sale, subject to any claims and defenses the Debtors may possess with respect thereto.  The Debtors accordingly request authority to convey the Assets to the Successful Bidder free and clear of all Encumbrances including liens, claims, rights, interests, charges, and encumbrances, with any such liens, claims, rights, interests, charges, and encumbrances to attach to the proceeds of the Sale.

36

**IV.    The Assumption and Assignment Procedures Are Appropriate and Should Be Approved.**

**A.    The Assumption or Assumption and Assignment of the Executory Contracts and Unexpired Leases Reflects the Debtors' Reasonable Business Judgment.**

46.    To facilitate and effectuate the Sale, the Debtors are seeking authority to assign or transfer the Executory Contracts and Unexpired Leases to the Successful Bidder to the extent required by such bidder.  Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assume and assign its executory contracts and unexpired leases, subject to the approval of the court, so long as the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.  The Debtors' decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment.  *See, e.g.*, *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) (applying a business judgment standard to debtor's determination to assume an unexpired lease); *In re Patterson*, 119 B.R. 59, 60 (E.D. Pa. 1990); *In re Penn Traffic Co.*, 524 F.3d 373, 383 (2d Cir. 2008) (business judgment test "rather obviously presupposes that the estate will assume a contract only where doing so will be to its economic advantage."); *In re Del Grosso*, 115 B.R. 136, 138 (Bankr. N.D. Ill. 1990) ("[T]he standard to be applied for approval of the assumption [of an executory contract] is the business judgment standard.").

47.    As set forth in the Bidding Procedures Order, the Debtors also request that any party that fails to object to the proposed assumption or assumption and assignment of any Assigned Contract be deemed to consent to the assumption or assumption and assignment of the applicable Executory Contracts and Unexpired Leases pursuant to section 365 of the Bankruptcy Code on the terms set forth in the Sale Order, along with the cure amounts identified in the Cure Notice. *See, e.g.*, *Hargrave v. Township of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858

(Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

48.     Here, the Court should approve the decision to assume or assume and assign the Executory Contracts and Unexpired Leases in connection with the Sale as a sound exercise of the Debtors' business judgment.    *First*, the Executory Contracts and Unexpired Leases are essential to the value of the Assets and, as such, they are essential to inducing the highest or otherwise best offer for the Assets and interests.    *Second*, it is unlikely that any purchaser would want to acquire the Assets unless a significant number of the contracts and leases needed to conduct business and manage day-to-day operations of the Assets were included in the transaction. *Third*, the Stalking Horse Purchase Agreement provides that the assumption or assumption and assignment of the Executory Contracts and Unexpired Leases is integral to, and inextricably integrated in, the Sale.    *Fourth*, the Executory Contracts and Unexpired Leases will be assumed or assumed and assigned through the process approved by the Court pursuant to the Bidding Procedures Order and, thus, will be reviewed by key constituents in these chapter 11 cases.

49.     Accordingly, the Debtors submit that the assumption or assumption and assignment of the Executory Contracts and Unexpired Leases by way of the Assumption and Assignment Procedures should be approved as an exercise of their business judgment.

### B.      Defaults Under the Assumed Contracts Will Be Cured in Connection with the Sale.

50.     Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code, specifically that a debtor (a) cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom,

and (c) provide adequate assurance of future performance thereunder.  This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain."  *In re Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

51.     The Debtors submit that the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be satisfied because the Assumption and Assignment Procedures provide a clear process by which to resolve disputes over Cure Amounts or other defaults.  Because this motion provides a clear process by which to resolve disputes over Cure Amounts and other defaults, the Debtors are confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of non-Debtor parties.

### C.     Non-Debtor Parties Will Be Adequately Assured of Future Performance.

52.     Similarly, the Debtors submit that the third requirement of section 365(b) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied given the facts and circumstances present here.  The phrase "adequate assurance of future performance" adopted from section 2-609(1) of the Uniform Commercial Code, is "to be given practical, pragmatic construction" based upon the facts and circumstances of each case.  *In re U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982).  Although no single solution will satisfy every case, the required assurance will "[fall] considerably short of an absolute guarantee of performance." *In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a

prospective assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).

53.     The Debtors will demonstrate that the requirements for assumption or assumption and assignment of the Executory Contracts and Unexpired Leases to the Successful Bidder will be satisfied.   As required by the Bidding Procedures, the Debtors will evaluate the financial wherewithal of Potential Bidders before designating such party an Acceptable Bidder or Successful Bidder, including as it relates to such Acceptable Bidder's financial credibility, willingness, and ability to perform under the Executory Contracts and Unexpired Leases assigned to the Successful Bidder.  Further, the Assumption and Assignment Procedures provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Successful Bidder to provide adequate assurance of future performance and object to the assumption of the Executory Contracts and Unexpired Leases or proposed Cure Amounts.  The Court therefore will have a sufficient basis to authorize the Debtors to reject or assume and assign the Executory Contracts and Unexpired Leases as set forth in the Definitive Purchase Agreement with the Successful Bidder.

## Notice

54.     The Debtors will provide notice of this motion to:  (i) the U.S. Trustee; (ii) counsel to the official committee of unsecured creditors; (iii) counsel for Tacit; (iv) counsel for the Ad Hoc Lender Group; and (v) any party that has requested notice pursuant to Bankruptcy Rule 2002. Notice of this motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors respectfully submit that no other or further notice is required or necessary.

WHEREFORE, the Debtors respectfully request that the Court enter the Bidding Procedures Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated:  October 2, 2020
Wilmington, Delaware

*/s/ Robert S. Brady*
Robert S. Brady (DE Bar No. 2847)
Sean T. Greecher (DE Bar No.4484)
Allison S. Miekle (DE Bar No.5934)
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 571-6600
Facsimile:    (302) 571-1253

Nicole L. Greenblatt, P.C. (admitted *pro hac vice*)
Derek I. Hunter (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Joshua M. Altman  (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

Mark McKane, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
555 California Street
San Francisco, California 94104
Telephone:    (415) 439-1400
Facsimile:    (415) 4391500

*Proposed Co-Counsel for the Debtors and Debtors in Possession*