# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TOWN SPORTS INTERNATIONAL, LLC, *et al.*,[1] | Case No. 20-12168 (CSS) |
| Debtors. | (Jointly Administered) |

## DECLARATION OF JOHN C. DIDONATO IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE DEBTORS' KEY EMPLOYEE RETENTION PROGRAM AND (II) GRANTING RELATED RELIEF

Pursuant to 28 U.S.C. § 1746, I, John C. DiDonato, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge and belief:

1. I am a Managing Director at Huron Consulting LLC ("**Huron**"), a restructuring advisory services firm with numerous offices throughout the country. I have been appointed to serve and am currently serving as the Chief Restructuring Officer ("**CRO**") for Town Sports International, LLC and its affiliated debtors and debtors in possession (collectively, the "**Debtors**"), in the above-captioned chapter 11 cases (the "**Cases**"). I am familiar with the day-to-day operations and business and financial affairs of the Debtors.

2. I submit this declaration (this "**Declaration**") in support of the *Debtors' Motion for Entry of an Order (I) Approving the Debtors' Key Employee Retention Program and*

---

[1] The last four digits of Town Sports International, LLC's federal tax identification number are 7365. The mailing address for Town Sports International, LLC is 399 Executive Boulevard, Elmsford, New York 10523. Due to the large number of debtors in these cases, for which the Debtors have requested joint administration, a complete list of the Debtors, the last four digits of their federal tax identification numbers, and their addresses are not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://dm.epiq11.com/TownSports, or by contacting the proposed undersigned counsel for the Debtors.

27191442.4

*(II) Granting Related Relief* (the "**Motion**").[2]  I have reviewed the Motion and am familiar with the information contained therein.

3. Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge; my discussions with other members of the Debtors' management, with my colleagues who are also working on this matter, and with the Debtors' professional advisors; my review of the Debtors' Key Employee Retention Program (the "**KERP**") and other relevant documents; or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition and companies in chapter 11.

4. If called to testify, I would testify competently to the facts set forth in this Declaration.

### I. The KERP

5. Pursuant to the Motion, the Debtors are seeking authority to implement the KERP to help ensure that certain valuable non-insider members of the Debtors' workforce, who are essential to the continuing operation of the Debtors' business, the ongoing process for the sale of substantially all of the Debtors' assets (the "**Sale Process**"), and the Cases generally, are properly motivated to continue working for the Debtors, and to maximize the value of the Debtors and their estates for the benefit of their stakeholders. The commencement of these Cases and the expeditious timeline of the Sale Process have placed unprecedented burdens on the Debtors' remaining employees, who are already facing challenges operating the Debtors' business during the COVID-19 pandemic. Now, more than ever, the Debtors' employees are navigating uncertain times as they balance the tension between maintaining the business as a going-concern while

---

[2] All capitalized terms used and not defined herein shall have the meanings ascribed to them in the Motion.

27191442.4

2

simultaneously managing the Cases and Sale Process. Ultimately, the Debtors' ability to maximize value (and all stakeholder recoveries) will depend entirely on the Debtors' essential employees.

6. The Debtors and their advisors, at the direction of the Debtors' board of directors (the "**Board**"), have determined that implementing the KERP is critical under the circumstances to align the interests of the Debtors' employees with the Debtors' stakeholders, and to maximize the value of the Debtors' estates. The Debtors believe that the total investment in the KERP is appropriate under the circumstances. Not only do the aggregate amounts of the program fit squarely within the Debtors' already approved budget (and, indeed, were expressly negotiated as a component of the Debtors' DIP budget), the Debtors believe that not paying these amounts would have a greater negative monetary impact on the outcome of the Sale Process.

7. During the process of developing the KERP, the Debtors carefully analyzed their workforce to determine which non-insider members of their workforce would be appropriate to include in the KERP considering, among other things, the importance of achieving a successful marketing and Sale Process. The Debtors selected 135 non-insider members of the Debtors' workforce to participate in the KERP (collectively, the "**KERP Participants**"). The Debtors also consulted with their professional advisors and those of their lenders and the Committee as the Debtors were formulating the KERP.

8. Each KERP Participant has a designated KERP amount (a "**KERP Payment**") based on the assessment by the Debtors' management as subsequently revised by me, in my role as Chief Restructuring Officer, after considering factors such as (a) each KERP Participant's salary, (b) the nature and criticality of the KERP Participant's work, and (c) the funds available to satisfy KERP Payments.

