## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TOWN SPORTS INTERNATIONAL, LLC, *et al.*,[1] | ) | Case No. 20-12168 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

### DISCLOSURE STATEMENT RELATING TO THE JOINT CHAPTER 11 PLAN OF TOWN SPORTS INTERNATIONAL, LLC AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Nicole L. Greenblatt, P.C. (admitted *pro hac vice*)
Derek I. Hunter (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

-and-

Joshua M. Altman  (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

Mark McKane, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
555 California Street
San Francisco, California 94104
Telephone:    (415) 439-1400
Facsimile:    (415) 439-1500

-and-

Robert S. Brady (DE Bar No. 2847)
Sean T. Greecher (DE Bar No. 4484)
Allison S. Mielke (DE Bar No. 5934)
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 571-6600
Facsimile:    (302) 571-1253

Dated:  October 20, 2020

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

---

[1]    The last four digits of Town Sports International, LLC's federal tax identification number are 7365. The mailing address for Town Sports International, LLC is 399 Executive Boulevard, Elmsford, New York 10523. A complete list of all the Debtors in these jointly administered cases, including the last four digits of their federal tax identification numbers and addresses, may be obtained on the website of the Debtors' claims and noticing agent at http://dm.epiq11.com/TownSports.

<div style="border: 1px solid black; text-align: center;">

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

</div>

**THE DEADLINE TO VOTE ON THE PLAN IS**
**December 7, 2020,[2] at 4:00 p.m. (prevailing Eastern Time)**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE <u>ACTUALLY</u> <u>RECEIVED</u> BY EPIQ CORPORATE RESTRUCTURING, LLC ON OR BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.**

**THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO CERTAIN HOLDERS OF CLAIMS OR INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE *JOINT CHAPTER 11 PLAN OF TOWN SPORTS INTERNATIONAL, LLC AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE.* NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. PRIOR TO DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VIII HEREIN. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN, THE RELEVANT PROVISIONS OF THE PLAN WILL GOVERN.**

**THE DEBTORS URGE HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO VOTE TO <u>ACCEPT</u> THE PLAN. THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE TRANSACTIONS CONTEMPLATED THEREBY. FURTHER, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.**

**THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN ANTICIPATED EVENTS IN THE CHAPTER 11 CASES, AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE INCORPORATED BY REFERENCE HEREIN. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.**

**IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THEIR BOOKS AND RECORDS OR THAT WAS OTHERWISE MADE AVAILABLE TO THEM AT THE TIME OF SUCH PREPARATION AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.**

**THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR THE PLAN ADMINISTRATOR MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO**

---

2    As of the date hereof, the Debtors have not obtained Court approval of the Confirmation Timeline. Accordingly, this Disclosure Statement will be revised after entry of an order approving such schedule.

CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.   INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING ARTICLE VIII, ENTITLED "RISK FACTORS," BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.   THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE.

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS.  THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS.  FORWARD-LOOKING STATEMENTS MAY INCLUDE STATEMENTS ABOUT THE DEBTORS':

- BUSINESS STRATEGY;

- **FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;**

- **LEVELS OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH DEBT COVENANTS;**

- **FINANCIAL STRATEGY, BUDGET, PROJECTIONS, AND OPERATING RESULTS;**

- **SUCCESSFUL RESULTS FROM THE DEBTORS' OPERATIONS;**

- **GENERAL ECONOMIC AND BUSINESS CONDITIONS;**

- **COUNTERPARTY CREDIT RISK;**

- **THE OUTCOME OF PENDING AND FUTURE LITIGATION;**

- **UNCERTAINTY REGARDING THE DEBTORS' FUTURE OPERATING RESULTS; AND**

- **PLANS, OBJECTIVES, AND EXPECTATIONS.**

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE DEBTORS AND THE POST-EFFECTIVE DATE DEBTORS' FUTURE PERFORMANCE.  THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE DEBTORS AND THE POST-EFFECTIVE DATE DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN.  THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING:  THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED; THE DEBTORS' ABILITY TO REDUCE THEIR OVERALL FINANCIAL LEVERAGE; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES; THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESS DURING THE CHAPTER 11 CASES; CUSTOMER RESPONSES TO THE CHAPTER 11 CASES; THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; EXPOSURE TO LITIGATION; THE DEBTORS' ABILITY TO IMPLEMENT COST REDUCTION INITIATIVES IN A TIMELY MANNER; THE DEBTORS' ABILITY TO DIVEST EXISTING BUSINESSES; AND ADVERSE TAX CHANGES.**

**THIS DISCLOSURE STATEMENT IS SUBJECT TO FURTHER REVISION AND WILL BE AMENDED PRIOR TO THE HEARING TO CONSIDER ADEQUACY OF THIS DISCLOSURE STATEMENT AND THE RELATED SOLICITATION PROCEDURES TO, AMONG OTHER THINGS, TAKE INTO ACCOUNT THE RESULTS OF THE AUCTION, IF ANY, FURTHER SPECIFICS OF ANY RESTRUCTURING TRANSACTION TO BE CONSUMMATED PURSUANT TO THE PLAN, AND TO ACCOMMODATE ADDITIONAL REQUESTS FOR DISCLOSURE.**

## TABLE OF CONTENTS

Page

I.  INTRODUCTION .................................................................................................................1

II.  PRELIMINARY STATEMENT ........................................................................................1

III.  QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
      THE PLAN ..........................................................................................................................3

      A.  What is chapter 11? ...................................................................................................3
      B.  Why are the Debtors sending me this Disclosure Statement? ..................................3
      C.  Am I entitled to vote on the Plan? ............................................................................3
      D.  What will I receive from the Debtors if the Plan is consummated? ..........................4
      E.  What happens to my recovery if the Plan is not confirmed or does not go effective? ...............7
      F.  If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
          Plan goes effective, and what is meant by "Confirmation," "Effective Date," and
          "Consummation?" ......................................................................................................7
      G.  What are the sources of Cash and other consideration required to fund the Plan? ...........7
      H.  Is there potential litigation related to the Plan? ......................................................8
      I.  Will the final amount of Allowed General Unsecured Claims affect the recovery of
          Holders of Allowed General Unsecured Claims under the Plan? .............................8
      J.  Will there be releases and exculpation granted to parties in interest as part of the Plan? ..........9
      K.  What is the deadline to vote on the Plan? ................................................................9
      L.  How do I vote for or against the Plan? .....................................................................9
      M.  Why is the Bankruptcy Court holding a Confirmation Hearing? ..............................9
      N.  When is the Confirmation Hearing set to occur? ...................................................10
      O.  What is the purpose of the Confirmation Hearing? ................................................10
      P.  What is the effect of the Plan on the Debtors' ongoing business? ..........................10
      Q.  Who do I contact if I have additional questions with respect to this Disclosure Statement
          or the Plan? .............................................................................................................10
      R.  Could subsequent events potentially affect recoveries under the Plan? .................11
      S.  Do the Debtors recommend voting in favor of the Plan? .......................................11

IV.  THE DEBTORS' PLAN ....................................................................................................11

      A.  The Plan ..................................................................................................................11
      B.  Means for Implementation of the Plan ...................................................................15

V.  THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW ..........17

      A.  Corporate History ...................................................................................................17
      B.  The Debtors' Business Operations ..........................................................................17
      C.  The Debtors' Prepetition Capital Structure .............................................................17

VI.  EVENTS LEADING TO THE CHAPTER 11 FILINGS .................................................18

      A.  Operational Challenges ...........................................................................................18
      B.  Exploration of Strategic Alternatives .....................................................................18

VII.  MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11
       CASES ................................................................................................................................19

      A.  First Day Relief .......................................................................................................19
      B.  Cash Collateral Motion ...........................................................................................19
      C.  Appointment of Official Committee ........................................................................20
      D.  Other Procedural and Administrative Motions ........................................................20
      E.  Retention of Debtor Professionals ..........................................................................21

F.      Approval of Debtor-in-Possession Financing ................................................................ 21
G.      Bidding Procedures and Marketing Process.............................................................. 21
H.      Litigation Matters ................................................................................................... 22
I.       Assumption and Rejection of Executory Contracts and Unexpired Leases ................ 22
J.       Claims Based on Rejection of Executory Contracts or Unexpired Leases.................... 23
K.      Cure of Defaults .................................................................................................... 24

**VIII.**   **RISK FACTORS** .................................................................................................... **25**

A.      Certain Bankruptcy Law Considerations ................................................................ 25
B.      Disclosure Statement Disclaimer ........................................................................... 28

**IX.**     **SOLICITATION AND VOTING PROCEDURES** .......................................................... **30**

A.      Holders of Claims Entitled to Vote on the Plan ...................................................... 30
B.      Voting Record Date ............................................................................................... 30
C.      Voting on the Plan ................................................................................................ 31
D.      Ballots Not Counted.............................................................................................. 31

**X.**      **CONFIRMATION OF THE PLAN**.............................................................................. **32**

A.      Requirements for Confirmation of the Plan ............................................................ 32
B.      Best Interests of Creditors/Liquidation Analysis .................................................... 32
C.      Feasibility............................................................................................................. 33
D.      Acceptance by Impaired Classes............................................................................ 33
E.      Confirmation without Acceptance by All Impaired Classes ...................................... 34

**XI.**     **MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES** ................................ **35**

A.      Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and Parent ............... 36
B.      Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Class 4 Prepetition Loan Claims....................................................................................... 37
C.      Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Class 5 General Unsecured Claim. ..................................................................................... 37
D.      Character of Gain or Loss. ...................................................................................... 38
E.      Market Discount.................................................................................................... 38
F.       Accrued Interest. ................................................................................................... 39
G.      Limitation on Use of Capital Losses ...................................................................... 39
H.      Certain U.S. Federal Income Tax Considerations to the Wind-Down Trust................... 39
I.       Information Reporting and Backup Withholding...................................................... 40

**XII.**    **RECOMMENDATION** ........................................................................................... **42**

**EXHIBITS**

**EXHIBIT A**    Chapter 11 Plan

## I.       INTRODUCTION

Town Sports International LLC and the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>" and together with certain non-Debtor affiliates, the "<u>Company</u>"), submit this disclosure statement (this "<u>Disclosure Statement</u>"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the *Joint Chapter 11 Plan of Town Sports International, LLC and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, filed contemporaneously herewith (as may be amended, supplemented, or modified from time to time, the "<u>Plan</u>").[1]   A copy of the Plan is attached hereto as **<u>Exhibit A</u>** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the other Debtors.  The rules of interpretation set forth in Article I.B of the Plan govern the interpretation of this Disclosure Statement.

