## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TOWN SPORTS INTERNATIONAL, LLC, *et al.*,[1] | Case No. 20-12168 (CSS) |
| Debtors. | (Jointly Administered) |

---

### NOTICE OF FILING OF PLAN SUPPLEMENT

**PLEASE TAKE NOTICE THAT** on November 3, 2020, the United States Bankruptcy Court for the District of Delaware (the "**Court**") entered an order [Docket No. 561] (the "**Interim Disclosure Statement Order**"): (a) authorizing Town Sports International, LLC, and its affiliated debtors and debtors in possession (collectively, the "**Debtors**"), to solicit acceptances for the *Joint Chapter 11 Plan of Town Sports International, LLC and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as modified, amended, or supplemented from time to time, the "**Plan**");[2] (b) approving the *Disclosure Statement Relating to the Joint Chapter 11 Plan of Town Sports International, LLC and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "**Disclosure Statement**") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code on an interim basis; (c) approving the solicitation materials and documents to be included in the solicitation packages; and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** as contemplated by the Plan and the Interim Disclosure Statement Order approving the Disclosure Statement, the Debtors filed the Plan Supplement with the Court on the date hereof. The Plan Supplement contains the following documents (each as defined in the Plan): (a) Rejected Executory Contracts and Unexpired Leases Schedule; (b) Assumed Executory Contracts and Unexpired Leases Schedule, (c) Schedule of Retained Causes of Action; (d) Asset Purchase Agreement; (e) any necessary documentation related to the Sale Transactions; (f) the identity of the Non-Released Claims Trustee; and (g) the Non-Released Claims Trust Agreement. Notwithstanding the foregoing, the Debtors have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date.

---

[1]  The last four digits of Town Sports International, LLC's federal tax identification number are 7365. The mailing address for Town Sports International, LLC is 399 Executive Boulevard, Elmsford, New York 10523. Due to the large number of debtors in these cases, for which the Debtors have requested joint administration, a complete list of the Debtors, the last four digits of their federal tax identification numbers, and their addresses are not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/TownSports, or by contacting the undersigned counsel for the Debtors.

[2]  Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider Confirmation of the Plan will commence on <u>**December 14, 2020.**</u>

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Epiq Corporate Restructuring, LLC, the notice and claims agent retained by the Debtors in these Chapter 11 cases (the "**Notice and Claims Agent**") by (a) visiting the Debtors' restructuring website at https://dm.epiq11.com/TownSports, (b) writing to: Epiq Corporate Restructuring, LLC, Re: Town Sports International, LLC, et al., 10300 SW Allen Blvd., Beaverton, OR 97005, (c) emailing TownSports@epiqglobal.com, or (d) calling the Debtors' Notice and Claims Agent at (888) 490-0677 (Domestic) or +1 (503) 520-4484 (International).  You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER at: <u>https://ecf.deb.uscourts.gov/</u>.

Dated: Wilmington, Delaware
November 25, 2020

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Sean T. Greecher*

Robert S. Brady (No. 2847)
Sean T. Greecher (No. 4484)
Allison S. Mielke (No. 5934)
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Email:  rbrady@ycst.com
            sgreecher@ycst.com
            amielke@ycst.com

and

KIRKLAND & ELLIS LLP
Nicole L. Greenblatt, P.C. (admitted *pro hac vice*)
Derek I. Hunter (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Email:  nicole.greenblatt@kirkland.com
            derek.hunter@kirkland.com

KIRKLAND & ELLIS LLP
Mark McKane, P.C. (admitted *pro hac vice*)
555 California Street
San Francisco, CA 94104
Telephone:  (415) 439-1400
Email:  mark.mckane@kirkland.com

KIRKLAND & ELLIS LLP
Joshua M. Altman (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Email:  josh.altman@kirkland.com

*Counsel to the Debtors*
*and Debtors in Possession*

## **EXHIBIT A**

### **Rejected Executory Contracts and Unexpired Leases Schedule**

To the extent not rejected pursuant to a prior order of the Bankruptcy Court, all Executory Contracts or Unexpired Leases that (i) were not assumed and assigned pursuant to the Sale or (ii) are not included on the exhibit of Assumed Contracts shall be rejected pursuant to the Plan.

## **EXHIBIT B**

**Assumed Executory Contracts and Unexpired Leases**

None

## **EXHIBIT C**

### **Schedule of Retained Causes of Action**

All Causes of Action constituting assets of the Debtors that have not been assigned pursuant to the Sale shall constitute Retained Causes of Action.

## EXHIBIT D

**Asset Purchase Agreement[1]**

---

[1]  As of the date of filing of this Plan Supplement, the sale contemplated by the Asset Purchase Agreement has not closed.  The Debtors will promptly file a revision to the Plan Supplement in the event of any modifications.

**Execution Copy**

---

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**TOWN SPORTS INTERNATIONAL, LLC,**

**THE OTHER SELLER PARTIES HERETO,**

**AND**

**NEW TSI HOLDINGS, INC.**

**OCTOBER 26, 2020**

---

# TABLE OF CONTENTS

<u>Page</u>

ARTICLE I DEFINITIONS ....................................................................... 1

    Section 1.1      Definitions........................................................................ 1
    Section 1.2      Index of Other Defined Terms......................................... 16
    Section 1.3      Interpretations ................................................................ 17

ARTICLE II PURCHASE AND SALE ....................................................... 19

    Section 2.1      Purchase and Sale of Assets........................................... 19
    Section 2.2      Assumed Liabilities ....................................................... 19
    Section 2.3      Consideration; Deposit.................................................... 19
    Section 2.4      Closing .......................................................................... 19
    Section 2.5      Closing Payments and Deliveries ................................... 20
    Section 2.6      Assumption/Rejection of Certain Contracts and Leases.... 20
    Section 2.7      Allocation...................................................................... 22
    Section 2.8      Removal of Excluded Assets .......................................... 23
    Section 2.9      Withholding ................................................................... 23

ARTICLE III SELLERS' REPRESENTATIONS AND WARRANTIES ............... 23

    Section 3.1      Organization of Sellers; Good Standing ......................... 23
    Section 3.2      Authorization of Transaction .......................................... 24
    Section 3.3      Noncontravention; Government Filings ........................... 24
    Section 3.4      Title to Assets ............................................................... 24
    Section 3.5      Designated Contracts ..................................................... 24
    Section 3.6      Real Property ................................................................. 24
    Section 3.7      Litigation; Decrees......................................................... 25
    Section 3.8      Labor Relations.............................................................. 25
    Section 3.9      Brokers' Fees ................................................................. 26
    Section 3.10     Taxes............................................................................. 26
    Section 3.11     Data Privacy .................................................................. 26
    Section 3.12     Employee Benefits ......................................................... 27
    Section 3.13     Intellectual Property....................................................... 27
    Section 3.14     Compliance with Laws; Permits ..................................... 28
    Section 3.15     Environmental Matters.................................................... 28
    Section 3.16     Related Party Transactions.............................................. 29
    Section 3.17     Financial Statements ...................................................... 29
    Section 3.18     Inventory ....................................................................... 29
    Section 3.19     Sufficiency of Assets ..................................................... 30

ARTICLE IV BUYERS' REPRESENTATIONS AND WARRANTIES ............... 30

    Section 4.1      Organization of Buyer; Good Standing ........................... 30
    Section 4.2      Authorization of Transaction .......................................... 30
    Section 4.3      Noncontravention........................................................... 30
    Section 4.4      Litigation; Decrees......................................................... 31
    Section 4.5      Brokers' Fees ................................................................. 31
    Section 4.6      Sufficient Funds; Adequate Assurances .......................... 31
    Section 4.7      Certain Arrangements .................................................... 31

i

# TABLE OF CONTENTS

ARTICLE V PRE-CLOSING COVENANTS ......................................................... 31

    Section 5.1      Efforts; Cooperation ............................................................. 31
    Section 5.2      Conduct of the Business Pending the Closing .................... 32
    Section 5.3      Bankruptcy Court Matters ................................................... 34
    Section 5.4      Notices and Consents .......................................................... 36
    Section 5.5      Notice of Developments ...................................................... 36
    Section 5.6      Access ................................................................................. 36
    Section 5.7      Bulk Transfer Laws ............................................................. 37

ARTICLE VI OTHER COVENANTS ................................................................ 37

    Section 6.1      Further Assurances .............................................................. 37
    Section 6.2      Access; Enforcement; Record Retention ............................ 38
    Section 6.3      Covered Employees ............................................................. 39
    Section 6.4      Transfer Taxes .................................................................... 41
    Section 6.5      Allocation of Taxes ............................................................. 41
    Section 6.6      Press Releases and Public Announcements ........................ 41
    Section 6.7      Non-Disclosure; Non-Solicit; Non-Disparagement. ........... 41
    Section 6.8      No Successor Liability ......................................................... 44
    Section 6.9      Acquired Avoidance Actions and Causes of Action ........... 44
    Section 6.10     Personal Information ........................................................... 44
    Section 6.11     Support Obligations ............................................................ 44
    Section 6.12     Acknowledgement by Buyers .............................................. 45

ARTICLE VII CONDITIONS TO OBLIGATION TO CLOSE ................................. 47

    Section 7.1      Conditions to Buyers' Obligations ...................................... 47
    Section 7.2      Conditions to Sellers' Obligations ...................................... 47
    Section 7.3      No Frustration of Closing Conditions .................................. 48

ARTICLE VIII TERMINATION ...................................................................... 48

    Section 8.1      Termination of Agreement .................................................. 48
    Section 8.2      Effect of Termination .......................................................... 50

ARTICLE IX MISCELLANEOUS ................................................................... 50

    Section 9.1      Survival .............................................................................. 50
    Section 9.2      Expenses ............................................................................. 50
    Section 9.3      Entire Agreement ................................................................ 50
    Section 9.4      Incorporation of Exhibits and Disclosure Schedule ........... 50
    Section 9.5      Amendments and Waivers .................................................. 50
    Section 9.6      Succession and Assignment ................................................ 51
    Section 9.7      Notices ................................................................................ 51
    Section 9.8      Governing Law ................................................................... 52
    Section 9.9      Submission to Jurisdiction; Service of Process .................. 53
    Section 9.10     Waiver of Jury Trial ............................................................ 53
    Section 9.11     Specific Performance .......................................................... 53
    Section 9.12     Severability ......................................................................... 54

## TABLE OF CONTENTS

Section 9.13        No Third Party Beneficiaries ............................................................. 54
Section 9.14        Non-Recourse .................................................................................... 54
Section 9.15        Mutual Drafting ................................................................................. 54
Section 9.16        Disclosure Schedule........................................................................... 54
Section 9.17        Headings; Table of Contents............................................................... 55
Section 9.18        Counterparts; Facsimile and Electronic Signatures ........................... 55
Section 9.1         Fiduciary Obligations........................................................................... 55

Exhibit A – Form of Bill of Sale for Acquired Assets
Exhibit B – Form of Assignment and Assumption Agreement
Exhibit C – Form Intellectual Property Assignment Agreement
Exhibit D – Form of Lease Assignment Agreement


Schedule A        Sellers
Schedule B        Other Excluded Assets
Schedule C        Unrestricted Affiliates
Schedule 2.6(a)        Executory Contracts
Schedule 2.6(b)        Designated Contracts and Assumed Leases
Schedule 3.6        Gym Locations
Schedule 3.7        Litigation
Schedule 3.8        Labor Relations
Schedule 3.8(c)        Certain Labor Matters
Schedule 3.10        Taxes
Schedule 3.12(a)        Employee Benefit Plans
Schedule 3.12(b)        Certain Benefit Matters
Schedule 3.13(a)        Owned Intellectual Property
Schedule 3.14        Compliance with Laws
Schedule 3.15        Environmental Matters
Schedule 3.16        Related Party Transactions
Schedule 5.2(b)        Conduct of Business
Schedule 5.4        Notices, Consents, etc.

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is entered into as of October 26, 2020 by and among Town Sports International, LLC (the "Company"), and the direct and indirect Subsidiaries of the Company identified Schedule A (together with the Company, each a "Seller" and, collectively, "Sellers"), and New TSI Holdings, Inc. ("NewCo"), and its designees (together with NewCo, each a "Buyer" and collectively, "Buyers").  Sellers and Buyers are referred to collectively herein as the "Parties" and each, a "Party".

WHEREAS, on September 14, 2020 (the "Petition Date"), the Company and certain of its Affiliates and Subsidiaries (collectively, the "Debtors") filed voluntary petitions for relief (collectively, the "Bankruptcy Cases"), under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, Sellers wish to sell their on-going health club and fitness business (the "Business"); and

WHEREAS, Sellers and Buyers desire to enter into this Agreement to provide for the applicable Buyer to purchase, acquire and assume from the applicable Seller all of the Acquired Assets (as defined below) and Assumed Liabilities (as defined below), all in the manner and subject to the terms and conditions set forth in this Agreement and in accordance with Sections 105, 363 and 365 and other applicable provisions of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1    Definitions.  For purposes of this Agreement:

"Acquired Assets" means, all of Sellers' right, title and interest as of the Closing in and to all of the properties, rights, interests and other tangible and intangible assets of Sellers for use in or relating to the Business (wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP) including any assets acquired by Sellers after the date hereof but prior to the Closing; provided, however, that the Acquired Assets shall not include any Excluded Assets.  Without limiting the generality of the foregoing, the Acquired Assets shall include all of Sellers' right, title and interest as of the Closing in and to the following (except to the extent listed or otherwise included as an Excluded Asset):

(a)    to the extent transferable, all Intellectual Property related to the Business, including all intellectual property rights arising from or relating to: all algorithms, APIs, designs, net lists, data, databases, data collections, diagrams, inventions (whether or not patentable), know how, methods, processes, proprietary information, protocols, schematics, specifications, tools, systems, servers, hardware, computers, point of sale equipment, inventory management equipment, software, software code (in any form,

1

including source code and executable or object code), merchant identification numbers, subroutines, techniques, user interfaces, URLs, web sites, works of authorship and other similar materials, including all documentation related to any of the foregoing, including instruction manuals, laboratory notebooks, prototypes, samples, studies and summaries, whether or not embodied in any tangible form and whether or not specifically listed herein, and all related technology, that are used in, incorporated in, embodied in, displayed by or relate to, or are used in connection with the foregoing;

(b)    all tangible assets owned or leased by Sellers related to the Business or Gym Locations, including all gym and exercise equipment and machinery, fixtures, trade fixtures, chairs, supplies, shelving, refrigeration equipment, computers, point-of-sale systems and other computer systems, branding, signs and signage located at the Gym Locations, warehouses, any corporate offices or any other real property (provided that, with respect to any such leased asset, the underlying lease is a Designated Contract);

(c)    all rights under the Assumed Leases and Designated Contracts, including, for the avoidance of doubt, any and all credits, refunds, allowances, or other accommodations associated with, related to, or provided pursuant to, any such Assumed Lease or Designated Contract, regardless of whether attributable to the period prior to, or following, the Closing Date;

(d)    all Inventory and Merchandise, whether at any Gym Locations, any warehouse(s) or in transit to the Gym Locations;

(e)    all membership agreements, Member Information, customer purchases or services provided to members or customers at the Gym Locations, in each case, to the extent permitted to be assigned by Sellers under Sellers' privacy policies and applicable Laws;

(f)    credit card receivables and any cash related thereto held by third parties;

(g)    all trade receivables, whether current or non-current, and all other accounts receivable, including payment processor receivables, for sales made prior to the Closing;

(h)    any Permit, to the extent transferable;

(i)    any and all books, records and other data relating to the Business and each Gym Location, including all merchant identification numbers with respect to payment processors, customer lists and customer and end-user information and data, supplier lists, mailing lists, accounting records, documentation or records, catalogs and printed materials relating thereto to the extent available, in each case, to the extent permitted to be assigned by Sellers under Sellers' privacy policies and applicable Laws;

(j)    all prepaid expenses, credits, advance payments, claims, security, refunds, rights of recovery, rights of set-off, rights of recoupment, deposits, charges, sums and fees (including any such item relating to the payment of Taxes) other than the Excluded Tax Assets;

(k)      any promotional materials, displays, media content and other property or equipment used in or related to the existing Business;

(l)      to the extent transferable, all Intellectual Property Licenses;

(m)      financial, marketing and business data, pricing and cost information, business and marketing plans and other information, files, correspondence, records, data, plans, reports and recorded knowledge, historical trademark files, prosecution files of Sellers in whatever media retained or stored, including computer programs and disks, including files in the possession of Sellers;

(n)      all goodwill associated with the Business or the Acquired Assets;

(o)      to the extent transferable, all right of publicity and all similar rights, including all commercial merchandising rights;

(p)      product designs, product names, trade names, design rights, tech packs, artwork, archival materials and advertising materials, copy, commercials, images and artwork;

(q)      royalty payments and licensing receivables generated by the Business and attributable to the period from and/or after the Closing;

(r)      all Sellers' telephone, fax numbers and email addresses;

(s)      any Avoidance Actions relating to any Designated Contract or trade vendor that any Buyer will conduct business with, following the Closing (the "Acquired Avoidance Actions");

(t)      all Causes of Action related to the Acquired Assets;

(u)      all of Seller's rights under warranties, indemnities and all similar rights against third parties to the extent related to any Acquired Assets;

(v)      all insurance benefits (other than in relation to any Excluded Benefit Plan or any Excluded Cause of Action), including rights and proceeds, arising from or relating to the Business, the Acquired Assets or the Assumed Liabilities, and the sponsorship of each Acquired Benefit Plan and all right, title and interest in any assets thereof or relating thereto (including all assets, trusts, insurance policies and proceeds, and administration service contracts related thereto);

(w)      all cash, including the Gym Locations Cash Amount, in excess of the Wind-Down Amount; provided, however, that the Excluded Cash shall be an Excluded Asset;

(x)      any Tax refunds, rebates, or credits of any Seller (including any rights Sellers may have with respect to any Tax refunds, rebates, or credits of any Restricted Affiliate, and any owner of any Seller) with respect to Taxes, including any Periodic Taxes

3

attributable to the portion of the Straddle Period beginning after the Closing Date (as determined pursuant to Section 6.5); and

(y)    any insurance claims, and related proceeds, related to an Acquired Asset, but excluding, for the avoidance of doubt, insurance claims, and related proceeds, related to the Excluded Causes of Action;

provided, however, notwithstanding anything to the contrary set forth in this definition, the Acquired Assets shall not include any Excluded Assets.

"Acquired Benefit Plan" means any Company Benefit Plan set forth on Schedule 3.12(a), other than any Excluded Benefit Plan.

"Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person, where "control" means the power, directly or indirectly, to direct or cause the direction of the management and policies of another Person, whether through the ownership of voting securities, by contract, or otherwise.

"Assumed Liabilities" means only the following Liabilities of each Seller incurred exclusively in the operation of the Business and existing as of the Closing (to the extent not paid prior to the Closing) or to the extent set forth in the following clauses:

(a)    all Liabilities under the Acquired Assets to the extent such Liabilities arise from and after the Closing Date;

(b)    all Liabilities to pay for goods or services ordered (and not paid by Sellers), prior to the Closing in the Ordinary Course of Business;

(c)    all (i) shop or customer credits, sales promotions, rebates, coupons, gift cards and certificates or (ii) returns of Merchandise, customer prepayments and overpayments, customer refunds, credits, reimbursements and related adjustments with respect to Merchandise;

(d)    (i) all accrued and unused vacation and sick time of the Transferred Employees (including any such vacation or sick time that, notwithstanding such Transferred Employees being Transferred Employees, is required under applicable Law to be paid in cash in connection with the Closing); (ii) all accrued payroll and related employer Taxes with respect to the Transferred Employees that remains unpaid as of the Closing; (iii) "IBNR" Liabilities with respect to the Company Benefit Plans; (iv) sponsorship of the Acquired Benefit Plans and all Liabilities under or related thereto, including with respect to COBRA; and (v) any other Liabilities described as being assumed or fulfilled by Buyer in Section 6.3;

(e)    Success Fees in an amount not to exceed five million, two hundred and seventy-five thousand Dollars ($5,275,000.00), which, for the avoidance of doubt, shall be paid by Buyer in cash at the Closing; provided that Buyer shall consider, in good faith and depending on the progress and outcome of the Bankruptcy Case, the transactions

4

contemplated by this Agreement, and the resources of the Debtors, a further amount to be payable to Huron Consulting Group in respect of its work related to the foregoing, which amount, if approved by Buyer in its sole discretion, shall increase the amount contemplated by this clause (e) only to the extent so approved and such amount to be payable only to Huron Consulting Group; and

(f)    all Cure Costs related solely to the Designed Contracts and Assumed Leases;

provided that the Assumed Liabilities will not include (x) any Liabilities arising from or related to any Litigation against or involving any Seller or any of its assets or Liabilities (including Litigation related to fraud, breach of fiduciary duty, misfeasance or under any other theory relating to conduct, performance or non-performance of the Company, or any of its Affiliates, directors, officers, employees or other Representatives) or (y) any Liabilities related to or affecting the Acquired Assets or the Assumed Liabilities with respect to: (i) any breaches, defaults, torts, violations of Law, infringements, indemnities, guaranties, or penalties existing, occurring, or accruing prior to the Closing, or (ii) successor liability claims or claims owed to or assessed by, Governmental Authorities or other Persons.

"Auction" has the meaning set forth in the Bidding Procedures Order.

"Avoidance Action" means any avoidance, preference or recovery, claim, action or proceeding arising under chapter 5 of the Bankruptcy Code or under any similar state or federal law.

"Bidding Procedures Order" means an order entered by the Bankruptcy Court authorizing and approving the bidding, auction and sale procedures regarding the Acquired Assets, and other related relief, on terms further described in Section 5.3 herein, in the form agreed by the Parties to be filed herewith, with such other changes as are reasonably satisfactory to Sellers and Buyer.

"Business Day" means any day, other than a Saturday, Sunday and any day which is a legal holiday under the laws of the State of Delaware or is a day on which banking institutions located in the State of Delaware are authorized or required by Law or other governmental action to close.

"Buyer Group" means each Buyer, any Affiliate of each Buyer, and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, Advisors, successors or permitted assigns.

"Cash Shortage" means an amount in cash equal to the Wind-Down Amount less the amount equivalent to cash on hand of the Debtors as of the Closing Date.

"Causes of Action" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity, including under common law, Law, or the Bankruptcy Code.

"Claim" means any claim within the meaning of section 101(5) of the Bankruptcy Code.

5

"COBRA" means sections 601 through 608 of the Employee Retirement Income Security Act of 1974 and section 4980B of the IRC.

"Company Intellectual Property" means all Intellectual Property that are owned or necessary to the Company or any other Seller in the conduct of the Business.

"Confidentiality Agreement" means the Non-Disclosure Agreement, effective as of August 12, 2020, between Town Sports International Holdings, Inc. and Tacit Capital LLC.

"Contract" means any agreement, contract, license, arrangement, commitment, promise, obligation, right, instrument, document or other similar understanding, which in each case is in writing and signed by parties intending to be bound thereby (other than any Leases).

"Consent" means any approval, consent, ratification, permission, waiver or other authorization, or an order of the Bankruptcy Court that deems or renders unnecessary the same (which may be the Sale Order).

"Covered Employee" means an employee of the Company or any of the other Debtors as of the date hereof whose duties relate primarily to the operation of any of the Business, including such employees who have been furloughed or are on short-term disability, long-term disability or any other approved leave of absence as of the Closing.

"Cure Costs" means all amounts payable, and obligations that must be satisfied, in order to cure any monetary defaults required to be cured under section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption of executory Contracts and Leases.

"Cure Objection" means any objection to the proposed assumption or assumption and assignment of a Designated Contract or Assumed Lease or to the Cure Cost related to a Designated Contract or Assumed Lease filed with the Bankruptcy Court in accordance with the procedures set forth in the Bidding Procedures Order.

"Decree" means any judgment, decree, ruling, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, administrative order or any other order of any Governmental Authority.

"DIP Financing" means that certain Town Sports International, LLC Term Sheet for Debtor-in-Possession Financing and Alternatively a Sale of Assets Under Section 363 of the Bankruptcy Code (as amended, amended and restated, supplemented or otherwise modified from time to time), among the DIP Lender, the Company, as borrower, and the guarantors party thereto as approved by the DIP Order.

"DIP Lender" means Fitness Recovery Holdings, LLC (together with its respective successors and assigns).

"DIP Order" means that certain Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors And Debtors In Possession To Obtain Post-Petition Financing, (II) Authorizing Use Of Cash Collateral, (III)

6

Granting Liens And Super-Priority Claims, (IV) Granting Adequate Protection To Prepetition Lenders, (V) Modifying The Automatic Stay, And (VI) Granting Related Relief [D.I. ___], as such order has been or may be amended or modified from time to time.

"Display Merchandise" means those items of Inventory used in the Ordinary Course of Business as displays or floor models at the Gym Locations, including Inventory that has been removed from its original packaging for the purpose of putting such item on display, which goods are not otherwise damaged or defective.  For the avoidance of doubt, Merchandise created for display and not saleable in the ordinary course of business shall not constitute Display Merchandise.

"Encumbrances" means any claim, community or other marital property interest, condition, equitable interest, right of way, encroachment, servitude, right of first refusal or similar restriction, including any restriction on use, voting (in the case of any security or equity interest), transfer, receipt of income or exercise of any other attribute of ownership.

"Environmental Law" means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation relating to the protection of the environment or natural resources.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any Person that, at any relevant time, is or was treated as a single employer with any Seller pursuant to of IRC § 414(b), (c), (m) or (o).

"Excluded Assets" means the following assets of Sellers as of the Closing, and only the following assets:

(a)    all files, books, records, and documents prepared in connection with this Agreement or the transactions contemplated hereby or primarily relating to the Bankruptcy Cases, all minute books, corporate records (such as stock registers) and organizational documents of Sellers, Tax Returns, other Tax work papers and Tax information, and all other files, books, records, and documents (i) that any Seller is required by Law to retain; or (ii) constituting personal data or information that are governed by any applicable Law prohibiting such sale, transfer, assignment or conveyance; provided that to the extent not prohibited by applicable Law, Buyer shall have the right to make copies of any portions thereof;

(b)    all files, books, records and documents constituting work product of Sellers' legal counsel;

(c)    all files, books, data, records and documents the disclosure or transfer of which is prohibited by third party agreement, a privacy policy of Seller, or applicable Laws;

(d)    any Contract that is not a Designated Contract;

(e)    any Lease that is not an Assumed Lease;

7

(f)      (i) any Tax refunds, net operating losses, rebates or credits of Unrestricted Affiliates of Sellers and the owners of the Sellers with respect to Taxes, including any Periodic Taxes attributable to the portion of the Straddle Period ending on the Closing Date (as determined pursuant to Section 6.5) (collectively, the "Excluded Tax Assets");

(g)      prepaid insurance;

(h)      all Excluded Causes of Action;

(i)      all insurance policies and binders, all claims, refunds and credits from insurance claims, insurance policies or binders due or to become due with respect to such policies or binders and all rights to proceeds thereof;

(j)      all equipment, tools or assets belonging to employees or independent contractors of the Sellers;

(k)      all cash on hand, including the Gym Locations Cash Amount, up to the Wind-Down Amount (the "Excluded Cash"); provided, however, that such Excluded Cash shall be used solely in connection with the Wind-Down and all cash remaining in the Debtors' estates following the Wind-Down and all cash in excess of the Wind-Down Amount shall be an Acquired Asset delivered to the Buyers following the Wind-Down;

(l)      all shares of capital stock or other equity interests of any Seller and all securities convertible into or exchangeable or exercisable for shares of capital stock or other equity interests of any Seller or any other Person;

(m)      all Excluded Benefit Plans (including all assets, trusts, insurance policies and proceeds, and administration service contracts related thereto); and

(n)      all assets, properties, rights, interests, and Claims of every kind and description of any Sellers which (A) are not Acquired Assets, (B) are not related to, used, or held for use in, the Business, (C) are owned or used by the Unrestricted Affiliates, or (D) are described on Schedule B.

"Excluded Benefit Plan" means any Company Benefit Plan that is (a) an incentive, commission, bonus, or similar program, (b) a qualified employee stock purchase program, or (c) a management stock purchase plan.

"Excluded Causes of Action" means any Avoidance Actions and Causes of Action that are not Acquired Assets, including, but not limited to, all Causes of Action against the Debtors' current or former officers, directors, members, agents, insiders, equity holders, partners, affiliates (including the Unrestricted Affiliates), and representatives.

"Excluded Liabilities" means any Liabilities of Sellers, whether existing on the Closing Date or arising thereafter as a result of any act, omission or circumstances taking place prior to the Closing, other than the Assumed Liabilities.  Without limiting the foregoing, Buyers shall not be obligated to assume, and do not assume, and hereby disclaims all the Excluded Liabilities, including the following Liabilities (which shall also be considered Excluded Liabilities) of any of

Sellers or of any predecessor of any of Sellers, whether incurred or accrued before or after the Closing:

(a)    any Liability not relating to or arising out of the Business or the Acquired Assets, including any Liability exclusively relating to or primarily arising out of the Excluded Assets;

(b)    any Liability of Sellers for Taxes (except as provided for in <u>Section 2.7</u> and <u>Section 6.4</u>);

(c)    all Liabilities of Sellers under this Agreement or any Related Agreement and the transactions contemplated hereby or thereby;

(d)    any Liability associated with any and all indebtedness including any guarantees of third party obligations and reimbursement obligations to guarantors of Sellers' obligations or under letters of credit of any Seller;

(e)    any Liabilities in respect of any Contracts or Leases that are not Designated Contracts or Assumed Leases, respectively;

(f)    all Liabilities for fees, costs and expenses that have been incurred or that are incurred or owed by Sellers in connection with this Agreement or the administration of the Bankruptcy Cases (including all fees and expenses of professionals engaged by Sellers) and administrative expenses and priority claims accrued through the Closing Date and specified post-closing administrative wind-down expenses of the bankrupt estates pursuant to the Bankruptcy Code (which such amounts shall be paid by Sellers from the proceeds collected in connection with the Excluded Assets) and all costs and expenses incurred in connection with (i) the negotiation, execution and consummation of the transactions contemplated under this Agreement and each of the other documents delivered in connection herewith, (ii) the negotiation, execution and consummation of the DIP Financing, and (iii) the consummation of the transactions contemplated by this Agreement, including any retention bonuses, "success" fees (other than the Success Fees), change of control payments and any other payment obligations of Sellers payable as a result of the consummation of the transactions contemplated by this Agreement and the documents delivered in connection herewith;

(g)    all Liabilities (i) related to WARN Act, to the extent applicable, with respect to the termination of Sellers' employees by a Seller, (ii) for any action resulting from Sellers' employees' separation of employment from Seller (the "<u>Company Severance Payments</u>"), and (iii) for vacation, sick leave, parental leave, and other paid time accrued by Sellers' employees who are not Transferred Employees  (the "<u>Company PTO Payments</u>");

(h)    all Liabilities relating to claims for workers compensation for acts that occurred prior to the Petition Date, including any claims under outstanding letters of credit.

(i)    all Liabilities with respect to the termination of employment of the Company "insiders" (as such term is defined under the Bankruptcy Code);

(j)      all Excluded Benefit Plans (including all trusts, insurance policies and administration service contracts, and liabilities related thereto);

(k)      all Liabilities with respect to any terminated employees with respect to COBRA, other than with respect to Acquired Benefit Plans;

(l)      all Liabilities of Sellers to its equity holders respecting dividends, distributions in liquidation, redemptions of interests, option payments or otherwise, and any liability of Sellers pursuant to any Affiliate Agreement;

(m)      all Liabilities arising out of or relating to any business or property formerly owned or operated by any of Sellers, any Affiliate or predecessor thereof, but not presently owned and operated by any of Sellers;

(n)      all Liabilities relating to Litigation, claims, actions, suits, arbitrations, litigation matters, proceedings or investigations (in each case whether involving private parties, Governmental Authorities, or otherwise) involving, against, or affecting any Acquired Asset, the Business, the Company or any assets or properties of Sellers, commenced, filed, initiated or threatened before the Closing and relating to facts, events or circumstances arising or occurring before the Closing;

(o)      all Liabilities arising under Environmental Laws relating to facts, events or circumstances arising or occurring before the Closing;

(p)      all accounts payable of the Sellers or of any of their predecessors, including all professional fees of the Sellers;

(q)      all Liabilities of the Unrestricted Affiliates;

(r)      Liabilities to any employees arising prior to the Closing, except for vacation, sick leave, parental leave and other paid time accrued by Sellers' employees who are Transferred Employees or as otherwise described as being assumed or fulfilled by Buyer in Section 6.3; and

(s)      all Liabilities of Sellers or its predecessors arising out of any contract, agreement, Permit, franchise or claim that is not transferred to a Buyer as part of the Acquired Assets or is not transferred to a Buyer because of any failure to obtain any third-party or governmental consent required for such transfer;

provided that in the event of any conflict between the terms set forth in this definition and the terms set forth in the definition of "Assumed Liabilities", the terms set forth in the definition of "Assumed Liabilities" will control.

"GAAP" means United States generally accepted accounting principles consistently applied.

10

"<u>Governmental Authority</u>" means any federal, state, local or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, department or other governmental entity.

