## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TOWN SPORTS INTERNATIONAL, LLC, *et al.*,[1] | Case No. 20-12168 (CSS) |
| Debtors. | (Jointly Administered) |

## DECLARATION OF JOHN C. DIDONATO IN SUPPORT
## OF CONFIRMATION OF THE SECOND AMENDED JOINT CHAPTER 11 PLAN
## OF TOWN SPORTS INTERNATIONAL, LLC AND ITS AFFILIATED DEBTORS
## PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

I, John C. DiDonato, hereby declare that the following is true to the best of my knowledge, information, and belief:[2]

1.      I am a Managing Director of Huron Consulting Services LLC ("Huron"), a financial consulting firm that specializes in, among other things, bankruptcy and restructuring consulting, interim management, and financial and operational consulting to financially troubled companies. Huron has been assisting the above-captioned debtors and debtors in possession (collectively, the "Debtors") since around September 24, 2020, and I was appointed Chief Restructuring Officer ("CRO") on September 29, 2020.   Additional information regarding my background and qualifications is set forth in the *Declaration of John C. DiDonato in Support of Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and*

---

[1]  The last four digits of Town Sports International, LLC's federal tax identification number are 7365.  The mailing address for Town Sports International, LLC is 399 Executive Boulevard, Elmsford, New York 10523.  Due to the large number of debtors in these jointly-administered cases a complete list of the Debtors, the last four digits of their federal tax identification numbers, and their addresses may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/TownSports, or by contacting the undersigned counsel for the Debtors.

[2]  Capitalized terms used but not defined herein have the meaning ascribed to such terms in the Plan, Asset Purchase Agreement, or the Confirmation Order, as applicable.

*Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lenders, (V) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 155].

2.      In my capacity as CRO, I am very familiar with the above-captioned Debtors day-to-day operations, business affairs, and books and records, as well as the Debtors' restructuring efforts.  I have also played an active role in the formulation of the Debtors' Plan.[3] Accordingly, I am familiar with the terms of the Plan as well as its negotiation and development.

3.      Except as otherwise indicated, all matters set forth in this declaration (the "Declaration") are based on:  (a)  my personal knowledge of the Debtors' business operations, my review of relevant information provided to me by other members of the Debtors' management and the Debtors' professional advisors, including Kirkland & Ellis LLP ("K&E"), Young Conaway Stargatt & Taylor LLP ("Young Conaway"), and Houlihan Lokey Capital, Inc. ("Houlihan"); (b) my opinion based upon my experience, knowledge, and information concerning the Debtors' operations; and (c) my review of relevant documents.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.

## I.      General Background and the Development of the Plan.

4.      The Plan is the product of extensive, good-faith, arm's-length negotiations among the Debtors, their lenders, the Purchaser, and the Committee, with all parties working towards an outcome that maximizes the value of the Debtors' Estates for the benefit of their stakeholders.  The Plan is designed to bring an orderly and efficient conclusion to these Chapter 11 Cases.

---

[3]  A detailed description of the Debtors and their business, including the facts and circumstances supporting the Debtors' chapter 11 cases, is set forth in greater detail in the *Declaration of Phillip Juhan in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 12] (the "First Day Declaration") filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on September 14, 2020 (the "Petition Date").

5.     On October 20, 2020, the Debtors filed an initial version of the Plan. On November 3, 2020 the Bankruptcy Court entered a disclosure statement order [Docket No. 561] (the "Disclosure Statement Order"), approving the Disclosure Statement on an interim basis, establishing a schedule for Plan confirmation, and scheduling a combined hearing on final approval of the Disclosure Statement and confirmation of the Plan.

6.     The Bankruptcy Court approved the Debtors' methods to solicit, receive, and tabulate votes to accept the Plan.  In accordance with these approved solicitation and notice procedures, the Debtors mailed the Holders of Claims entitled to vote the Solicitation Packages that included (a) the Disclosure Statement Order; (b) the notice of combined hearing to consider (i) the adequacy of the Disclosure Statement and (ii) Confirmation of the Plan; (c) a cover letter describing the contents of the Solicitation Package and urging the Holders of Claims in the Voting Classes to vote to accept the Plan; (d) the applicable form of Ballot, in substantially the form of the Ballot; and (e) additional documents that the Bankruptcy Court ordered to be made available. It is my understanding that on or about November 6, 2020, the Debtors caused the Notice and Claims Agent, Epiq Corporate Restructuring LLC, to serve the Solicitation Packages to Holders of Claims entitled to vote on the Plan, as of the Voting Record Date, in accordance with the provisions of the Disclosure Statement Order.  It is also my understanding that Epiq completed the distribution of the Solicitation Packages within the time required by the Disclosure Statement Order.

7.     In accordance with the Disclosure Statement Order, the Debtors filed notice of the Confirmation Hearing to consider approval of the Disclosure Statement on a final basis and Confirmation of the Plan [Docket No. 589].  Epiq served the notice on November 17, 2020 [Docket No. 692].