27191442.4

9. The KERP Participants perform a variety of important business functions for the Debtors that are vital to the Debtors' ability to preserve and enhance stakeholder value. Many of the KERP Participants have valuable institutional knowledge regarding the Debtors' business operations that would be difficult and expensive to replace on an expedited basis, and could very well harm the Debtors' operations, derail the Sale Process, and delay the Debtors' wind down. Moreover, the KERP Participants have provided important support to the Debtors' advisors in meeting the additional demands imposed by chapter 11 and the Debtors' ongoing sale efforts. The value of the KERP Participants' support to Huron are particularly acute here, as Huron's engagement commenced on September 24, 2020. The KERP Participants' active engagement and anticipated ongoing engagement with Huron has been, and will continue be, critical to meet the Debtors' various obligations in these chapter 11 cases.

10. It is my belief and business judgment that the KERP Participants may be faced with significant pressure to leave the Debtors' workforce during these Cases given the impending sale of the Debtors' assets, the significant burdens of both the chapter 11 process and complications with the COVID-19 pandemic, and the distinct possibility that the KERP Participants may not have opportunities for continued employment with the Debtors. Retention of the KERP Participants through the consummation of a sale, and for an appropriate period of time thereafter, is essential to maximizing estate value for the benefit of all stakeholders in these Cases.

11. Under the KERP, if earned, KERP Payments range from approximately 5% to 50% of the respective KERP Participant's annual base salary. The average base salary for the KERP Participants (allocated across all of the Debtors and their non-debtor affiliates) is approximately $84,524, and the average KERP Payment, if earned, is approximately $11,111. The aggregate amount of the potential KERP Payments is approximately $1,500,000.

27191442.4

12. Fifty (50) percent of each KERP award will be payable on the closing date (the "**Sale Closing Date**") of substantially all of the Debtors' assets. The remaining fifty (50) percent of each KERP award will be earned upon the earlier of (the "**Effective Date**") (i) entry of an order confirming a chapter 11 plan in these Cases or (ii) termination of a KERP Participant's employment without cause. Each KERP Participant will be paid at the most practical payroll processing date following termination. If any KERP Participant voluntarily leaves or is terminated for cause prior to the Effective Date, such KERP Participant shall forfeit his or her KERP Payment. If a KERP Participant is terminated without "cause" or due to death or disability prior to the Effective Date, any then unpaid pro rata portion of the KERP Payment (based on the target end date) will be accelerated and paid.

13. In the event that any KERP Participant forfeits or otherwise becomes ineligible to receive the KERP Participant's KERP Payment under the terms set forth herein, the Debtors seek authority to reallocate any KERP amounts associated with such participant to other valuable non-insider members of the Debtors' workforce. I believe that such relief will provide the Debtors with the necessary flexibility to ensure that members of their workforce are properly motivated to continue working for the Debtors and to achieve a successful outcome in connection with the Sale. The flexibility to re-allocate unearned KERP Payments will also allow the Debtors to address potential retention issues arising in the future, without incurring unnecessary additional costs.

## II. Reasonableness of the KERP

14. The Debtors and their advisors, including Huron, reviewed the KERP to determine whether the design, structure, and cost of the KERP are reasonable and consistent with market practice. The Debtors, with the assistance of their advisors, designed the KERP keeping

27191442.4

in mind their goals of maximizing the value of their estates for the benefit of all interested parties and ensuring that their operations are conducted in an effective and stable manner through the Sale Process.

15. The Debtors worked closely with their advisors to ensure that the KERP is reasonable when compared with postpetition retention plans implemented in other chapter 11 cases. In particular, personnel from Huron analyzed comparable non-insider plans approved in recent chapter 11 cases. Based on this review of comparable plans, the Debtors believe that the total cost of the KERP is reasonable relative to market comparisons. The total KERP as a percent of revenue and assets is 1.1% and 0.17%, respectively. As described in the DiDonato Declaration, this is below or comparable to the mean and median of similar incentive programs approved in several recent retail cases.

16. The award opportunities in the KERP reflect a reasonable, market-based approach and are justified under the circumstances of these chapter 11 cases. The KERP award opportunities, both as a percentage of average base salary or in absolute dollar terms, are within market practice. For these reasons, I believe that the requested relief in the Motion is necessary, prudent and a sound exercise of the Debtors' business judgment.