**THE DEBTORS SUPPORT THE PLAN, AND THE DEBTORS BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS.  AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.      PRELIMINARY STATEMENT

The Company is one of the nation's leading owners and operators of fitness clubs in the United States.  The Company operates clubs under localized brand names that seek to create an image and atmosphere consistent with the local community rather than a national chain.  Founded in 1973, the Company rapidly expanded its geographic footprint, in part through acquisitions, from a single fitness club to approximately 186 clubs worldwide.  The Company's fitness clubs are located in urban or suburban areas, and are open in clusters close to transportation hubs or office or retail centers, maximizing convenience for those who frequent the facilities.  The Company's members include a wide age demographic, covering the student market to the active mature market.

Unfortunately, the Debtors' business was brought to a halt as a direct result of the global COVID-19 pandemic.  In response to government regulations resulting from the pandemic, substantially all of the Debtors' operations were shut down by the end of March, and on May 1, 2020, monthly membership revenues were suspended.  Even though government mandates have begun to relax in certain states, the Debtors are still required to operate their gyms at a maximum of 25 percent capacity.  In addition, the Debtors are providing to members who were billed for membership dues while the gyms were closed between March and April a 45-day credit toward October and November membership dues, further reducing the Debtors' liquidity.  As a result of the hiatus in the Debtors' membership revenues, mandated decreased operational capacity, increased COVID-related cleaning, and changes in consumer behavior (including membership cancellations), the Debtors' liquidity became severely limited and necessitated the filing of the Chapter 11 Cases.

Prior to the Petition Date, the Debtors, with the assistance of Houlihan Lokey Capital, Inc. ("<u>Houlihan</u>"), conducted an evaluation of the Debtors' liquidity position and considered various solutions to the Debtors' need for an immediate and long-term capital infusion to fund the company through a sale process and fund a go-forward business.  The Debtors engaged with certain of their prepetition lenders on the potential terms of DIP financing and an overall restructuring transaction.  In connection with these conversations, the Debtors had interest from two groups of Prepetition Lenders regarding potential

---

[1]    Capitalized terms used but not otherwise defined in this Disclosure Statement have the meaning given to them in the Plan.

financing proposals.   After further negotiations with both parties, and upon review of each of their respective proposals, the Debtors ultimately decided to move forward with the proposal submitted by Tacit Capital ("Tacit"), in collaboration with the applicable ad hoc group of Prepetition Lenders.  Tacit's proposal consisted of a DIP facility, coupled with a going-concern credit bid of substantially all of the Debtors' assets.  That bid formed the basis for the Debtors' DIP financing and stalking horse bid.

Both before and after the Petition Date, the Debtors actively pursued a going-concern sale with all interested parties.  On October 2, 2020, the Debtors filed a motion seeking Bankruptcy Court approval of the Bidding Procedures pursuant to which the Debtors would market and sell all or substantially all of their assets prior to confirmation of the Plan.  The Bankruptcy Court approved the Bidding Procedures on October 9, 2020 [Docket No. 208] (the "Bidding Procedures Order"), which, among others, established the Bid Deadline (as defined in the Bidding Procedures) as October 26, 2020 at 5:00 p.m., prevailing Eastern Time and set the Auction (as defined in the Bidding Procedures), if necessary, for October 28, 2020 at 10:00 a.m., prevailing Eastern Time.

Subsequent to the contemplated sale for all or substantially all of the Debtors' assets being consummated, subject to Bankruptcy Court approval, the Debtors propose to liquidate under chapter 11 of the Bankruptcy Code.  Under chapter 11, a debtor may reorganize or liquidate its business for the benefit of its stakeholders.  The consummation of a going concern transaction followed by an orderly liquidation is the principal objective of the Chapter 11 Cases.

The primary objective of the Plan is to maximize the value of recoveries to all Holders of Allowed Claims and Allowed Interests and generally to distribute all property of the Estates that is or becomes available for distribution generally in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that the Plan accomplishes this objective and is in the best interest of the Estates.

Generally speaking, the Plan:

- provides the vesting of all Available Cash from the proceeds of Sale Transaction in the Post-Effective Date Debtors, for the purpose of distribution to Holders of Claims;

- provides for the full and final resolution of funded debt obligations;

- designates a Plan Administrator to wind down the Debtors' affairs, pay and reconcile Claims, and administer the Plan in an efficacious manner; and

- contemplates recoveries to Holders of Administrative Claims, Secured Tax Claims, Priority Tax Claims, Other Priority Claims, and Other Secured Claims as is necessary to satisfy section 1129 of the Bankruptcy Code.

The Debtors believe that Confirmation of the Plan will avoid the lengthy delay and significant cost of liquidation under chapter 7 of the Bankruptcy Code.

The Debtors believe that the Plan maximizes stakeholder recoveries in the Chapter 11 Cases as any alternative to a going-concern sale would materially reduce recoveries to Holders of Claims.  Accordingly, the Debtors urge all Holders of Claims entitled to vote to accept the Plan by returning their ballots so that Epiq Corporate Restructuring, LLC,[2] the Debtors' notice and claims agent (the "Notice and Claims Agent"), actually receives such ballots by December 7, 2020, at 4:00 p.m. prevailing Eastern Time

---

[2]   The Bankruptcy Court approved the Order to retain Epiq Corporate Restructuring, LLC as Notice and Claims Agent on September 16, 2020 [Docket No. 57].

(the "Voting Deadline").  Assuming the Plan receives the requisite acceptances, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

## III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly-situated creditors and similarly-situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.    Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims or interests whose votes on the Plan are being solicited.  This Disclosure Statement is being submitted in accordance with these requirements.

### C.    Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution (if any) under, the Plan depends on what type of Claim or Interest you hold and whether you held that Claim or Interest as of the Voting Record Date.  Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below:

| Class | Claim/Interest | Status | Voting Rights |
|-------|----------------|--------|---------------|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 4 | Prepetition Loan Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |

3

| 6 | Intercompany Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept or Reject) |
|---|---|---|---|
| 7 | Intercompany Interests | Unimpaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| 8 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 9 | Interests in TSI | Impaired | Not Entitled to Vote (Deemed to Reject) |

**D.      What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims or Interests under the Plan.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends on the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan, except to the extent that such Holder agrees to less favorable treatment, the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Holder's Allowed Claim or Allowed Interest.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery |
| 1 | Secured Tax Claims | Except to the extent that a Holder of an Allowed Secured Tax Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Secured Tax Claim, each Holder of an Allowed Secured Tax Claim shall receive, at the option of the Plan Administrator:<br><br>(i)   payment in full in Cash of such Holder's Allowed Secured Tax Claim; or<br><br>(ii)  equal semi-annual Cash payments commencing as of the Effective Date or as soon as reasonably practicable thereafter and continuing for five years, in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable | $[●] - $[●] | [●]% |

4

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery |
| | | non-default rate under non-bankruptcy law, subject to the option of the Plan Administrator to prepay the entire amount of such Allowed Secured Tax Claim during such time period. | | |
| 2 | Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive, at the option of the Plan Administrator:<br><br>(i)  payment in full in Cash of such Holder's Allowed Other Secured Claim;<br><br>(ii)  the collateral securing such Holder's Allowed Other Secured Claim;<br><br>(iii) Reinstatement of such Holder's Allowed Other Secured Claim; or<br><br>(iv) such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired. | $[●] - $[●] | [●]% |
| 3 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive payment in full in Cash on account of such Holder's Allowed Other Priority Claim or such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired. | $[●] - $[●] | [●]% |
| 4 | Prepetition Loan Claims | Except to the extent that a Holder of an Allowed Prepetition Loan Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Prepetition Loan Claim, each Holder of an Allowed Prepetition Loan Claim shall receive its Pro Rata share of (not to exceed the amount of such Holder's Prepetition Loan Claim) the Excess Distributable Cash in accordance with the distribution waterfall set forth in Article IV.C of the Plan. | $[●] - $[●] | [●]% |

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery |
| 5 | General Unsecured Claims | Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive:<br><br>(i) its Pro Rata share (not to exceed the amount of such Holder's Allowed General Unsecured Claim) of the General Unsecured Claims Reserve Amount;<br><br>(ii) following the payment in full in cash of the Prepetition Loan Claims pursuant to Article IV.C of the Plan, its Pro Rata share (not to exceed the amount of such Holder's Allowed General Unsecured Claim) of the Excess Distributable Cash; and<br><br>(iii) a complete waiver and release of any and all Claims, Causes of Action, and other rights against the Holders of Allowed Class 5 Claims based on claims pursuant to chapter 5 of the Bankruptcy Code or under similar or related state or federal statutes and common law including fraudulent transfer laws from the Debtors, the Post-Effective Date Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, subject to and in accordance with Article VIII of the Plan. | $[●] - $[●] | [●]% |
| 6 | Intercompany Claims | Holders of Intercompany Claims shall not receive any distribution on account of such Intercompany Claims. On or after the Effective Date, the Post-Effective Date Debtors may reconcile such Intercompany Claims as may be advisable in order to avoid the incurrence of any past, present, or future tax or similar liabilities by such Post-Effective Date Debtors. | $[●] - $[●] | 0% |
| 7 | Intercompany Interests | Intercompany Interests shall be, at the option of the Debtors either:<br><br>(i) Reinstated in accordance with Article III.G of the Plan; or | N/A | [●]% |

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery |
| | | (ii) Discharged, canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Intercompany Interests will not receive any distribution on account of such Intercompany Interests. | | |
| 8 | Section 510(b) Claims | Allowed Section 510(b) Claims, if any, shall be discharged, canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Section 510(b) Claims will not receive any distribution on account of such Allowed Section 510(b) Claims. | $[●] - $[●] | [●]% |
| 9 | Interests in TSI | Interests in TSI shall be discharged, canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Interests in TSI will not receive any distribution on account of such Interests. | N/A | 0% |

### E.  What happens to my recovery if the Plan is not confirmed or does not go effective?

In the event that the Plan is not confirmed or does not go effective, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.  Conversion to chapter 7 would require the Debtors to incur expenses related to the chapter 7 trustee and additional retained professionals, and such expenses may decrease recoveries for Holders of Allowed Claims in the Voting Classes.  *See, e.g.*, 11 U.S.C. §§ 326(a); 503(b)(2). The conversion to chapter 7 would require entry of a new bar date, which may increase the amount of Allowed Claims and thereby reduce Pro Rata recoveries.  See Fed. R. Bankr. P. 1019(2), 3002(c).