"<u>Governmental Authorization</u>" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Authority or pursuant to any Law.

"<u>Gym Locations Cash Amount</u>" means Sellers' cash located at the Gym Locations as of the Closing Date.

"<u>Intellectual Property</u>" means any and all intellectual property and other similar proprietary rights, in any jurisdiction in the world (whether arising under statutory or common law, contract, or otherwise), which includes rights pertaining to or arising from: (a) inventions, discoveries, processes, designs, techniques, developments and related improvements whether or not patentable; (b) patents, patent applications, industrial design registrations and applications therefor, divisions, divisionals, continuations, continuations-in-part, reissues, substitutes, renewals, registrations, confirmations, re-examinations, extensions and any provisional applications, or any such patents or patent applications, and any foreign or international equivalent of any of the foregoing; (c) trademarks (whether registered, unregistered or pending), trade dress, service marks, service names, trade names, brand names, product names, logos, domain names, internet rights (including IP addresses and AS numbers), corporate names, fictitious names, other names, symbols (including business symbols), slogans, translations of any of the foregoing and any foreign or international equivalent of any of the foregoing and all goodwill associated therewith and (to the extent transferable by law but subject to <u>Section 6.1(d)</u>) any applications or registrations in connection with the foregoing and all advertising and marketing collateral including any of the foregoing; (d) work specifications, databases and artwork; (e) technical, scientific and other know-how and information (including promotional material and tech packs and blocks), trade secrets, confidential information, methods, processes, practices, formulas, designs, patterns, assembly procedures, specifications; (f) rights associated with works of authorship including copyrights, moral rights, design rights, rights in databases, copyright applications, copyright registrations, rights existing under any copyright laws and rights to prepare derivative works; (g) work for hire; (h) all trade names, including "Town Sports International", "Boston Sports Club", "New York Sports Clubs", or any derivations thereof, (i) customer lists and databases, websites, social media sites and accounts (including the content contained therein, user names and passwords), diagrams, drawings, and all advertising and marketing materials and collateral (including all physical, digital, or electronic imagery and design files), samples, product catalogs, product designs and specifications (including tech specifications) vendor and Merchandise supplier data and information, (j) computer software and firmware, including data files, source code, object code and software-related specifications and documentation, (k) all books and records, files, data, reports, computer codes and sourcing data, advertiser and supplier lists, cost and pricing information, business plans, and manuals, blueprints, research and development files, and other records; (l) financial, marketing and business data, pricing and cost information, business and marketing plans and other information, files, correspondence, records, data, plans, reports and recorded knowledge, historical trademark files, prosecution files in whatever media retained or stored, including computer programs and disks, (m) the right to sue for infringement and other remedies against infringement

11

of any of the foregoing, and (n) rights to protection of interests in the foregoing under the laws of all jurisdictions.

"Intellectual Property Licenses" means (i) any grant to a third Person of any right to use any Owned Intellectual Property and (ii) any grant to Sellers of a right to use a third Person's Intellectual Property rights (other than off-the-shelf software for which Sellers pays less than fifty thousand Dollars ($50,000) in licensing or other fees per software title per annum).

"Inventory" means all of Sellers' inventory and goods now owned or hereinafter acquired, wherever located, relating to the Business, including all inventory and goods that (a) are leased by Sellers as lessor, (b) are held by Sellers for sale or lease or to be furnished by Sellers under a Contract of service, or (c) consist of raw materials, work in process, finished goods, supplies, or material used or consumed in connection with the Business maintained or held by, stored by or on behalf of, or in transit to, any of Sellers.

"IRC" means the Internal Revenue Code of 1986, as amended.

"IRS" means the Internal Revenue Service.

"Knowledge" of Sellers or the Company (and other words of similar import) means the knowledge of Nitin Ajmera, John C. DiDonato, and Laura Marcero, in each case, solely in their capacities as officers of the Company and not in any other capacity.

"Landlord" means the landlord of real property under any of the Sellers' Leases.

"Law" means any constitution applicable to, and any statute, treaty, code, rule, regulation, ordinance or requirement of any kind of, any Governmental Authority.

"Leases" means all leases, subleases, licenses, concessions, options, contracts, extension letters, easements, reciprocal easements, assignments, termination agreements, subordination agreements, nondisturbance agreements, estoppel certificates and other agreements (written or oral), and any amendments or supplements to the foregoing, and recorded memoranda of any of the foregoing, pursuant to which any Seller holds any leasehold or subleasehold estates and other rights in respect of any Gym Locations.

"Liability" means any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due) regardless of when arising.

"Lien" means any lien (statutory or otherwise), Claim, Encumbrance, deed of trust, right of first offer, easement, servitude, transfer restriction under any shareholder or similar agreement, mortgage, pledge, lien, charge, security interest, option, right of first refusal, easement, security agreement or other encumbrance or restriction on the use or transfer of any property, hypothecation, license, preference, priority, covenant, right of recovery, order of any Governmental Authority, of any kind or nature (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, and (iii) any leasehold

interest, license or other right, in favor of a third party or a Seller, to use any portion of the Acquired Assets), whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown; provided, however, that "Lien" shall not be deemed to include any license of Intellectual Property.

"Litigation" means any action, cause of action, suit, claim, investigation, audit, demand, hearing or proceeding, whether civil, criminal, administrative or arbitral, whether at law or in equity and whether before any Governmental Authority.

"Material Adverse Effect" means any effect, condition, fact, circumstance or change that has, or would reasonably be expected to have, individually or in the aggregate, a material adverse effect on the condition of the Acquired Assets, taken as a whole, other than any effects, circumstances or changes to the extent arising from or related to: (a) general business or economic conditions in any of the geographical areas in which the Gym Locations operate; (b) any condition or occurrence affecting gyms and health clubs or the fitness and health industry generally; (c) national or international political or social conditions, including the engagement by any country in hostilities, whether commenced before or after the date hereof and whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack; (d) financial, banking or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index); (e) the occurrence of any act of God or other calamity or force majeure events (whether or not declared as such), including any strike, labor dispute, civil disturbance, embargo, natural disaster, fire, flood, hurricane, tornado, or other weather event; (f) changes in Law or accounting rules (including GAAP); (g) (i) the taking of any action required or permitted by this Agreement or any Related Agreement or taken (or omitted to be taken) with the consent of the other Party (other than any action taken pursuant to Section 5.2(a)), (ii) the failure to take any action if such action is prohibited by this Agreement, or (iii) Buyer's failure to consent to any of the actions restricted in Section 5.2(b); (h) any effects or changes as a result of the announcement, pendency or completion of the transactions contemplated by this Agreement, including losses or threatened losses of employees, customers, suppliers, distributors or others having relationships with Sellers; (i) any filing or motion made under sections 1113 or 1114 of the Bankruptcy Code; (j) the closing of any locations not acquired by Buyers or the sale of any other assets or locations to any third parties by any Seller or any of its Affiliates; (k) any effects or changes arising from or related to the breach of the Agreement by Buyers; (l) the failure of Sellers to obtain any consent, permit, authorization, waiver or approval required in connection with the transactions contemplated hereby; (m) any items set forth in the Disclosure Schedule or the Parent SEC Documents; (n) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics; or (o) any effect resulting from (i) the filing or pendency of the Bankruptcy Cases or (ii) any objections in the Bankruptcy Court to (A) this Agreement or any of the transactions contemplated hereby or thereby, (B) the reorganization of Sellers or any plan or the disclosure statement relating thereto, (C) the Bidding Procedures Order or (D) the assumption or rejection of any Designated Contract; or (iii) any Decree of the Bankruptcy Court or any actions or omissions of Sellers or their Subsidiaries in compliance therewith; provided, however, that global coronavirus 2019-2020 pandemic, business restrictions related thereto, and Shelter-in-Place Laws shall not be considered a Material Adverse Effect, it being recognized that Sellers' Gym Locations will likely be closed for the entirety of the period through the Closing Date.

13

"Membership Information" shall mean all member, customer and end-user data and information, including lists of members, personally identifiable information of members, and any other information related to membership of the Business.

"Merchandise" shall mean (i) all finished goods inventory that is owned by the Sellers and located at the Gym Locations as of the Closing Date; (ii) any Merchandise located at a distribution center; and (iii) the Display Merchandise.

"Obligations" shall mean all obligations under the DIP Financing and the Prepetition Senior Secured Debt.

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Business through the date hereof consistent with past practice from the date of the filing of the Bankruptcy Cases, but subject, however, to (x) changes arising or resulting from the filing or pendency of the Bankruptcy Cases and (y) the "going out of business sales" contemplated as of the date hereof.

"Owned Intellectual Property" means all Intellectual Property owned by Sellers.

"Parent SEC Documents" means collectively, all reports, schedules, forms, statements, registration statements, prospectuses and other documents (including all exhibits, amendments and supplements thereto) filed or furnished by Town Sports International Holdings, Inc. with the SEC under the Securities Act or the Exchange Act since January 1, 2018.

"Permit" means any franchise, approval, permit, license, order, registration, certificate, variance or similar right obtained from any Governmental Authority.

"Permitted Lien" means (i) Liens for Taxes not yet delinquent or which are being contested in good faith by appropriate proceedings and arising or incurred in the Ordinary Course of Business; (ii) mechanic's, workmen's, repairmen's, warehousemen's, carrier's or other similar Liens, including all statutory liens, arising or incurred in the Ordinary Course of Business for amounts which are not delinquent and which are not, individually or in the aggregate, material to the business of Sellers; (iii) with respect to leased or licensed real or personal property, the terms and conditions of the lease, license, sublease or other occupancy agreement applicable thereto which are customary; (iv) with respect to real property, usual and customary zoning, building codes and other land use laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over such real property; (v) usual and customary easements, covenants, conditions, restrictions and other similar matters affecting title to real property and other encroachments and title and survey defects; provided that they do not materially detract from the current use of the property; (vi) easements, rights of way, restrictive covenants, encroachments and similar non-monetary Liens or non-monetary impediments against any of the Acquired Assets which do not, individually or in the aggregate, adversely affect the operation of the Acquired Assets; (vii) non-exclusive licenses of Intellectual Property entered into in the Ordinary Course of Business; (viii) such other Liens or title exceptions that do not, individually or in the aggregate, materially and adversely affect the operation of the Acquired Assets, and (ix) any Liens that will be removed or released by operation of the Sale Order.

14

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or any other entity, including any Governmental Authority or any group of any of the foregoing.

"Prepetition Lenders" means the lenders under the Prepetition Senior Secured Debt.

"Prepetition Senior Secured Debt" means Loan Agreement, effective as of November 13, 2013, by and among  TSI LLC, TSI Holdings II, LLC, a newly-formed, wholly-owned subsidiary of the Debtors, the lenders party thereto, Deutsche Bank AG, as administrative agent, and KeyBank National Association, as syndication agent and the other financial institutions or entities from time to time as lender parties thereto as amended from time to time, along with all ancillary loan documents.

"Related Agreements" means the Bill of Sale and the Assignment and Assumption Agreement.

"Representative" means, when used with respect to a Person, the Person's controlled and controlling Affiliates (including Subsidiaries) and such Person's and any of the foregoing Person's respective officers, directors, managers, members, shareholders, partners, employees, agents, representatives, advisors (including financial advisors, bankers, consultants, legal counsel and accountants) and financing sources.

"Restricted Affiliates" means those Subsidiaries and Affiliates of the Company that are not Unrestricted Affiliates.

"Restricted Business" means any health club, gym or fitness center within fifty (50) miles of any Gym Location other than Business conducted by the Unrestricted Affiliates as of the Closing Date.

"Sale Hearing" means the hearing for approval of, among other things, this Agreement and the transactions contemplated herein.

"Sale Order" means the sale order or orders in form and substance reasonably agreed by Buyer and Sellers.

"Shelter-in-Place Law" means any federal, state, local or foreign law, statute, code, ordinance, rule, regulation, order, or guideline restricting business operations in connection with the global coronavirus 2019 pandemic.

"Subsidiary" means, with respect to any Person, means, on any date, any Person (a) the accounts of which would be consolidated with and into those of the applicable Person in such Person's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date or (b) of which securities or other ownership interests representing more than fifty percent of the equity or more than fifty percent (50%) of the ordinary voting power or, in the case of a partnership, more than fifty percent (50%) of the general partnership interests or more than fifty percent of the profits or losses of which are, as of such date, owned, controlled or held by the applicable Person or one or more subsidiaries of such Person.

"Success Fees" means the amount(s), as approved by the Bankruptcy Court, payable to Hilco Real Estate, Huron Consulting Group, and Houlihan Lokey, as advisor(s) to the Debtors, upon the Closing.

"Tax" or "Taxes" means any United States federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, stamp, occupation, premium, windfall profits, environmental (including taxes under section 59A of the IRC), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether disputed or not.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Unrestricted Affiliates" means those Subsidiaries and Affiliates of the Company set forth on Schedule C.

"WARN Act" means, collectively, the Worker Adjustment and Retraining Notification Act of 1989 and any similar state or local law.

"Wind-Down" means any and all post-closing actions to be taken for the administrative wind-down of the bankruptcy estate pursuant to the Bankruptcy Code, including the preparation, solicitation, confirmation, implementation, and effectuation of a plan of liquidation under chapter 11 of the Bankruptcy Code, the closing of the Bankruptcy Cases, and the winding up and dissolution of the Sellers; provided, however, that the Wind-Down and the Wind-Down Amount shall be subject to budget categories that (a) are reasonably acceptable to Buyer, the majority of the Prepetition Lenders, and Sellers based on the general categories discussed by the Parties in negotiating the Wind-Down Amount to date and (b) do not include amounts to be paid in connection with the Wind-Down to or on behalf of Affiliates of the Sellers that are not Debtors; provided that the Wind-Down Amount shall not change and the amounts within such categories shall not be subject to consent of Buyer or the Prepetition Lenders, so long as the Wind-Down Amount is not exceeded.

"Wind-Down Amount" means three million, one hundred eighty-five thousand Dollars ($3,185,000).

Section 1.2    Index of Other Defined Terms. Each of the following terms is defined on the page set forth opposite such term.

| | | | |
|---|---|---|---|
| Acquired Avoidance Actions | 3 | Back-up Bidder | 34 |
| Affiliate Agreement | 29 | Bankruptcy Case | 1 |
| Agreement | 1 | Bankruptcy Code | 1 |
| Assignment and Assumption Agreement | 20 | Bankruptcy Court | 1 |
| Assumed Leases | 21 | Bidding Procedures Motion | 34 |

EAST\176343569.13

| | |
|---|---|
| Bill of Sale ................................................ 20 | Lease Assignment Agreement .................. 20 |
| Business ..................................................... 1 | Multiemployer Plan .................................. 27 |
| Buyer.......................................................... 1 | NewCo ........................................................ 1 |
| Buyers ........................................................ 1 | Outside Back-up Date ............................... 34 |
| Closing ..................................................... 19 | Overbid Protection .................................... 34 |
| Closing Date.............................................. 20 | Parties.......................................................... 1 |
| Company ..................................................... 1 | Party ........................................................... 1 |
| Company PTO Payments............................ 9 | Personal Information................................. 26 |
| Company Severance Payments ................... 9 | Petition Date................................................ 1 |
| Competing Bid .......................................... 34 | Prevailing Bidder ...................................... 34 |
| Credit Bid.................................................. 19 | Projections ................................................ 46 |
| Debtors........................................................ 1 | Purchase Price ........................................... 19 |
| Designated Contracts ................................ 21 | Purchase Price Allocation ......................... 22 |
| Disclosure Schedule.................................. 23 | Requesting Party ....................................... 38 |
| Excluded Cash ............................................ 8 | Restricted Parties ...................................... 42 |
| Excluded Tax Assets................................... 8 | Restricted Period....................................... 42 |
| Express Representations ............................ 45 | Seller ........................................................... 1 |
| Financial Statements ................................. 29 | Sellers.......................................................... 1 |
| Gym Location ............................................ 24 | Straddle Period.......................................... 41 |
| Gym Location Financial Statements......... 29 | Support Obligations .................................. 44 |
| Gym Locations........................................... 25 | Termination Date ...................................... 48 |
| Inactive Employee .................................... 39 | Total Consideration................................... 19 |
| Intellectual Property Assignment Agreement ................................................................ 20 | Transfer Tax.............................................. 41 |
| | Transferred Employee............................... 39 |
| Interim Financial Statements ................... 29 | Yearly Financial Statements .................... 29 |

Section 1.3    <u>Interpretations</u>.  Unless otherwise indicated herein to the contrary:

(a)      When a reference is made in this Agreement to an Article, Section, Exhibit, Schedule, clause or subclause, such reference shall be to an Article, Section, Exhibit, Schedule, clause or subclause of this Agreement.

(b)      The words "include," "includes" or "including" and other words or phrases of similar import, when used in this Agreement, shall be deemed to be followed by the words "without limitation."

(c)      The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement.

(d)      The words "to the extent" shall mean "the degree by which" and not "if."

(e)      The word "if" and other words of similar import shall be deemed, in each case, to be followed by the phrase "and only if."

(f)      The use of "or" herein is not intended to be exclusive.

(g)    The word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(h)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(i)    All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(j)    The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa.

(k)    All terms defined in this Agreement have their defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein.

(l)    References herein to a Person are also to its successors and permitted assigns.  Any reference herein to a Governmental Authority shall be deemed to include reference to any successor thereto.

(m)    Any reference herein to "Dollars" or "$" shall mean United States dollars.

(n)    Each Buyer acknowledges and agrees that the specification of any dollar amount in the representations, warranties or covenants contained in this Agreement is not intended to imply that such amounts or higher or lower amounts are or are not material, and each Buyer shall not use the fact of the setting of such amounts in any dispute or controversy between the Parties as to whether any obligation, item, or matter is or is not material.

(o)    Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

(p)    Any reference to any particular Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; provided that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Code section or Law, the reference to such Code section or Law means such Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(q)    A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and permitted assigns.

18

(r)      References in this Agreement to materials or information "furnished to Buyer", "provided to Buyer", "made available to Buyer" and other phrases of similar import include all materials or information made available to Buyer or its Representatives in the data room prepared by Sellers or provided to Buyer or its Representatives in response to requests for materials or information.

## ARTICLE II
## PURCHASE AND SALE

Section 2.1    Purchase and Sale of Assets.    On the terms and subject to the conditions set forth in this Agreement and the Sale Order, at the Closing, Buyers will purchase and acquire from Sellers, and Sellers will sell, transfer, assign, convey and deliver to Buyers all of the Acquired Assets, free and clear of all Liens (other than Permitted Liens).

Section 2.2    Assumed Liabilities.    On the terms and subject to the conditions set forth in this Agreement and the Sale Order, Buyers will assume and become responsible for the Assumed Liabilities at the Closing.   The applicable Buyer agrees to pay, perform, honor and discharge, or cause to be paid, performed, honored and discharged, all Assumed Liabilities in a timely manner in accordance with the terms thereof, including paying all Cure Costs.   For the avoidance of doubt, Sellers shall not be liable for, and shall have no obligation to pay or cause to be paid, any Cure Costs.

Section 2.3    Consideration; Deposit. The consideration for the Acquired Assets (the "Total Consideration") shall be (a) the assumption of the Assumed Liabilities, (b) the credit bid in an amount then-outstanding under the Prepetition Senior Secured Debt, in an amount equal to eighty million Dollars ($80,000,000.00) (the "Credit Bid"), and (c) the amount, paid in cash, equal to one million Dollars ($1,000,000.00) payable to general unsecured creditors; and (d) an amount, paid in cash (in an amount not to exceed three million, one hundred eighty five Dollars ($3,185,000)), equal to the Cash Shortage to be used solely in connection with the Wind-Down; provided that the Wind-Down shall be subject to budget categories that (y) are reasonably acceptable to Buyer, the majority of the Prepetition Lenders, and Sellers based on the general categories discussed by the Parties in negotiating the Wind-Down Amount to date and (z) do not include amounts to be paid in connection with the Wind-Down to or on behalf of Affiliates of the Sellers that are not Debtors; provided, however, that the Wind-Down Amount shall not change and the amounts within such categories shall not be subject to consent of Buyer or the Prepetition Lenders, so long as the Wind-Down Amount is not exceeded (together, the "Purchase Price"); provided further that Buyer reserves the right to increase the Purchase Price, subject to the Bidding Procedures Order and applicable Law.

Section 2.4    Closing.    The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of DLA Piper LLP (US), 1201 North Market Street, Suite 2100, Wilmington, DE 19801 (or such other location as shall be mutually agreed upon by Sellers and Buyer) commencing at 10:00 a.m. local time on the date that is one (1) Business Day following the date on which the conditions set forth in Article VII have been satisfied or duly waived, subject to the prior or simultaneous satisfaction or waiver all of the conditions to the obligations of Sellers and Buyer to consummate the transactions contemplated hereby set forth in Article VII, or on such other date as shall be mutually agreed upon by Sellers

and Buyer prior thereto.  The date on which the Closing is to occur shall be referred to herein as the "<u>Closing Date</u>".

Section 2.5    <u>Closing Payments and Deliveries</u>.

(a)    At the Closing, the applicable Seller will deliver to the applicable Buyer:

(i)    a duly executed Bill of Sale, substantially in the form of <u>Exhibit A</u> (the "<u>Bill of Sale</u>");

(ii)    a duly executed Assignment and Assumption Agreement, substantially in the form of <u>Exhibit B</u> (the "<u>Assignment and Assumption Agreement</u>");

(iii)    a duly executed Intellectual Property Assignment Agreement, substantially in the form of <u>Exhibit C</u> (the "<u>Intellectual Property Assignment Agreement</u>");

(iv)    a duly executed Lease Assignment and Assumption Agreement, substantially in the form of <u>Exhibit D</u> (the '<u>Lease Assignment Agreement</u>");

(v)    a duly executed certificate from an officer of each Seller to the effect that each of the conditions specified in <u>Section 7.1(a)</u> and <u>Section 7.1(b)</u> is satisfied; and

(vi)    a non-foreign affidavit from each Seller that is organized in or under the Laws of the United States or any state thereof, dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under Treasury Regulations issued pursuant to section 1445 of the IRC.

(b)    At the Closing, the applicable Buyer will deliver to the applicable Seller: (i) the Purchase Price; (ii) the Bill of Sale duly executed by such applicable Buyer; (iii) the Assignment and Assumption Agreement duly executed by such applicable Buyer; (iv) the Intellectual Property Assignment Agreement duly executed by such applicable Buyer; and (v) a duly executed certificate from an officer of such applicable Buyer to the effect that each of the conditions specified in <u>Section 7.2(a)</u> and <u>Section 7.2(b)</u> are satisfied.

(c)    At the Closing, the applicable Buyer shall, itself acting as agent on behalf of Sellers, repay or procure the repayment of, all amounts necessary to discharge fully the then-outstanding balance of all Obligations outstanding under the DIP Financing.

Section 2.6    <u>Assumption/Rejection of Certain Contracts and Leases</u>.

(a)    <u>Schedule 2.6(a)</u> sets forth a preliminary list or reference, as of the date hereof, of all executory Contracts and unexpired Leases to which any Seller is a party, which the Company shall use commercially reasonable efforts in good faith to continue to update prior to the Auction.

20

(b)      From and after the date hereof until the conclusion of the Auction, Buyer may, in its sole discretion, (i) designate a Contract listed or referenced on Schedule 2.6(a) for assumption and assignment to the applicable Buyer in accordance with Section 2.1 and Section 2.2, effective on and as of the Closing (such Contracts, the "Designated Contracts"), (ii) designate a Lease listed or referenced on Schedule 2.6(a) for assumption and assignment to the applicable Buyer in accordance with Section 2.1 and Section 2.2 or as otherwise determined by Buyer, effective on and as of the Closing, including any amendment or modification that may contain lease concessions (such Leases, the "Assumed Leases"), or (iii) designate any Contract or Lease listed or referenced on Schedule 2.6(a) for rejection.  The Designated Contracts and Assumed Leases as of the date hereof are set forth on Schedule 2.6(b) hereto, which will be supplemented as additional Leases and Contracts are designated for assumption and assignment or rejection prior to the conclusion of the Auction, if any, as set forth in this Section 2.6(b); provided that that if no Auction is held, Schedule 2.6(b) may be supplemented as additional Leases and Contracts are designated for assumption and assignment or rejection until the earlier of (x) one Business Day prior to the Sale Hearing or (y) three Business Days prior to the Closing.

(c)      Any Cure Objection filed in accordance with the procedures set forth in the Bidding Procedures Motion may be resolved by the Buyers, Sellers and the counterparty to such Designated Contract or Assumed Lease.  To the extent that any Cure Objection cannot be resolved by such parties, the Buyers and Sellers shall schedule a hearing for the Bankruptcy Court to hear and resolve such dispute.  Any Designated Contract or Assumed Lease subject to a Cure Objection shall not be assumed and assigned until satisfactory resolution, to be determined in the Buyers' reasonable discretion.  During the period in which a Cure Objection remains pending, following the Closing Date, such Designated Contract or Assumed Lease will be treated in accordance with Section 2.6(f).  If a Cure Objection is not satisfactorily resolved, the Buyers may, in their sole discretion, designate such Designated Contract or Assumed Lease for rejection by the Sellers and remove such Designated Contract or Assumed Lease from Schedule 2.6(b).  From and after the Closing until such time as either (i) such Cure Objection is resolved and such Designated Contract or Assumed Lease is assumed and assigned to Buyer or (ii) Buyer designates such Designated Contract or Assumed Lease for rejection pursuant to the immediately preceding sentence, Buyer shall be responsible for and shall promptly pay on behalf of Sellers, or reimburse Sellers for, all Liabilities incurred by Sellers in connection with such Designated Contract or Assumed Lease, including for the avoidance of doubt any increase in such Cure Costs as a result of such post-Closing period and any administrative costs of the Debtors incurred in respect of such Designated Contract or Assumed Lease during such post-Closing period.

(d)      Sellers shall take all actions reasonably required to assume and assign at the Closing the Designated Contracts and Assumed Leases to the applicable Buyer in accordance with this Agreement and the Sale Order and pursuant to Sections 363 and 365 of the Bankruptcy Code, including taking all actions reasonably necessary to facilitate any negotiations with the counterparties to such Contracts or Leases and, if necessary, to obtain an order of the Bankruptcy Court containing a finding that the proposed assumption and

assignment of the Contracts or Leases to the applicable Buyer satisfies all applicable requirements of section 365 of the Bankruptcy Code.

(e)    Buyers shall take all actions reasonably required for Sellers to assume and assign the Designated Contracts and Assumed Leases to the applicable Buyer (including the payment of the Cure Costs), including taking all actions reasonably necessary to facilitate any negotiations with the counterparties to such Contracts or Leases and, if necessary, to obtain an order of the Bankruptcy Court containing a finding that the proposed assumption and assignment of the Contracts or Leases to Buyers satisfies all applicable requirements of section 365 of the Bankruptcy Code.

(f)    Notwithstanding the foregoing, a Contract shall not be deemed assigned to, or assumed by, any Buyer to the extent such Contract (i) terminates or expires by its terms, on or prior to such time as it is to be assumed by a Buyer hereunder and it not continued or otherwise extended upon assumption or (ii) requires a Consent or Governmental Authorization (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to such Buyer of the applicable Seller's rights under such Contract, and such Consent or Governmental Authorization has not been obtained prior to such time as it is to be assumed by such Buyer hereunder.  In the event that any Contract is deemed not to be assigned pursuant to clause (ii) of the first sentence of this Section 2.6(f) or pursuant to Section 2.6(c), the Closing shall nonetheless take place subject to the terms and conditions set forth herein and, thereafter, through the earlier of such time as such Consent or Governmental Authorization is obtained and/or such Contract or Lease is assumed and assigned and six (6) months following the Closing (or the remaining term of such Contract or the closing of the Bankruptcy Cases, if shorter), Sellers and Buyers shall (A) use reasonable best efforts to secure such Consent or Governmental Authorization as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful and commercially reasonable arrangement reasonably proposed by Buyers, including subcontracting, licensing, or sublicensing to the applicable Buyer any or all of any Seller's rights and obligations with respect to any such Contract, under which (1) the applicable Buyer shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related Tax costs imposed on Sellers or their respective Affiliates) under such Contract with respect to which the Consent and/or Governmental Authorization has not been obtained and (2) the applicable Buyer shall assume any related burden and obligation (including performance) with respect to such Contract.  Upon satisfying any requisite Consent or Governmental Authorization requirement applicable to such Contract after the Closing, such Contract shall promptly be transferred and assigned to the applicable Buyer in accordance with the terms of this Agreement, the Sale Order and the Bankruptcy Code.

Section 2.7    Allocation.  Buyers and Sellers agree to allocate the Purchase Price (as finally determined hereunder), the Assumed Liabilities, and all other relevant items among the Acquired Assets in accordance with section 1060 of the IRC and the Treasury Regulations thereunder (and any similar provision of state, local, or non-U.S. Law, as appropriate) (the "Purchase Price Allocation").  Buyers shall deliver a draft of such allocation to Sellers within sixty (60) days after the Purchase Price is finally determined.  If Sellers notify Buyers in writing that Sellers object to one or more items reflected in the allocation prepared by Buyers, Buyers

22

and Sellers shall negotiate in good faith to resolve such dispute; provided, however, that if Buyers and Sellers are unable to resolve any dispute with respect to the allocation within sixty (60) days following the delivery of the allocation to Sellers, such dispute shall be resolved by a mutually agreed upon nationally recognized "big four" accounting firm.  The fees and expenses of the accounting firm shall be allocated to be paid by Buyers, on the one hand, and Sellers, on the other hand, based upon the percentage of the portion of the contested amount not awarded to each Party bears to the amount actually contested by the Parties, as determined by the accounting firm.  None of the Parties will take any position inconsistent with the Purchase Price Allocation, if any, on any Tax Return or in any audit or Tax proceeding, unless otherwise required by a final "determination" within the meaning of Section 1313 of the IRC (or comparable provision of state, local or foreign Tax Law).  Notwithstanding the foregoing, the Parties recognize that certain allocations may be necessary prior to the above time schedule, such as in the case of any Transfer Tax filings, and agree to reasonably cooperate in determining the appropriate allocation in a timely manner.

Section 2.8    Removal of Excluded Assets.  Subject to applicable Law, including applicable Shelter-in-Place Laws, as promptly as practicable following the Closing Date, Sellers shall use commercially reasonable efforts to remove at their expense all of the Excluded Assets that are located at the Gym Locations and, if requested by Sellers, Buyer shall arrange transportation of such Excluded Assets to a location designated by Sellers at Sellers' expense.

Section 2.9    Withholding.  Buyers shall not be entitled to deduct and withhold from any amounts otherwise payable pursuant to this Agreement, except to the extent resulting from Seller's failure to satisfy its obligations under Section 2.5(a)(vi).

## ARTICLE III
## SELLERS' REPRESENTATIONS AND WARRANTIES

Sellers represent and warrant to Buyers that the statements contained in this Article III are true and correct as of the date of this Agreement, except (a) as set forth in the disclosure schedule accompanying this Agreement (the "Disclosure Schedule"); provided that disclosure in the Disclosure Schedule as to a specific representation or warranty shall qualify any other sections of this Agreement to the extent (notwithstanding the absence of a specific cross reference) it is reasonably apparent that such disclosure relates to such other sections), (b) as otherwise disclosed or identified in the Parent SEC Documents filed prior to the date hereof (other than any forward-looking disclosures contained in the "Forward Looking Statements" and "Risk Factors" sections of the Parent SEC Documents) to the extent relating to the Business, and (c) such exceptions that result from the commencement of the Bankruptcy Cases (for the avoidance of doubt, any reference in this Article III to "Sellers" or "Seller" shall include any predecessors of any Seller):

Section 3.1    Organization of Sellers; Good Standing.  Each Seller is either a corporation duly organized or a limited liability company duly formed, validly existing, and in good standing under the laws of the state of its incorporation or formation and has, subject to the necessary authority from the Bankruptcy Court, all requisite corporate or company power and authority to own, lease, and operate its assets and to carry on its business as now being conducted, except where the failure to be so organized or formed, existing, or in good standing or have such power and authority would not reasonably be expected to have a Material Adverse Effect.

23

Section 3.2    <u>Authorization of Transaction</u>.  Subject to the Bankruptcy Court's entry of the Sale Order, each Seller has full power and authority (including full corporate power and authority) to execute and deliver this Agreement and all other agreements contemplated hereby to which it is a party and to perform its obligations hereunder and thereunder.  The execution, delivery, and performance of this Agreement and all other agreements contemplated hereby to which each Seller is a party have been duly authorized by such Seller.  Upon due execution hereof by each Seller, this Agreement (assuming due authorization and delivery by Buyers) shall constitute, subject to the Bankruptcy Court's entry of the Sale Order, the valid and legally binding obligation of such Seller, enforceable against such Seller in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar laws relating to creditors' rights and general principles of equity (whether considered in a proceeding in equity or at law).