8.      On November 25, 2020, the Debtors filed with the Bankruptcy Court the Plan Supplement [Docket No. 706], which included the (a) Rejected Executory Contracts and Unexpired Leases Schedule; (b) Assumed Executory Contracts and Unexpired Leases Schedule, (c) Schedule of Retained Causes of Action; (d) Asset Purchase Agreement; (e) any necessary documentation related to the Sale Transactions; and (f) the identity of the Non-Released Claims Trustee.  On December 2, 2020, the Debtors filed with the Bankruptcy Court the Non-Released Claims Trust Agreement [Docket No. 736].

9.      Concurrently with this Declaration, the Debtors are filing with the Bankruptcy Court their second amended Plan, which incorporates changes in accordance with subsequent comments the Debtors received to the Plan.

10.      As discussed herein, I believe that the prompt confirmation and consummation of the Plan is in the best interest of the Debtors, their creditors, and all other parties in interest, and that, accordingly, the Bankruptcy Court should confirm the Plan.

**The Plan Satisfies the Requirements for Confirmation**

11.      For the reasons detailed below and with the assistance of the Debtors' advisors, I believe the Plan satisfies the applicable Bankruptcy Code requirements for confirmation of a chapter 11 plan.  Specifically, it is my understanding that the Plan:  (a) complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code, including sections 1122 and 1123 of the Bankruptcy Code; (b) satisfies the mandatory requirements of section 1123(a) of the Bankruptcy Code; and (c) is consistent with section 1123(b) of the Bankruptcy Code.  I have set forth the reasons for such belief below, except where such compliance is apparent on the face of the Plan, the Plan Supplement, and the related documents or where it will be the subject of evidence introduced at the Confirmation Hearing.

I.      **The Plan Satisfies Each Requirement for Confirmation.**

    A.      **The Plan Complies with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(1)).**

12.     It is my understanding that the Plan complies with 11 U.S.C. § 1129(a)(1), which requires the Plan to comply with 11 U.S.C. §§ 1122 and 1123 in all respects.

    1. **The Plan's Classification of Claims and Interests Under Section 1122.**

13.     Article III.B of the Plan provides for the separate classification of Claims and Interests as follows:

| Class | Claim or Interest | Status | Voting Rights |
|:---:|:---:|:---:|:---:|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 4 | Prepetition Loan Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) |
| 7 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) |
| 8 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 9 | Interests in TSI | Impaired | Not Entitled to Vote (Deemed to Reject) |

14.     I believe each Class is composed of substantially similar Claims or Interests, and each instance of separate classifications of similar Claims and Interests was based on valid business, factual, and legal reasons.   No classification has been made for purposes of gerrymandering votes.

15.     First, dissimilar Claims and Interests are not classified together under the Plan. Generally speaking, the classification scheme follows the Debtors' capital structure.  For example, debt and equity are classified separately, and secured debt is classified separately from unsecured

debt.  It is my understanding that other aspects of the classification scheme reasonably recognize the different legal or factual nature of Claims or Interests.

16.     Specifically, the Plan separately classifies Claims in Class 1 to reflect the priority of such Claims under section 507(a) of the Bankruptcy Code and separately classifies Other Secured Claims in Class 2 and Other Priority Claims in Class 3 based on their distinct legal nature. Class 4 consists of claims arising under the Prepetition Term Loan Facility, whereas Class 5 consists of General Unsecured Claims.  Class 6 Intercompany Claims are separately classified because they do not involve third-party creditors, and Class 7 Intercompany Interests are separately classified from Class 9 Interests in TSI because they arise from intercompany transactions and do not impact recoveries to third parties.  Finally, Class 8 Section 510(b) Claims are separately classified to reflect the treatment of such Claims under section 510(b) of the Bankruptcy Code.

17.     It is my understanding that valid factual and legal reasons exist for separately classifying the various Classes of Claims and Interests created under the Plan.  In each instance, the Plan classifies Claims based upon their different rights and attributes.  Additionally, each of the Claims or Interests in each particular Class is substantially similar to the other Claims or Interests in such Class.  Accordingly, I believe the Plan fully complies with and satisfies section 1122 of the Bankruptcy Code.

**2. The Plan Satisfies the Mandatory Requirements of Section 1123(a) of the Bankruptcy Code.**

18.     I have been advised that the Plan satisfies the six applicable[4] requirements set forth in section 1123(a) of the Bankruptcy Code because:

- Article III of the Plan designates classes of claims and interests;

---

[4] It is my understanding that, because the Debtors are not issuing any new securities under the Plan, the confirmation requirements set forth in section 1123(a)(6) of the Bankruptcy Code are inapplicable to these Chapter 11 Cases.  In addition, section 1123(a)(8) of the Bankruptcy Code is only applicable to individual debtors.