**III.    The KERP Participants Are Not Insiders of the Debtors**

17. As an initial matter, none of the KERP Participants is a member of the Board, or have been elected or appointed to their positions by the Board. The KERP Participants do not attend Board meetings, do not have the authority to make company-wide decisions for the Debtors, and do not report to the Board. Furthermore, the KERP Participants' duties do not extend to the Debtors' business operations as a whole, but rather to specific and discreet areas of the Debtors' operations.

27191442.4

18. Attached hereto as <u>Exhibit A</u> is a list of the KERP Participants with titles of "Director", "Vice President", "Chief Information Officer" and the like with a description of each KERP Participant's role, scope of duties, and the title of the senior personnel to whom each KERP Participants reports. Each of the KERP Participants with the title of "director," "vice president," "manager," "executive vice president" or the like, which are common in the Debtors' industry, reports to a more senior member of the Debtors' workforce, and must obtain approval from appropriate senior personnel before taking any significant action with respect to, among other things, the Debtors' corporate policies or the disposition of significant assets. Therefore, while the titles of certain of the KERP Participants reflect their individual roles and functions, they do not confer insider status upon these employees, and the KERP Participants do not take part in the direction or management of the Debtors' overall business operations, notwithstanding the valuable role that they play in the Debtors' organization. Based on my understanding of the roles and responsibilities of the KERP Participants:

> a. None of the KERP Participants is considered to be an "officer" or a "director" as those terms are used in the Debtors' corporate organizational documents or bylaws;
>
> b. None of the KERP Participants is a member of any board of directors of the Debtors, nor do they report directly to any board of directors, and none of the KERP Participants is a relative of any director or person in control of the Debtors;
>
> c. None of the KERP Participants is responsible for making or has the discretion to make enterprise-level management decisions on behalf of the Debtors;
>
> d. None of the KERP Participants has fiduciary responsibilities relating to the day-to-day oversight or management of the Debtors;
>
> e. None of the KERP Participants is responsible for or involved in the corporate governance of the Debtors;
>
> f. None of the KERP Participants is solely responsible for directing the corporate strategies of the Debtors; and
>
> g. None of the KERP Participants had any role in or provided any input with respect to the development or proposed implementation of the KERP.

19. In short, given their intermediate positions in the corporate chain of command and the limited extent of their corporate authority, I believe and am advised that none of the KERP Participants are "insiders," as that term is defined in the Bankruptcy Code.

## **CONCLUSION**

20. In my opinion, the terms of the KERP are necessary and appropriate, particularly in light of the importance of the KERP Participants to the Debtors' business operations and their chapter 11 efforts, and will help to ensure the retention of the KERP Participants at a critical time for the Debtors and their estates. I also believe that key employee retention plans, such as the KERP, are commonplace in chapter 11, particularly in liquidating cases such as these Cases. Based upon my general knowledge, as well as that of my colleagues working on this matter, I believe that the KERP Payments are generally within restructuring industry norms.

21. In light of the foregoing, for the reasons stated herein and in the Motion, I believe that the relief sought in the Motion should be granted by the Court, as it represents a key step in the Debtors' chapter 11 efforts and an appropriate exercise of their business judgement.