### F.  If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"

"Confirmation" of the Plan refers to the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases approving the Plan.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can "go effective." Distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan.  *See* Article X of this Disclosure Statement, entitled "Confirmation of the Plan," for a discussion of the conditions precedent to consummation of the Plan.  "Consummation" means the occurrence of the Effective Date.

### G.  What are the sources of Cash and other consideration required to fund the Plan?

The Debtors and Post-Effective Date Debtors, as applicable, shall fund distributions under the Plan with Available Cash held in the Administrative Claims Escrow, Priority Claims Reserve, General Unsecured Claims Reserve, and the Post-Effective Date Debtor Account, as applicable, on the Effective

Date.  After the funding from Available Cash of the Administrative Claims Escrow, the Priority Claims Reserve, and the Post-Effective Date Debtor Account, all remaining Available Cash shall be applied *first* toward the DIP Claims, if applicable, until the DIP Claims are paid in full and *second* towards the Prepetition Loan Claims until the Prepetition Loan Claims are paid in full in cash.  In addition, any remaining Available Cash and Excess Distributable Cash after payment in full in cash of the DIP Claims and payment in full in cash of the Prepetition Loan claims, shall be allocated on a Pro Rata basis to Holders of General Unsecured Claims.

### H.    Is there potential litigation related to the Plan?

Parties in interest may object to Confirmation of the Plan, which objections potentially could give rise to litigation.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.  *See* Article VIII.A.4 of this Disclosure Statement, entitled "The Debtors May Not Be Able to Secure Confirmation of the Plan."

### I.    Will the final amount of Allowed General Unsecured Claims affect the recovery of Holders of Allowed General Unsecured Claims under the Plan?

The Debtors' estimate of aggregate Allowed General Unsecured Claims is approximately $[●].  Each Holder of an Allowed General Unsecured Claim will receive their Pro Rata share (not to exceed the amount of such Holder's Allowed General Unsecured Claim) of the General Unsecured Claims Reserve Amount.  There is a chance that there is no Available Cash or Excess Distributable Cash.

Although the Debtors' estimate of Allowed General Unsecured Claims is generally the result of the Debtors' and their advisors' analysis of reasonably available information, the projected amount of General Unsecured Claims set forth herein is subject to material change (either higher or lower), which difference could materially affect Class 5 recoveries, and reflects the Debtors' current view on potential rejection damages.  Any change in the number, identity, or timing of actual rejected Executory Contracts and Unexpired Leases could have a material impact on the amount of General Unsecured Claims.  To the extent that the actual amount of rejection damages Claims changes, the value of recoveries to Holders of General Unsecured Claims could change as well, and such changes could be material.

As of the Petition Date, the Debtors were parties to certain litigation matters that arose in the ordinary course of operating their business and could become parties to additional litigation in the future.  Although the Debtors have disputed, are disputing, or will dispute in the future the amounts asserted by such litigation counterparties, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amounts estimated by the Debtors herein, the value of recoveries to Holders of General Unsecured Claims could change as well, and such changes could be material.

The Debtors may also reject Executory Contracts and Unexpired Leases, which may result in parties asserting General Unsecured Claims for rejection damages.  Finally, the Debtors may object to certain Proofs of Claim, and any such objections ultimately could cause the total amount of Allowed General Unsecured Claims to change.  These changes could affect recoveries to Holders of General Unsecured Claims, and such changes could be material.

**J.    Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes.  The Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' chapter 11 efforts and were an essential element of the negotiations among the Debtors, the Prepetition Lenders, the DIP Lender, in obtaining their support for the Plan.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' chapter 11 process through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest.  Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

Importantly, each of the Releasing Parties will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all Claims and Causes of Action against the Debtors and the Released Parties.  The Releasing Parties are  (a) the Debtors; (b) the Post-Effective Date Debtors; (c) the Prepetition Agent; (d) the Prepetition Lenders; (e) the Purchaser; (f) the DIP Lender; (g) the Committee; (h) all Holders of Claims or Interests; (i) each current and former Affiliate of each Entity in clause (a) through the following clause (i); and (i) each Related Party of each Entity in clause (a) through this clause (i); *provided,* that in each case, an Entity shall not be a Releasing Party if it timely Files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before Confirmation; *provided, further*, that any such Entity shall be identified by name as a non-Releasing Party in the Confirmation Order.  The releases are an integral element of the Plan.

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit.  Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.  The release, exculpation, and injunction provisions that are contained in the Plan are copied in Article IV.A.4 of this Disclosure Statement, entitled "Releases."

**K.    What is the deadline to vote on the Plan?**

The Voting Deadline is December 7, 2020, at 4:00 p.m. (prevailing Eastern Time).

**L.    How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan.  For your vote to be counted, your ballot must be properly completed, executed, and delivered as directed, so that your ballot including your vote is **actually received** by the Debtors' Notice and Claims Agent **on or before the Voting Deadline, which is December 7, 2020, at 4:00 p.m. prevailing Eastern Time**.  *See* Article IX of this Disclosure Statement, entitled "Solicitation and Voting Procedures."

**M.    Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**N.      When is the Confirmation Hearing set to occur?**

The Confirmation Hearing is scheduled for December 11, 2020 at 1:00 p.m. (prevailing Eastern Time), or such other time as may be scheduled by the Bankruptcy Court.  The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation must be Filed and served on the Debtors, and certain other parties, by no later than December 7, 2020, at 4:00 p.m. (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order incorporated herein by reference.

**O.      What is the purpose of the Confirmation Hearing?**

The confirmation of a chapter 11 plan by a bankruptcy court binds the debtor, any person acquiring property under a chapter 11 plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a chapter 11 plan discharges a debtor from any debt that arose before the confirmation of such chapter 11 plan and provides for the treatment of such debt in accordance with the terms of the confirmed chapter 11 plan.

**P.      What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are liquidating under chapter 11 of the Bankruptcy Code.  Following Confirmation, the Plan will be consummated on the Effective Date, which is a date that is the first Business Day after the Confirmation Date on which (1) no stay of the Confirmation Order is in effect and (2) all conditions precedent to the occurrence of the Effective Date set forth in Article IX of the Plan have been satisfied or waived.  On or after the Effective Date, and unless otherwise provided in the Plan, the Plan Administrator will commence the wind down of the Post-Effective Date Debtors in accordance with the terms of the Plan. Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

**Q.      Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Notice and Claims Agent, Epiq Corporate Restructuring, LLC, via one of the following methods:

> *By regular mail, hand delivery, or overnight mail at:*
> Epiq Corporate Restructuring, LLC
> Re: Town Sports International, LLC, et al.
> 10300 SW Allen Blvd.
> Beaverton, OR 97005
>
> *By electronic mail at:*
> TownSports@epiqglobal.com
>
> *By telephone (toll free) at:*
> (888) 490-0677 (Domestic) or +1 (503) 520-4484 (International)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Notice and Claims Agent at the address above

or by downloading the exhibits and documents from the website of the Notice and Claims Agent at http://dm.epiq11.com/TownSports (free of charge) or the Bankruptcy Court's website at http://www.deb.uscourts.gov/bankruptcy (for a fee).

### R.    Could subsequent events potentially affect recoveries under the Plan?

Potentially, yes.  Recoveries under the Plan are only guaranteed after the Plan is confirmed and the Effective Date is reached.  Any number of subsequent events may interfere with Plan recovery.

### S.    Do the Debtors recommend voting in favor of the Plan?

Yes.  The Debtors believe that the Plan provides for a larger distribution to the Debtors' creditors and equity holders than would otherwise result from any other available alternative.  The Debtors believe that the Plan is in the best interest of all Holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

## IV.    THE DEBTORS' PLAN

### A.    The Plan

As discussed in Article III herein, the Plan contemplates liquidating the Debtors' business and remaining assets under chapter 11 of the Bankruptcy Code.  The Plan contemplates the following key terms, among others described herein and therein:

#### 1.    General Settlement of Claims and Interests

Pursuant to section 1123 of the Bankruptcy Code, Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

#### 2.    Sale Transaction

On October 2, 2020, the Debtors Filed a motion seeking, in part, approval of bidding procedures (the "Bidding Procedures") for a sale of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code [Docket No. 160] (the "Bidding Procedures Motion").  On October 9, 2020, the Bankruptcy Court entered the order approving the Bidding Procedures Motion [Docket No. 208].

The Debtors, led by Houlihan, have engaged, and will continue to engage, in a thorough marketing process for the sale of all or substantially all of the Debtors' assets in accordance with the Bidding Procedures.  The Debtors' marketing process is described in Article VII.GG of this Disclosure Statement, entitled "Bidding Procedures and Bidding Procedures and Marketing Process."  In addition, the Debtors have secured a stalking horse bid from Tacit, the Stalking Horse Bidder, constructed in the form of a going-concern credit bid of the amounts outstanding under the Prepetition Facility which credit bid the Term Lender Group has agreed to cap at $80 million.  As a credit bid, the Stalking Horse Bid (as defined in the

Bidding Procedures) would result in an infusion of Cash, however, would be a bid of certain prepetition debt amounts.  However, the Term Lender Group and the Stalking Horse Bidder (as defined in the Bidding Procedures) have agreed to a wind down budget that the Debtors believe would be sufficient to fund Claims and wind down the Estate on the contemplated timeline.

The Debtors believe that the Bidding Procedures allow the Debtors to seek and elicit the highest or otherwise best Sale Transaction offer.  Absent any other qualified bids, the Stalking Horse Bid (as defined in the Bidding Procedures) provides the Debtors with the best and only path forward for their estates, which would otherwise face complete liquidation.  The Sale Transaction is expected to be consummated prior to confirmation of the Plan.

### 3.  Recoveries to Certain Holders of Claims and Interests

The recoveries to Holders of Claims and Interests is described in Article III.D of this Disclosure Statement, entitled "What will I receive from the Debtors if the Plan is consummated?"