Section 3.3    <u>Noncontravention; Government Filings</u>.  Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in <u>Article II</u>), will (a) conflict with or result in a breach of the organizational documents of any Seller, (b) subject to the entry of the Sale Order, violate any Law or Decree to which any Seller is subject in respect of the Acquired Assets, or (c) subject to the entry of the Sale Order, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any material Contract or Lease to which any Seller is a party or to which any of the Acquired Assets is subject, except, in the case of either clause (b) or (c), for such conflicts, violations, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Other than as required by, or pursuant to, the Bankruptcy Code, the Bidding Procedures Order, or the Sale Order or any applicable antitrust or competition Law, no Seller is required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Authority in order for the Parties to consummate the transactions contemplated by this Agreement or any Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or prevent or materially impair or delay any Seller's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.

Section 3.4    <u>Title to Assets</u>.  At the Closing, subject to any Permitted Liens and licenses of Intellectual Property, Sellers will have good and valid title to, or the right to use, the Acquired Assets, except to the extent the failure to have such title or right to use would not reasonably be expected to have a Material Adverse Effect.  Pursuant to the Sale Order, Sellers will convey such title to or rights to use, all of the tangible Acquired Assets, free and clear of all Liens (other than Permitted Liens).

Section 3.5    <u>Designated Contracts</u>.  True and materially complete copies of all Contracts and Leases set forth on <u>Schedule 2.6(a)</u> have been made available to Buyer in the data room prepared by Sellers.

Section 3.6    <u>Real Property</u>.  <u>Section 3.6</u> of the Disclosure Schedule sets forth the location of each of the operating gyms and health clubs (each, a "<u>Gym Location</u>", and collectively,

the "Gym Locations"), each of which is leased to a Seller by a third party, and a list of all Leases. The total number of operating Gym Locations related to the Business is approximately seventy (70), certain of which presently are closed due to Shelter-in-Place Laws. Sellers have made available to Buyers a true and materially complete copy of each Lease.  With respect to each Lease, (a) assuming due authorization and delivery by the other party thereto, such Lease constitutes the valid and legally binding obligation of the Seller party thereto and, to Sellers' Knowledge, the counterparty thereto, enforceable against such Seller and, to Sellers' Knowledge, the counterparty thereto in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar laws relating to creditors' rights and general principles of equity, and (b) neither such Seller nor, to Sellers' Knowledge, the counterparty thereto is in breach or default under such Lease, except (i) for those defaults that will be cured in accordance with the Sale Order or waived in accordance with section 365 of the Bankruptcy Code (or that need not be cured under the Bankruptcy Code to permit the assumption and assignment of the Leases), (ii) to the extent such breach or default would not reasonably be expected to have a Material Adverse Effect, or (iii) due to, or as a result of, the Shelter-in-Place Laws.

Section 3.7  Litigation; Decrees.  Except as set forth in Section 3.7 of the Disclosure Schedule and other than the Bankruptcy Cases, there is no Litigation pending against the Sellers, jointly or individually, other than any Litigation pursuant to which no injunctive or equitable relief is sought and where the monetary damages are covered by insurance or would not reasonably be expected to have a Material Adverse Effect.  Other than the Bankruptcy Cases, no Seller is subject to any outstanding Decree that would (x) reasonably be expected to have a Material Adverse Effect or (y) prevent or materially delay such Seller's ability to consummate the transactions contemplated hereby or perform in any material respect its obligations hereunder.

Section 3.8  Labor Relations.  Except as set forth in Section 3.8 of the Disclosure Schedule:

(a)  No Seller is a party to or bound by any collective bargaining agreement with respect to any Covered Employees.  To Sellers' Knowledge, no union or other labor organization; (i) is currently attempting to organize any Covered Employees for the purpose of representation; or (ii) has demanded recognition or filed any petition seeking certification with respect to any Covered Employees.

(b)  Sellers have made available to Buyers in the data room a true, correct and complete list, as of the date of this Agreement, of all Covered Employees which identifies the job title, work location, date of hire, exempt or non-exempt status, part-time or full-time status, annual base salary or regular hourly wage rate, and bonus or commission paid to each such employee in 2019 (if any), as well as whether such employee is on leave and the date such leave began.

(c)  Except as set forth in Section 3.8(c) of the Disclosure Schedule, to Sellers' Knowledge, there is no material charge or complaint of discrimination or retaliation, lawsuit, governmental investigation or audit or other similar proceeding pending or threatened against the Company by, on behalf of or relating to any Covered Employees.

Section 3.9    <u>Brokers' Fees</u>.  Except with the recipients of any Success Fees, no Seller has entered into any Contract to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated hereby for which any Buyer could become liable or obligated to pay.

Section 3.10    <u>Taxes</u>.

(a)    Except as set forth in <u>Section 3.10</u> of the Disclosure Schedule and for matters that would not be reasonably expected to have a Material Adverse Effect, and except those Taxes for which the Sellers will seek authority from the Bankruptcy Court to pay, (i) Sellers have timely filed all Tax Returns required to be filed with the appropriate Governmental Authorities in all jurisdictions in which such Tax Returns are required to be filed (taking into account any extension of time to file granted or to be obtained on behalf of Sellers); (ii) all Taxes shown as due and payable on such Tax Returns have been paid (other than any Taxes not due as of the date of the filing of the Bankruptcy Cases as to which subsequent payment was prohibited by reason of the Bankruptcy Cases); (iii) Sellers are not a party to any Litigation by any taxing authority; and (iv) there are no pending or, to Seller's Knowledge, threatened Litigation by any taxing authority.

(b)    Sellers are not foreign persons within the meaning of section 1445 of the IRC.

Section 3.11    <u>Data Privacy</u>.  In connection with its collection, storage, transfer (including transfer across national borders) and/or use of any personally identifiable information from any individuals, including any members, customers, prospective members or customers, employees and/or other third parties (collectively "<u>Personal Information</u>"), to the Knowledge of Sellers, each Seller is and, during the last three (3) years, has been, in compliance with applicable Laws and each Seller privacy policy in relevant jurisdictions, except where the failure to be in compliance would not be reasonably expected to have a Material Adverse Effect.  Each Seller has all necessary right, title, or other interest in the Personal Information to use such Personal Information as it currently does in its operations.  Neither the execution, delivery, or performance of this Agreement, nor the consummation of any of the transactions contemplated under this Agreement will violate any of Seller written privacy policy or applicable Law.  Each Seller has commercially reasonable physical, technical, organizational and administrative security measures in place to protect all Personal Information collected by it or on its behalf from and against unauthorized access, use and/or disclosure in accordance with applicable Law.  Each Seller is and, during the last three (3) years, has been, in compliance with all Laws relating to data loss, theft and breach of security notification obligations, except where the failure to be in compliance would not be reasonably expected to have a Material Adverse Effect. To the Knowledge of Sellers, there has been no (i) unauthorized access, use, or disclosure of Personal Information in the possession or control of each Seller or any of its contractors with regard to any Personal Information obtained from or on behalf of Seller; or (ii) unauthorized intrusions or breaches of security into any Seller systems.  To the Knowledge of Sellers, each Seller is, and during the last three (3) years, has been, in compliance with the PCI Security Standards Council's Payment Card Industry Data Security Standard (PCI-DSS) and all other applicable security rules and requirements as promulgated by the PCI Security Standards Council, by any member thereof, or by any entity that functions as a card brand, card association, card network, payment processor,

acquiring bank, merchant bank or issuing bank, including all merchant- and service provider-specific requirements, the Payment Application Data Security Standards (PA-DSS) and all audit, scanning and filing requirements.

Section 3.12   Employee Benefits.

(a)     Section 3.12(a) of the Disclosure Schedule lists all "employee benefit plans," as defined in section 3(3) of ERISA, and all other material employee benefit plans or arrangements (other than governmental plans and statutorily required benefit arrangements), including bonus or incentive plans, deferred compensation arrangements, severance pay, sick leave, vacation pay, disability, medical insurance and life insurance maintained or contributed to by Sellers with respect to Covered Employees (the "Company Benefit Plans").

(b)     Each of the Company Benefit Plans sponsored by Sellers that is intended to qualify under section 401 of the IRC has been determined by the IRS to be so qualified, and, except as disclosed on Section 3.12(b) of the Disclosure Schedule, to the Knowledge of Sellers, nothing has occurred with respect to the operation of any such plan which could reasonably be expected to result in the revocation of such favorable determination.

(c)     To Sellers' Knowledge, each of the Company Benefit Plans has been maintained, in all material respects, in accordance with its terms and all provisions of applicable Law.

(d)     No Company Benefit Plan is a pension plan that is subject to Title IV or Section 302 of ERISA or Section 412 of the Code and neither the Company nor any of its ERISA Affiliates sponsors or contributes to a "multiemployer plan" (as defined in Section 3(37) of ERISA that is subject to Title IV of ERISA ("Multiemployer Plan") or has any liability with respect to any other pension plan that is or was subject to Title IV or Section 302 of ERISA or Section 412 of the Code.  Neither the Company nor any of its ERISA Affiliates has incurred any liability relating to the withdrawal or partial withdrawal from a Multiemployer Plan that remains outstanding.

(e)     No Company Benefit Plan provides benefits, including death or medical benefits, beyond termination of service or retirement other than (i) coverage mandated by Law, including COBRA coverage, or (ii) death or retirement benefits under a Company Benefit Plan qualified under Section 401(a) of the Code, and neither the Company nor any of its ERISA Affiliates has made a written or oral representation promising the same.

Section 3.13   Intellectual Property.

(a)     Section 3.13(a) of the Disclosure Schedule lists all registered Intellectual Property and, to the extent applicable, other applications for registration of Intellectual Property owned by a Seller. The Company or another Seller owns or possesses sufficient legal rights to all Company Intellectual Property and solely with respect to Owned Intellectual Property, without any known conflict with, or known infringement of, the rights of others, including prior employees or consultants, with which any of them may be

affiliated now or may have been affiliated in the past, in each case, except as would not be reasonably expected to have a Material Adverse Effect.

(b)     The Company or another Seller is the sole and unrestricted legal and beneficial owner of all Owned Intellectual Property, and no Owned Intellectual Property will at the Closing be subject to any Liens, adverse claims, any requirement of any past (if outstanding), present or future royalty payments or otherwise encumbered or restricted by any rights of any third party, other than Permitted Liens and licenses of Intellectual Property.  The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated thereby will not result in the loss, forfeiture, termination, license or impairment of, or give rise to any obligation to transfer or to create, change or abolish, or limit, terminate or consent to the continued use of any Company Intellectual Property that is material to the Company.

(c)     Sellers, as a practice, have taken commercially reasonable steps to protect, maintain and preserve in all material respects the confidentiality of any trade secrets included in the Owned Intellectual Property.

Section 3.14    Compliance with Laws; Permits.

(a)     Sellers are in compliance with all Laws applicable to the Business, except as set forth in Section 3.14 of the Disclosure Schedule, as resulting from the filing and pendency of the Bankruptcy Cases or where the failure to be in compliance would not be reasonably expected to have a Material Adverse Effect.  Sellers have not received any written notice of or been charged with the violation of any Laws, except where such violation would not be reasonably expected to have a Material Adverse Effect.

(b)     Sellers have all Permits which are required for the operation of the Business as presently conducted, except where such failure to have Permit would not be reasonably be expected to have a Material Adverse Effect.  Sellers are not in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) of any term, condition or provision of any Permit to which they are parties, except where such default or violation would not be reasonably expected to have a Material Adverse Effect.

Section 3.15    Environmental Matters.  The representations and warranties contained in this Section 3.15 are the sole and exclusive representations and warranties of Sellers with respect to environmental matters, including matters relating to Environmental Laws.  Except as would not be reasonably likely to have a Material Adverse Effect:

(a)     the operations of Sellers are in compliance with all applicable Environmental Laws, which compliance includes obtaining, maintaining and complying with all Permits issued pursuant to Environmental Laws necessary to operate the Business;

(b)     no Seller is the subject of any outstanding Litigation with any Governmental Authority with respect to Environmental Laws;

28

(c)    no Seller is the subject of any pending, or to the Knowledge of Sellers, threatened Litigation alleging that Sellers may (i) be in violation of any Environmental Law, or any Permit issued pursuant to Environmental Law, or (ii) have any Liability under any Environmental Law; and

(d)    to the Knowledge of Sellers, there are no pending or threatened investigations of Sellers, or currently or previously owned, operated or leased property of Sellers, which would reasonably be expected to result in Sellers or their Subsidiaries incurring Liability pursuant to any Environmental Law.

Section 3.16   Related Party Transactions.  Except (w) as set forth on Section 3.16 of the Disclosure Schedule, (x) loans and other extensions of credit to directors and officers of the Company and its Subsidiaries for travel, business or relocation expenses or other employment-related purposes in the Ordinary Course of Business, (y) employment arrangements in the Ordinary Course of Business, and (z) the Company Benefit Plans, no officer, director or executive committee member of any Seller or any member of their immediate family or any Affiliate of the Company or such Seller (a) is a party to any Contract or Lease set forth on Section 2.6(b) of the Disclosure Schedule or has any material business arrangement with, or has any material financial obligations to or is owed any financial obligations from, the Company or any actual competitor, vendor or licensor of the Company (each such Contract, Lease or business arrangement, an "Affiliate Agreement"), (b) to the Knowledge of Sellers, none of the foregoing Persons have any material cause of action or other claim against or related to the Business or the Acquired Assets, and (c) to the Knowledge of Sellers, the Company does not have any direct or indirect material business arrangement with or financial obligation to the foregoing Persons.

Section 3.17   Financial Statements.  True, correct and complete copies of (a) the consolidated balance sheets and statements of operations and comprehensive income, stockholders' equity and cash flow of the Company as of and for the years ended December 31, 2018 and December 31, 2019 (the "Yearly Financial Statements"), (b) balance sheets and income statements of each of the Gym Locations (the "Gym Location Financial Statements") for the years ended December 31, 2018 and December 31, 2019  and (c) an unaudited consolidated balance sheets and statements of operations and comprehensive loss, cash flow and stockholders' equity of the Company as of and for the three month period ended June 30, 2020 (the "Interim Financial Statements" and, together with Yearly Financial Statements, the "Financial Statements") have been provided to Buyers.  The Financial Statements present fairly, in all material respects, the financial position, results of operations and cash flows of the Company as of the dates and for the periods indicated in such Financial Statements, have been prepared in accordance with the books of account and other financial records of the Company and have been prepared in conformity with GAAP (except, in the case of the Interim Financial Statements, for the absence of footnotes and other presentation items and for normal year-end adjustments that are not material individually or in the aggregate).  The Gym Location Financial Statements have been prepared in accordance with the books of account and other financial records of the Company.

Section 3.18   Inventory.  The Inventory as a whole is of a quantity and quality historically useable or saleable in the conduct of the Business since the filing of the Bankruptcy Cases, except in respect to Inventory that would have been discarded in normal course after the date upon which the Gym Locations ceased operations.  All Inventory is free from defects in

materials and workmanship (normal wear and tear excepted), except as would not have a Material Adverse Effect.

Section 3.19  <u>Sufficiency of Assets</u>.  The Acquired Assets, together with any (a) Contracts that are not Designated Contracts, (b) leases that are not Assumed Leases, (c) Covered Employee that does not become a Transferred Employee, and (d) Company Benefit Plans, are sufficient for the continued conduct of the Business after the Closing in substantially the same manner as conducted since the filing of the Bankruptcy Cases and constitute substantially all of the rights (other than rights granted under Intellectual Property Licenses that are Excluded Assets), property and assets necessary to conduct the Business as currently conducted immediately prior to the date hereof.

## ARTICLE IV
## BUYERS' REPRESENTATIONS AND WARRANTIES

Buyers represent and warrant to each Seller that the statements contained in this <u>Article IV</u> are true and correct as of the date of this Agreement.

Section 4.1  <u>Organization of Buyer; Good Standing</u>.  Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to own, lease and operate its assets and to carry on its business as now being conducted.

Section 4.2  <u>Authorization of Transaction</u>.  Each Buyer has full power and authority (including full company power and authority) to execute and deliver this Agreement and all other agreements contemplated hereby to which it is a party and to perform its obligations hereunder and thereunder.  The execution, delivery and performance of this Agreement and all other agreements contemplated hereby to which a Buyer is a party have been duly authorized by such Buyer. This Agreement (assuming due authorization and delivery by Sellers) constitutes the valid and legally binding obligation of each Buyer, enforceable against each Buyer in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar laws relating to creditors' rights and general principles of equity.

Section 4.3  <u>Noncontravention</u>.  Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in <u>Article II</u>) will (a) conflict with or result in a breach of the certificate of incorporation or bylaws, certificate of formation or operating agreement, or other organizational documents, as applicable, of such Buyer, (b) violate any law or Decree to which Buyer is, or its assets or properties are, subject or (c) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any Contract or Lease to which a Buyer is a party or by which it is bound, except, in the case of either clause (b) or (c), for such conflicts, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, have a material adverse effect on Buyer or prevent or materially impair or delay any Buyer's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.  No Buyer is required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Authority in

order for the Parties to consummate the transactions contemplated by this Agreement or any Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, prevent or materially impair or delay any Buyer's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.

Section 4.4   Litigation; Decrees.   There is no Litigation pending or, to Buyer's knowledge, threatened in writing that challenges the validity or enforceability of this Agreement or seeks to enjoin or prohibit consummation of the transactions contemplated hereby. Neither Buyer nor any other Buyer is subject to any outstanding Decree that would prevent or materially impair or delay any Buyer's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.

Section 4.5   Brokers' Fees.   No Buyer has entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Sellers or any of their Affiliates could become liable or obligated to pay.

Section 4.6   Sufficient Funds; Adequate Assurances.   Buyer has and will have at the Closing immediately available funds sufficient for the satisfaction of all of its obligations under this Agreement, including the payment of the Purchase Price, the Cure Costs and all fees, expenses and other amounts required to be paid by Buyer in connection with the transactions contemplated hereby, including satisfaction of any Obligations outstanding under the DIP Financing Agreement. Each Buyer is capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Designated Contracts and Assumed Leases and the related Assumed Liabilities.

Section 4.7   Certain Arrangements.   There are no Contracts, undertakings, commitments, agreements or obligations, whether written or oral, between any Buyer, on the one hand, and any member of the management or board of directors (or applicable governing body) of the Company or its Subsidiaries, any holder of equity or debt securities of the Company or its Subsidiaries, or any lender or creditor of the Company or its Subsidiaries, on the other hand, (a) relating in any way to the acquisition of the Acquired Assets or the other transactions contemplated by this Agreement or (b) that would be reasonably likely to prevent, restrict, impede or affect adversely the ability of the Company to entertain, negotiate or participate in any such transactions.

## ARTICLE V
## PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing (except as otherwise expressly stated to apply to a different period):

Section 5.1   Efforts; Cooperation.   Upon the terms and subject to the conditions set forth in this Agreement (including Section 5.4(a)), each of the Parties shall use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things reasonably

31

necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated hereby, and prior to the Termination Date, including using its commercially reasonable efforts to deliver all documents so reasonably necessary and, with respect to Sellers, using its commercially reasonable efforts to respond to reasonable requests for documents and access to management to facilitate completion of due diligence.  Without limiting the generality of the foregoing, (i) each Seller shall use its commercially reasonable efforts to cause the conditions set forth in <u>Section 7.1</u> that are within its control or influence to be satisfied or fulfilled, and (ii) each Buyer shall use its commercially reasonable efforts to cause the conditions set forth in <u>Section 7.2</u> that are within its control or influence to be satisfied or fulfilled, in each case, prior to the Termination Date.

Section 5.2    <u>Conduct of the Business Pending the Closing</u>.

(a)    During the period prior to the Closing, Sellers shall use commercially reasonable efforts, except as otherwise required, authorized or restricted by applicable Law (including applicable Shelter-in-Place Laws), pursuant to the Bankruptcy Code, pursuant to a Decree of the Bankruptcy Court, or pursuant to the DIP Financing, to (i) operate the Business in the Ordinary Course of Business, (ii) preserve intact their business organizations, (iii) maintain the Business and the Acquired Assets in the Ordinary Course of Business (normal wear and tear excepted and recognizing the impact of the Shelter-in-Place Laws), (iv) keep available the services of its officers and Covered Employees, (v) maintain satisfactory relationships with licensors, licensees, suppliers, contractors, distributors, consultants, vendors, and others having business relationships with Sellers in connection with the operation of the Business (other than payment of pre-petition claims), and (vi) subject to the requirements of the Shelter-in-Place Laws, continue to operate the Business consistent with past practice in place immediately prior to the Petition Date.

(b)    Except (i) any and all matters as may be required and approved by order of the Bankruptcy Court, (ii) as required or restricted by applicable Law (including applicable Shelter-in-Place Laws), the Bankruptcy Code, Decree of the Bankruptcy Court, or the DIP Financing, (iii) as otherwise contemplated by this Agreement or set forth on <u>Section 5.2(b)</u> of the Disclosure Schedules, or (iv) with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), no Seller shall, solely as it relates to the Business:

(i)    (A) increase the compensation of any Covered Employee, including annual salaries, wages, commissions or bonuses, or (B) materially increase or decrease the coverage or the benefits available under any (or create any new) Company Benefit Plan;

(ii)    subject any of the Acquired Assets to any Lien, except for Permitted Liens and any Lien securing any debtor in possession loan facility or granted in an order authorizing use of cash collateral;

(iii)    terminate (other than by expiration), amend (other than by automatic extension or renewal), or fail to renew, obtain, or preserve any material Permit;

32

(iv)    make any material loans or material advances;

(v)    enter into any Contract that limits or restricts the conduct or operations of the business of the Company;

(vi)    incur, create, assume, guarantee, or become liable for any indebtedness, other than trade debt and other indebtedness incurred in the Ordinary Course of Business or any indebtedness that would be an Excluded Liability;

(vii)    except as previously disclosed to or known by Buyer, materially modify, amend, supplement, or terminate any Contract or Lease set forth on Schedule 2.6(a);

(viii)    fail to maintain in full force and effect any filings necessary to maintain the Owned Intellectual Property consistent with past practice, other than in the Ordinary Course of Business;

(ix)    engage or hire any new employee whose annual base salary would exceed one hundred thousand Dollars ($100,000);

(x)    reject any Contracts or Leases;

(xi)    seek to accelerate the receipt of any royalty payments or licensing receivables generated by the Business, by way of discount or otherwise;

(xii)    terminate any Covered Employee unless such termination is for "cause";

(xiii)    enter into any new or additional Lease or open any new, additional gym and health club other than the Gym Locations set forth on Section 3.6 of the Disclosure Schedules;

(xiv)    except as previously disclosed to or known to Buyer, commence or continue any material repairs or alterations to any of the Gym Locations;

(xv)    alter, change or otherwise modify the membership and/or pricing structure in existence as of the Petition Date at any Gym Location, including but not limited to the launch of any customer promotions;

(xvi)    propose or pay key employee retention or incentive payments or similar bonus payments;

(xvii)    settle any Litigation with any third party or any Governmental Authority, including *People of the State of New York v. Town Sports International Holdings, Inc. et al.*, Index No. 451969/2020, other than any settlement pursuant to which (A) any Liability thereunder will be an Excluded Liability, (B) no payment from Buyer is sought or required, and (C) no restrictions are placed on or affecting the Business from and after the Closing Date; and

(xviii)  agree to do anything prohibited by this <u>Section 5.2(b)</u>.

(c)    Nothing contained in this Agreement shall give Buyers or their respective Affiliates, directly or indirectly, the right to control or direct the Business prior to the Closing.  Each Buyer (x) acknowledges that the Company and its Subsidiaries operate in the Business and related markets and industries and that such markets and industries have been, are, and are expected to be impacted, directly or indirectly, by Laws, directives, pronouncements or guidelines issued by Governmental Authorities, the Centers for Disease Control and Prevention, the World Health Organization and other industry groups providing for business closures, "sheltering-in-place" or other restrictions that relate to, or arise out of, any epidemic, pandemic or disease outbreak (including the COVID-19 pandemic) and (y) agrees that compliance by the Company and its Subsidiaries with any such Law, directive, pronouncement or guideline shall not constitute a breach of this Agreement.

Section 5.3    <u>Bankruptcy Court Matters</u>.

(a)    No later than October 2, 2020, Sellers shall file with the Bankruptcy Court an application or motion seeking approval of (i) the Bidding Procedures Order (ii) the form of this Agreement and Sellers' authority to enter into this Agreement and (iii) the Overbid Protection (as defined below) (the "<u>Bidding Procedures Motion</u>").

(b)    The Bidding Procedures Order shall provide for an initial overbid protection in the amount of one million Dollars ($1,000,000) over and above the aggregate of the Purchase Price and minimum bid increments thereafter of five hundred thousand Dollars ($500,000) (the "<u>Overbid Protection</u>").

(c)    Unless otherwise agreed by the Parties in writing, the Bidding Procedures Order shall also (i) be entered by the Bankruptcy Court on or before October 12, 2020, (ii) provide that qualified bids must be submitted by October 26, 2020, and an auction, if any, shall take place on October 28, 2020, and (iii) provide that the Closing shall occur on or before November 13, 2020.

(d)    This Agreement and the transactions contemplated hereby are subject to Sellers' right and ability to consider higher or better competing bids with respect to the Business or a material portion of the Acquired Assets pursuant to the Bidding Procedures Order (each a "<u>Competing Bid</u>").  Each Buyer acknowledges that Sellers and their Affiliates and Representatives are and may continue soliciting inquiries, proposals, or offers for the Acquired Assets.

(e)    If an Auction is conducted, and Buyers are not the prevailing party(ies) at the conclusion of such Auction (such prevailing party, the "<u>Prevailing Bidder</u>"), Buyers shall be required to serve as a back-up bidder (the "<u>Back-up Bidder</u>") and keep Buyers' bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon in the Auction) open and irrevocable until the earlier of (i) 5:00 p.m. (prevailing Eastern time) on November 30, 2020 (the "<u>Outside Back-up Date</u>"), or (ii) the date of closing of a

Competing Bid with the Prevailing Bidder. Following the Sale Hearing and prior to the Outside Back-up Date, if the Prevailing Bidder fails to consummate the applicable alternative transaction as a result of a breach or failure to perform on the part of such Prevailing Bidder, the Back-up Bidder (if the Back-up Bidder is the next highest bidder at the Auction) will be deemed to have the new prevailing bid, and Sellers will be authorized, and Buyers will be required, without further order of the Bankruptcy Court, to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon in the Auction) with the Back-up Bidder.

(f)     Sellers shall promptly serve true and correct copies of the Sale Motion and all related pleadings in accordance with the Bidding Procedures Order, the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, and any other applicable order of the Bankruptcy Court.

(g)     The Sale Order shall be entered by the Bankruptcy Court. The Sale Order shall, among other things, (i) approve, pursuant to Sections 105, 363, and 365 of the Bankruptcy Code, (A) the execution, delivery and performance by Sellers of this Agreement, (B) the sale of the Acquired Assets to Buyers on the terms set forth herein and free and clear of all Liens (other than Liens included in the Assumed Liabilities and Permitted Liens), and (C) the performance by Sellers of their respective obligations under this Agreement; (ii) authorize and empower Sellers to assume and assign to Buyers the Designated Contracts; and (iii) find that each Buyer is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code, not a successor to any Seller and grant each Buyer the protections of Section 363(m) of the Bankruptcy Code. Buyers shall promptly take such actions as are reasonably requested by Sellers to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (a) demonstrating that each Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code and (b) establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code. In the event that the Bankruptcy Court's approval of the Sale Order shall be appealed, Sellers shall use reasonable efforts to defend such appeal.

(h)     Unless otherwise provided in the Bidding Procedures Order, the Bidding Procedures Order shall apply to the sale of the Business hereunder.

(i)     Subject to the consummation of the Plan, Buyers shall, on or as soon as reasonably practicable following the Closing (or, in the case of any Contract that is to be assigned following the Closing pursuant to Section 2.6, on or prior to the date of such assignment), pay the Cure Costs and cure any and all other defaults and breaches under the Designated Contracts and Assumed Leases so that such Contracts may be assumed by the applicable Seller and assigned to the applicable Buyer in accordance with the provisions of section 365 of the Bankruptcy Code and this Agreement.

EAST\176343569.13

(j)      Sellers' obligations under this Agreement and in connection with the transactions contemplated hereby are subject to entry of and, to the extent entered, the terms of any orders of the Bankruptcy Court.  Nothing in this Agreement shall require the Company or its Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

Section 5.4    Notices and Consents.    Prior to the Closing and as necessary following the Closing:

(a)      Sellers will give, or will cause to be given, any notices to third parties, and each of the Parties will use its commercially reasonable efforts to obtain any third party consents or sublicenses, if applicable, as are otherwise necessary and appropriate to consummate the transactions contemplated hereby as set forth on Schedule 5.4; and

(b)      each of the Parties will give any notices to, make any filings with, and use its commercially reasonable efforts to obtain any authorizations, consents, and approvals of Governmental Authorities necessary and appropriate to consummate the transactions contemplated hereby as set forth on Schedule 5.4.

Section 5.5    Notice of Developments.    Each Seller and each Buyer will give prompt written notice to the other Parties of (a) the existence of any fact or circumstance, or the occurrence of any event, of which it has Knowledge that would reasonably be likely to cause any of the representations and warranties contained in Article III (in the case of Sellers) or Article IV (in the case of Buyers) to be untrue or inaccurate such that a condition to a Party's obligations to consummate the transactions contemplated hereby set forth in Article VII not to be satisfied as of a reasonably foreseeable Closing Date, or (b) the receipt of any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement; provided, however, that the delivery of any such notice pursuant to this Section 5.5 shall not be deemed to amend or supplement this Agreement and the failure to deliver any such notice shall not constitute a waiver of any right or condition to the consummation of the transactions contemplated hereby by any Party; provided further that if the Closing occurs, any such notice will be considered and deemed to be part of the Schedules for all purposes under this Agreement.

Section 5.6    Access.

(a)      Sellers will provide Buyer and its Representatives access upon reasonable advance notice or request to the books and records, and Designated Contracts and Assumed Leases included in the Acquired Assets, which may be via an electronic data room; provided, however, that (i) such access does not unreasonably interfere with the normal operations of the Company and its Subsidiaries, (ii) all requests for access will be directed to Huron Consulting Group or Houlihan Lokey or such other Person(s) as the Company may designate in writing from time to time, and (iii) for avoidance of doubt, the foregoing shall not require any Person to waive, or take any action with the effect of waiving, its attorney-client privilege with respect thereto or to provide access or information in violation of applicable Law.  Each Buyer shall upon reasonable notice to, and with the prior

36

written consent of, Sellers, be permitted to contact Landlords, vendors, suppliers, licensors, and licensees. Sellers shall be entitled to be present at any such meetings.

(b)    The information provided pursuant to this <u>Section 5.6</u> will be used solely for the purpose of effecting the transactions contemplated hereby, and will be governed by all the terms and conditions of the Confidentiality Agreement (which Confidentiality Agreement shall not terminate upon the execution of this Agreement notwithstanding anything to the contrary therein) and the applicable confidentiality provisions of the Prepetition Senior Secured Debt and/or DIP Financing.  Neither the Company nor any Seller makes any representation or warranty as to the accuracy of any information, if any, provided pursuant to this <u>Section 5.6</u>, and Buyers may not rely on the accuracy of any such information.

(c)    Each Buyer will not, and will not permit its Representatives, contact any manager, employee, customer, supplier, lessee, lessor, licensee, licensor, or distributor of the Company or its Subsidiaries prior to the Closing with respect to the Company, its Subsidiaries, their business or the transactions contemplated by this Agreement without the prior written consent of the Company for each such contact.

(d)    From time to time upon reasonable request of Buyer, and additionally no later than three (3) Business Days prior to the Closing Date, Sellers shall provide Buyer with (i) a list, true and correct in all material respects and as of a date as close as reasonably practicable to the date of such request or such pre-Closing date, of all current members and their respective membership types for each Gym Location and (ii) copies, true and correct in all material respects, of the most recent, as of the time of such request, available unaudited Gym Location Financial Statements for each Gym Location.

Section 5.7    <u>Bulk Transfer Laws</u>.  The Parties intend that pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Liens, including any Liens or Claims arising out of the bulk transfer laws, except Permitted Encumbrances, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.  Each Buyer acknowledges that Sellers will not comply with the provisions of any bulk transfer laws or similar laws of any jurisdiction in connection with the transactions contemplated by this Agreement, including the United Nations Convention on the Sale of Goods, and hereby waives all claims related to the non-compliance therewith.

## ARTICLE VI
## OTHER COVENANTS

Section 6.1    <u>Further Assurances</u>.

(a)    In case at any time after the Closing any further action is necessary to carry out a Party's obligations under this Agreement, such Party will, at the requesting Party's sole cost and expense, take such further action, or cause such further action to be taken (including the execution and delivery of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation, providing materials and information) as the other Party may reasonably request which actions shall be reasonably

37

necessary to transfer, convey, or assign to the applicable Buyer all of the Acquired Assets to be acquired by such Buyer in accordance with <u>Section 2.1</u> or to confirm an applicable Buyer's assumption of the Assumed Liabilities to be assumed by such Buyer in accordance with <u>Section 2.2</u>.