- Article III of the Plan identifies unimpaired classes of claims and interests;

- Article III of the Plan specifies treatment of impaired classes of claims and interests;

- Article III of the Plan provides the same treatment for each claim or interest of a particular class, unless the holder of a particular claim agrees to a less favorable treatment of such particular claim or interest;

- Article IV of the Plan provides adequate means for its implementation, including by providing for, among other things, consummation of the Restructuring Transactions and the appointment of a Plan Administrator;

- Article IV.K of the Plan is consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of the company's officers and directors by appointing the Plan Administrator as the sole manager and officer of the Post-Effective Date Debtors who shall succeed to the powers of manager and directors.

**B.    The Discretionary Contents of the Plan Are Appropriate and Should Be Approved.**

19.    It is my understanding that the Plan includes various discretionary provisions that are consistent with section 1123(b) of the Bankruptcy Code. For example, the Plan provides for a general settlement of Claims and Interests, impairs certain Classes of Claims and Interests and leaves others Unimpaired, proposes treatment for Executory Contracts and Unexpired Leases, provides a structure for Claim allowance and disallowance and establishes a distribution process for the satisfaction of Allowed Claims entitled to distributions under the Plan. In addition, the Plan contains provisions implementing certain releases and exculpations, and permanently enjoining certain causes of action.

20.    I believe each of these provisions are appropriate because, among other things, they (a) are the product of arm's-length negotiations, (b) have been critical to obtaining the support of the various constituencies for the Plan, (c) are given for valuable consideration, (d) are fair and equitable and in the best interests of the Debtors, these Estates, and these Chapter 11 Cases, and (e) are consistent with the relevant provisions of the Bankruptcy Code and Third Circuit law. Such

provisions are discussed in turn below but, in summary, satisfy the requirements of section 1123(b).

> **1. The Plan's Release, Exculpation, and Injunction Provisions Satisfy Section 1123(b) of the Bankruptcy Code.**

21.     The Plan includes certain releases, an exculpation provision, and an injunction provision.  I believe these discretionary provisions are proper because, among other things, they are the product of extensive good-faith, arm's-length negotiations, are supported by the Debtors and their constituents, and, as I have been advised, are consistent with applicable precedent.

> a.      **The Debtor Releases in the Plan Are Appropriate**.

22.     I believe that the Debtor Releases are appropriate, justified, in the best interests of the stakeholders, and an integral part of the Plan.  Article VIII.C of the Plan provides for releases by the Debtors, the Post-Effective Date Debtors, their Estates, and certain Related Parties of any and all Claims and Causes of Action, including any derivative claims, the Debtors could assert against each of the Released Parties (the "<u>Debtor Releases</u>").

23.     I believe that the Debtor Releases meet the applicable standard because they are fair, reasonable, and in the best interests of the Debtors' Estates.  ***First***, an identity of interest exists between the Debtors and the parties to be released.  Each of the Released Parties, as a stakeholder and critical participant in the Plan process, shares a common goal with the Debtors in seeing the Plan succeed and would have been unlikely to participate in the negotiations and compromises that led to the ultimate formation of the Plan without the Debtor Releases.  Like the Debtors, these parties seek to confirm the Plan and implement the Restructurings Transactions contemplated therein.  Moreover, with respect to certain of the releases—*e.g.*, those releasing the Debtors' current and former directors, officers, affiliates, and principals—there is a clear identity of interest supporting the release because the Debtors will assume certain indemnification obligations under

8

the Plan that will be honored by the Post-Effective Date Debtor.  Thus, a lawsuit commenced by the Debtors (or derivatively on behalf of the Debtors) against certain individuals would effectively be a lawsuit against the Post-Effective Date Debtor itself.

24.     ***Second***, the substantial contributions are clear.  The Released Parties played an integral role in the formation of the Plan and have expended significant time and resources analyzing and negotiating the issues present in these Chapter 11 Cases to reach a value-maximizing chapter 11 plan.  Moreover, the Released Parties have expended time and resources analyzing and negotiating the issues presented by the Debtors' capital structure and the material barriers to the resolution thereof.  Here, the value contributed by the Released Parties is certainly substantial. Without the contributions of each of these parties, the Plan and the ultimate success of these Chapter 11 Cases would not be possible.

25.     ***Third***, the Debtor Releases are essential to the successful resolution of these Chapter 11 Cases because they constitute an integral term of the Plan.  Indeed, absent the Debtor Releases, it is highly unlikely the Released Parties would have agreed to support the Plan and the restructuring transaction contemplated therein.  As described above, each of the Released Parties contributed substantial value to these Chapter 11 Cases, and did so with the understanding that they would receive releases from the Debtors.  In the absence of these parties' support, the Debtors would not be in a position to confirm the Plan and emerge from chapter 11.  The Debtor Releases, therefore, are essential to the Debtors' successful resolution of these Chapter 11 Cases.

26.     ***Fourth***, no party in interest has contested the debtor release of any hypothetical claims, and as evidenced by the Voting Report and noted herein, parties voting in Class 5 have chiefly voted to approve the Plan.  Given the critical nature of the Debtor Releases and the Plan's overall support, the Debtors submit that the releases are proper.