Executed on October 15, 2020
Wexford, Pennsylvania

By: */s/ John C. DiDonato*
    John C. DiDonato
    Chief Restructuring Officer

27191442.4

## EXHIBIT A

## Description of Certain Job Titles

27191442.4

| Job Title | Job Description | Direct Supervisor |
|---|---|---|
| VP of Strategic Finance | Leads strategic initiatives in Financial Planning and Analysis (FP&A) to guide and support overall business strategy. Partners with our field leadership teams to drive operational improvements across all clubs. Develops, implement, and manage our financial models, departmental and club-level budgets, and operational and financial KPIs to measure business results, assess management performance, and hold department heads and field leadership accountable for actual versus forecasted results. Primary responsibilities of this role is to develop and manage Town Sports International, LLC's daily cash management practices, strategic pricing analysis, A/R credit analysis, data warehouse (in partnership with IT), business intelligence, internal reporting platforms, and our key financial models including but not limited to: Membership, Pricing, and Revenue Models, 4-Wall EBITDA Model (club-level economics), Monthly EBITDA Forecasts (actual vs. forecast for club-level, banner, and consolidated operations), Thirteen-Week Cash Forecast Model, Three-Statement Quarterly Financial Model. | CRO and Deputy CRO |
| Chief Accounting Officer ("**CAO**") | Duties for the CAO include managing compensation and benefits, overseeing all accounting departments, creating accounting strategies to maximize profits, managing payroll and taxes, regularly examining financial statements to ensure they are accurate and free of any errors, organizing and updating financial records, analyzing accounts and suggesting improvements to reduce costs and increase profits, making sure all financial data adheres to current tax laws and regulations, preparing, managing and presenting monthly reports and acting as a liaison to outside auditors. | CRO and Deputy CRO |
| Executive Chief Information Officer | Chief Information Officer creates business value through technology, strategic planning of business growth objectives, ensure tech systems and procedures lead to outcomes in line with business goals, oversee the development of customer service platforms, manage IT and the development of team personnel, approve vendor negotiations and IT architecture, information risk management (IRM), establish IT policies, strategies, and standards, and develop and approve technology futures and budgets. | CRO and Deputy CRO |

27191442.4

2

| Job Title | Job Description | Direct Supervisor |
|---|---|---|
| Vice President of Operations | The Regional Vice President is a senior leadership role that oversees sales, retention, customer service and fitness metrics, by driving results through other multi-unit leaders. This role also oversees ancillary sources of revenue such as SCFK, racquet sports and others. The ability to prioritize and focus on team development including recruiting, performance management and training is key to success in this role. The Regional Vice President oversees a regional span of clubs and provides strategic guidance through tactical business planning. The Regional Vice President will plan, direct, coordinate, and oversee sales and operations activities in the organization, ensuring development and implementation of efficient operations and cost-effective systems to meet current and future needs of the organization. | CRO and Deputy CRO |
| Vice President HR – Field | Vice President of HR drives the people strategy for company growth and maturation. Responsible for leading culture, employee engagement, delivering core HR functions and driving HR strategy, including talent acquisition/recruiting, talent management and retention, performance management, organizational learning and development, and organizational structure and design. | CRO and Deputy CRO |
| Facilities Operations Director | The Facilities Operations Director duties include maintaining the buildings and grounds of our clubs, overseeing the upkeep of equipment and supplies, determining and scheduling repairs or renovation projects, and coordinating safety inspections. The Facilities Operations Director oversees the budget for his department and must negotiate with outside vendors for supplies, repairs, and other measures. | VP of Operations |
| Sr. Director – Finance | Owner of treasury and external reporting systems as well as budgeting and planning. Directs and participates in the organization's financial planning and oversees accounting while directing and participating in activities based upon the overall strategic objectives of TSI and its subsidiaries and accounting procedures as well as the association's relationship with lending institutions, shareholders, and CPA firms. | CRO and Deputy CRO |

| Job Title | Job Description | Direct Supervisor |
|---|---|---|
| Business Intelligence Analyst | Implements new business intelligence platform intelligence platform (DOMO). Aggregate large data sets and data flow to structure comprehensive user reports. Develop, design and optimize complex MySQL queries. | VP of Strategic Finance |
| Controller Finance | Duties for the Financial Controller include financial analysis managing accounting records, evaluating and managing risk, ensuring compliance with regulations, publishing financial statements, overseeing accounting operations, analyzing financial data, monitoring expenditure, forecasting revenue, coordinating auditing processes, and ensuring accuracy of financial information. | Chief Accounting Officer |
| Accounting Director | The Accounting Director directs the establishment and implementation of the organization's accounting policies and procedures. H/She has overall responsibility for assigned accounting operations and systems as well as associated analysis and report preparation. The Accounting Director leads and directs accounting professional and support staff through subordinate managers. The Accounting Director manages a departmental sub-function within a broader departmental function. Creates functional strategies and specific objectives for the sub-function and develops budgets/procedures to support the functional infrastructure. | Chief Accounting Officer |
| Accounting Services Director | Oversees the timely, accurate and complete processing and accurate accounting for overhead costs and consolidate GA costs in accordance with GAAP. Partner with other departments to implement new efficiencies and cost reduction. Report on accounting for overhead costs and consolidate GA costs in accordance with GAAP and report on the metrics to measure performance against goals. Support executive management with analysis, with an eye toward continuous process improvement. | Chief Accounting Officer |