### 4.  Releases

The Plan contains certain releases, as described in Article III.JJ of this Disclosure Statement, entitled "Will there be releases and exculpation granted to parties in interest as part of the Plan?"  The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

#### (a)  Release of Liens.

**Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, including, for the avoidance of doubt, any Prepetition Loan Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to reinstate in accordance with Article III.B.1 of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Post-Effective Date Debtors to evidence the release of such Lien, including the execution, delivery, and Filing or recording of such releases.  The presentation or Filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

#### (b)  Releases by the Debtors.

**As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is deemed released and discharged by each and all of the Debtors, the Post-Effective Date Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and**

liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Post-Effective Date Debtors, or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Post-Effective Date Debtors, or their Estates or affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Post-Effective Date Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Restructuring Transactions, the Sale Transaction, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, Filing, or consummation of the Disclosure Statement, the DIP Facility, the Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the DIP Facility, or the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided* that any right to enforce the Plan and Confirmation Order is not so released.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article VIII.C of the Plan by the Debtors, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII.C of the Plan is: (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of such Claims; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or Post-Effective Date Debtors or their respective Estates asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

(c)      Releases by Holders of Claims and Interests.

As of the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each of the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each Debtor, Post-Effective Date Debtor, and Released Party from any and all any and all Claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Post-Effective Date Debtors, or their Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Post-Effective Date Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Restructuring Transactions, the Sale

13

Transaction, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, Filing, or consummation of the Disclosure Statement, the DIP Facility, the Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the DIP Facility, or the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided* that any right to enforce the Plan and Confirmation Order is not so released.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article VIII.D of the Plan, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII.D of the Plan is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of such Claims; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) an absolute and complete bar to any of the Debtors or Post-Effective Date Debtors or their respective Estates conveying direct or derivative standing to any person or entity to pursue any claim, Causes of Action or liability against any Released Party, or asserting any claim, Causes of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

(d)      Exculpation

Notwithstanding anything herein to the contrary, the Exculpated Parties shall neither have nor incur, and each Exculpated Party is released and exculpated from, any liability to any Holder of a Cause of Action, Claim, or Interest for any (a) prepetition act or omission in connection with, relating to, or arising out of, formulating, negotiating, or preparing the Plan, or (b) postpetition act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, consummation of the Sale Transaction, the formulation, preparation, dissemination, negotiation, Filing, or consummation of the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan or the distribution of property under the Plan or any other related agreement (whether or not such issuance or distribution occurs following the Effective Date), negotiations regarding or concerning any of the foregoing, the administration of the Plan or property to be distributed hereunder, or any other postpetition act or omission in connection with, relating to, arising out of, or in contemplation of the restructuring of the Debtors, except for actions determined by Final Order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

(e)    **Injunction**

**Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Post-Effective Date Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind, except to the extent such assertions are used as a defense to claims or Causes of Action by the Debtors arising prior to the Effective Date, against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.**

**Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in Article VIII.F of the Plan.**

For more detail, see Article VIII of the Plan, entitled "Settlement, Release, Injunction, and Related Provisions," which is incorporated herein by reference.

B.    **Means for Implementation of the Plan**

1.    **Plan Administrator**

On the Effective Date, the authority, power, and incumbency of the persons acting as directors and officers of the Post-Effective Date Debtors shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall be appointed by the Debtors as the sole director and the sole officer of the Post-Effective Date Debtors and shall succeed to the powers of the Post-Effective Date Debtors' directors and officers.  The Plan Administrator shall be the sole representative of, and shall act for the Post-Effective Date Debtors in the same fiduciary capacity as applicable to a board of managers and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same).  For the avoidance of doubt, the foregoing shall not limit the authority of the Post-Effective Date Debtors or the Plan Administrator, as applicable, to continue the employment any former director or officer.

The Plan Administrator shall act as the Wind-Down Trustee and shall have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Administrator,

are necessary to assist the Plan Administrator in the performance of his or her duties. The reasonable fees and expenses of such professionals shall be paid by the Post-Effective Date Debtors, upon the monthly submission of statements to the Plan Administrator. The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court.

### 2. Plan Administrator Exculpation, Indemnification, Insurance, and Liability Limitation

The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Post-Effective Date Debtors. The Plan Administrator may obtain, at the expense of the Post-Effective Date Debtors, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Post-Effective Date Debtors. The Plan Administrator may rely upon written information previously generated by the Debtors.

### 3. General Unsecured Claims Reserve

On the Effective Date, the Post-Effective Date Debtors shall establish and fund the General Unsecured Claims Reserve with Cash in an amount equal to the General Unsecured Claims Reserve Amount. The General Unsecured Claims Reserve shall be maintained in trust solely for Holders of Allowed General Unsecured Claims. Such funds shall not be considered property of the Estates of the Debtors or the Post-Effective Date Debtors. Allowed General Unsecured Claims shall be paid in accordance with Article VI.A of the Plan.

### 4. Tax Returns

After the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors and Wind-Down Trust, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

### 5. Dissolution of the Post-Effective Date Debtor

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made and completion of all its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Post-Effective Date Debtors and Wind-Down Trust shall be deemed to be dissolved without any further action by the Post-Effective Date Debtors, including the Filing of any documents with the secretary of state for the state in which the Post-Effective Date Debtors are formed or any other jurisdiction. The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the Post-Effective Date Debtors in and withdraw the Post-Effective Date Debtors from applicable states.

### 6. Statutory Committee and Cessation of Fee and Expense Payment

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases, including the Committee, shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases, except for the Filing of applications for compensation. The Post-Effective Date Debtors shall no longer be responsible for paying any fees or expenses incurred by any statutory committee, including the Committee, after the Effective Date.

## V.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.    Corporate History

The Company operates fitness clubs under localized brand names that seek to create an image and atmosphere consistent with the local community and to foster recognition as a local network of quality fitness clubs, rather than a national chain.  Since incorporating in 1973, the Company quickly expanded its footprint throughout the United States, particularly in the Northeast and Mid-Atlantic regions.  After years of success and growth, as of December 31, 2019, the Company, through its subsidiaries, operated 186 fitness clubs, collectively serving approximately 605,000 members.  In 2019, the Company generated over $400 million in revenue.

Notwithstanding this growth, the Debtors found themselves in a precarious position as a result of the global COVID-19 pandemic, which drove the Debtors' business to a halt and caused significant liquidity challenges.  Despite the industry headwinds, the Debtors have secured a viable, going-concern transaction supported by the Prepetition Lenders.

Shortly after the Petition Date, the Debtors retained Huron Consulting Services LLC ("Huron") on September 24, 2020.  As of the date of this Disclosure Statement, Huron's John C. DiDonato and Laura Marcera serve as the Debtors' Chief Restructuring Officer and Deputy Chief Restructuring Officer, respectively.  As of the date of this Disclosure Statement, the members of the boards of directors of TSI Holdings II, LLC and Town Sports International, LLC are:  Steven G. Panagos and Jill Frizzley.

### B.    The Debtors' Business Operations

The Company is one of the leading owners and operators of fitness clubs in the United States.  The Company maintains a unique portfolio of highly recognizable, localized brands (such as New York Sports Clubs, Boston Sports Clubs, and Philadelphia Sports Clubs) that deliver a high quality fitness experience. The Company predominantly operates across the United States, with clubs clustered in densely populated major metropolitan areas, including New York, Boston, Washington, Philadelphia, and South Florida.  As of December 31, 2019, the Company, through its subsidiaries and affiliates, operated 186 fitness clubs under various brand names, collectively serving approximately 605,000 members.

### C.    The Debtors' Prepetition Capital Structure

As of the Petition Date, the Debtors had approximately $167.2 million in total funded debt obligations.  The table below summarizes the Debtors' prepetition capital structure:

| Funded Debt | Maturity | Principal Amount (in USD millions) |
|---|---|---|
| Prepetition Term Loan Facility | November 15, 2020 | $153.0 |
| Prepetition Revolving Loan Facility | August 14, 2020 | $14.2 |
| *Total Debt Obligations* | | *$167.2* |

### 1.    Prepetition Facility

On November 15, 2013, Debtors Town Sports International, LLC ("TSI, LLC") and TSI Holdings II, LLC ("Holdings II"), as holdings, entered into a senior secured credit agreement (as amended,

supplemented, amended and restated or otherwise modified from time to time, the "Prepetition Loan Agreement") with a syndicate of lenders (in such capacities, the "Prepetition Lenders"), Deutsche Bank AG New York Branch, as administrative agent (in such capacity, together with its permitted successors and assigns, the "Prepetition Agent"), Keybank National Association, as syndication agent, (in such capacity, together with its permitted successors and assigns, the "Prepetition Syndication Agent," and together with the Prepetition Lenders and Prepetition Agent, the "Prepetition Secured Parties"). The Prepetition Loan Agreement provides for a term loan facility in the amount of $325 million (the "Prepetition Term Loan Facility") and revolving loan credit facility in an initial amount of $45 million (as reduced to $15 million pursuant to the Second Amendment, the "Prepetition Revolving Loan Facility," collectively, with the Prepetition Term Loan Facility, the "Prepetition Facility," and the secured obligations arising thereunder, the "Prepetition Obligations").

The Prepetition Term Loan Facility matures on November 15, 2020, and, and TSI, LLC's option, bears interest at either the Prepetition Agent's base rate plus 2.50 percent with a 2.00 percent base rate floor or a rate of LIBOR plus 3.50 percent per annum with a 1.00 percent LIBOR floor. The Prepetition Revolving Loan Facility matured on August 14, 2020, and, at TSI, LLC's option, was bearing interest at either the Prepetition Agent's base rate plus 2.50 percent or a rate of LIBOR plus 3.50 percent per annum.

As of the Petition Date, approximately $167.2 million in borrowings under the Prepetition Facility was outstanding, with approximately $153.0 million and $14.2 million outstanding on account of the Prepetition Term Loan Facility and the Prepetition Revolving Loan Facility, respectively.

### 2. Collateral of Debt Obligations

The Prepetition Facility is guaranteed by TSI Holdings II, LLC, Town Sports International, LLC, and, subject to customary exceptions, the wholly-owned domestic subsidiaries of Town Sports International, LLC (collectively, the "Prepetition Facility Guarantors") and is secured on a first-priority security interest in and liens on substantially all of the Prepetition Facility Guarantors' assets and property (the "Prepetition Collateral").