(b)     If, following the Closing, any Buyer or any Seller becomes aware that any Buyer or any of its Affiliates owns any asset or rights which is an Excluded Asset, such Party shall promptly inform the other Party of that fact.  Thereafter, at the request of any Seller, such Buyer shall execute, or cause the relevant Affiliate(s) of such Buyer to execute, such documents as may be reasonably necessary to cause the transfer of and such Buyer shall thereafter transfer any such asset or right to such Seller or such other entities nominated by such Seller for no consideration and such Seller shall do all such things as are reasonably necessary to facilitate such transfer.  If, following the Closing, a Buyer receives any payments in respect of an Excluded Asset, such Buyer shall promptly remit such payments to the applicable Seller or other entity nominated by such Seller.

(c)     If, following the Closing, any Buyer or any Seller becomes aware that a Seller or any of its Affiliates owns any asset or rights which is an Acquired Asset, such Party shall promptly inform the other Party of that fact.  Thereafter, at the request of any Buyer, the applicable Seller shall execute or cause the relevant Seller or Affiliate(s) of such Seller to execute such documents as may be reasonably necessary to cause the transfer of and such Seller shall thereafter transfer any such asset or right to such Buyer or any other entities nominated by such Buyer for no consideration and such Buyer shall do all such things as are reasonably necessary to facilitate such transfer.  If, following the Closing, a Seller or its Affiliates receive any payments in respect of the Acquired Assets, such Seller shall promptly remit such payments to such applicable Buyer or other entity nominated by Buyer.

(d)     With respect to any Acquired Asset (and any asset which is not an Acquired Asset solely as a result of a restriction on transfer or assignment) for which consent or approval is required for transfer or assignment but is not obtained prior to the Closing, Sellers shall reasonably cooperate with Buyers in any reasonable arrangement that Buyers may request to provide Buyers with all of the benefits of, or under, the applicable Acquired Assets (or assets that are not Acquired Assets solely as a result of a restriction on transfer or assignment), including taking actions reasonably required to enforce, for the benefit of a Buyer, any and all rights of Sellers against any party to the applicable Acquired Asset.

Section 6.2   <u>Access; Enforcement; Record Retention</u>.   From and after the Closing, upon request by any Party (the "<u>Requesting Party</u>"), the other Parties will permit such Requesting Party and its Representatives to have reasonable access during normal business hours, at the sole expense of such Requesting Party and in a manner so as not to interfere unreasonably with the normal business operations of such Party, to all premises, properties, personnel, books and records, and Contracts or Leases of such Party for the purposes of (a) preparing Tax Returns, (b) monitoring or enforcing rights or obligations under this Agreement or any of the Related Agreements, (c) defending third-party lawsuits or complying with the requirements of any Governmental Authority, or (d) any other reasonable business purpose (including assistance with the Wind-Down and the closing of the Bankruptcy Cases, the dissolution of Sellers, and related

38

Tax matters and other administrative matters); provided, however, that, for avoidance of doubt, the foregoing shall not require a Party to take any such action if (i) such action may result in a waiver or breach of any attorney/client privilege, (ii) such action could reasonably be expected to result in violation of applicable law, or (iii) providing such access or information would be reasonably expected to be disruptive to its normal business operations.  Buyers agree to maintain the files or records which are contemplated by the first sentence of this Section 6.2 in a manner consistent in all material respects with its document retention and destruction policies, as in effect from time to time, for six (6) years following the Closing.  From and after the Closing, Buyers will, and will cause their employees to, provide Sellers with reasonable assistance, support and cooperation with Sellers' Wind-Down and related activities (e.g., helping to locate documents or information related to preparation of Tax Returns or prosecution or processing of insurance/benefit claims).

Section 6.3    Covered Employees.

(a)    Buyer, or one of the other Buyers, shall offer employment to the Covered Employees who work at any Gym Location that is subject to an Assumed Lease and may offer employment to any or all of the other Covered Employees (including, in each case and for the avoidance of doubt, Inactive Employees).  At least two (2) Business Days prior to the Auction, Buyer shall provide Sellers a list of any such other Covered Employees that Buyer, or one of the other Buyers, would like to make an offer of employment; provided, however, that Buyers shall provide Sellers with advance notice to allow Sellers to comply with the WARN Act in the event that Buyers or Buyer fail to offer employment to a sufficient number of Covered Employees on sufficient enough terms and conditions such that Sellers would have an obligation to provide notice under the WARN Act.  Any such offer of employment will be effective as of the Closing Date and contingent upon the Closing.  Each Covered Employee who accepts such offer of employment shall be deemed a "Transferred Employee"; provided that any Covered Employee who has been furloughed or is on an approved leave of absence as of the Closing (an "Inactive Employee") shall not be considered a Transferred Employee unless and until such Inactive Employee returns to active status in accordance with this Section 6.3(a), and notwithstanding anything herein to the contrary, no Buyer or their respective Affiliates shall be responsible for Liabilities relating to such Inactive Employee prior to the date such Inactive Employee becomes a Transferred Employee.  Each Transferred Employee who becomes employed by a Buyer in connection with the transactions contemplated by this Agreement shall be eligible to receive the salary and benefits (excluding, severance and equity compensation) maintained for employees of Buyer on substantially similar terms and conditions in the aggregate as are provided to such Transferred Employees prior to the Closing. The employment of any Inactive Employee with Buyer or one of its Affiliates, as applicable, shall be effective upon his or her return to active work; provided that the Inactive Employee reports to work with Buyer or one of its Affiliates, as applicable, within five (5) Business Days after the end of any such approved leave and, to the extent permitted by applicable Law, in no event later than six (6) months following the later of (i) the Closing Date or (ii) repeal of the applicable Shelter-in-Place Laws, and, as of such date, such Inactive Employee shall be a Transferred Employee. Buyer, in its sole discretion shall also be permitted to offer employment to any Covered Employee that is not employed at a Gym Location and any such Covered Employee that accepts such offer of employment shall be a Transferred Employee.  Sellers

39

will reasonably cooperate with any reasonable requests by Buyer in order to facilitate the offers of employment and the delivery of such offers.

(b)     Service Credit.  Each Transferred Employee shall be given credit for all service with Sellers and their Subsidiaries, and their respective predecessors under any employee benefit plans or arrangements of Buyer and its respective Affiliates maintained by Buyer or its respective Affiliates in which such Transferred Employees participate following the Closing Date, for purposes of eligibility, vesting and entitlement to benefits, including for severance benefits and vacation entitlement and for accrual of pension benefits; provided, however, that (i) such credit shall be given pursuant to payroll or plan records of Sellers; and (ii) such service crediting shall be permitted and consistent with Buyer's or its applicable Affiliate's defined contribution retirement plan.  Notwithstanding the foregoing, nothing in this Section 6.3(b) shall be construed to require crediting of service that would result in a duplication of benefits.

(c)     No Third Party Beneficiary Rights.  Without limiting the generality of this Section 6.3, no provision of this Agreement shall create any third party beneficiary rights in any current or former employee or service provider of any Seller, any Covered Employee, or any Transferred Employee (including any beneficiary or dependent thereof) in respect of continued employment by Sellers or its Affiliates or Buyers or its Affiliates or otherwise.  Nothing herein shall (i) guarantee employment for any period of time or preclude the ability of any Buyer or any of its Affiliates to terminate any Transferred Employee for any reason, (ii) require any Buyer or any of its Affiliates to continue any Company Benefit Plans, employee benefit plans, or arrangements or prevent the amendment, modification or termination thereof after the Closing, or (iii) constitute an amendment to any Company Benefit Plan, employee benefit plans, or arrangements.

(d)     Effective as soon as practicable following the Closing Date, Sellers, or any applicable Affiliate, shall effect a transfer of assets and liabilities from the defined contribution retirement plan that it maintains, to the defined contribution retirement plan maintained by Buyer, with respect to those employees of the Business who become employed by Buyer, or an Affiliate of Buyer, in connection with the transactions contemplated by this Agreement. Any such transfer shall be in an amount sufficient to satisfy Section 414(l) of the Code.

(e)     Sellers shall retain any obligations under Section 4980B of the Code for Covered Employees (and their eligible dependents) who are "M&A qualified beneficiaries" (as such term is defined in Treasury Regulation Section 54.4980B-9, A-4) until such time as Sellers or any of their ERISA Affiliates cease to provide a group health plan. From and after such time, Buyer shall have the obligation to provide COBRA coverage to such individuals to the extent described in Treasury Regulation Section 54.4980B-9, A-8(c)(1).

(f)     Except for any Assumed Liabilities or as otherwise described in this Section 6.3, Sellers will have the sole and absolute responsibility for any financial or other commitments to their employees for the period prior to the Closing, including any and all claims or obligations for severance pay and any and all claims and obligations arising under

any collective bargaining agreement, employee benefit plan (including, any withdrawal liability) or any local, state or federal law, rule or regulation. Other than as set forth in Section 6.3(a), no Buyer of any of its Affiliates shall have any contractual or other obligation with respect to hiring, offering to hire or employing any Covered Employee or any of Sellers' other employees. Except as set forth in Section 6.3(a), in no event shall any Buyer be obligated to commit to any particular usage of employees or to any particular benefits or wage rates. Nothing contained herein shall be deemed an admission that Sellers have any financial obligation to employees or that obligations, if any, are entitled to a particular treatment or priority under the Bankruptcy Code. Sellers' failure to pay an obligation, if any, under this Section 6.3 shall not be a default under this Agreement.

Section 6.4    Transfer Taxes. Buyers shall pay any stamp, documentary, filing, recording, registration, sales, use, transfer, added-value or other non-income Tax, fee, or governmental charge (a "Transfer Tax") imposed under applicable Law in connection with the transactions contemplated hereby. The Party that is required by applicable Law to file any Tax Returns in connection with Transfer Taxes described in the immediately preceding sentence shall prepare and timely file such Tax Returns. The Parties hereto shall cooperate to permit the filing Party to prepare and timely file any such Tax Returns.

Section 6.5    Allocation of Taxes. In the case of any Taxes imposed with respect to a taxable period that includes (but does not end on) the Closing Date (a "Straddle Period"), the amount of any Taxes imposed on a periodic basis, such as real or personal property Taxes (such Taxes, "Periodic Taxes"), with respect to the portion of the Straddle Period ending on and including the Closing Date shall be deemed to be the amount of such Tax for the entire taxable period multiplied by a fraction the numerator of which is the number of days in the portion of the taxable period ending on and including the Closing Date and the denominator of which is the number of days in such taxable period. Any Tax Returns for Periodic Taxes imposed with respect to the Acquired Assets or the Business in a Straddle Period shall be prepared in a manner consistent with the past practices of Sellers and its Affiliates for filing such Tax Returns, except as otherwise required by applicable Law. If the actual amount of any Taxes imposed on a periodic basis for a Straddle Period determined pursuant to the first sentence in this Section 6.5 is not known for the Straddle Period as of the Closing Date, the amount of such Taxes attributable to the portion of the Straddle Period that ends on the Closing Date will be estimated as of the Closing Date based on the amount of Tax for the prior taxable period.

Section 6.6    Press Releases and Public Announcements. No Party shall issue any press release or make any public announcement relating to the existence or subject matter of this Agreement without the prior written approval of Buyer and the Company, unless a press release or public announcement is required by applicable law, or any rule or order of the Bankruptcy Court. If any such announcement or other disclosure is required, the disclosing Party shall give the nondisclosing Parties prior notice of, and an opportunity to comment on, the proposed disclosure. The Parties acknowledge that Sellers shall file this Agreement with the Bankruptcy Court in connection with obtaining the Sale Order.

Section 6.7    Non-Disclosure; Non-Solicit; Non-Disparagement.

(a)    <u>Non-Disclosure of Confidential Information</u>.    None of the Sellers (the "<u>Restricted Parties</u>") shall, directly or indirectly, disclose or use at any time (and shall cause their respective controlled Affiliates and Representatives, excluding, for the avoidance of doubt, the Unrestricted Affiliates, not to use or disclose) any Confidential Information (whether or not such information is or was developed by any of the Restricted Parties), except to the extent that such disclosure or use is (i) directly related to and required by the performance of such Restricted Party's duties to the Company or the Buyers, (ii) required by applicable law, any rule of the Bankruptcy Court, any Decree, or as otherwise provided hereunder, (iii) to such Restricted Parties' or their Affiliates' legal and financial advisors who agree to maintain the confidentiality of such information or (iv) to Buyers or any of their respective Subsidiaries or Affiliates.    The Restricted Parties each further agree to take commercially reasonable steps, to the extent within its control, to safeguard such Confidential Information and to protect it against disclosure, misuse, espionage, loss, and theft.    In the event any of the Restricted Parties is required by Law or Decree to disclose any Confidential Information, such Restricted Party shall promptly notify the Buyers in writing, which notification shall include the nature of the legal requirement and the extent of the required disclosure, and shall cooperate with the Buyers' reasonable requests to preserve the confidentiality of such Confidential Information consistent with applicable Law.    No Restricted Party shall use any Membership Information except to the extent required to operate the Business as conducted as of the Closing Date.    For purposes of this Agreement, "Confidential Information" means all information of a confidential or proprietary nature (whether or not specifically labeled or identified as "confidential"), in any form or medium, that relates to the Business, the Company, any other Seller, or their respective members, suppliers, distributors, customers, landlords, independent contractors or other business relations.    Confidential Information includes the following as they relate to the Company, any other Seller or the Business and, in each case, to the extent the Company, any other Seller or the Business obtains a commercial benefit from the secret nature of such information: Membership Information, internal business information (including information relating to strategic and staffing plans and practices, business, training, marketing, promotional and sales plans and practices, cost, rate and pricing structures, accounting and business methods and potential acquisition candidates); identities of, individual requirements of, and specific contractual arrangements with, the Company's or any other Seller's members, suppliers, distributors, customers, independent contractors or other business relations and their confidential information; trade secrets, know-how, compilations of data and analyses, techniques, systems, formulae, research, records, reports, manuals, documentation, models, data and data bases relating thereto; and inventions, innovations, improvements, developments, methods, designs, analyses, drawings, and reports.

(b)    <u>Non-Solicit</u>.  During the period commencing on the date hereof and ending on the third (3rd) anniversary of the Closing Date (the "<u>Restricted Period</u>"), the Restricted Parties shall not, and shall not cause their respective Affiliates and trusts, to, directly or indirectly, either individually or acting in concert with another Person or Persons, other than in the Ordinary Course of Business prior to the Closing in a manner that is not reasonably expected to be adverse to the Business:

(i)      request, induce or attempt to influence any distributor, supplier or customer of goods or services of the Business to curtail, cancel or refrain from maintaining or increasing the amount or type of business such distributor, supplier or customer of goods or services is currently transacting, or may be transacting during the Restricted Period, with the Business or adversely modify its pricing or other terms of sale with the Business;

(ii)     (a) influence or attempt to influence any member of the Business of any Gym Location at any time during the twelve (12) month period preceding the Closing Date to terminate or otherwise adversely modify their membership or (b) request, induce or attempt to influence any member of the Business of any Gym Location of any Restricted Affiliate at any time during the twelve (12) month period preceding the Closing Date to join or use any Restricted Business;

(iii)    solicit for employment or retention or hire, employ or retain any Person who is an employee of the Business during the Restricted Period or was an employee at any time during the twelve (12) month period preceding the Closing Date; or influence or attempt to influence any Person who is an employee of the Business during the Restricted Period or at any time during the twelve (12) month period preceding the Closing Date to terminate his or her employment with the Company or the Business.

(c)      Severability.  Notwithstanding anything to the contrary in this Agreement, if at any time, in any judicial or arbitration proceeding, any of the restrictions stated in this Section 6.7 are found by a final order of a court of competent jurisdiction or arbitrator to be unreasonable or otherwise unenforceable under circumstances then existing, the Parties each agree that the period, scope or geographical area, as the case may be, shall be reduced to the extent necessary to enable the court to enforce the restrictions to the extent such provisions are allowable under applicable Law, giving effect to the agreement and intent of the Parties that the restrictions contained herein shall be effective to the fullest extent permissible.  In the event of a breach or violation by any Restricted Party of any of the provisions of this Section 6.7, the Restricted Period, as the case may be, will be tolled for so long as such Restricted Party was in violation of such provision.  Each Restricted Party agrees that the restrictions contained in this Agreement are reasonable in all respects and necessary to protect each Buyer's interest in, and the value of, the Business.

(d)      Specific Performance; Injunctive Relief.  Each Restricted Party acknowledges and agrees that in the event of a breach or violation by any Restricted Party of any of the provisions of this Section 6.7, the Buyers would suffer irreparable harm, no adequate remedy at law would exist for the Buyers, and damages would be difficult to determine.  Consequently, in the event of any such breach or violation, the Buyers or their successors or assigns may, in addition to other rights and remedies existing in their favor, apply to any court of law or equity of competent jurisdiction for specific performance or injunctive or other relief in order to enforce or prevent any violations of the provisions hereof, in each case without the requirement of posting a bond or proving actual damages; provided that any such specific performance or injunctive relief shall be limited to

43

restraining or prohibiting such breach or threatened and not the cessation of operations or forced divestiture of the applicable business.

Section 6.8    No Successor Liability.  The Parties intend that upon the Closing, each Buyer and its Affiliates shall not and shall not be deemed to: (a) be a successor (or other such similarly situated party), or otherwise be deemed a successor, to Sellers, including a "successor employer" for the purposes of the Internal Revenue Code of 1986, the Employee Retirement Income Security Act of 1974, or other applicable laws; (b) have any responsibility or liability for any obligations of Sellers, or any affiliate of Sellers, based on any theory of successor or similar theories of liability; (c) have, de facto or otherwise, merged with or into any of Sellers; (d) be an alter ego or a mere continuation or substantial continuation of any of Sellers (and there is no continuity of enterprise between any Buyer and any Seller), including within the meaning of any foreign, federal, state or local revenue, pension, ERISA, tax, labor, employment, environmental, or other law, rule or regulation (including filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to Sellers' liability under such law, rule or regulation or doctrine; or (e) be holding itself out to the public as a continuation of any of Sellers or their respective estates.

Section 6.9    Acquired Avoidance Actions and Causes of Action.  No Buyer shall at any time following the Closing pursue, prosecute, sell, or transfer any of the Acquired Avoidance Actions. For the avoidance of doubt, nothing herein shall restrict any Buyer from pursuing, prosecuting, selling or transferring any Causes of Action against or relating to the Unrestricted Affiliates.

Section 6.10    Personal Information.  Notwithstanding anything contained in this Agreement to the contrary, Buyers acknowledge and agree that the Personal Information transferred to Buyers hereunder must be used in compliance with all applicable Laws and, except to the extent that Buyers obtain the necessary consents from customers permitting broader uses, may be used solely in connection with the Business and in compliance with applicable Law and Sellers' privacy policies.

Section 6.11    Support Obligations.  Buyer recognizes that Sellers and certain of its lenders have provided and/or collateralized letters of credit as support, performance or similar bonds, sureties, and similar instruments to and/or on behalf of the Sellers (collectively, the "Support Obligations").  Buyer shall use commercially reasonable efforts to, as promptly as reasonably practicable after the Closing Date, either (a) cause the Sellers to receive a full and unconditional release of each of the Support Obligations or (b) replace each of the Support Obligations, in each case in a manner reasonably acceptable to Sellers.  Buyer shall use commercially reasonable efforts to cause the beneficiary or beneficiaries of the Support Obligations to terminate and redeliver to Sellers, as soon as practicable, each original copy of the Support Obligations, as well as to redeliver promptly following release thereof to Sellers any cash collateral in respect of the Support Obligations that was originally provided by Sellers.  For so long as the Support Obligations are outstanding, Buyer shall indemnify, defend and hold harmless Sellers from and against any and all losses incurred by Sellers in connection with the Support Obligations, except to the extent due to the breach, gross negligence or willful misconduct of the Sellers.

44

Section 6.12  <u>Acknowledgement by Buyers</u>.

(a)        Each Buyer acknowledges and agrees, on its own behalf and on behalf of the Buyer Group, that it has conducted to its full satisfaction an independent investigation and verification of the business, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks (including risks relating to or arising out of, directly or indirectly, any epidemic or pandemic, including the COVID-19 pandemic) and prospects of the Company and its Subsidiaries and the Acquired Assets and the Assumed Liabilities, and, in making its determination to proceed with the transactions contemplated by this Agreement, Buyers and the Buyer Group have relied solely on the results of the Buyer Group's own independent investigation and verification and have not relied on, are not relying on, and will not rely on, any information, statements, disclosures, documents, projections, forecasts or other material made available to Buyers and the Buyer Group or any of their respective Affiliates or Representatives in the data room, the Projections or any information, statements, disclosures or materials, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or any Seller, or any failure of any of the foregoing to disclose or contain any information, except for the representations and warranties made by Sellers as expressly set forth in <u>Article III</u> (as modified by the Disclosure Schedules) (the "<u>Express Representations</u>") (it being understood that Buyers and the Buyer Group have relied only on the Express Representations.  Each Buyer acknowledges and agrees, on its own behalf and on behalf of the Buyer Group, that (i) the Express Representations are the sole and exclusive representations, warranties and statements of any kind made to Buyers or any member of the Buyer Group and on which Buyers or any member of the Buyer Group may rely in connection with the transactions contemplated by this Agreement; and (ii) all representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (A) with respect to the completeness or accuracy of, or any omission to state or to disclose, any information including in the data room, Projections, meetings, calls or correspondence with management of the Company and its Subsidiaries, any Seller or any other Person on behalf of the Company, its Subsidiaries or any Seller or any of their respective Affiliates or advisors and (B) the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks (including risks relating to or arising out of, directly or indirectly, any epidemic or pandemic, including the COVID-19 pandemic) or prospects of the Company or any of its Subsidiaries, or the quality, quantity or condition of the Company's or its Subsidiaries' assets, in each case, are specifically disclaimed by the Company, on its behalf and on behalf of each Seller.  Each Buyer, on its own behalf and on behalf of the Buyer Group: (x) disclaims reliance on the items in clause (ii) in the immediately preceding sentence and (y) acknowledges and agrees that it has relied on, is relying on and will rely on only the items in clause (i) in the immediately preceding sentence.  Without limiting the generality of the foregoing, each Buyer acknowledges and agrees, on its own behalf and on behalf of the Buyer Group, that neither the Company, nor any other Person (including any Seller), has made, is making or is authorized to make, and each Buyer, on its own behalf and on behalf of the Buyer Group, hereby waives, all rights and claims it or they may have against any Seller with respect to the accuracy of, any omission or concealment of, or any misstatement with respect to, (A)

any potentially material information regarding the Company, its Subsidiaries or any of their respective assets (including the Acquired Assets), Liabilities (including the Assumed Liabilities) or operations and (B) any warranty or representation (whether in written, electronic or oral form), express or implied, as to the quality, merchantability, fitness for a particular purpose, or condition of the Company's or its Subsidiaries' business, operations, assets, Liabilities, Contracts, environmental compliance, employee matters, regulatory compliance, business risks (including risks relating to or arising out of, directly or indirectly, any epidemic or pandemic, including the COVID-19 pandemic) and prospects or any portion thereof, except, in each case, solely to the extent expressly set forth in the Express Representations.

(b)    Without limiting the generality of the foregoing, in connection with the investigation by the Buyer Group of the Company and its Subsidiaries, Buyers and the Buyer Group and their respective Representatives, have received or may receive, from or on behalf of Sellers, certain projections, forward-looking statements and other forecasts (whether in written, electronic, or oral form, and including in the data room, management meetings, etc.) (collectively, "Projections").  Each Buyer acknowledges and agrees, on its own behalf and on behalf of the Buyer Group, that (i) such Projections are being provided solely for the convenience of each Buyer to facilitate its own independent investigation of the Company and its Subsidiaries, (ii) there are uncertainties inherent in attempting to make such Projections, (iii) each Buyer is familiar with such uncertainties, and (iv) each Buyer is taking full responsibility for making their own evaluation of the adequacy and accuracy of all Projections (including the reasonableness of the assumptions underlying such Projections.

(c)    Each Buyer acknowledges and agrees, on its own behalf and on behalf of the Buyer Group, that it will not assert, institute, or maintain, and will cause each other member of the Buyer Group not to assert, institute or maintain, any Cause of Action that makes any claim contrary to the agreements and covenants set forth in this Section 6.10, including any such Cause of Action with respect to the distribution to any Buyer or any member of the Buyer Group, or any Buyer's or any member of the Buyer Group's use, of the information, statements, disclosures or materials in the data room, Projections or any other information, statements, disclosures, or materials, in each case whether written or oral, provided by them or any Seller or its Affiliates or Representatives or any failure of any of the foregoing to disclose any information.

(d)    Each Buyer acknowledges and agrees, on its own behalf and on behalf of the Buyer Group, that the covenants and agreements contained in this Section 6.12 (i) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for the maximum extent permitted by applicable Law and in no event less than five (5) years; and (ii) are an integral part of the transactions contemplated by this Agreement and that, without these agreements set forth in this Section 6.12, Sellers would not enter into this Agreement.

## ARTICLE VII
## CONDITIONS TO OBLIGATION TO CLOSE

Section 7.1    <u>Conditions to Buyers' Obligations</u>.    Buyers' obligation to consummate the transactions contemplated hereby in connection with the Closing is subject to satisfaction or waiver of the following conditions:

(a)    the representations and warranties set forth in <u>Article III</u> shall have been true and correct on the date hereof and as of the Closing (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date), except where the failure of such representations and warranties to be so true and correct has not resulted in a Material Adverse Effect;

(b)    Sellers shall have performed and complied with its covenants and agreements hereunder that are required to be performed prior to the Closing in all material respects;

(c)    the Bankruptcy Court shall have entered the Bidding Procedures Order pursuant to the terms and conditions of <u>Section 5.3</u> herein;

(d)    the Bankruptcy Court shall have entered the Sale Order, and no Decree staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date;

(e)    no material Decree shall be in effect that prohibits consummation of the transactions contemplated by this Agreement; and

(f)    each delivery contemplated by <u>Section 2.5(a)</u> to be delivered to a Buyer shall have been delivered.

Section 7.2    <u>Conditions to Sellers' Obligations</u>.    Sellers' obligations to consummate the transactions contemplated hereby in connection with the Closing are subject to satisfaction or waiver of the following conditions:

(a)    the representations and warranties set forth in <u>Article IV</u> shall have been true and correct in all material respects on the date hereof and as of the Closing (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date);

(b)    each Buyer shall have performed and complied with its covenants and agreements hereunder that are required to be performed prior to the Closing in all material respects;

(c)    the Bankruptcy Court shall have entered the Sale Order, and no Decree staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date;

(d)       no material Decree shall be in effect that prohibits consummation of any of the transactions contemplated by this Agreement; and

(e)       each payment contemplated by Section 2.5(b) to be made to Sellers shall have been made, and each delivery contemplated by Section 2.5(b) to be delivered to Sellers shall have been delivered.

Section 7.3    No Frustration of Closing Conditions.   Neither Buyers nor Sellers may rely on the failure of any condition to their respective obligations to consummate the transactions contemplated hereby set forth in Section 7.1 or Section 7.2, as the case may be, to be satisfied if such failure was caused by such Party's or its Affiliates' failure to use its reasonable best efforts (or such other applicable efforts standard expressly contemplated hereby) to satisfy the conditions to the consummation of the transactions contemplated hereby or by any other breach of a representation, warranty or covenant hereunder.  Upon the occurrence of the Closing, except as set forth in writing executed between the Sellers and Buyers, which writing may be in the form of an email between counsel, following the date hereof and specifically referencing such conditions, any condition set forth in this Article VII that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing.

## ARTICLE VIII
## TERMINATION

Section 8.1    Termination of Agreement.    The Parties may terminate this Agreement at any time prior to the Closing as provided below:

(a)       by the mutual written consent of the Parties;

(b)       by any Party by giving written notice to the other Parties if:

(i)       any court of competent jurisdiction or other competent Governmental Authority shall have enacted or issued a Law or Decree, or taken any other action, permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement and such Law or Decree or other action shall have become final and non-appealable; provided, however, that the right to terminate this Agreement under this Section 8.1(b)(i) shall not be available to any Party if the failure to consummate the Closing because of such action by a Governmental Authority shall be due to the failure of such Party to have fulfilled any of its obligations under this Agreement; or

(ii)       the Closing shall not have occurred prior to the Termination Date; provided, however, that if the Closing shall not have occurred on or before the Termination Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Buyers or Sellers, then the breaching Party may not terminate this Agreement pursuant to this Section 8.1(b)(ii).  The "Termination Date" shall be November 30, 2020, unless the Parties mutually agree to a later Closing Date pursuant to Section 2.4, upon which such later date shall be the Termination Date.

48

(c)      by Buyers by giving written notice to Sellers if there has been a breach by any Seller of any representation, warranty, covenant, or agreement contained in this Agreement that has prevented the satisfaction of the conditions to the obligations of Buyers at the Closing set forth in <u>Section 7.1(a)</u> and <u>Section 7.1(b)</u>, and such breach has not been waived by Buyers, or, if such breach is curable, cured by such Seller prior to the earlier to occur of (A) ten (10) Business Days after receipt of Buyers' notice of intent to terminate and (B) the Termination Date; <u>provided</u> that Buyers shall not have a right of termination pursuant to this <u>Section 8.1(c)</u> if Sellers could, at such time, terminate this Agreement pursuant to <u>Section 8.1(d)</u>;

(d)      by Sellers by giving written notice to Buyers if there has been a breach by Buyers of any representation, warranty, covenant, or agreement contained in this Agreement that has prevented the satisfaction of the conditions to the obligations of Sellers at the Closing set forth in <u>Section 7.2(a)</u> and <u>Section 7.2(b)</u>, and such breach has not been waived by such Seller, or, if such breach is curable, cured by Buyer prior to the earlier to occur of (A) ten (10) Business Days after receipt of such Seller's notice of intent to terminate and (B) the Termination Date; <u>provided</u> that Sellers shall not have a right of termination pursuant to this <u>Section 8.1(d)</u> if Buyer could, at such time, terminate this Agreement pursuant to <u>Section 8.1(c)</u>;

(e)      by Sellers or Buyer, if (i) (x) Sellers enter into a definitive agreement with respect to a Competing Bid, (y) the Bankruptcy Court enters an order approving a Competing Bid and (z) the Person making the Competing Bid consummates the Competing Bid or (ii) the Bankruptcy Court enters an order that precludes the consummation of the transactions contemplated hereby on the terms and conditions set forth in this Agreement;

(f)      upon entry of an order of the Bankruptcy Court dismissing or converting to a case or cases under Chapter 7 of the Bankruptcy Code, or appointing a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of the Company is appointed in the Bankruptcy Case;

(g)      by written notice from the Company to Buyers, if any Seller or the board of directors (or similar governing body) of any Seller determines that proceeding with the transactions contemplated by this Agreement or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties;

(h)      by Buyer if any of the following milestones are not complied with:

(i)      Sellers shall file a motion to approve the Bidding Procedures, which shall contain this Agreement and which shall seek approval of the Bid Protections, no later than October 2, 2020;

(ii)      the Bankruptcy Court shall have entered an order approving the Bidding Procedures in a form satisfactory to Buyer and the Prepetition Lenders no later than October 12, 2020;

(iii)      the deadline for qualified bids for the Auction shall have occurred no later than October 26, 2020;

49

(iv)    Sellers shall have commenced an auction for the sale of the Acquired Assets no later than October 28, 2020; and

(v)    the Bankruptcy Court shall have entered an order approving this Agreement and the transactions contemplated therein no later November 5, 2020.

Section 8.2    Effect of Termination.  If any Party terminates this Agreement pursuant to Section 8.1, all rights and obligations of the Parties hereunder shall terminate upon such termination and shall become null and void (except that Article I, Section 6.12, Article IX, and this Section 8.2 shall survive any such termination) and no Party shall have any Liability to the other Party hereunder; provided, however, that nothing in this Section 8.2 shall relieve any Party from Liability for any breach occurring prior to any such termination (but solely to the extent such breach was willful, grossly negligent or fraudulent) set forth in this Agreement.

## ARTICLE IX
## MISCELLANEOUS

Section 9.1    Survival.  Except for any covenant that by its terms is to be performed (in whole or in part, but only to the extent of such part) by any Party following the Closing, none of the representations, warranties, or covenants of any Party set forth in this Agreement or in any certificate delivered pursuant to Section 2.5(a) or Section 2.5(b) shall survive, and each of the same shall terminate and be of no further force or effect as of, the Closing. Any obligations to be performed post-Closing shall survive until completion.  Buyers hereby waive all rights and remedies with respect to any environmental, health or safety matters, including those arising under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, or any other Environmental Laws, relating to the Business, the Acquired Assets, this Agreement or the transactions contemplated hereby.

Section 9.2    Expenses.  Except for as provided by orders of the Bankruptcy Court including the DIP Order, each Party will bear its own costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby, including all fees of law firms, commercial banks, investment banks, accountants, public relations firms, experts, and consultants.  For the avoidance of doubt, Buyers shall pay all recording fees arising from the transfer of the Acquired Assets.

Section 9.3    Entire Agreement.  This Agreement and the Related Agreements constitute the entire agreement between the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or between the Parties to the extent they relate in any way to the subject matter hereof.

Section 9.4    Incorporation of Exhibits and Disclosure Schedule.  The Exhibits to this Agreement and the Disclosure Schedule are incorporated herein by reference and made a part hereof.