27.     ***Fifth***, the Plan provides for meaningful consideration under the circumstances for all creditors potentially giving up colorable claims under the releases.  As demonstrated by the Liquidation Analysis attached to the Disclosure Statement, the Plan provides for meaningful recoveries for the Classes affected by the Debtor Releases—recoveries that would be unavailable absent the Plan.

28.     I believe the Debtors have satisfied the business judgment standard in granting the Debtor Releases under the Plan.  The Debtor Releases easily meet the applicable standard because they are fair, reasonable, and in the best interests of the Debtors' Estates.

**b.     The Third-Party Releases are Wholly Consensual**

29.     In addition to the Debtor Releases, the Plan provides for releases by certain Holders of Claims and Interests.  Specifically, Article IX.D of the Plan provides that each Releasing Party shall release any and all Claims and Causes of Action such parties could assert against the Debtors, the Post-Effective Date Debtor, and the Released Parties (the "Third-Party Release" and, together with the Debtor Releases, the "Releases").  The Releasing Parties include, among others, the Prepetition Agent, the Prepetition Lenders, the DIP Lender, the Purchaser, all Holders of Claims or Interests who have not opted out, and the Post Effective Date-Debtor.  I believe the Third-Party Releases are consensual and integral to the Plan, and I have been advised that they are consistent with established Third Circuit law.

30.     I believe the Third-Party Releases are consensual.  All parties in interest had ample opportunity to evaluate and opt out of the Third-Party Releases by objecting to the Third-Party Release.  Importantly, the ballots distributed to Holders of Claims entitled to vote on the Plan quoted the entirety of the Third-Party Release, clearly informing Holders of Claims entitled to vote of the steps they should take if they disagreed with the scope of the release.  Similarly, the

Non-Voting Status Notices distributed to Holders of Claims and Interests not entitled to vote on the Plan also quoted the entirety of the Third-Party Release, clearly informing Holders of Claims and Interests not entitled to vote of the steps they should take if they disagreed with the scope of the release. Thus, affected parties received a notice of the Third-Party Release, including the option to opt out of the Third-Party Release. As such, I believe the Third-Party Releases are consensual releases of all Holders of Claims or Interests who did not object.

31. Moreover, I believe the Third-Party Releases are fair and necessary to the success of these Chapter 11 Cases, and that fair consideration is given in exchange for the release.

32. The circumstances of these Chapter 11 Cases warrant the Third-Party Releases because they are critical to the success of the Plan, and it is fair and appropriate. Without the efforts of the Released Parties both in providing the DIP Financing and actively participating in the Sale Transaction and Plan negotiations, the Debtors would not been able to consummate a value-maximizing Sale Transaction for the benefit of all stakeholders and an orderly post-sale wind down through the Plan. In addition, many of the Released Parties have been instrumental in supporting these Chapter 11 Cases and facilitating a smooth administration thereof. Finally, throughout the entire case and all these negotiations, the Debtors' directors and officers steadfastly maintained their duties to maximize value for the benefit of all stakeholders, investing countless hours both pre- and postpetition.

33. Moreover, the third parties bound by the Releases have received sufficient consideration in exchange for the release of their Claims against the Released Parties to justify the Third-Party Release. The Released Parties have made massive concessions and commitments that will allow the Debtors to maximize the value of their Estates. The Released Parties have been active and important participants in the development of the Plan and have expended significant

time and resources analyzing and negotiating the issues presented by the Debtors' capital structure and the material barriers to the resolution thereof.  In addition to significant concessions under the Plan, the Released Parties made the contributions as discussed above, each in exchange for, among other things, the Third-Party Releases.

34.    Accordingly, for all of the above reasons, I believe that the Debtors have a good-faith basis for including the Releases in the Plan.  I further believe that the Third-Party Release is reasonable and appropriate in light of the unique circumstances of these Chapter 11 Cases, and satisfies all applicable requirements of the Bankruptcy Code.

**C.    The Exculpation Provision Is Appropriate.**

35.    Article IX.E of the Plan provides for the exculpation of the Exculpated Parties. I believe the exculpation is fair and appropriate under the facts and circumstances of these Chapter 11 Cases.  The Plan's exculpation provision is the product of arm's-length negotiations, was critical to obtaining the support of various constituencies for the Plan, and, as part of the Plan, has received support from the Debtors' stakeholders.  The exculpation provision was important to the development of a feasible, confirmable Plan, and the Exculpated Parties participated in these Chapter 11 Cases in reliance upon the protections afforded to those constituents by the exculpation.

36.    The Exculpated Parties have participated in good faith in formulating and negotiating the Plan as it relates to the Debtors, and they should be entitled to protection from exposure to any lawsuits filed by disgruntled creditors or other unsatisfied parties.  Here, the Debtors and their officers, directors, and professionals actively negotiated with Holders of Claims and Interests across the Debtors' capital structure in connection with the Plan and these Chapter 11 Cases.  Such negotiations were extensive and the resulting agreements were implemented in good faith with a high degree of transparency, and as a result, the Plan enjoys support from the requisite

Holders of Claims entitled to vote.  The Exculpated Parties played a critical role in negotiating, formulating, and implementing the Disclosure Statement, the Plan, the Asset Purchase Agreement, and related documents in furtherance of the Debtors' chapter 11 efforts.  Furthermore, the Exculpation is limited to acts during these Chapter 11 Cases and does not extend beyond such time period.