## VI.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A.    Operational Challenges

The COVID-19 pandemic and the accompanying closures of the Debtors' fitness clubs, which effectively halted the Debtors' business operations, left the Debtors without any meaningful source of revenue to fund their ongoing operations. By the end of March 2020, substantially all of the Debtors' operations were shut down. Additionally, on May 1, 2020, membership revenues were suspended. The resultant, significant liquidity challenges ultimately precipitated the Chapter 11 Cases.

Nonetheless, the Debtors took immediate steps to reduce operating costs and to conserve cash. The Debtors terminated all non-executive employees working at clubs and, with the assistance of their advisors, engaged in conversations with landlords to discuss rent relief. Additionally, the Debtors ceased paying rent at club locations that were subject to mandatory closure and permanently closed eight clubs during the second fiscal quarter of 2020 and expects to permanently close additional clubs during the third fiscal quarter of 2020.

### B.    Exploration of Strategic Alternatives

Recognizing that they would soon run out of adequate cash to fund operations, beginning in May 2020, the Debtors, with the assistance of Houlihan, worked diligently to evaluate options for a balance sheet restructuring transaction, including a potential out-of-court debt exchange transaction with lenders

within the Debtors' prepetition capital structure. Despite the Debtors' best efforts, as it became increasingly unlikely that an out-of-court transaction would be the best path forward for the Debtors' business, the Debtors and Houlihan increased their attention to a potential in-court transaction.

In connection with this process, the Debtors and Houlihan initiated a marketing process to identify possible DIP financing sources to fund their chapter 11 efforts. Specifically, the Debtors engaged in discussions with Kennedy Lewis Investment Management, LLC ("KLIM"), as well as an ad hoc group of certain other holders under the Prepetition Facility (the "Term Lender Group"). The proposal submitted by KLIM lacked the required support of the majority of Prepetition Lenders and, thus, was not actionable. The Ad Hoc Lender Group ultimately resulted in the Tacit proposal.

Concurrently, Houlihan contacted at least four potential lenders outside of the Debtors' prepetition capital structure to gauge their interest in providing DIP financing. None of these potential lenders were interested in providing competing financing facilities on a junior or unsecured basis, nor did any have interest in signing a nondisclosure agreement to obtain access to the Debtors' diligence materials considering the implementation challenges associated with a non-consensual priming facility.

Moreover, on June 15, the Debtors' non-Debtor parent filed an 8-K notifying the market of the possibility that the Debtors would need to file for bankruptcy protection and would require DIP financing to fund the chapter 11 cases. *See* Town Sports International Holdings, Inc., Quarterly Report 2020 (Form 8-K) (Jun. 15, 2020). Despite this broad notice to the market, no potential lender reached out to the Debtors or Houlihan with interest in providing DIP financing (or participating in any transaction with the Debtors).

## VII.    MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

### A.    First Day Relief

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors Filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases. On September 16, 2020, the Bankruptcy Court entered orders approving the First Day Motions on either an interim or final basis. On October 9, 2020, the Bankruptcy Court entered orders approving certain of the First Day Motions on a final basis.

A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of Phillip Juhan in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 12] (the "First Day Declaration"), filed on September 14, 2020. The First Day Motions, the First Day Declaration, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at https://dm.epiq11.com/case/TownSports.

### B.    Cash Collateral Motion

On the Petition Date, the Debtors Filed the *Motion of the Debtors for Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 11] (the "Cash Collateral Motion"), requesting that the Bankruptcy Court authorize the Debtors to use the Prepetition Collateral, including the Cash Collateral, of the Prepetition Lenders under the Prepetition Loan Agreement and providing adequate protection to the Prepetition Lenders for any diminution in value of

their assets in the Prepetition Collateral. On September 16, 2020, the Bankruptcy Court entered an order approving the Cash Collateral Motion on interim basis [Docket No. 64].

### C.    Appointment of Official Committee

On September 24, 2020, the U.S. Trustee Filed the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 98], notifying parties in interest that the U.S. Trustee had appointed a statutory committee of unsecured creditors (the "Committee") in the Chapter 11 Cases. The Committee is currently comprised of: (a) 575 Lex Property Owner, LLC; (b) Philips International Holding Corporation; (c) BDG 99QB, LLC; (d) Mykola Kolomiichuk; and (e) Nancy Radford.

On September 28, 2020, the Committee Filed the *Notice of Appearance and Request for Service of Papers* [Docket No. 105], identifying their proposed counsel as Cole Schotz P.C. The Debtors intend on holding a meeting of creditors pursuant to section 341 of the Bankruptcy Code on October 23, 2020.

### D.    Other Procedural and Administrative Motions

During the Chapter 11 Cases, the Debtors also Filed several other motions to further facilitate the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith, including:

- Interim Compensation Procedures Motion. The *Debtors' Motion for Entry of an Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and (II) Granting Related Relief* [Docket No. 133] (the "Interim Compensation Motion"), Filed on September 30, 2020, seeking approval of procedures for the interim compensation and reimbursement of expenses of retained Professionals in the Chapter 11 Cases. On October 8, 2020, the Debtors Filed a certificate of counsel stating no objections to the Interim Compensation Motion had been Filed and asking the Bankruptcy Court enter an order granting the Interim Compensation Motion [Docket No. 189]. On October 9, 2020, the Bankruptcy Court entered an order approving the Interim Compensation Motion on a final basis [Docket No. 195].

- Ordinary Course Professionals Motion. The *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Retain and Compensate Professionals Utilized in the Ordinary Course of Business and (II) Granting Related Relief* [Docket No. 134] (the "OCP Motion"), Filed on September 30, 2020, seeking authorization for the Debtors to retain and compensate certain professionals utilized in the ordinary course of business. On October 8, 2020, the Debtors Filed a certificate of counsel stating no objections to the OCP Motion had been Filed and asking the Bankruptcy Court enter an order granting the OCP Motion [Docket No. 187]. On October 9, 2020, the Bankruptcy Court entered an order approving the OCP Motion on a final basis [Docket No. 199].

- Claims Bar Date Motion. The *Debtors' Motion Seeking Entry of an Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, and (IV) Approving Form and Manner of Notice Thereof* [Docket No. 289], Filed on October 20, 2020, seeking to establish bar dates for filing proofs of claims, an amended schedules bar date, rejection damages bar date, and approving the form and manner for filing proofs of claims.

- SOFA Extension Motion. The *Debtors' Motion for Entry of an Order Extending the Time to File Schedules and Statements* [Docket No. 132] (the "SOFA Extension Motion"), seeking an extension of the deadlines by which the Debtors must File certain schedules of assets and liabilities and statements of financial affairs for each Debtor (the "Schedules and SOFAs") to November 12, 2020. On October 8, 2020, the Debtors Filed a certificate of counsel stating no objections to the SOFA Extension Motion had been Filed and asking the Bankruptcy Court enter an order granting the SOFA Extension Motion [Docket No. 188]. On October 9, 2020, the Bankruptcy Court entered an order approving the SOFA Extension Motion on a final basis [Docket No. 201]. The Debtors will anticipate Filing the Schedules and SOFAs on or before November 12, 2020.

### E.    Retention of Debtor Professionals

The Debtors Filed applications for, and the Bankruptcy Court entered orders approving, the retention of various professionals to assist the Debtors in carrying out their duties as debtors in possession and to represent their interests in the Chapter 11 Cases:

- Kirkland & Ellis, LLP as legal counsel [Docket No. 238],

- Young Conaway Stargatt & Taylor, LLP as legal counsel [Docket No. 233],

- Houlihan Lokey Capital, Inc. as investment banker [Docket No. 235], and

- Huron Consulting Services LLC as chief restructuring advisor [Docket No. 237], (collectively, the "Retention Applications").

The foregoing professionals are, in part, responsible for the administration of the Chapter 11 Cases. The postpetition compensation of all of the Debtors' professionals retained pursuant to sections 327 and 328 of the Bankruptcy Code is subject to the approval of the Bankruptcy Court.

### F.    Approval of Debtor-in-Possession Financing

On October 1, 2020, the Debtors Filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lenders, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 146] (the "DIP Motion"), requesting that the Bankruptcy Court authorize the Debtors to access the $32 million DIP facility. On October 2, 2020, the Bankruptcy Court entered an order approving the DIP Motion on an interim basis [Docket No. 159]. On October 9, 2020, the Bankruptcy Court entered a second interim order approving the DIP Motion [Docket No. 205]. On October 16, 2020, the Bankruptcy Court entered the DIP Order on a final basis [Docket No. 277].

### G.    Bidding Procedures and Marketing Process[3]

As described above, the Debtors are conducting a marketing and Auction process for all of substantially all of their assets. The Debtors, working with Houlihan, contacted over 62 potentially interested parties, including both financial and strategic counterparties. Additionally, the Debtors have

---

[3]    Capitalized terms used but not otherwise defined in this section have the meaning given to them in the Bidding Procedures.

distributed a teaser and other marketing materials to a total of 45 potential bidders, including certain strategic companies in the fitness space and a range of distressed and private equity investors focused on multi-location concepts, health and wellness, or other concepts related to the Debtors' business. The Debtors, with the assistance of Houlihan, have hosted telephonic information sessions with at least 20 potential bidders in the aggregate. Additionally, 12 potential bidders requested and executed a nondisclosure agreement. Each was provided access to a confidential information memorandum and virtual data room containing detailed information regarding the assets.[4]

Under the Bidding Procedures approved by the Bankruptcy Court, the deadline for interested parties to submit binding Bids is October 26, 2020 at 5:00 p.m., prevailing Eastern Time. Pursuant to the Bidding Procedures, Qualified Bids must satisfy the general Bid Requirements set forth in the Bidding Procedures.

The Debtors selected Tacit as the Stalking Horse Bidder. The Debtors may hold an Auction, if necessary, to determine whether any entity other than the Stalking Horse Bidder is willing to enter into a definitive agreement on terms more favorable to the Debtors than the Stalking Horse Bid.