Section 9.5    Amendments and Waivers.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Buyer and each Seller.  No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement.  No waiver by any Party of

50

any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant.   No conditions, course of dealing or performance, understanding, or agreement purporting to modify, vary, explain, or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this Section 9.5 except as expressly provided herein.  Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power, or privilege hereunder shall operate as a waiver thereof.

Section 9.6    Succession and Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder with the prior written consent of the other Parties.  Notwithstanding the foregoing, each Buyer may assign (in whole or in part) either this Agreement or any of its rights, interests, or obligations hereunder to an Affiliate of such Buyer without the prior written consent of the other Parties; provided that such assignment shall not relieve such Buyer of its obligations hereunder.

Section 9.7    Notices.    All notices, requests, demands, claims, and other communications hereunder shall be in writing except as expressly provided herein.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (a) when delivered personally to the recipient; (b) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (c) upon receipt of confirmation of receipt if sent by facsimile transmission; (d) on the day such communication was sent by e-mail (unless after 5:00 p.m. local time of the recipient or on a non-Business Day, in which case, on the next Business Day); or (e) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to any Seller:        TOWN SPORTS INTERNATIONAL, LLC
                        399 Executive Blvd.
                        Elmsford, NY 10523
                        Attention:      Patrick Walsh
                        E-mail:         Patrick.Walsh@tsiclubs.com

                        With a mandatory copy (which shall not constitute notice to

Sellers) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention:    Nicole L. Greenblatt, P.C.
              Steve Toth
              Joshua M. Altman
E-mail:       nicole.greenblatt@kirkland.com
              steve.toth@kirkland.com
              josh.altman@kirkland.com

If to Buyers:    New TSI Holdings, Inc
                 c/o New Town Sports Holdings, LLC
                 1140 Avenue of the Americas, Floor 10
                 New York NY 10036
                 Attention:    Azhar Quader and Andrew Goldman
                 E-mail: azhar.quader@queenscourtcap.com;
                 agoldman@coalitioninvest.com

                 With a mandatory copy (which shall not constitute notice to
                 Buyers) to:

                 DLA Piper LLP (US)
                 444 West Lake Street, Suite 900
                 Chicago, IL 60606-0089
                 Attention:    Richard Chesley
                 E-mail:       Richard.Chesley@us.dlapiper.com

If to Prepetition    Gibson, Dunn & Crutcher LLP
Lenders:             200 Park Avenue
                     New York, NY 10166-0193
                     Attention:    Scott J. Greenberg
                     E-mail:       sgreenberg@gibsondunn.com

                     FTI Consulting
                     Three Times Square, 9th Floor
                     New York, NY, 10036
                     Attention:    Jonathan Miller
                     E-mail:       jonathan.miller@fticonsulting.com

Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Parties notice in the manner set forth in this Section 9.7.

        Section 9.8    Governing Law.    This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware (without giving effect to

the principles of conflict of Laws thereof), except to the extent that the Laws of such state are superseded by the Bankruptcy Code.

Section 9.9    <u>Submission to Jurisdiction; Service of Process</u>.  Each of the Parties irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby and agrees that all claims in respect of such Litigation may be heard and determined in any such court.  Each Party also agrees not to (a) attempt to deny or defeat such exclusive jurisdiction by motion or other request for leave from the Bankruptcy Court or (b) bring any action or proceeding arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby in any other court.  Each of the Parties irrevocably and unconditionally waives any objection to the laying of venue in, and any defense of inconvenient forum to the maintenance of, any Litigation so brought and waives any bond, surety or other security that might be required of any other Party with respect thereto.  Any Party may make service on any other Party by sending or delivering a copy of the process to the Party to be served at the address and in the manner provided for the giving of notices in  <u>Section 9.7</u>; <u>provided</u>, <u>however</u>, that nothing in this <u>Section 9.9</u> shall affect the right of any Party to serve legal process in any other manner permitted by law or in equity.  Each Party agrees that a final judgment in any Litigation so brought shall be conclusive and may be enforced by Litigation or in any other manner provided by law or in equity.  The Parties intend that all foreign jurisdictions will enforce any Decree of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby.

Section 9.10    <u>Waiver of Jury Trial</u>.    EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY RELATED AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

Section 9.11    <u>Specific Performance</u>.  The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the transactions contemplated by this Agreement.  It is accordingly agreed that (i) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the Parties' respective covenants and agreements under this Agreement that survive the Closing, without the requirement of posting a bond or other security, and without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (ii) the right of specific performance and other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, neither Sellers nor Purchaser would have entered into this Agreement.  The remedies available to Sellers pursuant to this <u>Section 9.11</u> will be in addition to any other remedy to which they were entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit any Seller from seeking to collect or collecting damages.  If, prior to the Termination Date, any Party brings any action, in each case in accordance with <u>Section 9.11</u>, to enforce specifically the

53

performance of the terms and provisions hereof by any other Party, the Termination Date will automatically be extended (y) for the period during which such action is pending, plus ten (10) Business Days or (z) by such other time period established by the court presiding over such action, as the case may be.  In no event will this Section 9.11 be used, alone or together with any other provision of this Agreement, to require any Seller to remedy any breach of any representation or warranty of any Seller made herein.

Section 9.12    Severability.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement.  In the event that any of the provisions of this Agreement shall be held by any Governmental Authority to be illegal, invalid, or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

Section 9.13    No Third Party Beneficiaries.  This Agreement shall not confer any rights or remedies upon any Person other than Buyers, each Seller, and their respective successors and permitted assigns.

Section 9.14    Non-Recourse.  All claims, obligations, liabilities, or Causes of Action that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to this Agreement, the negotiation, execution or performance of this Agreement (including any representation or warranty made in connection with or as an inducement to this Agreement) or the transactions contemplated hereby may be made only against (and are those solely of) the Persons that are expressly identified as Parties to this Agreement. No other Person, including any of their Affiliates, directors, officers, employees, incorporators, members, partners, managers, stockholders, agents, attorneys, or representatives of, or any financial advisors or lenders to any of the foregoing shall have any liabilities for any claims, Causes of Action, obligations, or liabilities arising under, out of, in connection with, or related in any manner to this Agreement or based on, in respect of, or by reason of this Agreement or its negotiation, execution, performance, or breach.

Section 9.15    Mutual Drafting.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Section 9.16    Disclosure Schedule.  All capitalized terms not defined in the Disclosure Schedule shall have the meanings ascribed to them in this Agreement.  The representations and warranties of Sellers in this Agreement are made and given, and the covenants are agreed to, subject to the disclosures and exceptions set forth in the Disclosure Schedule.  The listing of any matter shall expressly not be deemed to constitute an admission by Sellers.  No disclosure in the Disclosure Schedule relating to any possible breach or violation of any Contract or law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.  In no event shall the listing of any matter in the Disclosure Schedule be deemed or interpreted to expand the scope of Sellers' representations, warranties, or covenants set forth in this Agreement.  All attachments to the Disclosure Schedule are incorporated by

reference into the applicable section of the Disclosure Schedule in which they are directly or indirectly referenced.

Section 9.17  <u>Headings; Table of Contents</u>.  The section headings and the table of contents contained in this Agreement and the Disclosure Schedule are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 9.18  <u>Counterparts; Facsimile and Electronic Signatures</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  This Agreement or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original.

Section 9.1  <u>Fiduciary Obligations</u>.  Nothing in this Agreement, or any document related to the transactions contemplated hereby, will require any Seller or any of their respective directors, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations. For the avoidance of doubt, Sellers retain the right to pursue any transaction or restructuring strategy that, in Sellers' business judgment, will maximize the value of their estate.

[*Remainder of page intentionally left blank.*]

EAST\176343569.13

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**SELLERS**:


TOWN SPORTS INTERNATIONAL, LLC,
ON ITS BEHALF AND ON BEHALF OF ALL SELLERS

By: _____
    Name:  John C. DiDonato
    Title:    Chief Restructuring Officer

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

<b><u>BUYERS</u></b>:

NEW TSI HOLDINGS, INC.

By: _____

     Name:   Andrew Goldman

     Title:      .

## SCHEDULE A

### Sellers[1]

1. Town Sports International, LLC[2],
2. TSI Holdings II, LLC
3. TSI International, Inc.[3]
4. TSI – Lucille 38th Avenue, LLC
5. TSI – Lucille Austin Street, LLC
6. TSI – Lucille Kings Highway, LLC
7. TSI – Lucille Valley Stream, LLC
8. TSI – 1231 3rd Avenue, LLC
9. TSI – 30 Broad Street, LLC
10. TSI – 555 6th Avenue, LLC
11. TSI Allston, LLC
12. TSI Astor Place LLC
13. TSI Astoria, LLC
14. TSI Avenue A, LLC
15. TSI Bay Ridge, LLC
16. TSI Bay Ridge 86th Street, LLC
17. TSI Boylston, LLC
18. TSI Broadway, LLC
19. TSI Brooklyn Belt, LLC
20. TSI Bulfinch, LLC
21. TSI Carmel, LLC
22. TSI Cash Management, LLC
23. TSI Central Square, LLC
24. TSI Cobble Hill, LLC
25. TSI Commack, LLC
26. TSI Court Street, LLC
27. TSI Croton, LLC
28. TSI Deer Park, LLC
29. TSI Dobbs Ferry, LLC
30. TSI Downtown Crossing, LLC
31. TSI East 23, LLC
32. TSI East 36, LLC
33. TSI East 51, LLC
34. TSI East 76, LLC
35. TSI East 86, LLC
36. TSI East 91, LLC
37. TSI Fenway, LLC
38. TSI First Avenue, LLC
39. TSI Forest Hills, LLC
40. TSI Garden City, LLC
41. TSI Garnerville, LLC
42. TSI Giftco, LLC[4]
43. TSI Glendale, LLC
44. TSI Grand Central, LLC
45. TSI Greenpoint, LLC
46. TSI Hartsdale, LLC
47. TSI Hawthorne, LLC
48. TSI Hicksville, LLC
49. TSI Holdings (CIP), LLC
50. TSI Holdings (DC), LLC
51. TSI Holdings (MA), LLC
52. TSI Holdings (MD), LLC
53. TSI Holdings (NJ), LLC
54. TSI Holdings (PA), LLC
55. TSI Holdings (VA), LLC
56. TSI Larchmont, LLC
57. TSI Lincoln, LLC
58. TSI Long Beach, LLC
59. TSI Massapequa, LLC
60. TSI Morris Park, LLC
61. TSI Murray Hill, LLC
62. TSI Oceanside, LLC
63. TSI Pine Street, LLC
64. TSI Providence Eastside, LLC
65. TSI Rego Park, LLC
66. TSI Scarsdale, LLC
67. TSI Sheridan, LLC
68. TSI Smithtown, LLC
69. TSI South Park Slope, LLC
70. TSI Staten Island, LLC
71. TSI Total Woman Holdco, LLC[5]
72. TSI Stoked, LLC
73. TSI Sunnyside, LLC
74. TSI Varick Street, LLC
75. TSI West 115th, LLC
76. TSI West 125, LLC

---

[1]    Each a Delaware limited liability company except where noted
[2]    New York limited liability company
[3]    Delaware corporation
[4]    Pennsylvania limited liability company
[5]    California limited liability company

77. TSI West 145th Street, LLC
78. TSI West 16, LLC
79. TSI West 23, LLC
80. TSI West 38, LLC
81. TSI West 41, LLC
82. TSI West 48, LLC
83. TSI West 73, LLC
84. TSI West 80, LLC
85. TSI West 94, LLC
86. TSI West Hartford, LLC
87. TSI Westborough, LLC
88. TSI White Plains City Center, LLC
89. TSI White Plains, LLC
90. TSI Whitestone, LLC
91. TSI-ATC Holdco, LLC
92. TSI-HR 13th Street, LLC
93. TSI-HR 45th Street, LLC
94. TSI-HR 76th Street, LLC
95. TSI-HR Whitehall Street, LLC
96. TSI Holdings (IP), LLC
97. TSI Columbia Heights, LLC
98. TSI Connecticut Avenue, LLC
99. TSI Dupont II, Inc.[6]
100. TSI Gallery Place, LLC
101. TSI Georgetown, LLC
102. TSI Glover, LLC
**103.** TSI University Management, LLC
104. TSI Back Bay, LLC
105. TSI Beacon Street, LLC
106. TSI Davis Square, LLC
107. TSI Dorchester, LLC
108. TSI Elite Back Bay, LLC
109. TSI Lexington (MA), LLC
110. TSI Lynnfield, LLC
111. TSI Methuen, LLC
112. TSI Newton, LLC
113. TSI Peabody, LLC
114. TSI Salisbury, LLC
115. TSI South End, LLC
116. TSI South Station, LLC
117. TSI Waltham, LLC
118. TSI Watertown, LLC
119. TSI Wayland, LLC
120. TSI Wellesley, LLC

121. TSI Wellington Circle, LLC
122. TSI Westboro Tennis, LLC
123. TSI North Bethesda, LLC
124. TSI South Bethesda, LLC
125. TSI – Lucille Clifton, LLC
126. TSI Bayonne, LLC
127. TSI Butler, LLC
128. TSI Clifton, LLC
129. TSI Colonia, LLC
130. TSI Hoboken, LLC
131. TSI Hoboken North, LLC
132. TSI Jersey City, LLC
133. TSI Livingston, LLC
134. TSI Marlboro, LLC
135. TSI Matawan, LLC
136. TSI Newark, LLC
137. TSI Princeton, LLC
138. TSI Ramsey, LLC
139. TSI Ridgewood, LLC
140. TSI Springfield, LLC
141. TSI Westwood, LLC
142. TSI Highpoint, LLC
143. TSI Radnor, LLC
144. TSI Society Hill, LLC
145. TSI Clarendon, LLC
146. **T**SI – Alameda, LLC[7]
147. TSI – Cal. Glendale, LLC
148. TSI – Irvine, LLC
149. TSI – Northridge, LLC
150. TSI – Placentia, LLC
151. TSI – San Jose, LLC
152. TSI – Studio City, LLC
153. TSI – Topanga, LLC
154. TSI – Torrance, LLC
155. TSI – Valencia, LLC
156. TSI – Westlake, LLC
157. TSI-ATC Alico Mission, LLC
158. TSI-ATC Ben Pratt, LLC
159. TSI-ATC Beneva Road, LLC
160. TSI-ATC Boyscout, LLC
161. TSI-ATC Cape Coral, LLC
162. TSI-ATC Tamiami Trail, LLC

---

[6]    Delaware corporation

[7]    Each of 146 through 156 is a California limited liability company.

### SCHEDULE B

**Other Excluded Assets**

1. None

## **SCHEDULE C**

### **Unrestricted Affiliates**

1. Town Sports Group, LLC
2. Elmsford Elite Laundry, LLC
3. Palm Beach Sports Club, LLC [FL]
4. Dixie Highway Realty, LLC [FL]
5. TSI – Gold, LLC [FL]
6. Jeff Goldsmith 15%
7. TSI – Peacock, Port St. Lucie, LLC [FL]
8. TSI – Donald Ross Realty, LLC [FL]
9. TSI – US Highway, Jupiter, LLC [FL]
10. TSI Elite Sheridan, LLC
11. Town Sports Investment Group, LLC
12. TSI Hell's Kitchen, LLC
13. TSI-LIV Holdco, LLC [PR]
14. TSI-LIV Guaynabo, LLC [PR]
15. TSI-LIV Condado, LLC [PR]
16. TSI – Lucille Real Estate, LLC

## **<u>EXHIBIT E</u>**

**Documentation related to the Sale Transactions**

**THIS DOCUMENT IS INTENDED SOLELY TO FACILITATE DISCUSSIONS AMONG THE PARTIES REFERENCED HEREIN.  IT IS NOT INTENDED, AND WILL NOT BE DEEMED, TO CREATE A LEGALLY BINDING OR ENFORCEABLE OFFER OR AGREEMENT OF ANY TYPE OR NATURE PRIOR TO EXECUTION HEREOF BY SUCH PARTIES.**

# DISCLOSURE SCHEDULE

to that certain

## ASSET PURCHASE AGREEMENT

by and among

## TOWN SPORTS INTERNATIONAL, LLC

## THE OTHER SELLERS PARTY THERETO

and

## NEW TSI HOLDINGS, INC.

## DATED AS OF OCTOBER 26, 2020

Reference is made to that certain Asset Purchase Agreement, dated as of October 26, 2020, (the "Agreement"), by and among Town Sports International, LLC, a Delaware limited liability company ("TSI" or the "Company"), the direct and indirect Subsidiaries or Affiliates of TSI identified on the signature pages thereto (together with TSI, each a "Seller" and collectively, the "Sellers"), New TSI Holdings, Inc. ("NewCo"), and its designees (together with NewCo, each a "Buyer" and collectively, "Buyers"). The Company, the Sellers, and the Buyers are referred to collectively herein as the "Parties" and each, a "Party". Capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the Agreement.

This Disclosure Schedule ("Disclosure Schedule") is being delivered in connection with the Agreement. The representations and warranties of Sellers in the Agreement are made and given, and the covenants are agreed to, subject to the disclosures and exceptions set forth in this Disclosure Schedule. The listing of any matter shall expressly not be deemed to constitute an admission by Sellers. No disclosure in this Disclosure Schedule relating to any possible breach or violation of any Contract or law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred. In no event shall the listing of any matter in this Disclosure Schedule be deemed or interpreted to expand the scope of Sellers' representations, warranties, or covenants set forth in the Agreement. All attachments to this Disclosure Schedule are incorporated by reference into the applicable section of this Disclosure Schedule in which they are directly or indirectly referenced.

## **TABLE OF CONTENTS**

**Page**

**Section 3.3 - Noncontravention; Government Filings** ..................................................**4**

**Section 3.6 - Real Property** ..........................................................................................**5**

**Section 3.7 - Litigation; Decrees** ...............................................................................**16**

**Section 3.8 - Labor Relations** .....................................................................................**28**

**Section 3.9 - Brokers' Fees** .........................................................................................**29**

**Section 3.10 - Taxes** ....................................................................................................**30**

**Section 3.11 - Data Privacy** ........................................................................................**31**

**Section 3.12 - Employee Benefits** ..............................................................................**32**

**Section 3.13 - Intellectual Property** ............................................................................**33**

**Section 3.14 - Compliance with Laws; Permits** .........................................................**44**

**Section 3.16 - Related Party Transactions** ..................................................................**45**

**Section 3.17 - Financial Statements** ...........................................................................**47**

**Section 5.2(b) - Conduct of Business Pending the Closing** ........................................**48**

**Section 3.3 - Noncontravention; Government Filings**

1. Agreement of Limited Partnership of Kalorama Sports Management Associated Limited Partnership, by and between LEL, Inc., TSI Dupont Circle, Inc., and the general partners of the Partnership (as defined therein) dated as of October 2, 1991.

2. Agreement, by and among Paul London, TSI Washington, Inc., Jonathan Roosevelt and Washington Squash Management Corporation, dated as of December 23, 1991.

3. Operating Agreement, by and among Town Sports International LLC, B3ACQ LLC, TO106 LLC and TSI-TOH Holdco, LLC, dated as of September 1, 2018.

**Section 3.6 - Real Property**

| No. | Club # | Club Name | Address | Address 2 | Brand |
|---|---|---|---|---|---|
| 1. | 116 | E. 76th Street | 349 East 76 Street | New York, NY  10065 | NYSC |
| 2. | 117 | W. 80th Street | 248 West 80 Street | New York, NY  10022 | NYSC |
| 3. | 125 | W. 49th Street | 1601 Broadway 15th floor | New York, NY  07652 | NYSC |
| 4. | 119 | Glover Park | 2251 Wisconsin Ave, NW | Washington, DC  21117 | WSC |
| 5. | 129 | Scarsdale | 696 White Plains Road | Scarsdale, NY  10583 | NYSC |
| 6. | 128 | E. 23rd Street | 113 East 23 Street | New York, NY  10019 | NYSC Elite |
| 7. | 133 | E. 91st Street | 1637 Third Avenue | New York, NY  10128 | NYSC Elite |
| 8. | 130 | E. 51st Street | 575 Lexington Ave. | New York, NY  19178-0236 | NYSC |
| 9. | 139 | Allston | 15 Gorham Street | Allston, MA  02027 | BSC |
| 10. | 137 | E. 36th Street | 200 Madison Avenue | New York, NY  10016 | NYSC |
| 11. | 132 | Forest Hills | 69-47 Austin Street | Forest Hills, NY  11021 | NYSC |
| 12. | 179 | Bulfinch | One Bulfinch Place | Boston, MA  80202 | BSC |
| 13. | 150 | Croton | 420 So. Riverside Avenue | Croton-on-Hudson, NY  10461 | NYSC |
| 14. | 187 | Larchmont | 15 Madison Avenue | Larchmont, NY  10538 | NYSC |
| 15. | 170 | Whitestone | 153-37 Cross Island Parkway | Whitestone, NY  08807-6817 | NYSC |
| 16. | 138 | North Bethesda | 10400 Old Georgetown Rd. | Bethesda, ND  20153-1442 | WSC |
| 17. | 181 | W. 73rd Street | 23 West 73 Street | New York, NY  10023 | NYSC |
| 18. | 160 | Oceanside | 2909 Lincoln Avenue | Oceanside, NY  11021-3051 | NYSC |
| 19. | 195 | Long Beach | 265 East Park Avenue | Long Beach, NY  11802-7767 | NYSC |
| 20. | 143 | Society Hill | 220-250 S. 5th Street | Philadelphia, PA  20001 | PSC |
| 21. | 142 | Fenway | 201 Brookline Avenue | Boston, MA  02241-7230 | BSC |
| 22. | 218 | Wellesley | 140 Great Plain Avenue | Wellesley, MA  02157 | BSC Elite |
| 23. | 146 | W. 125th Street | 300 West 125th Street | New York, NY  28260-0103 | NYSC |
| 24. | 223 | W. 16th Street | 128 8th Avenue | New York, NY  10023 | NYSC |
| 25. | 196 | Garden City | 833-835 Franklin Avenue | Garden City, NY  11530 | NYSC |
| 26. | 202 | Chalfont/Highpoint | One Highpoint Drive | Chalfont, PA  19106 | PSC |
| 27. | 200 | Market Street | 1735 Market Street | Philadelphia, PA  10007 | PSC |
| 28. | 206 | Central Square | 625 Massachusetts Avenue | Cambridge, MA  02109 | BSC |

| 29. | 226 | W. 94th Street | 2527 Broadway | New York, NY  10023 | NYSC |
| 30. | 237 | Murray Hill/34th & Park | 3 Park Avenue | New York, NY  10022 | NYSC |
| 31. | 238 | Downtown Crossing | 10 Franklin Street 3rd Floor | Boston, MA  55435 | BSC |
| 32. | 244 | Waltham | 840 Winter Street | Waltham, MA  02110-2704 | BSC Elite |
| 33. | 240 | Rock Center | 1221 Ave of the Americas | New York, NY  10020 | NYSC |
| 34. | 230 | South Park Slope | 324 Ninth Street | Brooklyn, NY  10036 | NYSC |
| 35. | 246 | Astoria | 38-11 30th Avenue | Astoria, NY  11313 | NYSC |
| 36. | 252 | Bay Ridge | 7118 Third Avenue | Brooklyn, NY  11378 | NYSC |
| 37. | 251 | White Plains City Center | 4 City Center | White Plains, NY  60693-0139 | NYSC |
| 38. | 264 | Hawthorne | 24 Saw Mill River Road | Hawthorne, NY  10023 | NYSC |
| 39. | 259 | Boylston | 505 Boylston Street | Boston, MA  60693 | BSC |
| 40. | 257 | South End | 560 Harrison Ave | Boston, MA  02118 | BSC |
| 41. | 265 | Varick St. | 225 Varick Street | New York, NY  10087-8795 | NYSC |
| 42. | 260 | South Station | Plymouth Rock Building 695 Atlantic Avenue | Boston, MA  02111 | BSC |
| 43. | 250 | Hoboken North | 210 14th Street | Hoboken, NJ  07030 | NYSC |
| 44. | 270 | Glendale | 8000 Cooper Avenue | Glendale, NY  90084-3383 | NYSC |
| 45. | 267 | Rego Park | 99-01 Queens Blvd. | Queens, NY  11791 | NYSC |
| 46. | 271 | Carmel | Putnam Plaza Route 6 | Carmel, NY  15262-0001 | NYSC |
| 47. | 276 | W. 145th Street | 303 West 145 St. | New York, NY  10016 | NYSC |
| 48. | 287 | Sunnyside | 39-01 Queens Blvd | Sunnyside, NY  10017 | NYSC |
| 49. | 278 | Davis Square | One Davis Square | Somerville, MA  01801 | BSC |
| 50. | 279 | Smithtown | 5 Browns Road | Smithtown, NY  11747 | NYSC |
| 51. | 281 | Dobbs Ferry | 50 Livingstone Ave | Dobbs Ferry, NY  10017 | NYSC |
| 52. | 283 | Columbia Heights | 3100 14th St, N.W. | Washington, DC  10027 | WSC |
| 53. | 288 | Westborough | 1500 Union St | Westborough, MA 10017 | BSC |
| 54. | 285 | Hicksville | 100 Duffy Avenue | Hicksville, NY  11801 | NYSC |
| 55. | 296 | Woburn | 400 Presidential Way | Woburn, MA  90274 | BSC |
| 56. | 282 | Butler | 1481 Route 23 | Butler, NJ  07740 | NYSC |
| 57. | 301 | Back Bay / Prudential | 800 Boylston Street | Boston, MA  02241-3557 | BSC |
| 58. | 309 | Dorchester | 540 Gallivan Blvd | Boston, MA  02124-5401 | BSC |
| 59. | 310 | Wayland | 110 Andrew Avenue | Wayland, MA  02462 | BSC |

| | | | | | |
|---|---|---|---|---|---|
| 60. | 313 | FiDi | 30 Broad Street | New York, NY  14267 | NYSC Elite |
| 61. | 401 | LR Flushing | 135-39 38th Avenue | Flushing, NY  11229 | Lucille Roberts |
| 62. | 402 | LR Forest Hills | 70-20 Austin Street | Forest Hills, NY  10170 | Lucille Roberts |
| 63. | 403 | LR Clifton | 1075 Bloomfield Avenue | Clifton, NJ  07012 | Lucille Roberts |
| 64. | 413 | LR Kings Highway | 925 Kings Highway | Brooklyn, NY  10024 | Lucille Roberts |
| 65. | 415 | LR Valley Stream | 225 West Merrick Road | Valley Stream, NY  11581 | Lucille Roberts |
| 66. | 343 | Boy Scout | 1755 Boy Scout Dr | Fort Myers, FL  33907 | Around the Clock |
| 67. | 346 | Six Mile | 9375 Six Mile Cypress Pkwy #210 | Fort Myers, FL  46204 | Around the Clock |
| 68. | 342 | Cape Coral | 1140 Ceitus Terrace #8 | Cape Coral, FL  85255 | Around the Clock |
| 69. | 99901 | Kalorama/DuPont Circle | 1835 Connecticut Ave, NW | Washington, DC  21275-9153 | Managed |
| 70. | 204 | Forum | | | Swiss |
| 71. | 205 | Luxor | | | Swiss |
| 72. | 239 | Joggeli (Basel) | | | Swiss |

1. Agreement of Lease, by and between Richard Chapman and TSI East 76, Inc., dated as of September 22, 1992, as amended by that certain First Amendment to Lease, dated as of October 28, 1992, as further amended by that certain Second Amendment to Lease, dated as of September 19, 1996, as further amended by that certain Amended and Restated First Amendment to Lease, dated as of March 31, 1992, by and between Richard Chapman and TSI East 76, Inc., as further amended by that certain Third Amendment of Lease, dated as of July 31, 2018, by and between Banner Garage, LLC and TSI East 76, LLC, and the related Guaranty by Town Sports International Holdings, Inc., dated as of July 31, 2018.

2. Agreement of Lease, by and between ZKZ Associates, L.P., Gayle Friedland, Merilyn Ava Friedland, Eric Friedland, Melvin Friedland, Elizabeth Friedland, Pamela Friedland and Melvin Friedland as custodians for William Friedland and TSI West 80, Inc., dated as of April 30, 1993, as amended by that certain Lease Modification Agreement, dated as of April 15, 1999, as further amended by that certain Lease Modification and Extension Agreement, dated as of July 1, 2018 and the related Guaranty by Town Sports International, Inc., dated as of April 30, 1993.

3. Lease, by and between Broadway 48th - 49th Street Associates and TSI Broadway, Inc., dated as of August 25, 1994,  as amended by that certain Amendment of Lease, dated as of February 26, 1998, as further amended by that certain Amendment of Lease, dated as of September 30, 2003, as further amended by that certain Third Amendment to Lease, dated as of September 21, 2009, as further amended by that certain Letter, dated as of June 26, 2018 and the related Guaranty by Town Sports International, Inc., dated as of August 25, 1994.

4. Retail Lease Agreement, by and between 2251 Wisconsin Avenue, LLC and TSI Glover, LLC, undated, and related Declaration of Reciprocal Easements, Covenants and Restrictions, by 2251 Wisconsin Avenue, LLC, undated.

5. Indenture of Lease, by and between Salvatore and Catherine Pepe, Partners d/b/a Vernon Hills Shopping Center and TSI Scarsdale, Inc., dated as of October 8, 1995, as further amended by that certain Letter dated as of June 5, 2007, as further amended by that certain Letter, dated as of November

18, 2009, as further amended by that certain Letter, dated as of November 1, 2019, as further amended by that certain Letter, dated as of November 26, 2019, as further amended by that certain Letter, dated as of December 16, 2019 and the related Guaranty by Town Sports International, dated as of October 2, 1995.

6.  Agreement of Lease, by and between 303 Park Avenue South Associates and TSI East 23, Inc., dated as of May 25, 1995, as amended by that certain Lease Modification Agreement, dated as of April 4, 2001, as further amended by that certain Second Lease Modification and Partial Surrender Agreement, dated as of May 2002, as further amended by that certain Third Amendment to Lease and Partial Surrender Agreement, dated as of October 29, 2015, as further amended by that certain Surrender and Modification Agreement, undated and the related Guaranty by Town Sports International, Inc., dated as of May 25, 1995.

7.  Agreement of Lease, by and between Yorkville Towers Associates LLC and TSI East 91, LLC, dated as of December 23, 2009, as amended by that certain First Amendment of Lease and Forbearance Agreement, dated as of April 16, 2020 and the related Guaranty of Lease by Town Sports International, LLC, dated as of December 23, 2009.

8.  Agreement of Lease, by and between Tenth City LLC and TSI East 51, Inc., dated as of February 15, 1996, as amended by that certain Lease Modification Agreement, dated as of May 31, 1996, as further amended by that certain Second Lease Modification Agreement, dated as of April 28, 1997, as further amended by that certain Third Lease Modification Agreement, dated as of September 15, 1999, as further amended by that certain Letter, dated as of April 16, 2012, as further amended by that certain Letter, dated as of January 17, 2013, as further amended by that certain Fourth Amendment to Lease, dated as of April 1, 2012, as further amended by that certain Letter, dated as of August 26, 2015 and the related Guaranty by Town Sports International, dated as of February 15, 1996.

9.  Lease, by and between Jeffrey L. Randall, Donn A. Randall, and TSI Allston, Inc., dated as of June 27, 1997, as amended by that certain Lease Surrender Agreement, dated as of June 27, 1997, as further amended by that certain Letter, dated as of November 5, 1997, as further amended by that certain Second Amendment to Lease, dated as of December 23, 2013, as further amended by that certain Third Amendment of Lease and Forbearance Agreement, dated as of April 22, 2020, as further amended by that certain Fourth Amendment to Lease, dated as of July 20, 2020 and the related Guaranty of Lease by Town Sports International, Inc., dated as of June 27, 1997.

10. Agreement of Lease, by and between 200 Madison Associates, LP and American Fitness Franchise Corp., dated as of October 31, 1995, as amended by that certain Agreement, dated as of February 26, 1997, as further amended by that certain Second Lease Modification Agreement, dated as of December 15, 1999, as further amended by that certain Third Amendment to Lease, dated as of September 30, 2009 and the related Continuing Guaranty by Town Sports International, LLC, dated as of September 30, 2009.

11. Lease, by and between Austin-Mayflower, Inc. and TSI Forest Hills, Inc., dated as of June 24, 1996, as amended by that certain Lease Modification Agreement, dated as of May 30, 2003, as further amended by that certain Fourth Amendment to Lease, dated as of February 13, 2015 and the related Guaranty by Town Sports International, Inc., dated as of May 30, 2003.

12. Agreement of Lease, by and between Intercontinental I Bulfinch, LLC and TSI Bulfinch, Inc., dated as of August 11, 1998, as amended by that certain First Amendment to Lease, dated as of September 15, 1998, as further amended by that certain Second Amendment to Lease, dated as of May 1, 2000, as further amended by that certain Third Amendment to Lease, dated as of October 1, 2009, as further amended by that certain Letter, dated as of April 20, 2017, as further amended by that certain Fourth Amendment to Lease, dated as of November 21, 2017 and the related Guaranty by Town Sports International, Inc., dated as of August 11, 1998.