37.    Additionally, the promise of exculpation played a significant role in facilitating Plan negotiations.  All of the Exculpated Parties played a key role in developing the Plan that paved the way for a successful resolution of these Chapter 11 Cases, and likely would not have been so inclined to participate in the plan process without the promise of exculpation.  It is my understanding that Exculpation for parties participating in the plan process is appropriate where plan negotiations could not have occurred without protection from liability.

38.    Accordingly, I had been advised that under the circumstances, particularly where the Plan, including the exculpation provision, is supported by the requisite voting Classes in these Chapter 11 Cases, it is appropriate for the Bankruptcy Court to approve the exculpation provision, and to find that the Exculpated Parties have acted in good faith and in compliance with the law.

**D.    The Plan Complies with Section 1123(d) of the Bankruptcy Code.**

39.    Article V.D of the Plan provides for the satisfaction of all monetary defaults under each Executory Contract and Unexpired Lease assumed pursuant to the Plan by payment of the default amount, subject to the terms and conditions of the Plan, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  The Debtors, in accordance with the Disclosure Statement and the Plan, distributed notices of proposed assumption to the applicable third parties.  These notices included procedures for objecting to the proposed

assumptions of Executory Contracts and Unexpired Leases and any Cure Claim, as well as a process for resolving any disputes concerning the foregoing with the Bankruptcy Court.

40.     Under the Plan, the Debtors, the Post-Effective Date Debtor, and the Plan Administrator, as applicable, with the consent of the Purchaser and the Term Lender Group not to be unreasonably withheld, reserve the right to modify the Schedule of Assumed Executory Contracts and Unexpired Leases as follows: (i) with respect to Unexpired Leases, through and including the Confirmation Date and (ii) with respect to Executory Contracts, through and including thirty (30) days following the Effective Date.

41.     I believe the extension of the assumption and rejection period for executory contracts is essential to allow the Purchaser adequate time to evaluate Debtors' contracts.  In addition, this time period provides the Purchaser with the opportunity to ensure a smooth transition of the business post-closing.  All parties benefit from this extension because the Purchaser will honor any obligations under these executory contracts from the closing through and including a rejection, if applicable.  I have been advised that the extension of the assumption and rejection period for executory contracts is appropriate and has been granted before by bankruptcy courts.

42.     Accordingly, it is my understanding that the Plan complies with section 1123(d) of the Bankruptcy Code.

**E.     The Debtors Have Complied with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2)).**

43.     It is my understanding that, the Debtors have satisfied section 1129(a)(2) of the Bankruptcy Code, which requires the plan proponent to comply with the applicable provisions of the Bankruptcy Code.  As set forth below, I have been advised that the Debtors have complied with these provisions, including sections 1125 and 1126 of the Bankruptcy Code, as well as Bankruptcy Rules 3017 and 3018, by distributing the Disclosure Statement and soliciting

acceptances of the Plan through their Notice and Claims Agent in accordance with the Disclosure Statement Order.

> **2. The Debtors Have Complied with the Disclosure and Solicitation Requirements of Section 1125.**

44.     Before the Debtors solicited votes on the Plan, the Bankruptcy Court approved the Disclosure Statement on an interim basis in accordance with section 1125(a)(1).  The Bankruptcy Court also approved the contents of the Solicitation Packages provided to Holders of Claims entitled to vote on the Plan, the non-voting materials provided to parties not entitled to vote on the Plan, and the relevant dates for voting and objecting to the Plan.  As stated in the Voting Report, the Debtors, through the Notice and Claims Agent, complied with the content and delivery requirements of the Disclosure Statement Order, thereby satisfying sections 1125(a) and (b) of the Bankruptcy Code.  It is my understanding that the Debtors also satisfied section 1125(c) of the Bankruptcy Code, which provides that the same disclosure statement must be transmitted to each holder of a claim or interest in a particular Class.  Here, the Debtors caused the Combined Hearing Notice, including instructions on how to obtain the Plan and the Disclosure Statement without a fee through the Debtors' restructuring website or for a fee at the Bankruptcy Court's PACER website, to be transmitted to voting parties and all parties in interest.  Moreover, at all times, the Debtors and their advisors acted in good faith and took appropriate actions in compliance with the Bankruptcy Code in connection with the solicitation of the Plan.

45.     Based on the foregoing, it is my understanding that the Debtors have complied in all respects with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure Statement Order, and no party has asserted otherwise.

3. **The Debtors Have Satisfied the Plan Acceptance Requirements of Section 1126.**

46.     The Debtors solicited votes only from the Voting Classes, holders of Allowed Claims and Interests in Classes 4 and 5, because each of these Classes is Impaired and entitled to receive a distribution under the Plan.