### H.    Litigation Matters

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

Several Attorney Generals have alleged that the Debtors have violated, or have received complaints of alleged violations of, the consumer protection laws within their respective jurisdictions, with such jurisdictions including Massachusetts, New York, Washington D.C., and Rhode Island. These complaints and allegations are in connection to, among others, certain members' inability to cancel their memberships and the Debtors' continued collection of membership fees during COVID-related closures. The Debtors are working to resolve such litigation matters during the Chapter 11 Cases.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

### I.    Assumption and Rejection of Executory Contracts and Unexpired Leases

The Debtors are party to a substantial number of executory contracts. The Debtors, with the assistance of their advisors, have reviewed and will continue to review the Executory Contracts and Unexpired Leases to identify contracts and leases to either assume or reject pursuant to sections 365 or 1123 of the Bankruptcy Code. On September 14, 2020, the Debtors Filed the *Motion of Debtors Pursuant to Sections 105(a), 365(a), and 554(a) of the Bankruptcy Code, Authorizing the Debtors to Reject (I) Certain Unexpired Leases of Nonresidential Real Property Effective as of the Petition Date and (II) Abandon Property in Connection Therewith* [Docket No. 9] (the "Rejection Motion") seeking to reject certain leases and abandon any interest that the Debtors had in the underlying premises. On September 29,

---

[4]    For the avoidance of doubt, one potential bidder with an executed nondisclosure agreement indicated that they were no longer interest in moving forward with the sale process prior to accessing the confidential information memorandum or virtual data room.

2020, the Debtors Filed the *Second Omnibus Motion of the Debtors Pursuant to Sections 105(a), 365(a), and 554(a) of the Bankruptcy Code, Authorizing the Debtors to Reject (I) Certain Unexpired Leases of Nonresidential Real Property Effective as of September 29, 2020 and (II) Abandon Property in Connection Therewith* [Docket No. 121] (the "Second Rejection Motion") seeking to reject certain additional leases. On October 16, 2020, the Bankruptcy Court entered an order approving the Second Rejection Motion [Docket No. 266], with a corrected order Filed at [Docket No. 274].

Additionally, the Debtors Filed the *Debtors' Motion Seeking Entry of an Order (I) Authorizing and Approving Procedures to Reject or Assume Executory Contracts and Unexpired Leases and (II) Granting Related Relief* [Docket No. 135] (the "Rejection Procedures Motion"). On October 13, 2020, the Bankruptcy Court entered an order approving the Rejection Procedures Motion [Docket No. 224].

On the Effective Date, except as otherwise provided herein, each Executory Contract or Unexpired Lease not previously assumed, assumed and assigned, or rejected shall be deemed automatically rejected, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (2) is the subject of a motion to assume (or assume and assign) such Executory Contract that is pending on the Confirmation Date; (3) is a contract, release, or other agreement or document entered into in connection with the Plan; (4) is a directors and officers insurance policy; (5) is the Asset Purchase Agreement; or (6) is an Executory Contract assumed and assigned pursuant to the Asset Purchase Agreement.

Notwithstanding anything to the contrary in the Plan, the Debtors, the Post-Effective Date Debtors, and the Plan Administrator, as applicable, with the consent of the Purchaser and the Term Lender Group not to be unreasonably withheld, reserve the right to alter, amend, modify, or supplement the Assumed Executory Contracts and Unexpired Leases Schedule and the Rejected Executory Contracts and Unexpired Leases Schedule identified in Article V of the Plan and in the Plan Supplement at any time through and including ninety (90) days after the Effective Date. The Debtors or the Post-Effective Date Debtors, as applicable, shall provide notice of any amendments to the Rejected Executory Contracts and Unexpired Leases Schedule or the Assumed Executory Contracts and Unexpired Leases Schedule to the parties to the Executory Contracts or Unexpired Leases affected thereby.

Although their analysis is ongoing, the Debtors currently estimate that the aggregate amount of Claims on account of rejection of Executory Contracts and Unexpired Leases may be significant.

## J.    Claims Based on Rejection of Executory Contracts or Unexpired Leases

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time and after notice to the Holder of such Claim will be disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Post-Effective Date Debtors, the Estates, or their property without the need for any objection by the Post-Effective Date Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified in accordance with the Bankruptcy Code and in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claims each Holder of such Claims shall receive the same treatment provided to Holders of Allowed General Unsecured

Claims in Class 5 set forth in Article III of the Plan or such other treatment as agreed to by the Post-Effective Date Debtors and the Holder of such Claim.

### K.    Cure of Defaults

Any monetary defaults under each Assumed Executory Contract or Unexpired Lease pursuant to the Plan (it being understood that the assumption and assignment of the Executory Contracts or Unexpired Leases pursuant to the Asset Purchase Agreement shall be authorized and governed by the Sale Order, and, in the event of any inconsistency between this Plan and Sale Order concerning the assumption and assignment of such Executory Contracts or Unexpired Leases, the terms of the Sale Order shall govern and control) shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount in Cash on the Effective Date, or as soon as reasonably practicable thereafter, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Post-Effective Date Debtors or any assignee to provide "adequate assurance of future performance"[5] (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.  At least ten (10) days prior to the Confirmation Hearing, the Debtors shall provide for notices of proposed assumption and proposed cure amounts to be sent to applicable third parties and for procedures for objecting thereto and resolution of disputes by the Bankruptcy Court.

Any objection by a lease or contract counterparty to proposed assumption of an Executory Contract or Unexpired Lease or the related cure amount (including as set forth in the Assumed Executory Contracts and Unexpired Leases Schedule) must be Filed, served, and actually received by the Debtors at least three (3) days prior to the Confirmation Hearing.  The Debtors, Post-Effective Date Debtors, or Purchaser, as applicable, with the consent of the Term Lender Group not to be unreasonably withheld, may settle any cure amounts without any further notice to or action, order, or approval of the Bankruptcy Court.  If an objection to a proposed assumption or related cure amount is not withdrawn or resolved, the cure amount shall be paid promptly in full following (a) an agreement between the Debtors, Post-Effective Date Debtors, or Purchaser, as applicable, and the objecting counterparty to the Executory Contract or Unexpired Lease or (b) the entry of a Final Order resolving the dispute and approving the assumption pursuant to a hearing not more than thirty (30) days after the Confirmation Date or such other date set by the Bankruptcy Court.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have consented to such assumption or proposed cure amount.  For the avoidance of doubt, to the extent an Executory Contract or Unexpired Lease proposed to be assumed is not listed as having a related cure cost, any counterparty to such Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption will be deemed to have consented to such assumption and deemed to release any Claim or Cause of Action for any monetary defaults under such Executory Contract or Unexpired Lease.

---

5    Evidence of adequate assurance may include: (i) the specific name of the proposed assignee/tenant, if not the prospective purchaser, and the proposed name under which the assignee intends to operate the store if not a current trade-name of the Debtors; (ii) the potential assignee's intended use for the space if different from the present retail operation; (iii) audited financial statements and annual reports for the proposed assignee for the past three (3) years, including all supplements or amendments thereto; (iv) cash flow projections for the proposed assignee, the proposed assignee's most recent business plan, all cash flow projections for the lease(s) subject to the assignment request, and any financial projections, calculations, and/or pro-formas prepared in contemplation of purchasing the lease(s); (v) all documents and other evidence of the potential assignee's retail experience and experience operating stores in a shopping center; and (vi) a contact person for the proposed assignee that landlords may directly contact in connection with the adequate assurance of future performance.

Subject to payment of the cure, assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary (solely to the extent agreed between the Debtors and the counterparty to an applicable Executory Contract or Unexpired Lease), including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults arising under any Assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any Proofs of Claim Filed with respect to an Assumed Executory Contract or Unexpired Lease shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.**

## VIII.    RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth, as well as the other information set forth in this Disclosure Statement and the documents delivered together with this Disclosure Statement, referred to or incorporated by reference in this Disclosure Statement, below before voting to accept or reject the Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and its implementation.

### A.    Certain Bankruptcy Law Considerations

The occurrence or nonoccurrence of any or all of the following contingencies, and any others, may affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

#### 1.    Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 2.    The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent. If such conditions precedent are waived or not met, the Effective Date will not take place.

#### 3.    The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to pursue another strategy to wind down the Estates, such as confirm an alternative chapter 11 plan, a dismissal of the Chapter 11 Cases and an out-of-court dissolution, an assignment for the benefit of creditors, a conversion to a chapter 7 case, or other strategies. There can be no assurance that the terms of any such alternative strategies would be similar or as favorable to the Holders of Interests and Allowed Claims as those proposed in the Plan.

### 4.   The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and the voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If the Plan is not confirmed by the Bankruptcy Court, it is unclear what distributions, if any, Holders of Allowed Claims and Allowed Interests will receive with respect to their Allowed Claims and Allowed Interests.  The Bankruptcy Court, as a court of equity, may exercise substantial discretion.

The Debtors reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications may result in a less favorable treatment of any Class, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan.  Such a less favorable treatment may include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

### 5.   Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 6.   Plan Exclusivity Period

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their Petitions.  If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

7.  **The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code**

If a bankruptcy court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the bankruptcy court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of the additional expenses the Debtors would necessarily incur related to the chapter 7 trustee and additional retained professionals. Such expenses may decrease recoveries for Holders of Allowed Claims in the Voting Classes. *See, e.g.*, 11 U.S.C. §§ 326(a), 503(b)(2). The conversion to chapter 7 would require entry of a new bar date, which may increase the amount of Allowed Claims and thereby reduce Pro Rata recoveries. *See* Fed. R. Bankr. P. 1019(2), 3002(c).

8.  **The Debtors May Object to the Amount or Classification of a Claim**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

9.  **Risk of Non-Occurrence of the Effective Date**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

10. **Contingencies May Affect Votes of Impaired Classes to Accept or Reject the Plan**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which may affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

11. **Releases, Injunctions, and Exculpations Provisions May Not Be Approved**

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Post-Effective Date Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in

the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

### 12. The Total Amount of Allowed General Unsecured Claims May Be Higher Than Anticipated By the Debtors

With respect to Holders of Allowed General Unsecured Claims, the claims filed against the Debtors' estates may be materially higher than the Debtors have estimated.

### 13. Certain Tax Implications of the Plan

Holders of Allowed Claims should carefully review Article XI of this Disclosure Statement, entitled "Material United States Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Post-Effective Date Debtors and Holders of Claims and Interests.