13. Standard Form of Lease, by and between 420 South Riverside, LLC and TSI Croton, LLC, dated as of February 8, 2018.

14. Lease, by and between Madison-Larchmont, Inc. and TSI Larchmont, Inc. (as successor in interest to Rygo Exercise Industries, Inc.), dated as of January 1, 1998, as further amended by that certain Assignment and Assumption of Seller's Lease, dated as of November 25, 1998, as further amended by that certain Lessor's Consent and Lease Modification Agreement, dated as of November 25, 1998, as further amended by that certain Second Amendment of Lease, dated as of July 2009, as further amended by that certain Third Amendment of Lease, dated as of December 2011, as further amended by that certain Fourth Amendment to Lease, dated as of June 23, 2014, as further amended by that certain Fifth Amendment of Lease and Forbearance Agreement, dated as of June 8, 2020.

15. Lease, by and between Redmont Realty Company and TSI Whitestone, Inc., dated as of December 30, 1996, as amended by that certain Owner's Consent and Lease Modification Agreement, dated as of June 16, 1998, as further amended by that certain Letter, dated as of September 13, 2005, as further amended by that certain Letter, dated as of October 2015, as further amended by that certain Letter, dated as of November 19, 2015, as further amended by that certain Letter of Intent, dated as of October 16, 2018.

16. Lease Agreement, by and between Georgetown Square Limited Partnership and TSI Rockville, Inc., dated as of May 13, 1997, as amended by that certain First Amendment to Lease, dated as of October 31, 2007, as further amended by that certain Second Amendment to Lease, dated as of August 26, 2009, as further amended by that certain Third Amendment to Lease, dated as of January 1, 2012, as further amended by that certain Fourth Amendment to Lease, dated as of April 20, 2017, as further amended by that certain Fifth Amendment to Lease, dated as of May 31, 2019 and the related Guaranty of Lease by Town Sports International, Inc., dated as of May 13, 1997.

17. Agreement of Lease, by and between Broadway Associates and TSI West 73, Inc. (as successor in interest to D&M Royal Realty LLC), dated as of September 1, 1998, as amended by that certain First Amendment of Lease, dated as of November 12, 1999 and the related Guarantee by Town Sports International, Inc., dated as of August 25, 1994.

18. Agreement of Lease, by and between Oceanside Bowl, L.P. and TSI Oceanside, Inc., dated as of April 28, 1998, as amended by that certain Letter, dated as of April 9, 2013, as further amended by that certain Letter, dated as of May 31, 2018 and the related Guaranty by Town Sports International, Inc., dated as of April 28, 1998.

19. Lease, by and between Parkroe Realty, Inc. and TSI Long Beach, LLC (as successor in interest to Hollywood Health Spa, Inc.), dated as of July 21, 1999, as amended by that certain Collateral Assignment of Lease, dated as of July 21, 1999, as further amended by that certain Letter, dated as of January 6, 2014, as further amended by that certain July 26, 2018 and the related Guaranty by Town Sports International, Inc., dated as of July 1999 and the related Parking Area Agreement, dated as of July 1996.

20. Lease, by and between Society Hill Clubs, LLC and TSI Society Hill, Inc., dated as of December 17, 1997, as amended by that certain Amendment to Lease, dated as of March 3, 1998, as further amended by that certain Second Amendment to Lease, dated as of July 12, 1999, as further amended by that certain Letter, dated as of July 12, 2007, as further amended by that certain Letter, dated as of June 14, 2012, as further amended by that certain Third Amendment to Lease, dated as of April 21, 2017, as further amended by that certain Fourth Amendment to Lease, dated as of January 29, 2020 and the related Guaranty by Town Sports International, Inc., dated as of January 18, 1998.

21. Indenture of Lease, by and between Landmark Center Park Drive (successor in interest to Abbey Landmark Operating LLC) and TSI Fenway, Inc., dated as of October 2, 1997, as amended by that

certain Letter, dated as of July 31, 2018 and the related Payment and Performance Guaranty by Town Sports International, Inc., dated as of October 2, 1997.

22. Restated and Amended Commercial Lease, by and between Babson College and TSI Wellesley, Inc., dated as of July 1, 2001, as amended by that certain Amendment to Lease, dated as of July 31,2015, as further amended by that certain Amendment of Lease, dated as of December 17, 2015, as further amended by that certain Amendment of Lease, dated as of November 18, 2015, as further amended by that certain Amendment of Lease, dated as of January 29, 2016, as further amended by that certain Letter, dated as of February 25, 2016 and the related Guaranty by Town Sports International, dated as of August 8, 2001.

23. Lease, by and between HUSA Operating Co., LLC and TSI West 125, Inc., dated as of March 11, 1998, as amended by that certain First Amendment, dated as of April 30, 2007 and the related Guaranty by Town Sports International, Inc., dated as of March 1998.

24. Lease, by and between Chelsea Eight Limited Partnership and TSI West 16, Inc. (as successor in interest to Fitness Everlasting, Inc.), dated as of August 3, 1993, as amended by that certain First Amendment to Lease, dated as of January 25, 1994, as further amended by that certain Letter, dated as of July 14, 1994, as further amended by that certain Second Amendment to Lease, dated as of September 21, 1995, as further amended by that certain Third Amendment to Lease, dated as of December 7, 1995, as further amended by that certain Fourth Amendment to Lease, dated as of April 12, 1996, as further amended by that certain Assignment and Assumption of Lease and Fifth Amendment to Lease, dated as of December 5, 2000, as further amended by that certain Collateral Assignment of Lease, dated as of December 2000, as further amended by that certain Sixth Amendment to Lease, dated as of August 14, 2012.

25. Commercial Lease, by and between Renaissance Development II LLC and TSI Garden City, Inc., dated as of July 20, 1999, as amended by that certain Modification of Lease, dated as of May 3, 2000, as further amended by that certain Modification of Lease, dated as of October 31, 2003, as further amended by that certain Third Modification of Lease, dated as of June 14, 2019 and the related Second Restated Guaranty of Payment and Performance by Town Sports International, Inc., dated as of October 31, 2003.

26. Lease, by and between Club Investors Group, LP and TSI Highpoint, LLC, dated as of January 1, 2000, as amended by that certain First Amendment to Lease, dated as of July 17, 2020, and the related Guaranty of Lease by Town Sports International, Inc., dated as of January 5, 2000.

27. Fitness Center Lease, between Nine Penn Center Associates, LP and TSI Market Street, LLC, dated as of December 29, 1999, as amended by that certain First Amendment of Office Lease, dated as of June 16, 2000, as further amended by that certain Second Amendment of Lease, dated as of October 31, 2000, as further amended by that certain Third Amendment of Lease, dated as of November 27, 2000, as further amended by that certain Fourth Amendment of Lease, dated as of June 8, 2009, as further amended by that certain Letter, dated as of November 6, 2015, as further amended by that certain Letter, dated as of January 14, 2016, as further amended by that certain Letter, dated as of February 19, 2016, as further amended by that certain Letter, dated as of March 15, 2016, as further amended by that certain Letter Agreement, dated as of April 28, 2016, as further amended by that certain Letter Agreement, dated as of May 31, 2016 and the related Guaranty of Lease by Town Sports International, Inc., dated as of December 1999.

28. Lease, by and between 625 Mass Ave Owner, LLC (as successor in interest to Samuels Central Square LLC) and TSI Central Square, Inc., dated as of May 15, 2000, as amended by that certain First Amendment to Lease, dated as of November 30, 2011, as further amended by that certain Second Amendment to Lease, dated as of December 4, 2018, as further amended by that certain Letter, dated as of August 23, 2018.

29. Lease, by and between Related Broadway Development, LLC and TSI West 94, Inc., dated as of March 1, 2001, as amended by that certain First Amendment to Lease, dated as of March 3, 2015 and the related Ratification of Guaranty by Town Sports International, LLC, dated as of February 10, 2015.

30. Indenture of Lease, by and between Three Park Avenue Building Co., L.P. and TSI Murray Hill, Inc., dated as of August 8, 2001.

31. Lease, by and between 350 Washington Street, LLC and TSI Downtown Crossing, Inc. dated as of July 30, 2001, as amended by that certain First Amendment to Lease, dated as of May 2010, as further amended by that certain Second Amendment to Lease, dated as of March 17, 2015, as further amended by that certain Letter, dated October 4, 2011, as further amended by that certain Letter, dated September 15, 2014 and the related Guaranty of Lease by Town Sports International, Inc., dated as of July 30, 2001, as amended by that certain First Amendment to Guaranty of Lease, dated as of March 17, 2015.

32. Lease, by and between DMP Healthpoint, LLC, DMP City Square, LLC and DMP Grinberg, LLC (as successors in interest to Massachusetts Wellness and Fitness, LLC) and TSI Waltham, LLC, dated as of November 17, 2002, as amended by that certain Amendment of Lease, dated as of September 3, 2003, as further amended by that certain Second Amendment of Lease, dated as of December 17, 2003, as further amended by that certain Third Amendment of Lease, dated as of March 16, 2007, as further amended by that certain Fourth Amendment of Lease, dated as of January 2, 2010, as further amended by that certain Fifth Amendment to Lease, dated as of October 26, 2016 and the related Guaranty by Town Sports International, Inc., dated as of June 17, 2016.

33. Amended and Restated Lease, by and between Rock-McGraw, Inc. and TSI West 48, Inc., dated as of January 31, 2002, as amended by that certain Letter, dated as of December 17, 2019 and the related Guaranty Agreement by Cardio Ventures, LLC to and for the benefit of TSI West 48, Inc. , dated as of January 30, 2002.

34. Lease, by and between Park Slope Fifth Avenue NY LLC and TSI South Park Slope, Inc. dated as of December 13, 2000 and the related Guaranty by Town Sports International, Inc., dated as of December 2000.

35. Agreement of Lease, by and between 2856-2861 Steinway St. LLC and TSI Astoria, Inc., dated as of April 18, 2003, as amended by that certain First Amendment to Lease, dated as of May 19, 2005 and the related Guaranty by Town Sports International, Inc., dated as of April 14, 2003.

36. Agreement of Lease, by and between Glenmore Associates and TSI Bay Ridge, Inc. (as successor in interest to Bay Ridge Fitness, Inc.), dated as of January 19, 1998, as amended by that certain Amendment to Lease, dated as of September 3, 2000, as further amended by that certain Second Amendment to Lease, dated as of April 1, 2003, as further amended by that certain Assignment and Assumption of Seller's Lease, dated as of May 5, 2004, as further amended by that certain Owner's Consent and Lease Modification Agreement, dated as of May 5, 2004 and the related Guaranty, dated as of January 19, 1998.

37. Lease Agreement, by and between LC White Plains Recreation, LLC and TSI White Plains City Center, Inc., dated as of April 1, 2004, as amended by that certain Amendment to Lease and Certain Amended and Restated Work Letter, dated as of August 2, 2004, as further amended by that certain Second Amendment to Lease, dated as of February 2, 2006, as further amended by that certain Letter Agreement, dated as of January 5, 2010, as further amended by that certain Amendment to Letter Agreement, dated as of January 24, 2011, as further amended by that certain Second Amendment to Letter Agreement, dated as of September 15, 2012, as further amended by that certain Third Amendment to Lease, dated as of September 15, 2020 and the related Guaranty of Lease by Town Sports International, Inc., dated as of April 2004,  as amended by that certain Guaranty Rider, dated as of September 9, 2020.

38. Lease, by and between Broadway Hawthorne, LLC and TSI Hawthorne, Inc., dated as of May 2005, as amended by that certain First Amendment to Lease, dated as of September 20, 2005 and the related Guaranty by Town Sports International, Inc., dated as of May 2005.

39. Lease, by and between TSI Boylston and 501 Boylston Street Property LLC, dated as of November 29, 2004, as amended by that certain Lease Amendment No. 1, dated as of July 11, 2005 and the related Guarantee by Town Sports International, Inc., dated as of 2004.

40. Agreement of Lease, by and between South End/Berkeley LLC and TSI South End, Inc. dated as of November 9, 2004 and the related Guaranty by Town Sports International, Inc., dated as of November 9, 2004.

41. Lease, by and between The Rector, Church-Wardens and Vestrymen of Trinity Church in the City of New York and TSI Varick Street, Inc., dated as of August 1, 2005 and the related Guaranty by Town Sports International, Inc., dated as of August 1, 2005.

42. Lease, by and between 695 Atlantic Avenue Company LLC and TSI South Station, dated as of December 30, 2004, as amended by that certain First Amendment to Lease, dated as of April 10, 2006 and the related Guaranty by Town Sports International, Inc., dated as of December 30, 2004.

43. Lease Agreement, by and between 210 14th Street LLC and TSI Hoboken North, LLC, dated March 18, 2004 and the related Guaranty by Town Sports International, Inc., dated as of March 2004.

44. Lease, by and between Atlas Park LLC and TSI Glendale LLC, dated as of January 18, 2006, as amended by that certain First Amendment to Lease and Extension of Term, dated as of May 22, 2019 and the related Guaranty by Town Sports International, Inc., dated as of January 18, 2006.

45. Lease, by and between VNO 99-01 Queens Blvd LLC and TSI Rego Park, Inc., dated as of May 16, 2006, as amended by that certain Letter, dated as of June 29, 2016 and the related Guaranty by Town Sports International, Inc., dated as of May 16, 2006.

46. Lease Agreement, by and between Gandol Realty Corporation and TSI Carmel, LLC, dated as of May 2006, as amended by that certain Rent Reconciliation Agreement, dated as of May 24, 2019 and the related Guaranty Agreement by Town Sports International, Inc., dated as of May 2006.

47. Lease Agreement, by and between Site 6 LLC and TSI West 145th Street, LLC, dated as of December 13, 2006, as amended by that certain First Amendment to Lease, dated as of May 2, 2007, as further amended by that certain Letter Agreement, dated as of May 15, 2007, as further amended by that certain Letter Agreement, dated as of March 20, 2008, as further amended by that certain Amendment to Lease, dated as of June 7, 2012, as further amended by that certain Amendment of Lease and Forbearance Agreement, dated as of April 1, 2020 and the related Guaranty by Town Sports International, Inc., dated as of March 1998.

48. Lease, by and between 39-01 QB LLC and TSI Sunnyside, LLC, dated as of May 17, 2007 and the related Guaranty by Town Sports International Holdings, Inc., dated as of May 17, 2007.

49. Lease, by and between Davis Square LLC and TSI Davis Square, LLC, dated as of May 19, 2006, as amended by that First Amendment to Lease, dated as of January 30, 2009, as further amended by that certain Second Amendment to Lease, dated as of August 29, 2019 and the related Guaranty by Town Sports International, Inc., dated as of 2006.

50. Lease, by and between Country View Commons, LLC and TSI Smithtown, Inc., dated as of October 28, 2005, as amended by that certain Amendment to Lease, dated as of October 29, 2014, as further amended by that certain Second Amendment to Lease, dated as of December 10, 2018 and the related Guaranty by Town Sports International, Inc.

51. Lease, by and between One Lawrence Street, LLC and TSI Dobbs Ferry, Inc., dated as of February 27, 2006, as amended by that certain Assignment and Assumption of Leases, dated as of August 12, 2011

and related Guaranty, dated as of February 15, 2006, by Town Sports International, Inc. and Parking Lot Lease, dated as of March 3, 2010, by and between Akzo Nobel Chemicals Inc. and TSI Dobbs Ferry, LLC.

52. Lease, by and between DC USA Operating Co., LLC and Columbia Heights, Inc., dated as of November 2005,  and the related Guaranty by Town Sports International, Inc., dated as of 2005.

53. Lease, by and between Westborough CC LLC and TSI Westborough, LLC, dated as of June 13, 2007, and the related Guaranty by Town Sports International, LLC, dated as of June 13, 2007.

54. Lease Agreement, by and between 100 Duffy, LLC and TSI Hicksville, LLC, dated as of February 12, 2007, as amended by that certain First Amendment to Lease, dated as of December 21, 2007, as further amended by that certain Second Amendment to Lease, dated as of April 30, 2008, as further amended by that certain Third Amendment to Lease, dated as of July 25, 2013, as further amended by that certain Fourth Amendment to Lease, dated as of March 17, 2015 and the related Declaration of Restrictive Covenants, by 100 Duffy, LLC, dated as of September 12, 2006 and the related Guaranty by Town Sports International, LLC, dated as of February 12, 2007.

55. Lease, by and between 400 MetroNorth Corporate Center LLC and TSI Woburn LLC, dated as of October 25, 2007, as amended by that certain Letter, dated as of October 3, 2017 and the related Guaranty by Town Sports International, Inc., dated as of October 25, 2007.

56. Lease, by and between Butler Bowl, Inc. and TSI Butler, Inc., dated as of February 2007, and the related Guaranty by Town Sports International, LLC, dated as of February 17, 2007.

57. Indenture of Lease, by and between BP 111 Huntington Avenue LLC and TSI Back Bay, LLC (as successor in interest to Fitcorp Healthcare Centers, Inc.), dated as of June 1, 2011, as amended by that certain Landlord Acknowledgement and Assignment and Assumption of Lease and Amendment of Lease, dated as of May 17, 2013 and the related Guaranty Agreement by Town Sports International, LLC, dated as of March 17, 2013.

58. Reinstatement, Amendment and Restatement of Lease, by and between Superior Realty Co., Inc. and TSI Dorchester LLC, dated as of May 1, 2017, as amended by that certain Rent Deferral, dated as of April 12, 2020.

59. Lease, by and between WTC Retail LLC and TSI Wayland, LLC, dated as of October 15, 2013 and the related Payment Guaranty Agreement, dated as of October 15, 2013, by Town Sports International, LLC.

60. Agreement of Lease, by and between Gotham Broad LLC and BFX 30 Broad Street, LLC, dated as of April 7, 2014, as amended by that certain First Amendment of Lease, dated as of June 2014, as further amended by that certain Second Amendment to Lease, dated as of March 4, 2016, as further amended by that certain Third Amendment of Lease, dated as January 1, 2018 and the related Limited Guaranty by Town Sports International, LLC, dated as of April 7, 2014.

61. Agreement of Lease, by and between Main 38 Realty, Inc. and TSI Lucille 38th Avenue, LLC (successor in interest to LRHC Flushing NY, LLC), dated as of August 15, 2011, as amended by that certain Assignment and Assumption of Lease, dated as of August 11, 2017.

62. Agreement of Lease, by and between Austin-Forest Associates and TSI-Lucille Austin Street, LLC (successor in interest to The Fitness Place Forest), dated as of June 11, 1996, as amended by that certain Assignment and Assumption of Lease, dated as of September 11, 2017.

63. Agreement of Lease, by and between Styertowne Shopping Center and TSI - Lucille Clifton, LLC (successor in interest to Clifton NJ Fitness LLC), dated as of September 2009, as amended by that certain First Amendment to Lease, dated as of December 6, 2011, as further amended by that certain Assignment and Assumption of Lease, dated as of September 11, 2017.

64. Agreement of Lease, by and between County Holding Corp. and TSI - Lucille Kings Highway, LLC (successor in interest to Kings Highway Spa, Inc. (d/b/a Lucille Roberts)), dated as of April 19, 2017, as amended by that certain Assignment and Assumption of Lease, dated as of September 11, 2017.

65. Agreement of Lease, by and between Serota Valley Stream, LLC and TSI - Lucille Valley Stream, LLC (successor in interest to 225 West Merrick Road, LLC), dated as of February 14, 2007, as amended by that certain Assignment and Assumption Agreement, dated as of September 11, 2017.

66. Shopping Center Lease Agreement, by and between Lags Ventures, Inc. and TSI - ATC Boyscout, LLC (successor in interest to ATC Fitness Fort Myers 2, LLC), dated as of October 2013, as amended by that certain Assignment and Assumption of Lease, Amendment and Landlord Consent, dated as of February 27, 2019, as further amended by that certain Second Amendment to Lease, dated as of July 14, 2020 and the related Limited Guaranty by TSI-ATC Holdco, LLC, dated as of February 21, 2019, and related Indemnity and Reimbursement Agreement for Guaranty, dated as of February 26, 2019.

67. Lease, by and between KRG Fort Meyers Colonial Square, LLC and ATC Fitness Cape Coral, LLC, dated as of May 15, 2012, as amended by that certain First Lease Amendment, dated as of December 8, 2012, as further amended by that certain Second Lease Amendment, dated as of June 29, 2017, as further amended by that certain Assignment and Assumption and Third Amendment to Lease, dated as of April 2, 2019 and the related Guaranty Rider, dated as of April 2, 2019.

68. Amended and Restated Lease Agreement, by and between Store Master Funding XI, LLC and TSI - ATC Cape Coral, LLC, dated as of February 27, 2019, as amended by that certain Amendment to Amended and Restated Lease Agreement, dated as of April 1, 2020.

69. Landlord and Tenant Lease, by and between Universal Bldg. North, Inc. and Kalorama Sports Management Associates, Limited Partnership, dated as of May 31, 1996, as amended by that certain First Amendment to Landlord and Tenant Lease, dated as of October 25, 1996, as amended by that certain Second Amendment to Landlord and Tenant Lease, dated as of April 18, 2005, as further amended by that certain Third Lease Amendment and Extension of Lease, dated as of November 25, 2019, as amended by that certain Letter Agreement, dated as of March 25, 2020.

70. Landlord and Tenant Lease, by and between Universal Building, Inc. and Kalorama Sports Management Associates, Limited Partnership, dated as of April 19, 2005, as amended by that certain Lease Amendment and Extension of Lease, dated as of November 25, 2019, as amended by that certain Letter Agreement, dated as of March 25, 2020.

71. Sublease Agreement, by and between Kalorama Sports Management Associates, Ltd. Partnership and Marriott Corporation, dated as of October 2, 1989.

72. Lease, by and between TSI-Lucille Real Estate LLC and TSI Massapequa, LLC, dated as of November 13, 2017.

73. Lease, by and between JSP Realty Investments, LLC and TSI Westboro Tennis, LLC, dated as of January 1, 2018.

74. Lease Agreement, by and between Store Master Funding VIII and The Westborough Club, Inc., dated as of February 15, 2017, as amended by that certain Memorandum of Assignment and Assumption of Lease, dated as of January 1, 2018, as further amended by that certain Amendment to Lease Agreement, dated as of April 1, 2020 and related Unconditional Guaranty of Payment and Performance by Town Sports International Holdings, Inc., dated as of January 1, 2018.

75. Agreement, dated September 11, 1979, by and between Intercity Verwaltungs AG and Town Sports International, LLC, as amended by that certain Amendment 1, dated September 18, 1979, as further amended by that certain Amendment 2, dated December 12, 1994, as further amended by that certain Amendment 3, dated August 22, 2005, as further amended by that certain Amendment 4, dated October 12, 2012.

76. Pre-Agreement, dated April 6, 2000, by and between Genossenschaft Fussballstadion St. Jakob, Basel and Town Sports International, LLC and related Details of Agreement, dated August 9, 2001, as further amended by that certain Amendment 1, undated, and related Agreement, dated December 12, 2001, by and between Musfeld AG and Town Sports International, LLC.

77. Agreement, dated November 6, 2014, by and between SUVA Luzern and Town Sports International, LLC, as amended by that certain Amendment 1, dated July 1, 2016.

**Section 3.7 - Litigation; Decrees**

| | CASE | REFERENCE NO. |
|---|---|---|
| 1. | Dos Santos v. New York Sports Club & Town Sports International LLC | MPOS 17-24841 |
| 2. | Da Silva v. Town Sports International, LLC. | Queens Supreme Court Index No. 715609/18 |
| 3. | Dantes Medina v. Town Sports International, LLC | Case 01-19-0001-1652 (AAA) |
| 4. | Diaz v. Town Sports International LLC | Supreme Court New York County, Index no. 161574/19 |
| 5. | Zdrakas v. Town Sports International LLC | Suffolk County Index no. 600334/20 |
| 6. | Disla v. Town Sports International, LLC d/b/a New York Sports Club | Case no. 10200855 |
| 7. | Parker v. Town Sports International LLC | Case no. 10205888 |
| 8. | Rodriguez v. Town Sports International, LLC d/b/a New York Sports Club | Case no. 10200194 |
| 9. | Mikayla Coble v. Town Sports International, Inc. | MCAD No. 18 WEM01426 |
| 10. | Dorothelia Barnett v. New York Sports Club | Case no. 1910016 |
| 11. | Matatov v. Town Sports International, LLC | Index no 155264/18 |
| 12. | Chaplin v. Town Sports International, Boston Sports Club, Town Sports International, LLC | MCAD no. 19BEM01793, EEOC no. 16C-2019-01947 |
| 13. | Robert D'Agostino v. Town Sports International dba Boston Sports Club | Mass. Commission Against Discrimination Complaint No. (not assigned yet) |
| 14. | James Silverberg v Town Sports International  LLC, d/b/a New York Sports Club | NYC Commission on Human Rights Complaint No. M-E-V 19-76811 |
| 15. | Brittany Mays v. Town Sports International, LLC | Case no. 102079567 |
| 16. | Sisay Beshah v. TSI Society Hill d/b/a Philadelphia Sports Club, TSI Market Street d/b/a Philadelphia Sports Club | PCHR charge no. 2018-12.21.788 |
| 17. | James Todd Grubbs v. Town Sports International, LLC and Town Sports International Holdings, Inc. d/b/a New York Sports Club | City of New York Commission on Human Rights Complaint No. M-E-ADOS-20-86237-E |
| 18. | Thomas Morris v. New York Sports Club, Samuel Vascones, Geraldine Dry | Case no. MENV-19-69146 |
| 19. | Sandra Clarke v. Patrick Walsh, CEO and Town Sports International, LLC | WC746-0618-HUM |
| 20. | Ale Moz v. Washington Sports Club | District of Columbia Office of Human Rights Case no 17-640-PA |
| 21. | Joevani Cruz v. Town Sports International, LLC, Nicole Smith and Berard Molino | AAA Case no 01-16-001-4021 |
| 22. | Kelsey Cooper with Total Woman | |
| 23. | Rebecca Jackson with Total Woman | |
| 24. | D and M Kings Realty, LLC  v. TSI Brooklyn Belt LLC | Kings County Civil Index No. LT-057106-20/KI |

| 25. Ross Procurement Inc. v. TSI West 38 Inc. | NY Supreme 657464/2019 |
| 26. Avi Rubin v New York Sports Club and Town Sports International LLC | Nassau County District Court 1st District Small Claims Index No. SC-001972-19/NA |
| 27. Avi Hadar v NY Sports Club dba Town Sports International | Nassau County District Court, 3rd District Small Claims Index No. SC-000222-20/NH |
| 28. Ana Ruiz v Town Sports International, dba New York Sports Clubs | Suffolk County District Court 6th District Small claims Patchogue Index no. SC-000019-20/BR |
| 29. Dobbs Ferry Shopping LLC v. TSI Dobbs Ferry Inc. and Town Sports International LLC | Westchester County Supreme Court Index 55729/2020 |
| 30. Rivertown Square Regency LLC v. TSI Dobbs Ferry LLC dba New York Sports Club | Westchester County Index No. 58344/2020 |
| 31. 200 Park LP v. TSI Grand Central LLC dba New York Sports Club, Town Sports International LLC, ABC Co., and XYZ Co. | New York Supreme Court Index No. 156605/2020 |
| 32. 110 BP Property LLC v. TSI Cobble Hill, Inc., dba NY Sports Club and Town Sports International, Inc. | Supreme Court New York, Kings County Index No. 514680/2020 |
| 33. Tanger Outlets Deer Park LLC v TSI Deer Park LLC, TSI Deer Park, LLC d/b/a Town Sports International, TSI Deer Park, LLC d/b/a New York Sports Club, and Town Sports International, LLC | Supreme Court New York, Suffolk County, Index No. 611443/2020 |
| 34. Recovery Office Services 2, LLC v. TSI Grand Central LLC | Supreme Court New York, New York County, Index No. 654070/2020 |
| 35. 278 Eighth Associates v. TSI West 23, LLC and Town Sports International, LLC | Supreme Court, New York County, Index No. 654175/2020 |
| 36. 885 Second Avenue Lessee LLC v. Town Sports International LLC | |
| 37. 39-01  QB  LLC v.  TSI Sunnyside LLC  and Town Sports International, Inc. | Supreme Court New York County; Index No. 652221/2020 |
| 38. D and M Kings Realty, LLC v. TSI Brooklyn Belt LLC | Kings County Civil Index No. LT-057106-20/KI |
| 39. Ross Procurement Inc. v. TSI West 38 Inc. | NY Supreme 657464/2019 |
| 40. IVAS Facilities Services, LLC, IVAS Distributors Inc., V & M Audio Visual LLC, v. Town Sports International LLC | Nassau Supreme Court Index No. 607149/2019 |
| 41. Kristin Horn v. Town Sports International Holdings LLC, Desiree Tyres and Richard Gearhart | Suffolk County Supreme Court Index No. 603421/2019 |
| 42. Pacifc Link International  Corp. v. Town Sports International, LLC | Supreme Court Nassau County Index No. 600923/2019 |
| 43. The Home of the Project Network & Company Ltd. trading as TPN International v. Town Sports International Holdings Inc. dba Town Sports International | Index No. 59711/2019 |
| 44. Ciamara Corporation v Town Sports International LLC, dba TMPL Gym, TMPL Holdings LLC, RP Builders Group, David Barton, Rich Privitera, 117 Seventh Avenue South Property Co, L.P. and The Guarantee Company of North America | Index No. 161791/2019 |
| 45. Avi Rubin v New York Sports Club and Town Sports International LLC | Nassau County District Court 1st District Small Claims Index No. SC-001972-19/NA |

| | | |
|---|---|---|
| 46. | Avi Hadar v NY Sports Club dba Town Sports International | Nassau County District Court, 3' District Small Claims Index No. SC-000222-20/NH |
| 47. | Heloisa R. Guimaraes v LR Rockville | Nassau County District Court — 2d District Small Claims Index No. SC-000346-20/HE |
| 48. | Flatlands Shopping Center Associates v. TSI Lucille Ralph Avenue, LLC and Town Sports International Holdings, Inc. | NY County Supreme Court Index No. 653632/2020 |
| 49. | New York State Department of Taxation and Finance action against all corporate entities | |
| 50. | Rivertown Square Regency LLC v. TSI Dobbs Ferry LLC dba New York Sports Club | Supreme Court, Westchester County Index No. 58344/2020 |
| 51. | 200 Park LP v. TSI Grand Central LLC dba New York Sports Club, Town Sports International LLC, ABC Co., and XYZ Co. | New York Supreme Court Index No. 156605/2020 |
| 52. | D and M Richmond Realty, LLC v. TSI Staten Island LLC, successor in interest to TSI Staten Island Inc., TSI Staten Island LLC d/b/a/ New York Sports Clubs (NYSC), TSI Holding, Inc. and Town Sports International Inc. | Supreme Court Richmond County, Index No. 151263/2020 |
| 53. | Recovery Offce Services 2, LLC v. TSI Grand Central LLC | Supreme Court New York, New York County, Index No. 654070/2020 |
| 54. | Diane Perry v. Town Sports International, dba New York Sports Club | Superior Court, Judicial District of Stamford, CT, Case No. FST-CV-19-6040932-S |
| 55. | Cora Deutchman v. Town Sports International LLC, New York Sports Club LLC | Supreme Court, New York County Index No. 153254/2020 |
| 56. | Debra Cohen v. TSI — Westlake Village, LLC dba Total Woman Gym & Spa, Robin Fromhold | Case No. 205TCV08202 |
| 57. | Annette Copti v. TSI-Westlake Village | |
| 58. | ALEKSEI TSELUIKO, AS FATHER AND NATURAL GUARDIAN OF LILIANA TSELUIKO v. TOWN SPORTS INTERNATIONAL, LLC D/B/A NEW YORK SPORTS CLUB, ROOM & BOARD, and STONE CRAFTERS, INC. | Supreme Court of the State of New York, Kings County Index No.: 515134/16 |
| 59. | JOSEPH LUPO and ROSEMARIE LUPO v. TOWN SPORTS INTERNATIONAL, LLC d/b/a NEW YORK SPORTS CLUB | Supreme Court of the State of New York Suffolk County, Index No.: 17827/14 |
| 60. | SUSAN CONFREY v. TOWN SPORTS INTERNATIONAL HOLDINGS, INC., NEW YORK SPORTS CLUB, TOWN SPORTS INTERNATIONAL HOLDINGS d/b/a NEW YORK SPORTS CLUB, JOSEPH ANDULICS and MONTY TWO EAST 86TH STREET ASSOCIATES, LLC. | Supreme Court of the state of New York, New York County, Index No.: 153450/2016 |
| 61. | MARK RUBIN v. TOWN SPORTS INTERNATIONAL, LLC, TSI CLUB, LLC, TSI EAST 91, LLC, NEW YORK SPORTS CLUBS, YORKVILLE TOWERS ASSOCIATES, LLC and INTER-COUNTY MECHANICAL CORP | Supreme Court of the State of New York, Westchester County, Index No.: 71659/2014 |
| 62. | JASON HOLZBERG v. TOWN SPORTS INTERNATIONAL, LLC d/b/a NEW YORK SPORTS CLUBS; | Supreme Court of the State of New York, New York County, Index No.: 152003/16 |
| 63. | SIMONE PRYCE and DAVID PRYCE v. TOWN SPORTS INTERNATIONAL, LLC d/b/a NEW YORK SPORTS CLUB | United States District Court, Southern District of New York, Index No.: 1:18 CV: 05863-KPF |