47.     The Voting Report, summarized above, reflects the results of the voting process in accordance with section 1126 of the Bankruptcy Code.  As set forth in the Voting Declaration and summarized above, a large majority of the Holders in Class 5 voted to accept the Plan. Additionally, as discussed below, the Debtors have satisfied the requirements of section 1129(a)(10) of the Bankruptcy Code and will be able to "cram down" Class 4, which voted to reject the Plan, pursuant to section 1129(b) of the Bankruptcy Code.  Based on the foregoing, I believe that the Debtors have satisfied the requirements of section 1129(a)(2), and no party has asserted otherwise.

F.     **The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law (Section 1129(a)(3)).**

48.     I believe the Plan was proposed with honesty, good intentions, and a desire to maximize the value of the Debtors' business.  Throughout these cases, the Debtors worked to build consensus among their various stakeholders.  The Plan and the process leading up to its formulation are the result of extensive arm's-length negotiations among the Debtors, their lenders, the Purchaser, and the Committee.  Throughout the negotiation of the Plan and these cases, the Debtors have upheld their fiduciary duties to stakeholders and protected the interests of all constituents with an even hand.

49.     Accordingly, I have been advised that the Plan fully complies with and satisfies all of the requirements of section 1129(a)(3) of the Bankruptcy Code.

**G.     The Plan Provides for Court Approval of Certain Administrative Payments (Section 1129(a)(4)).**

50.     It is my understanding that all payments made or to be made by the Debtors for services or for costs or expenses in connection with these Chapter 11 Cases prior to the Effective Date, including all budgeted Professional Fee Claims, have been approved by, or are subject to approval of, the Bankruptcy Court.  Article II.B of the Plan provides that all final requests for payment of Professional Fee Claims shall be filed no later than sixty (60) days after the Effective Date for determination by the Bankruptcy Court, after notice and a hearing, in accordance with the procedures established by the Bankruptcy Court.  Therefore, it is my understanding that the Plan complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.

**H.     Post-Emergence Board Composition Has Been Appropriately Disclosed and Is Consistent with Public Policy (Section 1129(a)(5)).**

51.     The Plan provides for a Plan Administrator.  The Plan provides that the Plan Administrator will act for the Post-Effective Date Debtor in the same fiduciary capacity as applicable to a board of managers and officers and also provides that on the Effective Date, the authority, power, and incumbency of the persons acting as managers and officers of the Post-Effective Date Debtor shall be deemed to have resigned, solely in their capacities as such. At that time, I will be appointed as the sole manager and sole officer of the Post-Effective Date Debtor.

52.     In addition, I have been advised that the Plan satisfies section 1129(a)(5)(B) of the Bankruptcy Code because the Debtors will publicly disclose the identities and affiliations of all insiders, if any, that the Post-Effective Date Debtor will employ or retain at or prior to the Confirmation Hearing in compliance with the Bankruptcy Code.

53.     Accordingly, I believe the above facts and circumstances comply with all of the elements of section 1129(a)(5) of the Bankruptcy Code.

**I.      The Plan Does Not Require Governmental Approval of Rate Changes (Section 1129(a)(6)).**

54.     It is my understanding that there is no governmental regulatory commission that has jurisdiction over the Debtors' or the Post-Effective Date Debtor's rates.

**J.      The Plan Is in the Best Interests of Creditors and Interest Holders (Section 1129(a)(7)).**

55.     The Debtors' advisors assisted with the preparation of the liquidation analysis that was filed as Exhibit B to the Disclosure Statement (the "Liquidation Analysis") to determine the respective value of distributions (if any) that Holders of Claims and Interests would receive on account of such Claims and Interests if the Debtors were to be liquidated under chapter 7 of the Bankruptcy Code.  The Liquidation Analysis was completed with the direct involvement of people under my direct supervision.  I am familiar with the methods used, and the conclusions reached, in the preparation of the Liquidation Analysis.  It is my understanding that the Liquidation Analysis represents the Debtors' best estimate of the cash proceeds, net of liquidation-related costs that would be available for distribution to the Holders of Claims and Interests if the Debtors were to be liquidated under chapter 7 of the Bankruptcy Code.

56.     The Liquidation Analysis was based on a variety of assumptions, which are detailed in the notes to the Liquidation Analysis, and which I believe are reasonable under the circumstances.   The Liquidation Analysis represents an estimate of recovery values and percentages based upon a hypothetical liquidation if the Bankruptcy Court were to convert the Debtors' chapter 11 cases to a proceeding under chapter 7 of the Bankruptcy Code and a chapter 7 trustee were to proceed to convert the Debtors' assets into cash.   The Liquidation Analysis

demonstrates that recoveries under the Plan are at least as high as they would be in a hypothetical liquidation. Accordingly, I believe that the Plan satisfies section 1129(a)(7) because creditors are getting more out of the Plan than they would in a chapter 7 liquidation.