### B.    Disclosure Statement Disclaimer

#### 1. The Financial Information Contained in this Disclosure Statement Has Not Been Audited

In preparing this Disclosure Statement, the Debtors and their advisors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information, and any conclusions or estimates drawn from such financial information, provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant that the financial information contained herein, or any such conclusions or estimates drawn therefrom, is without inaccuracies.

#### 2. Information Contained in this Disclosure Statement Is for Soliciting Votes

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

#### 3. This Disclosure Statement Was Not Reviewed or Approved by the United States Securities and Exchange Commission

This Disclosure Statement was not filed with the United States Securities and Exchange Commission under the Securities Act or applicable state securities laws. Neither the United States Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibit or the statements contained in this Disclosure Statement.

#### 4. This Disclosure Statement May Contain Forward Looking Statements

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "will," "might," "expect," "believe," "anticipate," "could," "would," "estimate," "continue," "pursue," or the negative thereof or comparable terminology. All forward looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ

materially from those referred to in such forward looking statements. The information contained herein is an estimate only, based upon information currently available to the Debtors.

### 5. No Legal or Tax Advice Is Provided to You by this Disclosure Statement

***This Disclosure Statement is not legal advice to you.*** The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder of a Claim or an Interest should consult his or her own legal counsel, accountant, or other applicable advisor with regard to any legal, tax, and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

### 6. No Admissions Made

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, Holders of Allowed Claims or Allowed Interests, or any other parties in interest.

### 7. Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtors or the Plan Administrator may seek to investigate, File, and prosecute Claims and Interests and may object to Claims or Interests after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

### 8. No Waiver of Right to Object to Claim or Interest

The vote by a Holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors (or any entity, as the case may be) to object to that Holder's Claim or Interest, regardless of whether any claims or causes of action of the Debtors or their respective Estates are specifically or generally identified in this Disclosure Statement.

### 9. Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement.

### 10. Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

### 11. No Representations Outside this Disclosure Statement Are Authorized

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtors and the U.S. Trustee.

## IX.    SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a ballot or ballots to be used for voting on the Plan, is being distributed to the Holders of Claims or Interests in those Classes that are entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order.

***The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement in formulating a decision to vote to accept or reject the Plan.***

---

**THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.

PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

---

### A.    Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan. The table in Article III.C of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?" provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim or Interest) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims in Classes 4 and 5 (collectively, the "Voting Classes"). The Holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are ***not*** soliciting votes from Holders of Claims or Interests in Classes 1, 2, 3, 6, 7, 8, and 9. Additionally, the Disclosure Statement Order provides that certain Holders of Claims or Interests in the Voting Classes, such as those Holders whose Claims or Interests have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

### B.    Voting Record Date

**The Voting Record Date is October 29, 2020**. The Voting Record Date is the date on which it will be determined which Holders of Claims or Interests in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims or Interests have been properly assigned or transferred under

Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim or Interest.

C.    **Voting on the Plan**

**The Voting Deadline is December 7, 2020, at 4:00 p.m. (prevailing Eastern Time)**.  To be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered as directed, so that your ballot containing your vote is **actually** **received** by the Notice and Claims Agent on or before the Voting Deadline.

To vote, complete, sign, and date your ballot and return it (with an original signature) *promptly* in the enclosed reply envelope or to one of the below addresses.

| |
|---|
| **If sent by first class mail**<br><br>**Town Sports**<br>**c/o Epiq Corporate Restructuring, LLC**<br>**P.O. Box 4422**<br>**Beaverton, OR 97005** |
| **If sent by hand delivery, or overnight mail**<br><br>**Town Sports**<br>**c/o Epiq Corporate Restructuring, LLC**<br>**10300 SW Allen Blvd.**<br>**Beaverton, OR 97005** |

**OR**

**SUBMIT VIA AN ELECTRONIC BALLOT THROUGH THE NOTICE AND CLAIMS AGENT'S ONLINE ELECTRONIC BALLOT SUBMISSION PORTAL AT HTTP://DM.EPIQ11.COM/TOWNSPORTS.**

**PLEASE SELECT JUST ONE OPTION TO VOTE.**

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE NOTICE AND CLAIMS AGENT TOLL FREE AT (888) 490-0677 (DOMESTIC) or +1 (503) 520-4484 (INTERNATIONAL) OR VIA ELECTRONIC MAIL TO TOWNSPORTS@EPIQGLOBAL.COM.**

D.    **Ballots Not Counted**

**No ballot will be counted toward Confirmation if, among other things**:  (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim or Interest; (2) it was transmitted by means other than as specifically set forth in the ballots; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was cast for a Claim listed in the Debtors' schedules as contingent, unliquidated, or disputed for which the applicable bar date has passed and no proof of claim was filed; (5) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily

allowed in accordance with the Disclosure Statement Order); (6) it was sent to the Debtors, the Debtors' agents/representatives (other than the Notice and Claims Agent), or the Debtors' financial or legal advisors instead of the Notice and Claims Agent; (7) it is unsigned; or (8) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan. **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR THAT IS OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL NOT BE COUNTED.**

## X.    CONFIRMATION OF THE PLAN

### A.    Requirements for Confirmation of the Plan

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

### B.    Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

The Debtors believe that liquidation of the Debtors' business under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Allowed Claims or Interests as compared to distributions contemplated under the Plan.  Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Allowed Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of their collateral.  If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid.  Unsecured creditors are paid from any remaining sale proceeds, according to their respective priorities.  Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority.  Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

All or substantially all of the assets of the Debtors' business will have been liquidated through the Sale Transaction and the Plan effects a wind down of the Debtors' remaining assets not otherwise acquired in the Sale Transaction. Although a chapter 7 liquidation would achieve the same goal, the Debtors believe that the Plan provides a greater recovery to Holders of Allowed Claims than would a chapter 7 liquidation.

Liquidating the Debtors' Estates under the Plan likely provides Holders of Allowed Claims with a larger, more timely recovery in part because of the expenses that would be incurred in a chapter 7 liquidation, including the potential added time (thereby reducing the present value of any recover for Holders) and expense incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Chapter 11 Cases. *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee); 11 U.S.C. 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals). Additionally, the Debtors' Estates would continue to be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for Professionals), which may constitute Allowed Claims in any chapter 11 case. Moreover, the General Unsecured Claims Reserve Amount was contemplated under the Asset Purchase Agreement and, thus, may not otherwise be available to Holders of General Unsecured Claims under a chapter 7 liquidation; distribution from the General Unsecured Claims Reserve is only guaranteed through the Plan.

The conversion to chapter 7 would also require entry of a new bar date. *See* Fed. R. Bankr. P. 1019(2); 3002(c). Thus, the amount of Claims ultimately filed and Allowed against the Debtors could materially increase, thereby further reducing creditor recoveries versus those available under the Plan.

In light of the foregoing, the Debtors submit that a chapter 7 liquidation would result in reduced sale proceeds and recoveries, increased expenses, delayed distributions, and the prospect of additional claims that were not asserted in the Chapter 11 Cases. Accordingly, the Debtors believe that the Plan provides an opportunity to bring the highest return for creditors.

C.      **Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a chapter 11 plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

The Plan provides for the liquidation and distribution of the Debtors' assets. Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

D.      **Acceptance by Impaired Classes**

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority

in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Pursuant to Article III.F of the Plan, if a Class contains Claims or Interests is eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

### E.    Confirmation without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

#### 1.    No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

#### 2.    Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the

Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## XI.    MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to the Debtors and beneficial owners of Claims (each, a "Holder"). This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law"). Changes in Applicable Tax Law may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

Except as specifically set forth below, this summary does not apply to Holders that are not U.S. Persons (as such term is defined in the Tax Code) and does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, employees or persons who received their Claims pursuant to the exercise of an employee stock option or otherwise as compensation, persons who hold Claims as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and Holders of Claims who are themselves in bankruptcy), unless otherwise specifically stated herein. Furthermore, this summary assumes that a Holder holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code. This summary does not discuss differences in tax consequences to a Holder that acts or receives consideration in a capacity other than as a Holder of a Claim of the same Class, and the tax consequences for such Holders may differ materially from that described below.

For purposes of this discussion, a "U.S. Holder" is a holder of a Claim that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "non-U.S. Holder" is any Holder of a Claim that is not a U.S. Holder other

than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

### A.    Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and Parent

Immediately prior to the Consummation of the Plan the Debtors will each be treated as disregarded entities for U.S. federal income tax purposes. For U.S. federal income tax purposes, the respective assets of each of the Debtors will be treated as if they were owned by Town Sports International Holdings, Inc. ("Parent"), which is the sole owner of Interests in Town Sports International LLC and is regarded for U.S. federal income tax purposes. Consequently, the U.S. federal income tax consequences of consummating the Plan will generally not be borne by the Debtors, but will be borne by Parent.

### 1.    COD Income.

In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (1) the adjusted issue price of the indebtedness satisfied, over (2) the fair market value of any consideration given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, a taxpayer is not required to include COD Income in gross income (a) if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that case (the "Bankruptcy Exception"), or (b), to the extent that the taxpayer is insolvent immediately before the discharge (the "Insolvency Exception"). Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income. In general, tax attributes will be reduced in the following order: (a) net operating losses ("NOLs"); (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credits. Alternatively, the taxpayer can elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code.

Under section 108(d)(6) of the Tax Code, when an entity, that is treated as a disregarded entity for U.S. federal income tax purposes, realizes COD Income, its regarded parent is treated as receiving such COD Income and the Bankruptcy Exception and the Insolvency Exception (and related attribute reduction) are applied at the parent level rather than at the entity level. Accordingly, Parent will be treated as realizing all of the COD Income realized by the Debtors. While Parent is not a Debtor in the bankruptcy, it may be eligible for the Insolvency Exception.

The Debtors, and accordingly, Parent, expect to realize significant COD Income as a result of the consummation of the Plan. The exact amount of any COD Income that will be realized by the Debtors and Parent will not be determinable until the consummation of the Plan.

### 2.    Recognition of COD Income and Gain on Sale Transaction.

Pursuant to the Sale Transaction, the Debtors transferred all or substantially all of their assets to the Purchaser, whereby the Cash received in such a Sale Transaction will be used to fund the applicable creditor recoveries pursuant to the Plan. Such transfer generally should be treated as a Taxable Sale or exchange of the assets of the Debtors for U.S. federal income tax purposes.