| | | |
|---|---|---|
| 64. | NIGEL SAMUELS and TEASHA VON SAMUELS v. TOWN SPORTS INTERNATIONAL, LLC d/b/a NEW YORK SPORTS CLUB | Supreme Court of the State of New York, Bronx County, Index No.: 22178/13 |
| 65. | Eric Fishman v. Town Sports International, LLC and TSI Society Hill, LLC | Bucks County Court of Common Pleas No. 2017-04261 |
| 66. | Richard Simnor v. Philadelphia Sports Clubs and Town Sports Interational Holdings, Inc. | Philadelphia Court of Common Please No. 180200426 |
| 67. | Skyler Boss v. Philadelphia Sports Club | Philadelphia Court of Common Pleas No. 181101717 |
| 68. | Michael Corney v. Philadelphia Sports Club | Philadelphia court of Common Pleas No. 190500515 |
| 69. | Adelinda Becht v. Philadelphia Sports Club | Philadelphia Court of Common Pleas No. 140903658 |
| 70. | Keith Reid v. Philadelphia Sports Clubs | Bucks County Court of Common Pleas, 2020-04462 |
| 71. | Sophia Kraf v. Philadelphia Sports Club | Philadelphia Court of Common Pleas, 180201162 |
| 72. | Richard Douglas v. New York Sports Clubs, et. al. | Superior Court of New Jersey, Law Division, Essex County; Docket No. ESX-L-4487-15 |
| 73. | James Kole v. TSI Hoboken North, LLC | Superior Court of New Jersey, Law Division, Bergen County Docket No. BER-L-8112-19 |
| 74. | Natalie Cefaratti v. TSI Hoboken North, LLC | Superior Court of New Jersey, Law Division, Hudson County Docket No. HUD-L-3245-19 |
| 75. | Gwen Goodman v. Town Sports International LLC, et. al. | Superior Court of New Jersey, Law Division, Monmouth County Docket No. MON-L-1505-20 |
| 76. | Aura Zapata v. New York Sports Clubs, et. al. | Superior Court of New Jersey, Law Division, Bergen County Docket No. BER-L-4968-19 |
| 77. | Bonnie May v. New York Sports Clubs, et. al. | Superior Court of New Jersey, Law Division, Bergen County Docket No. BER-L-6729-18 |
| 78. | Seth Benkel v. TSI Englewood, LLC et. at. | Superior Court of New Jersey, Law Division, Bergen County Docket No. BER-L-2358-20 |
| 79. | Luisa Santos v. TSI Livingston, LLC | Superior Court of New Jersey, Law Division, Essex County Docket No. ESX-L-3432-20 |
| 80. | Ken Spitz v. Town Sports International, LLC d/b/a New York Sports Club, New York Sports Club, and Glenmore Associates | 7529/2011 |
| 81. | Mark Rubin v. Town Sports international, LLC, TSI Club, LLC, TSI East 91, LLC, New York Sports Clubs, Yorkville Towers Associates, LLC, Inter-County Mechanical Corp., The Ruppert Yorkville Towers Condominium and TY Management Co., INC. | 71659/2014 |
| 82. | Sean Dalton v. Town Sports International Holdings, INC. | 62875/2018 |
| 83. | Maureen McCafferty v. New York Sports Club, INC., TSI West 14, LLC, and TSI West 14, INC. | 61673/2018 |
| 84. | Fred Rosenberg v. Town Sports International, LLC d/b/a New York Sports Club | 155759/2017 |

| | | |
|---|---|---|
| 85. | Benjamin Lavon v. Town Sports International, LLC d/b/a New York Sports Clubs and TSI South Park Slope, LLC | 512899/2018 |
| 86. | Tatyana Kirichenko v. Town Sports International, LLC d/b/a New York Sports Club | 514933/2018 |
| 87. | Norton Narins and Joyce Narins v. Town Sports International, LLC d/b/a New York Sports Club Smithtown | 66960/2018 |
| 88. | Israel Schiller v. TSI Scarsdale, LLC d/b/a New York Sports Club | 32099/2018E |
| 89. | Clare Curtin v. Town Sports International, LLC and Lucille Roberts | 616313/2018 |
| 90. | Efstratios Velonakis v. New York Sports Club and Town Sports International, LLC | 57768/2019 |
| 91. | Joan Ryan v. Andrew Walsh, Jonathan Reyes, Town Sports International, LLC d/b/a New York Sports Club, TSI East 41, LLC and 633 Realty LLC | 157570/2018 |
| 92. | Rosemary Sawyer v. New York Sports Clubs, Town Sports International, Inc., and Johnny Loaiza | 704297/2019 |
| 93. | James Koukoulas v. Town Sports International, LLC., and new York Sports Clubs | 16113/2014 |
| 94. | Agripina Trillo v. Town Sports International, LLC and Anarkan Esengulova | 502055/2019 |
| 95. | Janet Donat v. Town Sports International Holdings, INC., individually and d/b/a New York Sports Club and Town Sports International, LLC, individually and d/b/a New York Sports Club and Ariel Miller | 155309/2019 |
| 96. | Connor Kilbane v. Town Sports International, LLC d/b/a New York Sports Club | 158649/2019 |
| 97. | Michelle Balsamo and John Balsamo v. Parkroe Realty, INC., Town Sports International, LLC and new York Sports Club | 612519/2019 |
| 98. | Robert Rice v. Town Sports International Holdings, INC., d/b/a New York Sports Clubs | 717909/2019 |
| 99. | Jacqueline Wein v. New York Sports Clubs, Geraldine Dry, Nicholas Cato and Town Sports International Holdings, INC. | 56256/2020 |
| 100. | Elizabeth Jimenez v. town Sports International, INC. d/b/a New York Sports Club | 717293/2017 |
| 101. | Katerina Kyriannis, an infant under the age of 18 years, by her m/n/g Helen Kyriannis, Individually v. Town Sports International | 623379/2019 |
| 102. | Ryan Kulesa v. New York Sports Club, LLC, Town Sports International, LLC, Town Sports International, INC., Town Sports International Holdings, LLC, Town Sports International Holdings, INC., Town Sports International Holdings, LLC d/b/a New York Sports Club and Parkroe Realty, INC. | 57235/2020 |
| 103. | Adam Addesso v. Town Sports International, LLC, Town Sports International, LLC d/b/a New York Sports Club, TSI | 55547/2020 |

| | |
|---|---|
| Scarsdale, LLC, TSI Scarsdale LLC d/b/a New York Sports Club | |
| 104. Matthew Smith v. New York Sports Club, LLC, New York Sports Club, LLC d/b/a New York Sports Clubs, TSI Croton, LLC, TSI Croton, LLC, d/b/a New York Sports Clubs, Town Sports International, LLC, Town Sports International, LLC d/b/a New York Sports Clubs, Simone Developments Company, LLC. | 56023/2020 |
| 105. Carmen Olivence v. Town Sports International, LLC d/b/a New York Sports Club, New York Sports Club, LLC, 1400 Retail Owner LLC, 1400 5th Commercial LLC, 1400 5th Ave. Commercial LLC, The 1400 Fifth Avenue Condominium Association, INC. and Maxwell-Kates, INC. | 152816/2020 |
| 106. Donovan Lightbourne v. Town Sports International, LLC, TSI Club, LLC, TSI East 91, LLC and New York Sports Clubs | 25139/2020E |
| 107. Eve Miceli v. Town Sports International, LLC, New York Sports Club, LLC. and Larisa Delvecchio | 605413/2020 |
| 108. Artscroll Printing Corp. and Elliot Schwartz v. Town Sports International, LLC. d/b/a New York Sports Club, and TSI West 41 LLC. v. IDK Cooling Corp. | 161820/2019 |
| 109. Edward Decabooter v. Town Sports International, INC., and New York Sports Club | 155041/2019 |
| 110. Rosario Lambiase v. Rosario Lambiase v. Town Sports International, INC., Town Sports International, LLC d/b/a New York Sports Club and New York Sports Club | 26053/2019E |
| 111. Scott Burgos v. Town Sports International, LLC d/b/a New York Sports Club | 55798/2019 |
| 112. H.S., an infant by his parents and natural guardians Carol Sejdija and Valon Sejdija, G.S., an infant by his parents and natural guardians Carol Sejdija and Valon Sejdija, Carol Sejdija, Individually and Valon Sejdija, Individually v. Town Sports International, LLC d/b/a New York Sports Club and "JOHN DOES" intended to represent agents, servants and/or employees of Town Sports International, LLC d/b/a New York Sports Club | 22503/2017E |
| 113. Diane Perry v. Town Sports International | Docket No: FST-CV19-6040932-S |
| 114. Cora Deutchman v. Town Sports International | 153254/2020 |
| 115. Richard Lane v. Monty Two East 86th Street Associates, LLC, Town Sports International, LLC and New York Sports Clubs | 150088/2018 |
| 116. Barry Schulman v. Town Sports International, LLC, d/b/a New York Sports Clubs | 155259/2015 |
| 117. Aleksei Tseluiko, As Father And Natural Guardian Of Liliana Tseluiko v. Town Sports International, LLLC d/b/a New York Sports Club, Room & Board, and Stone Crafters, INC. | 515134/2016 |
| 118. Joseph Lupo and Rosemarie Lupo v. Town Sports International, LLC d/b/a New York Sports Club | 17827/2014 |

| | |
|---|---|
| 119. Susan Confrey v. Town Sports International Holdings, Inc., New York Sports Club, Town Sports International Holdings d/b/a New York Sports Club, Joseph Andulics and Monty Two East 86th Street Associates, LLC | 153450/2016 |
| 120. Jason Holzberg v. Town Sports International, LLC d/b/a New York Sports Clubs | 15003/2016 |
| 121. Simone Pryce And David Pryce v. Town Sports International, LLC d/b/a New York Sports Club | 1:18 CV: 05863-KPF |
| 122. Nigel Samuels and Teasha Von Samuels v. Town Sports International, LLC d/b/a New York Sports Club | 22178/2013E |
| 123. Kira Geiger v. Town Sports International | 510376/2019 |
| 124. Joshua Towe v. Town Sports International | 34612/2019E |
| 125. Kathleen Hicks v. Town Sports International | 52442/2020 |
| 126. Tylinna Ogletree v. Town Sports International d/b/a Lucille Roberts | 717338/2019 |
| 127. Anthony Bozymowski v. Town Sports International | 032314/2011 |
| 128. Liza Winick v. Town Sports International | 08952/2020 |
| 129. Barnett Serchuk v. Town Sports International, LLC, d/b/a New York Sports Clubs, and Parkroe Realty INC. | 613450/2017 04709/2020 |
| 130. Noah Morris v. 28-30 Avenue A, LLC and New York Sports Club INC. | 035760/2018 |
| 131. Arlene Heaphy v. Lucille Roberts Health Clubs, Tsi-Lucille Bayshore, LLC, Town Sports International, LLC, TSI Holding Co, INC., Town Sports International Holding Co, INC and Town Sports International Holdings, INC d/b/a New York Sports Club | 601132/2020 |
| 132. Annette Pineiro v. New York Sports Club, LLC., Urstadt Biddle Properties, INC. and Maple Leaf Associates, INC | 500992/2018 |
| 133. Giovanna Olivo v. New York Sports Club and Matthew Montanez | 58112/2019 |
| 134. Delores Mastropola v. Town Sports International, LLC, Town Sports International, LLC d/b/a New York Sports Club, TSI Dobbs Ferry, LLC and Dobbs Ferry LLC d/b/a New York Sports Club | 70307/2013 |
| 135. Town Sports International v. Arnold Gonzalez, Arnold Santiago, and Larry Stepansky | 153743/2020 |
| 136. Michaela Sepe v. Town Sports International and New York Sports Club | 524646/2017 |
| 137. Linda Sannicandro v. Town Sports International | Docket No: ESX-L-002791-20 |
| 138. Samia Samadi v. New York Sports Club and Town Sports International | 702816/2020 |
| 139. Margaret Martire v. Lucille Roberts and Town Sports International | 503617/2020 |

| | Docket No: |
|---|---|
| 140. Susan Gioffre v. New York Sports Club and Town Sports International | |
| 141. Susan Confrey v. Town Sports International Holdings, Inc., New York Sports Club, Town Sports International Holdings, Inc. d/b/a New York Sports Club and Joseph Andulics | MID-L-4434-20 |
| 142. James Groves, Jr. v. Town Sports International, LLC, Penske Truck Leasing Co., L.P., and Joe Ramos, Jr. | 153450/2016 |
| 143. Jeffrey Davila v. Town Sports International, LLC d/b/a New York Sports Clubs, and Anthony E. Adams | 31313/2017E |
| 144. Daniel Santiago v. Gabriel Cruz, James Jimenez, and Town Sports International, LLC d/b/a New York Sports Club and New York Sports Club | 503106/2019 |
| 145. Shakir Farsakh v. Town Sports International d/b/a New York Sports Club | 155539/2014 02467/2020 |
| 146. Susan Reitano, as Administrator of The Estate of Steven Reitano, and Susan Reitano Individually v. Stanken Associates Limited Partnership, 633 Realty LLC, Sandhurst Associates LTD, Board of Managers of the 633 Third Avenue Condominium, and New York Sports Club | 526644/2019 |
| 147. Silvana DeSimone vs. Town Sports International, LLC d/b/a New York Sports Club and Leonard Smith | 55709/2018 |
| 148. Anthony DeLuigi vs. Town Sports International, LLC d/b/a New York Sports Club | 160324/2017 |
| 149. Anne Sanzeri-Galgano vs. Town Sports International Commack, LLC d/b/a New York Sports Club | 606778/2018 |
| 150. Ruslan Naymon v. Town Sports International, LLC. | 504924/2018 |
| 151. Innocent Iyere v. Town Sports International, LLC | 55886/2018 |
| 152. David Acres v. Town Sports International, LLC d/b/a New York Sports Club | 155031/2018 |
| 153. Narsha Rivera v. Town Sports International, LLC d/b/a New York Sports Club | 300449/2017 |
| 154. Cathalin Langevin v. New York Sports Club, TSI Massapequa, LLC and TSI-Lucille Real Estate, LLC | 609386/2019 |
| 155. Revital Sharabi and Rubi Sharabi v. TSI-Lucille Kings Highway LLC | 524652/2019 |
| 156. Julio Ellis v. New York Sports Club, Town Sports International, LLC and New Roc Parcel 1A, LLC | 65013/2017 |
| 157. Carol Yarmosh v. Town Sports International, LLC d/b/a New York Sports Club | 160476/2017 |
| 158. Anthony Leader v. Town Sports International | 23713/2020E |
| 159. Xin Qu v. Dany Perez Polinez, Town Sports International and Penske Leasing & Rental Company | 52045/2020 |
| 160. Shaneika Hardy v. Serota Valley Stream, LLC, Town Sports International, LLC d/b/a New York Sports Club | 707162/2020 |

| | |
|---|---|
| 161. Department of Consumer Affairs v. Town Sports International | Index No: 190496 |
| | Record Nos: 2016-00744-ENF (0744-2016-PSLD) |
| 162. David Reibman v. Town Sports International, LLC | SCH 353/2019 |
| 163. John Ruiz v. New York Sports Club and Town Sports International | 17.2020.2 17.2020.1 |
| 164. Alexander Lerner v. New York Sports Club | 54-SCNY-2020.1 |
| 165. Anisha Baidya v. TSI | TSIKK- 1153739 |
| 166. Robert Bryant v. TSI Salisbury | TSIKK - 1191166 |
| 167. Michael Bernstein v. TSI Wellington Circle | TSIKK- 1168192 |
| 168. James Bagley v. TSI Lynnfield | TSIKK- 1164821 |
| 169. Joseph Chaves v. TSI | TSIKK- |
| 170. Tian v. TSI | TSIKK-1147986 |
| 171. Stephanie Louis v. TSI Wellington Circle, LLC | TSIKK - 1178650 |
| 172. Oliver Stark v. TSI | TSIKK-1187781 |
| 173. Sanpou v. Latitude | TSIKK-1200393 |
| 174. Sadie Thomas v. TSI | TSIKK-1196251 |
| 175. Aandre Davis v. TSI Wellington Circle | TSIKK- 1190011 |
| 176. Alice Chang v. TSI | TSIKK-1134315 |
| 177. Jaqueline Mahoney v. TSI Wellesley | TSIKK- 1192977 |
| 178. Arya Tehrani v. TSI | TSIKK-1204249 |
| 179. Amber Barros v. Town Sports International LLC | California/Orange County, Case No. 30-2018-01036571-CU-OE-CXC |
| 180. Amber Barros v. Town Sports International, LLC, Total Woman Gym and Day Spa, TSI - Placentia, LLC | California/Orange County, Case No. 30-2020-01141441 |
| 181. Rosalyn Hanson v. Town Sports International, LLC | California/Orange County, Case No. 30-2019-01112265 |
| 182. Superb Score LLC and Ramone Moreno-Cuevas v. Town Sports International d/b/a New York Sports Club et. al. | USDC Conn. Docket N3:19-cv-01803-KAD |
| 183. Dept. of Consumer Affairs (DCA) v. Town Sports International, LLC, d/b/a New York Sports Clubs | Office of Administrative Trials and Hearings, City of New York Record No. 00744-2016-PLSD |
| 184. Mary Namorato v. Town Sports International, LLC, Inc., and Town Sports International Hodgins, Inc., d/b/a New York Sports Clubs | USDC SDNY Docket No. 20-cv-025803-(VSB) |
| 185. Nancy Radford and Kaycee Farland v. Town Sports International Holdings, Inc., and Town Sports International, LLC, d/b/a New York Sports Clubs, Boston Sports Clubs, Washington Sports Clubs, Philadelphia Sports Clubs, Lucille Roberts, Palm Beach Sports Clubs, Around the Clock Fitness, and Total Woman Gym and Spa. | USDC SDNY Docket No. 20-cv-02938-(CM) |

| | |
|---|---|
| 186. TSI South Station, Inc., and TSI South Station, LLC v. 695 Atlantic Avenue Company, LLC | Mass. Superior Court Suffolk County Business Litigation Session (2084-cv-01059-BLS2) |
| 187. D.C. v. Town Sports International LLC., d/b/a Washington Sports Clubs | Superior Court of the District of Columbia Case No.: 2019 CA 000126B |
| 188. Larry Turner v. Town Sports International Holdings, Inc. | Superior Court of the District of Columbia Case No.: 2019 CA 004470B |
| 189. Paul Profeta v. TSI Livingston, LLC d/b/a New York Sports Club | NJ Superior Court, Essex County Docket N.: ESX-L-3394-16 |
| 190. Richard Chusid v. Town Sports International, LLC d/b/a New York Sports Club | USDC New Jersey Docket No.: 2:19-cv-05577-MCA-LDW |
| 191. Mykola Kolomiichuk v. Town Sports International | SDNY Docket No.: 18-cv-01223-KMK |
| 192. Joshua Blimes et al. v. Town Sports International, LLC and Town Sports International Holdings, Inc. d/b/a New York Sports Clubs, Boston Sports Clubs, Washington Sports Clubs and Philadelphia Sports Clubs | USDC New Jersey Docket No.: 2:19-cv-05577-MCA-LDW |
| 193. Town Sports International, LLC, d/b/a New York Sports Clubs v. Arnold Gonzalez, Arnold Santiago, Larry Stepansky, et. al. | Supreme Court of the State of New York, County of New York Index No.: 153743/2020 |
| 194. Cardillo (f/k/a DelVecchio), et al. v. TSI, LLC, d/b/a BSC | USDC, District of Massachusetts Civil Action No. 1:20-cv-10666-MLW |
| 195. Andrew Seecharan v. Town Sports International, LLC, a limited liability corporation Alexandra Lozano, individually and Leah Molina, individually | Hudson County Superior Court, New Jersey Docket No. HUD-L-1149-19 |
| 196. John Ruiz v. Town Sports International | Civil Court of the City of New York, County of New York, Small Claims Part Index No: 17.2020 1 |
| 197. John Ruiz v. N.Y. Sports Club | Civil Court of the City of New York, County of New York, Small Claims Part Index No: 17.2020 2 |
| 198. Alexander Lerner v. New York Sports Club | Civil Court of the City of New York, County of New York, Small Claims Part Index No: 54. SCNY 2020 1 |
| 199. Town Sports v. 3F Management and Derik Fay (anticipated) | Lee County, Florida A case number will be assigned following the filing of suit. |
| 200. Karen Eisenberg v Town Sports International LLC | LA County, California, Superior Court; Case Mo. 20STLC05735 |
| 201. TSI Hoboken v. Vito and Power Fitness Hoboken | Superior Court, New Jersey, Hudson County Case No. 005110-20 |
| 202. Colonia Limited Partnership v. TSI Colonia, LLC et. al | Superior Court of New Jersey,  Docket NO. MID-L-5758-18 |
| 203. 6828 Wisconsin Avenue LLC v. TSI South Bethesda and Town Sports International LLC | Circuit Court Montgomery County, Maryland Case No. 482074-V |

| | |
|---|---|
| 204. Donahue Schriber Realty Group LP v. TSI Placentia LLC, TSI Total Woman Holdco LLC and Does 1-20 | California Superior Court, Orange County  case no. 30-2020-01-01153766-CU-BC-CJC |
| 205. Riverview Retail LLC v. Town Sports International, LLC | U.S. District Court of Rhode Island Case No.  20 CV 354 |
| 206. Superior Realty Co., Inc. v. TSI Dorchester LLC | Mass. Dorchester Division of Boston Municipal Court , Case No. 20075000023 |
| 207. Kevin McCarron and all others similarly situated  v. TSI Lynfiled LLC and Town Sports International LLC | Mass. Superior Court 2077 CV 00563A |
| 208. District of Columbia v. Town Sports International, LLC | District of Columbia Superior Court; 2020 CA 003691B |
| 209. Kensington Investment Company Inc., LLC v. TSI Newbury Street, LLC | Boston Municipal Court, Central Division; no docket number provided |
| 210. Farren's Stable LLC v. Paul London and Town Sports International LLC | Montgomery County, Maryland  483118-V |
| 211. TSI Wellington Circle, LLC v. Station Landing III, LLC | Mass. Superior Court, Middlesex County; 2081-CV-01603 |
| 212. Landmark Center Park Drive LLC v. TSI Fenway LLC | Boston Municipal Court, Roxbury Division case no. 2002-SU-000015 |
| 213. TGF Winter Street Property, LLC v. TSI Waltham, LLC | Waltham District Court, MA, case no. 2051-SU-000031 |
| 214. Dos Santos v. New York Sports Club & Town Sports International LLC | MPOS 17-24841 |
| 215. Da Silva v. Town Sports International, LLC. | Queens  Supreme  Court  Index  No.715609/18 |
| 216. Dantes Medina v. Town Sports International, LLC | Case 01-19-0001-1652 (AAA) |
| 217. Brittany Mays v. Town Sports International- NYSDHR complaint | Case no 102079567 |
| 218. Diaz v.  Town Sports International LLC | Index  no. 161574/19 |
| 219. Zdrakas v. Town Sports International LLC | Index no. 600334/20 |
| 220. Thomas Morris v. NYSC | Case no. MENV-19-69146 |
| 221. Disla v. NYSC | Case no. 10200855 |
| 222. Rodriguez v. Town Sports International | Case no. 10200194 |
| 223. Beshah v. PSC | PCR Charge # 2018-12.21.788 |
| 224. Coble v. Town  Sports  International | MCAD No. 18 WEM01426 |
| 225. Ale Moz v. Washington Sports Club | Case no 17-640-PA |
| 226. Joevani Cruz v. Town Sports International, LLC | Case no 01-16-001-4021 |
| 227. Sandra Clarke v. Patrick Walsh and TSI, LLC | WC746-0618-HUM |
| 228. Dorothelia Barnett v. NYSC- CHRO | Case no. 1910016 |
| 229. Matatov v. Town Sports | Index no 155264/18 |
| 230. Chaplin v. Town Sports International, LLC | MCAD no. 19BEM0179 |

| | |
|---|---|
| 231. D'agostino v. Town Sports International dba Boston Sports Club | Not assigned yet |
| 232. James Todd Grubbs v. Town Sports International, LLC and Town Sports International Holdings, Inc. | Complaint No. M-E-ADOS-20-86237-E |
| 233. 39-01 QB LLC v. TSI Sunnyside LLC and Town Sports International, Inc. | Index No. 652221/2020 |
| 234. D and M Kings Realty, LLC  v. TSI Brooklyn Belt LLC- Kings County Civil | Index No. LT-057106-20/KI |
| 235. Ross Procurement Inc. v. TSI West 38 Inc. | 657464/2019 |
| 236. IVAS Facilities Services, LLC, IVAS Distributors Inc., V & M Audio Visual LLC, v. Town Sports International LLC | Index No. 607149/2019 |
| 237. Kristin Horn v. Town Sports International Holdings LLC, Desiree Tyres and Richard Gearhart | Index No. 603421/2019 |
| 238. Pacific Link International, Corp. v. Town Sports International, LLC | Index No. 600923/2019 |
| 239. The Home of the Project Network & Company Ltd. trading as TPN International v. Town Sports International Holdings Inc. dba Town Sports International - Westchester | Supreme Index No. 59711/2019 |
| 240. Ciamara Corporation v Town Sports International LLC, dba TMPL Gym, TMPL Holdings LLC, RP Builders Group, David Barton, Rich Privitera, 117 Seventh Avenue South Property Co, L.P. and The Guarantee Company of North America | Supreme Court Index No. 161791/2019 |
| 241. Ana Ruiz v Town Sports International, dba New York Sports Clubs | Suffolk County District Court 6th District Small claims Patchogue Index no. SC-000019-20/BR |
| 242. Heloisa R. Guimaraes v LR Rockville | Nassau County District Court - 2d District Small Claims Index No. SC-000346-20/HE |
| 243. Dobbs Ferry Shopping LLC v. TSI Dobbs Ferry Inc. and Town Sports International LLC - Westchester County | Supreme Court Index 55729/2020 |
| 244. Flatlands Shopping Center Associates v. TSI Lucille Ralph Avenue, LLC and Town Sports International Holdings, Inc. | NY County Supreme Court Index No. 653632/2020 |
| 245. 200 Park LP v. TSI Grand Central LLC dba New York Sports Club, Town Sports International LLC, ABC Co., and XYZ Co. | New York Supreme Court Index No. 156605/2020 |
| 246. 278 Eighth Associates v. TSI West 23, LLC and Town Sports International, LLC, | Supreme Court, New York County, Index No. 654175/2020 |

**Section 3.8 - Labor Relations**

(a)

    None

(b)

    None

(c)

    None

**Section 3.9 - Brokers' Fees**

1. Huron Consulting Group
2. Hilco Real Estate
3. Cushman & Wakefield

**Section 3.10 - Taxes**

1.  The Company received a notification letter from the New York State Department of Taxation and Finance on July 7, 2010 indicating that the Company had been selected for audit. Reed Smith submitted an Opinion Letter on behalf of Town Sports International Holdings, Inc. and its combined affiliates to address New York State / New York City tax claim regarding TSI Insurance, Inc.'s status as a parent captive insurance company and subsequent corporate franchise tax liabilities arising therefrom.

**Section 3.11 - Data Privacy**

On September 22, 2020, the Company's CEO received an email from an individual at TechCrunch, which indicated that the Company had a security misconfiguration on one of its AWS S3 Buckets that allowed public exposure of data in a single folder called "Townsports" used for backing up data.  The Company's CEO promptly informed the Company's SVP of Strategic Initiatives & CIO.  The Company's IT staff responded by re-configuring the affected folder. The Company also implemented two-step verification for settings in AWS such that any change to an AWS permission setting must first be verified by the Company's IT management.

**Section 3.12 - Employee Benefits**

(a)

1. Aetna Value Plan, Aetna Core Plan, and Aetna Premium Plan (Medical, Prescription Drug)
2. Aetna Employee Assistance Plan
3. Aetna Dental DMO Plan, Aetna Dental PPO Plan and Guardian Dental PPO Plan (Dental)
4. VSP Vision Plan (Vision)
5. Benefit Resource, Inc. (Commuter Benefits Plan)
6. MetLife Inc. Life Insurance (Basic Life/ADD, and voluntary plans including employee life, spouse life and voluntary life).
7. Unum long term disability
8. ShelterPoint Short-Term Disability Insurance (short term disability)
9. Principal Financial Group 401K Plan (No employer match)
10. Various incentive / commission / bonus programs
11. Qualified employee stock purchase program
12. Management stock purchase plan

## Section 3.13 - Intellectual Property

(a)

Trademark registrations and applications:

| Trademark | Country | Filing Date/ Registration Date | Application/ Registration No. | Status | Owner[1] |
|---|---|---|---|---|---|
| LUCILLE ROBERTS | United States | 07/27/1979 08/18/1981 | 73225191 1165132 | Registered | TSI Holdings (IP), LLC |
| LUCILLE ROBERTS | United States | 09/28/1982 03/12/1985 | 73391626 1324009 | Registered | TSI Holdings (IP), LLC |
| TOWN SPORTS INTERNATIONAL | United States | 01/27/1993 11/23/1993 | 74359262 1806497 | Registered | TSI Holdings (IP), LLC |
| TSI | United States | 01/27/1993 10/26/1993 | 74359263 1801172 | Registered | TSI Holdings (IP), LLC |
| NYSC & Design | United States | 06/02/1997 08/18/1998 | 75301425 2182153 | Registered | TSI Holdings (IP), LLC |

---

[1] For the trademark registrations marked *, pursuant to an Asset Purchase Agreement, dated February 22, 2018, among TW Holdings, Inc., Town Sports International Holdings, Inc., and the other Sellers and Buyers identified therein, TW Holdings, Inc. and Sellers transferred certain assets to Buyers. Pursuant to a subsequent Trademark Assignment, TW Holdings, Inc. assigned these trademark registrations to TSI Holdings (IP), Inc. on April 13, 2018. However, on December 23, 2002 (approximately 16 years before the Trademark Assignment), TSI Holdings (IP), Inc. converted into TSI Holdings (IP), LLC.