### K. The Plan Can Be Confirmed Notwithstanding the Requirements of Section 1129(a)(8).

57.     As will be discussed in greater detail below, I have been advised that Class 5 (General Unsecured Claims) voted to accept the Plan at nearly all Debtors and Class 4 (Prepetition Loan Claims) voted to reject the Plan. Moreover, it is my understanding that Holders of Claims and Interests in Class 8 (Section 510(b) Claims) and Class 9 (Interests in TSI) are deemed to have rejected the Plan and, thus, were not entitled to vote. Notwithstanding that Classes 4, 8, and 9 voted to reject or are deemed to reject the Plan, it is my understanding that the Plan is confirmable because it satisfies section 1129(b) of the Bankruptcy Code.

### L. The Plan Complies with Statutorily Mandated Treatment of Administrative and Priority Tax Claims (Section 1129(a)(9)).

58.     The Plan generally provides that each holder of an Allowed Administrative Claim will receive Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim in accordance with the following: (1) if such Administrative Claim is Allowed on or prior to the Effective Date, no later than thirty (30) days after the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the

particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Post-Effective Date Debtor, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.  Moreover, it is my understanding that the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code because, based on the Debtors' current projections, no holders of the types of Claims specified by 1129(a)(9)(B) are Impaired under the Plan.  Finally, Allowed Priority Tax Claims will be paid in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

59.    As described below, I believe that the Debtors have sufficient cash on hand to pay for all such claims that are liabilities of the estate.  It is my understanding that, because the Plan provides for specified Cash payments to Holders of Claims entitled to priority under section 507(a), it is in compliance with section 1129(a)(9) of the Bankruptcy Code.

**M.    At Least One Impaired Class of Claims Has Accepted the Plan, Excluding the Acceptance of Insiders (Section 1129(a)(10)).**

60.    I have been informed that section 1129(a)(10) of the Bankruptcy Code is an alternative to the requirement set forth in section 1129(a)(8) of the Bankruptcy Code that each class of claims or interests must either accept a plan or be unimpaired under the plan.  It provides that if a class of claims is impaired under a plan, at least one impaired class of claims must accept the plan, excluding acceptance by any insider.  As set forth in the Voting Certification, the Debtors have obtained the requisite acceptance to confirm the Plan, independent of any insiders' votes. Therefore, it is my belief that the Plan fully complies with and satisfies all of the requirements of section 1129(a)(10) of the Bankruptcy Code.

### N.     The Plan Is Feasible (Section 1129(a)(11)).

61.     I believe the Plan satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code by providing that the Debtors will be able to satisfy all of their obligations under the Plan.

62.     Under the Plan, the Debtors and Post-Effective Date Debtor, as applicable, shall fund the distributions and obligations under the Plan with Available Cash held in the Administrative Claims Escrow, Priority Claims Reserve, and the Post-Effective Date Debtor Account, as applicable, on the Effective Date.   After the funding from Available Cash of the Administrative Claims Escrow, the Priority Claims Reserve, and the Post-Effective Date Debtor Account, all remaining Available Cash shall be applied towards the Prepetition Loan Claims until the Prepetition Loan Claims are paid in full in Cash.   In addition, any remaining Available Cash and Excess Distributable Cash after payment in full in Cash of the Prepetition Loan Claims, shall be paid to the Non-Released Claims Trust promptly after the full payment of the Prepetition Loan Claims.   The Non-Released Claims Trustee will fund distributions related to Holders of General Unsecured Claims with Cash from the Non-Released Claims Trust.   Finally, as indicated in Article II of the Plan, pursuant to the Sale Order, the DIP Claims have been satisfied in connection with the Sale Transaction.

63.     Under my supervision, the Debtors and their advisors have thoroughly analyzed their ability to meet their obligations under the Plan.   The Debtors sized the wind-down contribution contemplated by the Stalking Horse Agreement as a result of that analysis.   More specifically, the Debtors' Available Cash is sufficient to pay all known administrative-expense claims pursuant to section 1129(a)(9) with approximately $3.2 million available to fund wind-down costs.   Because the Purchaser assumed the vast majority of contracts that generated

administrative claims (and therefore needs to pay obligations under such contracts as part of cure), I believe this estimate is reasonable and conducted with the appropriate estimates and reserves for risk. Based on this analysis, the Post-Effective Date Debtor will have sufficient funds to satisfy all requirements and obligations under the Plan. Accordingly, I believe that the Plan is feasible.

**O.    The Plan Provides for Payment of All Fees Under 28 U.S.C. § 1930 (Section 1129(a)(12)).**

64.    It is my understanding that Article XIII.C of the Plan provides that the Debtors shall pay all fees and applicable interest under section 1930(a) of the Judicial Code and 31 U.S.C. § 3717, as applicable, as determined by the Bankruptcy Court, for each quarter (including any fraction thereof) until these Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first. Accordingly, it is my understanding that the Plan fully complies with and satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.