Accordingly, the Debtors may recognize gain upon the transfer of certain assets to the Purchaser. As described above, because Parent is the only parent of the Debtors that is regarded for U.S. federal income tax purposes, such gain or loss will be allocated to Parent.

In the Sale Transaction, Parent should recognize gain or loss equal to the difference between the proceeds of the sale and Parent's adjusted basis in the property sold. Recent IRS guidance indicates that because the Prepetition Loan Claims are issued by the Debtors (which are disregarded as entities separate from Parent for U.S. federal income tax purposes) but are not guaranteed by Parent, such Prepetition Loan Claims will be treated as "non-recourse" debt of Parent. As a result, the transfer of the Debtors' assets to Purchaser pursuant to the Sale Transaction would be treated as though Parent sold its assets in exchange for proceeds equal not only to the fair value of such assets or the amount of Cash received, but also the amount of debt that is credit bid. It is also possible that because the remainder of such Prepetition Loan Claims will be cancelled pursuant to the Plan, Debtors may be treated as selling their assets in exchange for the full amount of the Prepetition Loan Claims, not just the amount credit bid. As a consequence Parent would realize less COD Income and more gain (or less loss) on the Sale Transaction than it would if the Prepetition Loan Claims were guaranteed by Parent and thus were treated as recourse debt for U.S. federal income tax purposes.

The character of any such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors including which assets of the Debtors are held as capital assets and whether and to what extent any gain on their sale represents the recapture of prior depreciation or amortization.

### B.    Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Class 4 Prepetition Loan Claims.

Prior to the Effective Date, and pursuant to the Sale Transaction, Holders of Prepetition Loan Claims will be treated as exchanging a portion of such Claims, together with cash, for the assets. Pursuant to the Plan, each Holder of a Class 4 Claim will receive (i) its Pro Rata share of (not to exceed the amount of such Holder's Claim) the Excess Distributable Cash in accordance with the distribution waterfall set forth in Article IV.C of the Plan and (ii) a beneficial interest in the Wind-Down Trust. Such Holder will recognize gain or loss equal to the (a) sum of (i) any Cash received and (ii) the fair market value its share of the Wind-Down Trust Assets (if any) minus (b) the Holder's adjusted tax basis in its Class 4 Claim.

### C.    Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Class 5 General Unsecured Claim.

Pursuant to the Plan, each Holder of an Allowed Class 5 General Unsecured Claim will receive (i) its Pro Rata share (not to exceed the amount of such Holder's Allowed General Unsecured Claim) of the General Unsecured Claims Reserve Amount; (ii) following the payment in full in cash of the Prepetition Loan Claims pursuant to Article IV.C, its Pro Rata Share (not to exceed the amount of such Holder's

Allowed General Unsecured Claim) of the Excess Distributable Cash; and (iii) a beneficial interest in the Wind-Down Trust;. Such Holders should recognize gain or loss equal to  (a) the sum of (i) any Cash received and (ii) the fair market value of such holders share of the Wind-down Trust Assets (if any) minus (b) the Holder's adjusted tax basis in its General Unsecured Claim.

### D.    Character of Gain or Loss.

Where gain or loss is recognized by a Holder of a Claim upon the exchange of its Allowed Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, the tax status of the Holder, whether the Allowed Claim constitutes a capital asset in the hands of the Holder and how long it has been held, whether the Allowed Claim was acquired at a market discount (discussed below), whether and to what extent the Holder previously had claimed a bad debt deduction, and the nature and tax treatment of any fees, costs or expense reimbursements to which consideration is allocated.  Each Holder of an Allowed Claim is urged to consult its tax advisor to determine the character of any gain or loss recognized with respect to the satisfaction of its Allowed Claim.

Holders of Allowed Claims who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses.  For corporate Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. Corporate Holders who have more capital losses than can be used in a tax year may be allowed to carry over unused capital losses for the five taxable years following the capital loss year and may be allowed to carry back unused capital losses to the three taxable years that precede the capital loss year.

### E.    Market Discount.

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of any gain realized by a Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if its Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (ii) in the case of a debt instrument issued with "original issue discount" ("OID")  its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the exchange of debt constituting its Allowed Claim that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).

Under Section 451 of the Tax Code, accrual method United States persons that prepare an "applicable financial statement" generally would be required to include certain items of income, such as OID (but not market discount), into gross income no later than the time such amounts are reflected on such a financial statement.  This could result in income recognition differing from that which would otherwise result from the rules described below.  The U.S. Department of the Treasury has released proposed regulations that would exclude from this rule any item of gross income for which a taxpayer uses a special method of accounting required by certain sections of the Code, including, income subject to the timing rules for OID and de minimis OID, income under the contingent payment debt instrument rules, income under the variable debt instrument rules, income and gain associated with an integrated transaction, accrued

market discount, and de minimis market discount. These regulations are proposed to apply to taxable years beginning on or after the date the final regulations are published. A taxpayer may generally rely on the proposed regulations provided the taxpayer meet certain requirements outlined in the regulations. Holders should consult their tax advisors with regard to interest, OID, market discount and premium matters concerning the Claims and non-Cash consideration received therefor.

F.    **Accrued Interest.**

To the extent that any amount received by a Holder of a surrendered Allowed Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the Holder's gross income, such amount should be taxable to the Holder as ordinary interest income. Conversely, a Holder of a surrendered Allowed Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instruments constituting such claim was previously included in the Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary; however, the tax law is unclear on this point.

The extent to which the consideration received by a Holder of a surrendered Allowed Claim will be attributable to accrued interest on the debts constituting the surrendered Allowed Claim is unclear. Certain Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal. Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear. Pursuant to the terms of the Plan, distributions in respect of Allowed Claims are allocated first to the principal amount of such claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the claims, to any portion of such claims for accrued but unpaid interest. However, the provisions of the Plan are not binding on the IRS nor a court with respect to the appropriate tax treatment for Holders.

G.    **Limitation on Use of Capital Losses**

A Holder of a Claim who recognizes capital losses as a result of the transactions undertaken pursuant to the Plan will be subject to limits on the use of such capital losses. For a non-corporate Holder, capital losses may be used to offset any capital gains recognized (without regard to holding periods), and also ordinary income recognized to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of such capital losses over such capital gains. A non-corporate Holder may carry over unused capital losses recognized and apply them against future capital gains recognized and a portion of their ordinary income recognized for an unlimited number of years. For corporate Holders, capital losses recognized may only be used to offset capital gains recognized. A corporate Holder that recognizes more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

H.    **Certain U.S. Federal Income Tax Considerations to the Wind-Down Trust.**

For U.S. federal income tax purposes, the Debtors intend that (a) the Wind-Down Trust be treated as (x) a "liquidating trust" pursuant to the Internal Revenue Code of 1986, as amended (the "Tax Code") and the regulations promulgated thereunder ("Treasury Regulations"), including Treasury Regulation section 301.7701-4(d), with no objective or authority to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of the Wind-Down Trust and (y) a "grantor trust" for U.S. federal income tax purposes, pursuant to sections 671-677 of the Tax Code, and (b) the beneficiaries of the Wind-Down Trust will be treated as grantors and deemed owners thereof. Accordingly, for U.S. federal income tax purposes, it is intended that each beneficiary of the

Wind-Down Trust be treated as if they had received a distribution of an undivided interest in the Wind-Down Trust assets and then contributed such undivided interest to the Wind-Down Trust.

As soon as possible after the transfer of the Wind-Down Trust assets to the Wind-Down Trust, the Wind-Down Trustee shall make a good faith valuation of the Wind-Down Trust assets and make such valuation available to the beneficiaries of the Wind-Down Trust.  Each of the Debtors, the Wind-Down Trustee, and the Wind-Down Trust Beneficiaries shall use such valuation of the Wind-Down Trust assets for all related U.S. federal income tax purposes.  The Wind-Down Trust shall bear all of the reasonable costs and expenses incurred in connection with determining such value.

The Wind-Down Trustee shall provide the Post-Effective Date Debtors, as transferors to the Wind-Down Trust, with any statements or reports required by Treasury Regulation section 1.671-4 or other applicable Treasury Regulations, to enable the Post-Effective Date Debtors to calculate tax obligations and attributes arising from the Wind-Down Trust.

The Wind-Down Trust shall in no event be dissolved later than five (5) years from the Effective Date, unless the Wind-Down Trust advisory board determines that a fixed period extension (approved by the Bankruptcy Court within six (6) months of the beginning of the extended period, if the Wind-Down Trust advisory board reasonably determines that such approval is necessary to meet the requirements set forth within Revenue Procedure 94-45, 1994-2 C.B. 684, and not to exceed two (2) years, including any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Wind-Down Trustee that any further extension would not adversely affect the status of the Wind-Down Trust as a "liquidating trust" for U.S. federal income tax purposes) is necessary to facilitate or complete the liquidation of the Wind-Down Trust assets.

**I.      Information Reporting and Backup Withholding**

The Debtors will withhold all amounts required by law to be withheld from distributions or payments.  The Debtors will comply with all applicable reporting requirements of the Tax Code. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan.  In addition, backup withholding of taxes (currently at a 24% rate) will generally apply to payments in respect of an Allowed Claim under the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of non-U.S. Holder, such non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such non-U.S. Holder's eligibility for an exemption).

Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules may be credited against a Holder's U.S. federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.   ALL HOLDERS OF**

**CLAIMS AND EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

[*Remainder of page intentionally left blank*]

## XII.    RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.


Dated:  October 20, 2020                     Town Sports International, LLC
                                             on behalf of itself and its debtor affiliates


                                             /s/
                                             _____
                                             John C. DiDonato
                                             Chief Restructuring Officer of the Debtors and
                                             Debtors in Possession

COUNSEL:

Dated:  October 20, 2020
Wilmington, Delaware

*/s/ Robert S. Brady*

Robert S. Brady (DE Bar No. 2847)
Sean T. Greecher (DE Bar No. 4484)
Allison S. Mielke (DE Bar No. 5934)
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:      (302) 571-6600
Facsimile:      (302) 571-1253

Nicole L. Greenblatt, P.C. (admitted *pro hac vice*)
Derek I. Hunter (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

Joshua M. Altman  (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

Mark McKane, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
555 California Street
San Francisco, California 94104
Telephone:      (415) 439-1400
Facsimile:      (415) 4391500

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

## **EXHIBIT A**

**Chapter 11 Plan**