For the trademark registration marked **, Tomas Rodgers assigned this trademark registration to TSI Holdings (IP), Inc. on December 8, 2017. However, on December 23, 2002 (approximately 15 years before the trademark assignment), TSI Holdings (IP), Inc. converted into TSI Holdings (IP), LLC.

| Trademark | Country | Filing Date/ Registration Date | Application/ Registration No. | Status | Owner[1] |
|---|---|---|---|---|---|
| NYSC new york sports clubs | United States | 06/02/1997 03/02/1999 | 75301426 2227316 | Registered | TSI Holdings (IP), LLC |
| NEW YORK SPORTS CLUBS | United States | 09/08/1997 03/02/1999 | 75353258 2227597 | Registered | TSI Holdings (IP), LLC |
| PHILADELPHIA SPORTS CLUBS | United States | 09/08/1997 03/21/2000 | 75353259 2333610 | Abandoned[2] | TSI Holdings (IP), LLC |
| PSC & Design | United States | 09/08/1997 04/13/1999 | 75353261 2239729 | Registered | TSI Holdings (IP), LLC |
| PSC philadelphia sports clubs & Design | United States | 09/08/1997 04/18/2000 | 75353260 2343957 | Registered | TSI Holdings (IP), LLC |
| WASHINGTON SPORTS CLUBS | United States | 10/02/1997 07/13/1999 | 75367067 2260453 | Registered | TSI Holdings (IP), LLC |
| WSC & Design | United States | 10/02/1997 03/19/2002 | 75367069 2548666 | Registered | TSI Holdings (IP), LLC |
| WSC Washington sports clubs & Design | United States | 10/02/1997 08/13/2002 | 75367068 2606256 | Registered | TSI Holdings (IP), LLC |

---

[2]    **Note**: No representations or warranties in this Agreement shall apply to this abandoned trademark.

| Trademark | Country | Filing Date/ Registration Date | Application/ Registration No. | Status | Owner[1] |
|---|---|---|---|---|---|
| BOSTON SPORTS CLUB | United States | 10/06/1997 07/20/1999 | 75368393 2262192 | Registered | TSI Holdings (IP), LLC |
| BSC & Design | United States | 10/06/1997 12/22/1998 | 75368395 2212754 | Registered | TSI Holdings (IP), LLC |
| BSC boston sports club & Design | United States | 10/06/1997 03/07/2000 | 75368394 2325163 | Registered | TSI Holdings (IP), LLC |
| NYSC & Design | United States | 12/15/1997 02/23/1999 | 75405152 2225662 | Registered | TSI Holdings (IP), LLC |
| NYSC new york sports clubs & Design | United States | 12/15/1997 02/16/1999 | 75405153 2224136 | Registered | TSI Holdings (IP), LLC |
| THERE'S A MILLION REASONS TO JOIN | United States | 10/23/1998 07/25/2000 | 75575862 2370104 | Registered | TSI Holdings (IP), LLC |
| WHERE YOU LIVE. WHERE YOU WORK. | United States | 11/06/1998 10/24/2000 | 75584488 2396940 | Registered | TSI Holdings (IP), LLC |
| TOTAL WOMAN[3] | United States | 01/03/2000 12/18/2001 | 75886037 2519313 | Registered | * |
| NYSC | United States | 12/19/2001 | 76351348 | Registered | TSI Holdings |

---

[3]  **Note to Draft**: A nunc pro tunc assignment is being obtained from TW Holdings, Inc. to reflect true owner as TSI Holdings (IP), LLC, which will be retroactive to April 13, 2018.

| Trademark | Country | Filing Date/ Registration Date | Application/ Registration No. | Status | Owner[1] |
|---|---|---|---|---|---|
| | | 02/25/2003 | 2690385 | | (IP), LLC |
| SPORTS CLUBS FOR KIDS | United States | 07/08/2004 01/31/2006 | 78447788 3053462 | Registered | TSI Holdings (IP), LLC |
| SPORTS CLUBS FOR KIDS Stylized | United States | 07/13/2004 01/31/2006 | 78449898 3053486 | Registered | TSI Holdings (IP), LLC |
| NEW YORK SPORTS CLUBS | European Union | 01/21/2005 04/13/2006 | 4247771 4247771 | Registered | TSI Holdings (IP), LLC |
| NYSC new york sports clubs & Design | European Union | 01/21/2005 03/12/2008 | 4247731 4247731 | Registered | TSI Holdings (IP), LLC |
| NYSC & Design | European Union | 02/21/2005 03/12/2008 | 4247755 4247555 | Registered | TSI Holdings (IP), LLC |
| LATTITUDE & Design | United States | 08/04/2005 09/11/2007 | 78685920 3291766 | Registered | TSI Holdings (IP), LLC |
| RIDE REPUBLIC | United States | 01/18/2012 10/21/2014 | 85519580 4625274 | Registered | TSI Holdings (IP), LLC |
| BFX BOUTIQUE FITNESS EXPERIENCE | United States | 04/04/2013 08/04/2015 | 85895485 4786292 | Registered | TSI Holdings (IP), LLC |

| Trademark | Country | Filing Date/ Registration Date | Application/ Registration No. | Status | Owner[1] |
|---|---|---|---|---|---|
| TOTAL WOMAN | United States | 04/17/2013 12/23/2014 | 85982582 4660480 | Registered | * |
| EMPOWERING WOMEN TO LIVE THEIR BEST LIVES | United States | 04/17/2013 12/16/2014 | 85907411 4656975 | Registered | * |
| TW Stylized & Design | United States | 04/17/2013 12/23/2014 | 85982581 4660479 | Registered | * |
| UXF | European Union | 04/30/2013 09/23/2013 | 11783586 11783586 | Registered | TSI Holdings (IP), LLC |
| UXF ULTIMATE FITNESS EXPERIENCE & Design | European Union | 04/30/2013 09/24/2013 | 11783784 11783784 | Registered | TSI Holdings (IP), LLC |
| UXF | Switzerland | 04/30/2013 07/11/2013 | 55205/2013 646071 | Registered | TSI Holdings (IP), LLC |
| UXF ULTIMATE FITNESS EXPERIENCE & Design | Switzerland | 04/30/2013 07/10/2013 | 55207/2013 646052 | Registered | TSI Holdings (IP), LLC |
| UXF | United States | 04/30/2013 10/21/2014 | 85918421 4625689 | Registered | TSI Holdings (IP), LLC |
| BFX | United States | 05/07/2013 12/30/2014 | 85924931 4664403 | Registered | TSI Holdings (IP), LLC |
| BFX STUDIO | United States | 05/07/2013 | 85924938 | Registered | TSI Holdings |

| Trademark | Country | Filing Date/ Registration Date | Application/ Registration No. | Status | Owner[1] |
|---|---|---|---|---|---|
| | | 12/02/2014 | 4649888 | | (IP), LLC |
| RIDE REPUBLIC | United States | 05/23/2013 08/11/2015 | 85941064 4791073 | Registered | TSI Holdings (IP), LLC |
| RIDE REPUBLIC | United States | 05/23/2013 08/18/2015 | 85941034 4795693 | Registered | TSI Holdings (IP), LLC |
| BFX STUDIO & Design | United States | 06/04/2013 12/02/2014 | 85950409 4649919 | Registered | TSI Holdings (IP), LLC |
| MASTER CLASS & Design | United States | 06/04/2013 03/17/2015 | 85950556 4704505 | Registered | TSI Holdings (IP), LLC |
| Miscellaneous Design | United States | 06/04/2013 01/20/2015 | 85950561 4676069 | Registered | TSI Holdings (IP), LLC |
| Miscellaneous Design | United States | 06/04/2013 08/04/2015 | 85950511 4786338 | Registered | TSI Holdings (IP), LLC |
| RIDE REPUBLIC & Design | United States | 06/04/2013 03/08/2016 | 85950433 4914114 | Registered | TSI Holdings (IP), LLC |
| UXF CIRCUIT | United States | 02/26/2014 10/14/2014 | 86204771 4620423 | Registered | TSI Holdings (IP), LLC |

| Trademark | Country | Filing Date/ Registration Date | Application/ Registration No. | Status | Owner[1] |
|---|---|---|---|---|---|
| BFX STUDIOS | United States | 06/04/2014 08/04/2015 | 86300226 4787147 | Registered | TSI Holdings (IP), LLC |
| FORUM FITNESS | Switzerland | 07/31/2014 04/14/2015 | 58908/2014 671855 | Registered | TSI Holdings (IP), LLC |
| NYSC | Switzerland | 7/31/2014 03/16/2015 | 58904/2014 670640 | Registered | TSI Holdings (IP), LLC |
| NYSC NEW YORK SPORTS CLUBS | Switzerland | 09/02/2015 09/21/2015 | 58905/2014 678051 | Registered | TSI Holdings (IP), LLC |
| NYSC & Design | United States | 06/27/2016 07/25/2017 | 87085268 5252302 | Registered | TSI Holdings (IP), LLC |
| REPS ON RHYTHM | United States | 05/23/2017 12/04/2018 | 87460327 5620058 | Registered | ** |
| AROUND THE CLOCK FITNESS & Design | United States | 05/31/2017 06/18/2019 | 87469968 5778403 | Registered | TSI Holdings (IP), LLC |
| AROUND THE CLOCK FITNESS | United States | 06/01/2017 06/11/2019 | 87471505 5772457 | Registered | TSI Holdings (IP), LLC |
| NEW YORK MINUTE | United States | 01/28/2020 | 88775831 | Allowed Intent to Use | TSI Holdings (IP), LLC |

| Trademark | Country | Filing Date/ Registration Date | Application/ Registration No. | Status | Owner[1] |
|---|---|---|---|---|---|
| NEW YORK MINUTE | United States | 01/28/2020 | 88775823 | Allowed Intent to Use | TSI Holdings (IP), LLC |
| LUXOR FITNESS | Switzerland | 7/31/2014 | 58907/2014 | Abandoned[4] | TSI Holdings (IP), LLC |

Patents:

None.

Copyrights:

| Title | Registration No. | Publication Date / Year of Creation | Registration Date | Owner |
|---|---|---|---|---|
| Quality management tool how to manual. | TXu001345489 | 2007 | March 29, 2007 | TSI Holdings (IP), LLC |
| Washington Sports Clubs, fitness instructor certification training handbook. | TX0004523595 | July 15, 1995 | April 14, 1997 | TSI Holdings (IP), LLC |

Domain Names:

| Domain Name | Expiration Date | Registrant Organization |
|---|---|---|
| bfxclubs.com | 4/5/2025 | Town Sports International |
| bfxclubs.net | 4/5/2025 | Town Sports International |
| bfxclubs.org | 4/5/2025 | Town Sports International |

---

[4]    **Note**: No representations or warranties in this Agreement shall apply to this abandoned trademark.

| Domain Name | Expiration Date | Registrant Organization |
|---|---|---|
| bfxfeedback.com | 12/2/2020 | Town Sports International |
| bfxfitness.com | 4/5/2025 | Town Sports International |
| bfxfitness.net | 4/5/2025 | Town Sports International |
| bfxfitness.org | 4/5/2025 | Town Sports International |
| bfxstudio.com | 4/5/2025 | Town Sports International |
| bfxstudio.net | 4/5/2025 | Town Sports International |
| bfxstudios.net | 4/5/2025 | Town Sports International |
| bostonsportclubs.com | 8/28/2021 | Town Sports International |
| bostonsportsclub.com | 5/13/2021 | Town Sports International LLC |
| bostonsportsclubs.com | 5/13/2021 | Town Sports International LLC |
| bscfeedback.com | 12/2/2020 | Town Sports International |
| companiesgetfit.com | 8/23/2021 | Town Sports International |
| elitenysc.com | 5/16/2021 | Town Sports International LLC |
| joinmysportsclubs.com | 7/24/2023 | Town Sports International, LLC |
| lucilleroberts.com | 10/14/2027 | Town Sports International |
| lucillerobertsfranchise.com | 9/27/2021 | Town Sports International |
| lucillerobertsfranchising.com | 9/27/2021 | Town Sports International |
| mysportsclubs.com | 6/27/2021 | Town Sports International |
| mysportsclubsfeedback.com | 3/18/2022 | Town Sports International |
| mysportsclubsforkids.com | 10/3/2021 | Town Sports International |

| Domain Name | Expiration Date | Registrant Organization |
|---|---|---|
| mysportscompany.com | 7/18/2021 | Town Sports International |
| newyorksportsclub.com | 3/10/2021 | Town Sports International |
| newyorksportsclubs.com | 12/25/2020 | Town Sports International |
| nysc.com | 12/1/2020 | Town Sports International |
| nyscfeedback.com | 12/2/2020 | Town Sports International |
| nyscstudio.com | 1/23/2021 | Town Sports International LLC |
| nysc-studio.com | 1/23/2021 | Town Sports International LLC |
| palmbeachsportsclub.com | 8/27/2021 | Town Sports International |
| philadelphiasportclubs.com | 8/28/2021 | Town Sports International |
| philadelphiasportsclubs.com | 1/19/2021 | Town Sports International, Inc |
| pscfeedback.com | 12/2/2020 | Town Sports International |
| sportsclubsforkids.com | 10/31/2020 | Town Sports International, LLC |
| townsports.net | 7/14/2021 | Town Sports International |
| town-sports.net | 3/17/2021 | Town Sports International |
| townsportsinternational.com | 10/23/2020 | Town Sports International |
| tsicareers.com | 6/20/2021 | Town Sports International |
| tsiethics.com | 12/5/2020 | Town Sports International |
| tsiethics-convercent.com | 12/5/2020 | Town Sports International |
| washingtonsportclubs.com | 8/28/2021 | Town Sports International |
| washingtonsports.com | 8/2/2021 | Town Sports International |

| Domain Name | Expiration Date | Registrant Organization |
|---|---|---|
| washingtonsportsclub.com | 3/10/2021 | Town Sports International |
| washingtonsportsclubs.com | 12/25/2020 | Town Sports International |
| wscfeedback.com | 12/2/2020 | Town Sports International |
| tsiclubs.com | 1/25/2012 | Domains By Proxy, LLC |

## Section 3.14 - Compliance with Laws; Permits

(a)

None.

**Section 3.16 - Related Party Transactions**

1. Service Agreement, by and between Town Sports International LLC and Elmsford Elite Laundry LLC, dated as of May 29, 2017.

2. Management Agreement, by and between Town Sports International Holdings, Inc. and Elmsford Elite Laundry, LLC, dated as of May 25, 2017.

3. Management Agreement, by and between Town Sports International Holdings, Inc. and Town Sports Group, LLC, dated as of May 25, 2017.

4. Management Agreement, by and between Town Sports International Holdings, Inc. and Town Sports Investment Group, LLC, dated as of May 25, 2017.

5. Management Agreement, by and between Town Sports International Holdings, Inc. and Dixie Highway Realty LLC, dated as of August 18, 2018.

6. Management Agreement, by and between Town Sports International Holdings, Inc. and Elmsford Elite Laundry, LLC, dated as of August 18, 2018.

7. Management Agreement, by and between Town Sports International Holdings, Inc. and Palm Beach Sports Club, LLC, dated as of August 18, 2018.

8. Management Agreement, by and between Town Sports International Holdings, Inc. and Town Sports Group, LLC, dated as of August 18, 2018.

9. Management Agreement, by and between Town Sports International Holdings, Inc. and Town Sports Investment Group, LLC, dated as of August 18, 2018.

10. Management Agreement, by and between Town Sports International Holdings, Inc. and TSI - Donald Ross Realty, LLC, dated as of August 18, 2018.

11. Management Agreement, by and between Town Sports International Holdings, Inc. and TSI - Gold, LLC, dated as of August 18, 2018.

12. Management Agreement, by and between Town Sports International Holdings, Inc. and TSI - Lucille Real Estate, LLC, dated as of August 18, 2018.

13. Management Agreement, by and between Town Sports International Holdings, Inc. and TSI - Peacock, Port St. Lucie, LLC, dated as of August 18, 2018.

14. Management Agreement, by and between Town Sports International Holdings, Inc. and TSI - US Highway, Jupiter, LLC, dated as of August 18, 2018.

15. Management Agreement, by and between Town Sports International Holdings, Inc. and TSI Elite Sheridan, LLC, dated as of August 18, 2018.

16. Management Agreement, by and between Town Sports International Holdings, Inc. and TSI Hell's Kitchen, LLC, dated as of August 18, 2018

17. Management Agreement, by and between Town Sports International Holdings, Inc. and TSI-LIV Holdco, LLC, dated as of August 18, 2018.

18. Management Agreement, by and between Town Sports International Holdings, Inc. and TSI-LIV Guaynabo, dated as of August 18, 2018.

19. Management Agreement, by and between Town Sports International Holdings, Inc. and TSI-LIV Condado, LLC, dated as of August 18, 2018.

20. Engagement Letter, by and between Town Sports International, Inc. and Stuart M. Steinberg P.C., dated as of February 4, 2016, as amended by that certain Amendment to Engagement Letter dated as of August 1, 2016, as further amended by that certain Amendment to Engagement Letter dated as of May 1, 2017.

21. Management and Service Agreement, by and between TSI-Gold, LLC and GW Management Enterprises, LLC, dated as of January 1, 2018.

22. Consulting Agreement, by and between TSI Westboro Tennis, LLC and Justin Lundberg, dated as of January 1, 2018.

23. Lease, by and between TSI-Lucille Real Estate LLC and TSI Massapequa, LLC, dated as of November 13, 2017.

24. Lease, by and between JSP Realty Investments, LLC and TSI Westboro Tennis, LLC, dated as of January 1, 2018.

**Section 3.17 - Financial Statements**

See attached.

**Consolidating Balance Sheet**
**As of December 31, 2018**
**Unaudited**
Strictly Confidential

| | |
|---|---:|
| Cash and cash equivalents | 46,120 |
| Accounts receivable, net | 2,401 |
| Inventory | - |
| Prepaid corporate income taxes | 746 |
| Prepaid expenses and other current assets | 10,441 |
| Total current assets | 59,708 |
| Fixed assets, net | 122,684 |
| Goodwill | 15,655 |
| Intangible assets, net | 7,560 |
| Deferred membership costs | 1,776 |
| Intercompany investment | - |
| Other assets | 12,508 |
| TOTAL ASSETS | 219,891 |
| | |
| Current portion of long-term debt | 20,162 |
| Capital lease liability | 605 |
| Current portion of mortgage | - |
| Accounts payable | 4,078 |
| Accrued expenses | 30,938 |
| Accrued interest | 34 |
| Deferred revenue - short term | 36,144 |
| Corporate income taxes payable | - |
| Total Current liabilities | 91,961 |
| | |
| Debt - Long Term | 175,103 |
| Capital lease liability | 2,899 |
| Mortgage liabilities | - |
| Deferred lease liabilities | 44,170 |
| Deferred tax liability - Long term | - |
| Deferred revenue - Long term | 258 |
| Other liabilities | 10,698 |
| TOTAL LIABILITIES | 325,089 |
| | |
| Common stock | 1 |
| Additional paid-in capital | 54,132 |
| Accumulated other comprehensive income | 1,841 |
| Intercompany equity - Group | - |
| Common dividend | (271,662) |

| | |
|---|---:|
| Retained earnings | 110,701 |
| Non-controlling interests | (211) |
| Total Equity | (105,198) |
| TOTAL LIABILITIES AND EQUITY | 219,891 |

**Consolidating Statement of Operations**
**Unaudited**
Strictly Confidential

**YTD December 31,**

| | |
|---|---:|
| Revenues: | |
| Club operations | 426,663 |
| Fees and other | 5,724 |
| | 432,387 |
| | |
| Operating Expenses: | |
| Payroll and related | 159,770 |
| Club operating | 197,362 |
| General and administrative | 23,749 |
| Depreciation and amortization | 34,948 |
| Impairment of fixed assets | 2,082 |
| | 417,911 |
| Operating income (loss) | 14,476 |
| | |
| Interest expense, net | 12,097 |
| Equity in the earnings of investees | (344) |
| Provision for corporate income taxes | (891) |
| Net income (loss) | 3,614 |
| Net loss attributable to non-controlling interests | (211) |
| Net loss attributable to Parent and subsidiaries | 3,825 |

## Consolidating Cash flow Statement

## Unaudited

Strictly Confidential

|  | YTD December 31, 2 |
|---|---|
| Net income (loss) | 3,614 |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: | |
| Depreciation and amortization | 34,948 |
| Impairment of fixed assets | 2,082 |
| Amortization of discount | 976 |
| Amortization of debt issuance costs | 580 |
| Noncash rental expense, net of noncash rental income | (3,592) |
| Share based compensation expense | 2,616 |
| Net change in deferred taxes | (166) |
| Change in certain working capital components | 26,772 |
| Change in deferred membership costs | (817) |
| Landlord contributions to tenant improvements | 800 |
| Change in insurance reserves | (61) |
| Other | (1,415) |
| **Total cash provided by operating activities** | **66,337** |
| Cash flows from investing activities: | |
| Capital expenditures | (8,875) |
| Acquisition of businesses | (19,650) |
| Acquisition of assets | - |
| Other | 135 |
| **Total cash used in investing activities** | **(28,390)** |
| Cash flows from financing activities: | |
| Repayment of 2013 Term Loan Facility | (2,083) |
| Debt  issuance costs | (186) |
| Proceeds from mortgage and term loan | - |
| Principal payments on mortgage and term loan | - |
| Principal payments on capital lease obligations | (490) |
| Repayment of intercompany loan from TSI Group | 51 |
| Cash dividends paid | (2) |
| Proceeds from stock option exercises | 30 |
| **Total cash used in financing activities** | **(2,680)** |
| **Effect of exchange rate changes on cash** | **61** |
| Total cash change | 35,328 |
| Cash and cash equivalents at beginning of period | 12,764 |
| **Cash and cash equivalents at end of period** | **48,092** |

**As of December 31, 2019**

**Unaudited**

Strictly Confidential

| | |
|---|---:|
| Cash and cash equivalents | 8,343 |
| Accounts receivable, net | 2,075 |
| Prepaid corporate income taxes | 795 |
| Prepaid expenses and other current assets | 13,209 |
| Total current assets | 24,422 |
| Fixed assets, net | 111,601 |
| Operating lease right-of-use assets | 542,397 |
| Goodwill | 26,236 |
| Intangible assets, net | 6,912 |
| Deferred membership costs | 888 |
| Intercompany investment | - |
| Other assets | 7,724 |
| TOTAL ASSETS | 720,180 |
| | |
| Current portion of long-term debt | 178,184 |
| Current portion of operating lease liabilities | 72,510 |
| Current portion of mortgage | - |
| Accounts payable | 4,744 |
| Accrued expenses | 32,126 |
| Accrued interest | 27 |
| Deferred revenue - short term | 34,800 |
| Total Current liabilities | 322,391 |
| | |
| Debt - Long Term | 4,358 |
| Operating lease liabilities | 512,972 |
| Mortgage liabilities | - |
| Deferred lease liabilities | - |
| Deferred tax liability - Long term | - |
| Deferred revenue - Long term | 89 |
| Other liabilities | 11,751 |
| TOTAL LIABILITIES | 851,561 |
| | |
| Common stock | 1 |
| Additional paid-in capital | 57,691 |
| Accumulated other comprehensive income | 1,909 |
| Intercompany equity - Group | - |
| Common dividend | (287,662) |
| Retained earnings | 97,590 |
| Non-controlling interests | (910) |
| Total Equity | (131,381) |
| | |
| TOTAL LIABILITIES AND EQUITY | 720,180 |
| | - |

**Unaudited**
Strictly Confidential

|  | FY 2019 |
|---|---|
| Revenues: | |
| Club operations | 442,471 |
| Fees and other | 6,715 |
| | 449,186 |
| | |
| Operating Expenses: | |
| Payroll and related | 168,233 |
| Club operating | 217,065 |
| General and administrative | 25,729 |
| Depreciation and amortization | 33,835 |
| Impairment of fixed assets | 7,189 |
| | 452,051 |
| Operating income (loss) | (2,865) |
| | |
| Interest expense, net | 11,839 |
| Equity in the earnings of investees | (299) |
| Provision for corporate income taxes | (593) |
| Net loss | (13,812) |
| Net (loss) income attributable to non-controlling interests | (700) |
| Net loss attributable to Parent and subsidiaries | (13,112) |

**Unaudited**
Strictly Confidential

|                                                                          | FY 2019   |
|--------------------------------------------------------------------------|----------:|
| Net loss                                                                 | (13,812)  |
|                                                                          |           |
| Adjustments to reconcile net loss to net cash provided by operating activities: |           |
| Depreciation and amortization                                            | 33,835    |
| Impairment of fixed assets                                               | 7,189     |
| Amortization of discount                                                 | 1,014     |
| Amortization of debt issuance costs                                      | 445       |
| Noncash rental expense, net of noncash rental income                     | 155       |
| Share based compensation expense                                         | 3,559     |
| Change in certain working capital components                             | (5,095)   |
| Change in deferred membership costs                                      | 888       |
| Landlord contributions to tenant improvements                            | 51        |
| Change in insurance reserves                                             | 1,312     |
| Other                                                                    | (358)     |
| **Total cash provided by operating activities**                          | **29,183** |
|                                                                          |           |
| Cash flows from investing activities:                                    |           |
| Capital expenditures                                                     | (12,428)  |
| Acquisition of businesses                                                | (21,667)  |
| **Total cash used in investing activities**                              | **(34,095)** |
|                                                                          |           |
| Cash flows from financing activities:                                    |           |
| Repayment of 2013 Term Loan Facility                                     | (20,076)  |
| Borrowing on Revolver                                                    | -         |
| Intercompany dividend                                                    | (16,000)  |
| Intercompany loan                                                        | (2,000)   |
| Principal payments on mortgage and term loan                             | -         |
| Principal payments on capital lease obligations                          | (1,422)   |
| Repayment of intercompany loan from TSI Group                            | 6,875     |
| Proceeds from stock option exercises                                     | 5         |
|                                                                          |           |
| **Total cash (used in) provided by financing activities**                | **(32,618)** |
| **Effect of exchange rate changes on cash**                              | **(25)**  |
| Total cash change                                                        | (37,555)  |
|                                                                          |           |
| Cash and cash equivalents at beginning of period                         | 48,093    |
|                                                                          |           |
| **Cash and cash equivalents at end of period**                           | **10,538** |

**DRAFT unaudited**

|  | Qtr 1 |
|---|---|

### Income Statement

|  | TSI LLC |
|---|---|
| **REVENUES:** |  |
| Club operations | 92,849 |
| Fees and other | 1,381 |
| **Total Revenue** | **94,230** |
|  |  |
| **OPERATING EXPENSES:** |  |
| Payroll and related | 38,509 |
| Club operating | 114,585 |
| General and administrative | 8,908 |
| Depreciation and amortization | 7,499 |
| Impairment of fixed assets | 43,202 |
| Impairment of goodwill | 11,050 |
| Impairment of intangible assets | 761 |
| **Operating Income** | **(130,284)** |
|  |  |
| Gain on extinguishment of debt | 0 |
| Interest expense | 2,789 |
| Interest income | (6) |
| Equity in the earnings of investees and rental income | (30) |
| Income (loss) before provision (benefit) for corporate income taxes | (133,037) |
| Total taxes | (8,612) |
|  |  |
| **Net income (loss)** | **(124,425)** |
| Non-controlling interest | (356) |
| **Net income (loss) attributable to TSI** | **(124,069)** |

### Balance Sheet

|  | TSI LLC |
|---|---|
| Cash and cash equivalents | 23,788 |
| Accounts receivable, net | 776 |
| Inventory | (0) |
| Deferred tax assets current | - |
| Prepaid corporate income taxes | 9,378 |
| Prepaid expenses and other current assets | 11,446 |
| **Total current assets** | **45,388** |
| Fixed assets, net | 65,086 |
| Operating lease right-of-use assets | 465,472 |
| Goodwill | 15,192 |
| Intangible assets, net | 5,616 |
| Deferred tax assets, net | - |
| Deferred membership costs | 825 |
| Other assets | 6,861 |
| **TOTAL ASSETS** | **604,439** |
|  |  |
| Debt - Short Term | 190,686 |
| Mortgage payable | - |
| Current portion of operating lease liabilities | 72,237 |
| Accounts payable | 8,757 |
| Accrued expenses | 24,610 |
| Accrued interest | 24 |
| Capital lease liability - Short term | - |
| Deferred revenue - short term | 49,875 |
| Corporate income taxes payable | - |
| Deferred tax liability - Short term | - |
| **Total Current liabilities** | **346,188** |
| Debt - Long Term | 3,864 |
| Mortgage Payable - Long Term | - |
| Long-term operating lease liabilities | 497,192 |
| Capital lease liability - Long term | - |
| Deferred lease liabilities | - |
| Deferred tax liability - Long term | - |
| Deferred revenue - Long term | 75 |
| Other liabilities | 11,509 |
| **TOTAL LIABILITIES** | **858,828** |
|  |  |
| Common stock | 1 |
| Additional paid-in capital | 57,953 |
| Accumulated other comprehensive income | 1,924 |
| Common Dividend | - |
| Intercompany dividend | (287,662) |
| Other Comprehensive Income | - |
| 301017 - I/C Equity - Group | - |
| Valuation allowance | - |
| 322024 - Non Controlling Interest TSI Gold | - |
| 322025 - Non Controlling Interest TSI Tapout | 0 |
| Retained earnings | (26,605) |
| **Total Equity** | **(254,389)** |
|  |  |
| **TOTAL LIABILITIES AND EQUITY** | **604,439** |
| Balance check | (0) |

C:\Users\ttmason\AppData\Local\Microsoft\Windows\INetCache\Content.Outlook\9ORQOSSO\TSI - APA Disclosure Schedule - Financial Statements (3.17)_(71958139_1).XLSX-Q12020

11/23/2020-2:30 AM

**DRAFT Unaudited**

|  | Qtr 2 | YTD |
|---|---|---|
| **Income Statement** | **TSI LLC** | **TSI LLC** |
| **REVENUES:** | | |
| Club operations | 2,747 | 95,595 |
| Fees and other | 462 | 1,843 |
| **Total Revenue** | **3,209** | **97,438** |
| | | |
| **OPERATING EXPENSES:** | | |
| Payroll and related | 7,123 | 45,633 |
| Club operating | 39,428 | 154,013 |
| General and administrative | 4,048 | 12,956 |
| Depreciation and amortization | 3,977 | 11,476 |
| Impairment of fixed assets | 0 | 43,202 |
| Impairment of goodwill | 0 | 11,050 |
| Impairment of intangible assets | 0 | 761 |
| **Operating Income** | **(51,367)** | **(181,653)** |
| | | |
| Gain on extinguishment of debt | (15,383) | (15,383) |
| Interest expense | 2,381 | 5,170 |
| Interest income | (2) | (9) |
| Equity in the earnings of investees and rental income | 127 | 97 |
| Income (loss) before provision (benefit) for corporate income taxes | (38,490) | (171,528) |
| Total taxes | 40 | (8,571) |
| | | |
| **Net income (loss)** | **(38,530)** | **(162,957)** |
| Non-controlling interest | (16) | (372) |
| **Net income (loss) attributable to TSI** | **(38,514)** | **(162,585)** |

|  | TSI LLC |
|---|---|
| **Balance Sheet** | |
| Cash and cash equivalents | 16,206 |
| Accounts receivable, net | (95) |
| Inventory | (0) |
| Deferred tax assets current | - |
| Prepaid corporate income taxes | 9,124 |
| Prepaid expenses and other current assets | 16,264 |
| **Total current assets** | **41,498** |
| Fixed assets, net | 62,169 |
| Operating lease right-of-use assets | 437,267 |
| Goodwill | 15,192 |
| Intangible assets, net | 5,330 |
| Deferred tax assets, net | - |
| Deferred membership costs | 822 |
| Other assets | 6,663 |
| **TOTAL ASSETS** | **568,941** |
| | |
| Debt - Short Term | 169,742 |
| Mortgage payable | - |
| Current portion of operating lease liabilities | 69,287 |
| Accounts payable | 38,642 |
| Accrued expenses | 24,918 |
| Accrued interest | 232 |
| Capital lease liability - Short term | - |
| Deferred revenue - short term | 65,847 |
| Corporate income taxes payable | - |
| Deferred tax liability - Short term | - |
| **Total Current liabilities** | **368,669** |
| Debt - Long Term | 14,093 |
| Mortgage Payable - Long Term | - |
| Long-term operating lease liabilities | 468,979 |
| Capital lease liability - Long term | - |
| Deferred lease liabilities | - |
| Deferred tax liability - Long term | - |
| Deferred revenue - Long term | 27 |
| Other liabilities | 11,213 |
| **TOTAL LIABILITIES** | **862,981** |
| | |
| Common stock | 1 |
| Additional paid-in capital | 58,692 |
| Accumulated other comprehensive income | 1,970 |
| Common Dividend | - |
| Intercompany dividend | (289,583) |
| Other Comprehensive Income | - |
| 301017 - I/C Equity - Group | - |
| Valuation allowance | - |
| 322024 - Non Controlling Interest TSI Gold | - |
| 322025 - Non Controlling Interest TSI Tapout | 0 |
| Retained earnings | (65,120) |
| **Total Equity** | **(294,040)** |
| | |
| **TOTAL LIABILITIES AND EQUITY** | **568,941** |
| Balance check | (0) |

**Section 5.2(b) - Conduct of Business Pending the Closing**

(xvii)

1. <u>Commonwealth of Massachusetts proposed settlement in the matter of Town Sports International LLC d/b/a New York Sports Clubs</u>

   There is no docket number or Venue because no Complaint has been filed.

2. <u>People of the State of New York, by Letitia James, Attorney General of the State of New York v. Town Sports International Holdings, Inc. and Town Sports International, LLC, d/b/a New York Sports Club and Lucille Roberts</u>

   Venue:    New York County Supreme Court

   Index No.:  451969/2020

3. <u>District of Columbia v. Town Sports International, LLC et al.</u>

   Venue:    Superior Court of the District of Columbia

   Case No.:   2019 CA 126B

4. <u>District of Columbia v. Town Sports International, LLC et al.</u>

   Venue:    Superior Court of the District of Columbia

   Case No.:   2020 CA 3691B

5. <u>Amber Barros v. Town Sports International LLC</u>

   Venue:    Superior Court of the State of California, Orange County

   Case No.: 30-2018-01036571-CU-CXC.

6. <u>Kevin McCarron, on behalf of himself and all others similarly situated v. TSI Lynnfield, LLC; and Town Sports International, LLC</u>

   Venue:    MA Superior Court, Essex County

   Case No.:   2077-CV-00563A

7. <u>Alanna Cardillo, Lisa Chiango, Stephen R. Cohen, Paul Delvecchio, Lynn Delvecchio, Duncan K. Johnson, Tony J. Proctor v. Town Sports International, LLC, and Town Sports International Holdings, Inc., d/b/a Boston Sports Club/S</u>

   Venue:    USDC, District of Massachusetts

   Civil Action No.:   1:20-cv-10666-MLW

8. <u>Joshua Bilmes, et. al. v. Town Sports International, LLC, and Town Sports International Holdings, Inc. d/b/a New York Sports Clubs, Boston Sports Clubs, Washington Sports Clubs and Philadelphia Sports Clubs</u>

   Venue:    USDC, Southern District of New York

   Civil Action No.:   18-cv-01737-LLS-KNF.

9. <u>Mary Namorato et. al. v. Town Sports International, LLC, Inc. and Town Sports International Holdings, Inc., d/b/a New York Sports Clubs</u>

   Venue:    USDC, Southern District of New York

   Civil Action No.:   20-cv-025803.

10. <u>Nancy Radford et. al. v. Town Sports International Holdings, Inc. and Town Sports International, LLC</u>

    Venue:               USDC, Southern District of New York

    Civil Action No.:   1:20-cv-29938.

11. <u>Mykola Kolomiichuk v. Town Sports International Holding Inc. and Town Sports International, LLC</u>

    Venue:               USDC, Southern District of New York

    Civil Action No.:   7:18-cv-01223-KMK.

12. <u>Department of Consumer Affairs v. Town Sports International, LLC</u>

    Venue:    Office of Administrative Trials and Hearings, City of New York

    Record No.: 00744-2016-PSLD

    Index No.:  190496

## **EXHIBIT F**

### **Non-Released Claims Trustee**

META Advisors, LLC

## **EXHIBIT G**

### **Non-Released Claims Trust Agreement**

[*to be filed*]