**P.    Non-Applicability of Certain Sections (11 U.S.C. §§ 1129(a)(13), (14), (15), and (16)).**

65.    It is my understanding that Sections 1129(a)(13) through 1129(a)(16) do not apply to the Plan because the Debtors have no obligation to pay retiree benefits and because, the Debtors are not subject to domestic support obligations, are not "individuals," and are moneyed, business, or commercial corporations, and no party has asserted otherwise.

**Q.    The Plan Complies with the Other Provisions of Section 1129 of the Bankruptcy Code (Section 1129(c)–(e)).**

66.    It is my understanding that the Plan satisfies the remaining provisions of section 1129 of the Bankruptcy Code. Section 1129(c), prohibiting confirmation of multiple plans, is not implicated because there is only one proposed chapter 11 plan. Moreover, the Plan has not been filed for the purpose of avoidance of taxes or the application of section 5 of the Securities Act. In addition, no party that is a governmental unit, or any other entity, has requested that the Bankruptcy

Court decline to confirm the Plan on the grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act. The Plan was proposed in good faith and not by any means forbidden by law. I believe the Debtors filed the Plan to accomplish their objective of efficiently and responsibly providing recoveries to their stakeholders. Accordingly, I believe that the Debtors have satisfied the requirements of section 1129(d) of the Bankruptcy Code.

67.    Lastly, it is my understanding that section 1129(e) of the Bankruptcy Code is inapplicable because none of the Debtors' chapter 11 cases is a "small business case." Thus, the Plan satisfies the Bankruptcy Code's mandatory confirmation requirements.

### R.    The Plan Satisfies the Requirements of Section 1129(b) of the Bankruptcy Code.

68.    Class 5 (General Unsecured Claims) voted to accept the Plan at nearly all Debtors and Class 4 (Prepetition Loan Claims) voted to reject the Plan. Moreover, Holders of Claims and Interests in Class 8 (Section 510(b) Claims) and Class 9 (Interests in TSI) are deemed to have rejected the Plan and, thus, were not entitled to vote. In addition, Holders of Claims and Interests in Class 6 (Intercompany Claims) and Class 7 (Intercompany Interests) may be conclusively deemed to reject the Plan based on the Debtors' ultimate determination to maintain or cancel these intercompany claims and interests. It is my understanding that nonetheless, as set forth below, the Plan does not unfairly discriminate and is "fair and equitable," and therefore satisfies the requirements under section 1129(b) of the Bankruptcy Code.

### 4.    The Plan Does Not Unfairly Discriminate with Respect to Impaired Classes That Have Not Voted to Accept the Plan.

69.    I believe that the Plan's treatment of those Classes that are deemed to reject the Plan is proper and not "unfair" because Holders of Claims and Interests with similar legal rights

will not be receiving materially different treatment under the Plan.  As I discussed above, the Plan's classification scheme categorizes Claims and Interests based on their priority within the Debtors' capital structure, their differing legal nature, and their respective rights against the Debtors. Further, Claims and Interests in the Classes deemed to reject the Plan are not similarly situated to any other Classes, given their distinctly different legal character from all other Claims and Interests.  Accordingly, I believe that the Plan does not discriminate unfairly with respect to Classes of Claims and Interests that are deemed to reject the Plan.

**5.    The Plan Is Fair and Equitable.**

70.    I believe the Plan is "fair and equitable" to Holders of Claims and Interests in those Classes that were deemed to reject the Plan because the Plan satisfies the absolute priority rule with respect to each of these non-accepting Impaired Classes.  Specifically, no holder of any junior claim or interest will receive or retain any property under the Plan on account of such junior claim or interest.

71.    In addition, to the extent that Intercompany Interests are Reinstated under the Plan, it is my understanding that distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience, for the ultimate benefit of all parties in interest. Accordingly, I believe that any reinstatement of Intercompany Interests will have no economic substance.

72.    Therefore, I believe the Plan is fair and equitable with respect to the all Impaired Classes of Claims and Interests and satisfies section 1129(b) of the Bankruptcy Code.

II.     **The Waiver of a Stay of the Confirmation Order and the Proposed Modifications to the Plan Are Appropriate.**

A.      **Cause Exists to Waive a Stay of the Confirmation Order.**

73.     I have been advised that cause exists for waiving the stay of the entry of the Confirmation Order such that the Confirmation Order will be effective immediately upon its entry. As noted above, the Debtors have undertaken great efforts to facilitate their exit from chapter 11 as soon as practicable.   Each day the Debtors remain in chapter 11 they incur significant administrative and professional costs.

B.      **Modifications to the Plan.**

74.     It is my understanding that the Debtors' modifications to the Plan in response to comments from stakeholders do not adversely impact creditors who have not consented to such modified treatment.  I believe that the changes are permissible modifications to the Plan and are supported by the Debtors, and either improve or do not reflect material differences to recoveries of each affected class—*i.e.*, no holder is "likely" to reconsider its acceptance.

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  December 9, 2020                    Respectfully submitted,


*/s/ John C. DiDonato*
John C. DiDonato
Chief Restructuring Officer