1                 UNITED STATES BANKRUPTCY COURT
                   DISTRICT OF DELAWARE

2

                        .   Chapter 11

3  IN RE:                      .

4                        .   Case No. 20-12168 (CSS)
  TOWN SPORTS INTERNATIONAL, LLC, .

5  *et al.,*                 .

                        .

6                        .   Courtroom No. 6
                        .   824 Market Street

7                        .   Wilmington, Delaware 19801

                        .

8            Defendant.    .   November 30, 2020
  . . . . . . . . . . . . . . . . .   10:00 A.M.

9

10                TRANSCRIPT OF TELEPHONIC HEARING
       BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI

11            UNITED STATES BANKRUPTCY JUDGE

12

13  TELEPHONIC APPEARANCES:

14  For the Debtors:         Robert S. Brady, Esquire
                       Sean T. Greecher, Esquire

15                     Allison S. Meilke, Esquire
                       YOUNG CONAWAY STARGATT & TAYLOR LLP

16                     Rodney Square
                       1000 North King Street

17                     Wilmington, Delaware 19801

18

  Audio Operator:         Leslie Murin, ECRO

19

20  Transcription Company:   Reliable
                       1007 N. Orange Street

21                     Wilmington, Delaware 19801
                       (302)654-8080

22                     Email:  gmatthews@reliable-co.com

23  Proceedings recorded by electronic sound recording,

24  transcript produced by transcription service.

25

1   TELEPHONIC APPEARANCES (continued):

2   For the debtors:              Nicole L. Greenblatt, Esquire
                                  Derek I. Hunter, Esquire
3                                 KIRKLAND & ELLIS LLP
                                  601 Lexington Avenue
4                                 New York, New York 10022

5                                 - and -

6                                 Mark McKane, Esquire
                                  KIRKLAND & ELLIS LLP
7                                 555 California Street
                                  San Francisco, California 94104

8                                 - and -

9                                 Joshua M. Altman, Esquire
10                                KIRKLAND & ELLIS LLP
                                  300 North LaSalle Street
11                                Chicago, Illinois 60654

12  For the Ad Hoc Term           Mary Beth Maloney, Esquire
    Lender Group:                 Jason Goldstein, Esquire
13                                GIBSON DUNN & CRUTCHER LLP
                                  200 Park Avenue
14                                New York, New York 10166

15  For the U.S. Trustee:         David Buchbinder, Esquire
                                  UNITED STATES DEPARTMENT OF JUSTICE
16                                OFFICE OF THE UNITED STATES TRUSTEE
                                  844 King Street, Suite 2207
17                                Lockbox 35
                                  Wilmington, Delaware 19801
18
    For the Committee:            Seth Van Aalten, Esquire
19                                COLE SCHOTZ P.C.
                                  1325 Avenue of the Americas
20                                19th Floor
                                  New York, New York 10019
21

22

23

24

25

MATTERS GOING FORWARD:

Emergency Motion of the Ad Hoc Term Lender Group for (A)
Injunctive Relief Pending Interpretation or (B) Amendment or
Alteration of the Order (I) Authorizing the Sale of
Substantially All of the Debtors Assets Free and Clear of
Liens, Claims, Encumbrances, and Interests, (II) Authorizing
the Debtors to Enter Into the Asset Purchase Agreement, (III)
Authorizing the Assumption and Assignment of Certain
Executory Contracts and Unexpired Leases, and (IV) Granting
Related Relief [Docket No. 710, 11/27/20]

**Ruling:   23**

1      (Proceedings commenced at 10:00 a.m.)

2           THE COURT:  Good morning everybody.  Very early

3  good morning for those of you on the West Coast.  We're here

4  today in the Town Sports case with regard to the issue about

5  a closing of the transaction.

6           I want to thank everyone who worked over the

7  holiday weekend to provide briefs on the schedule I imposed.

8  They were very helpful. I'm sure people worked harder and

9  longer then they wanted to over the holiday weekend, but this

10  is, obviously, an issue of great economic importance to the

11  company and the parties in interest.  So thank you all very,

12  very much for doing that.

13           Before we get started today just a couple

14  reminders.  First and foremost, absolute rule is to mute your

15  phones when you're not speaking.  It's extremely disruptive

16  to get background noise whether it's typing, or paper

17  shuffling or the dog barking, et cetera.  So, please do that.

18           Then a slightly less important rule is to try to

19  remember to unmute your phones when you do speak.  This

20  happens relatively frequently and I do it all the time,

21  certainly not a big deal, but try to remember to unmute your

22  phones when you do speak.

23           All the other rules you guys all know.  You have

24  been on the CourtCall for eight months now.  So, you do

25  remember everything.  The last thing, as I said, CourtCall,

1  the audio is not Zoom.  The audio is by CourtCall.  The Zoom

2  audio has been muted and your ability to unmute yourself has

3  been disabled.  So, everything is on CourtCall.

4          We do have Zoom problems with some disruptions.  I

5  will try to address them, if I can't we will simply terminate

6  the Zoom portion of the hearing and just go forward the good

7  old fashioned way on telephone only.

8          With that I will -- it's not really the debtor's

9  motion, but I will turn it over to the debtor to, sort of,

10  set the table and then we will get started.

11          MS. GREENBLATT:  Thank you, Your Honor.  Nicole

12  Greenblatt from Kirkland & Ellis on behalf of the debtors.

13  Can you hear me okay?

14          THE COURT:  Yes, ma'am.

15          MS. GREENBLATT:  Great.  As you said, it's not our

16  motion. This is the term lender's motion.  I will say we are,

17  again, disappointed that there wasn't able to be a commercial

18  resolution of this.  You know, we are here on injunctive

19  relief and, frankly, you know, if this was even a close call

20  on the merits in terms of how to interpret your sale order

21  that would be one thing.  We don't think it is, but certainly

22  in terms of the balance of harm it's kind of (indiscernible)

23  from our perspective that his ability to close the sale would

24  be incredibly detrimental to the debtors and all of their

25  stakeholders.

1       It actually would not do any harm to the term

2   lenders group.  They are receiving some consideration in

3   connection with the sale.  They can continue to negotiate or

4   litigate with their own selected joint venture partners, kind

5   of, post-close as necessary.  So, our overall perspective is

6   simply that injunctive relief is not appropriate, but I will

7   reserve argument until after Mr. Greenburg or someone at

8   Gibson has had an opportunity to present their position.

9       THE COURT:  Thank you, Ms. Greenblatt.

10      MR. BUCHBINDER:  Your Honor, this is Dave

11  Buchbinder.  May I be heard briefly, Your Honor?

12      THE COURT:  Yes, sir, Mr. Buchbinder.

13      MR. BUCHBINDER:  Thank you, Your Honor.  This is

14  Dave Buchbinder on behalf of the Office of the United States

15  Trustee.

16      I was out of my office on Friday and just reviewed

17  the pleadings this morning.  I do have one observation to

18  make.  To the extent that the motion seeks an injunction no

19  adversary proceeding has been filed and Bankruptcy Rule of

20  Procedure 7017 requires that an adversary proceeding be filed

21  and the Third Circuit case of In Re Mansaray-Ruffin, 530 F.3d

22  230, 2008, requires that the matter proceed by way of

23  adversary proceeding.

24      I want to make this observation to the court.  I

25  understand what the motion is about and I understand all the

1 consequences.  I leave this observation to the court to the

2 extent it desires to proceed this morning.

3             Thank you, Your Honor.

4             THE COURT:  Thank you, Mr. Buchbinder.

5             All right.  I will turn it over to the term

6 lenders.  I don't know who is going to speak.

7             MS. MALONEY:  Your Honor, this is Mary Beth

8 Maloney and I am joined by my colleague, Scott Greenburg and

9 Jason Goldstein on behalf of the ad hoc term of lenders.

10             First, in response to the U.S. Trustees comment

11 regarding the filing of an adversary proceeding under Section

12 105 it's our understanding that an adversary proceeding is

13 not necessary for the court to exercise its discretion to

14 enter what we are requesting, which is merely a temporary

15 injunction which, frankly, the parties have, essentially,

16 agreed to by not having closed on Friday.

17             As I will address in my argument, we actually

18 think this can be resolved by the court today with absolutely

19 no intention of holding up the sales process, but we do think

20 that it is essential that this sale go through subject to the

21 terms of the sale order.

22             So, Your Honor, we really appreciate the

23 opportunity to submit papers over the holiday and to be heard

24 this morning.  We would not have sought Your Honor's

25 intervention lightly.  We recognize that it's a burden on the

1 parties to have to address this when they had hoped to close

2 on Friday, but the events that transpired immediately before

3 the Thanksgiving holiday, including our being told on Monday,

4 11/23, that the parties would try to close the sale without

5 the buyer credit bidding the acquired loans from the

6 prepetition lenders as part of the purchase price under the

7 APA or as a result of that we felt we had no other choice but

8 to accept Your Honor's offer, made at the court conference on

9 Wednesday, to seek a brief injunction of the closing t

10        Your Honor, the issue of whether the buyer must

11 credit bid the acquired loans from the prepetition lenders to

12 close this sale can be resolved in one of three ways.

13        First, the plain and unambiguous language of the

14 sale order at Paragraph (x) authorizes the sale subject to

15 loans from the prepetition lenders being credit bid by the

16 buyer.  We believe Your Honor can resolve that today.

17        Second, even if you do not view Paragraph (x) to

18 unambiguously require that you close the loans from the

19 prepetition lenders be credit bid by the buyer, the related

20 transaction documents, that is the credit agreement and the

21 security agreement, leave no doubt.  Again, we believe Your

22 Honor can look to these agreements today to resolve this and

23 avoid any further delay at closing.

24        Last, if you think the contract, on its face, and

25 the related transaction documents still leave doubt as to the

1  requirements to close the loans from the -- as to the

2  requirement that to close the loans from the prepetition

3  lenders be credit bid by the buyer it is appropriate to look

4  to the understanding of the parties at the time they entered

5  the sale order.  Now we don't think that's necessary given

6  the plain language of the agreements, but should the court

7  believe it is necessary and appropriate to consider the

8  evidence of the parties understanding we believe that could

9  be achieved today based on the evidence submitted in support

10  of our motion or in the alternative and with no interest in

11  further delay of the close.  We're open to scheduling a brief

12  evidentiary hearing on an expedited timeframe.

13        Unless Your Honor wishes for me to proceed

14  differently I would now turn to the first reason why the

15  court should clarify that the sale order requires to close

16  the loan from the prepetition lenders be credit bid by the

17  buyer.  That is the plain language of Paragraph (x) of the

18  sale order.

19        Is that okay, Your Honor?

20        THE COURT:  Yes.

21        MS. MALONEY:  Jason, Mr. Goldstein, if you could

22  pull-up -- Your Honor, if you will allow me I think it would

23  be helpful for us all to look at the plain language of

24  Paragraph (x) of the sales order.  Would that be all right

25  for my colleague, Jason Goldstein, to pull-up a slide

1  reflecting that language?

2          THE COURT:  Yes.  Just you have to give me a

3  minute.  I have to make him a co-host to have authority.  So

4  let me see if I can find him here.  Where is he?

5          Did he drop off?  I'm not seeing him.

6          MR. GOLDSTEIN:  I'm here, Your Honor.

7          THE COURT:  Oh, there you are.  I got you now.

8  You should be able to share your screen now.

9          MS. MALONEY:  Thank you.

10         Paragraph (x) of the sale order unambiguously

11 defines the credit bid consideration as $80 million dollars

12 that will be credit bid, and that's the third to last line

13 that is on your screen, and upon closing the prepetition

14 lenders will be owners of the NewCo.  That is the third line

15 from the top on your screen.

16         The paragraph expressly contemplates that the

17 loans under the credit agreement will be credit bid because

18 the credit bid is owned by and has always been owned by the

19 required lenders and the agent.  So, for the buyer to have

20 any right to it the credit bid must first be contributed to

21 the buyer before the buyer is able to complete the purchase.

22         This is typical in a common sense way parties

23 undertake these transactions.  It would make no sense for the

24 prepetition lenders to contribute $80 million dollars of the

25 loans under the credit agreement in advance as the debtor's

1  seem to suggest they have done, and they have not.  The

2  credit bid was to be contributed at close in exchange for

3  consideration in the form of debt and equity issued by the

4  buyer.

5        Now if you could turn to the next slide, Mr.

6  Goldstein, the sales order does not provide any direction to

7  make the credit bid.  It very easily could have included a

8  direction to credit bid, but it did not.  That also makes

9  sense because Paragraph (x) of the sales order is

10 definitional and not operational.  It simply defines the

11 credit bid consideration as it is contemplated under the

12 APA's definition of the purchase price.  That is that last

13 sentence of Paragraph (x) which is up on your screen.

14       That last sentence confirms that the buyer must

15 provide the credit bid consideration as part of the purchase

16 price under the APA.  It is obvious the buyer had failed to

17 satisfy this condition for two reasons.

18       First, the buyer cannot include the credit bid in

19 its purchase price because it does not own or control the

20 credit bid.  And the credit bid has not been contributed to

21 the buyer.  Only the agent who is controlled by the required

22 lenders can exercise powers or take actions that bind all

23 prepetition lenders.  That is explicit under the credit

24 agreement.  The buyer does not now have and never has had any

25 right or entitlement to credit bid the loan.

1       Second, the buyer does not even purport to have

2  included the credit bid in its purchase price; far from it.

3  They're paying $5 million dollars to fund closing costs and

4  they believe that cash payment alone is sufficient to close.

5  The debtors own objection and supporting declaration makes

6  clear that this exchange, which is credit bid for

7  consideration, has not yet occurred.

8       If you look to the Cleeton declaration at

9  Paragraph 3 he states that they are prepared to close and

10 "the cash purchase consideration be wired to the debtors."

11 Unsurprisingly, there is no reference whatsoever to the

12 credit bid which, again, under the APA is part of the

13 purchase price.  They don't even purport to show that the

14 buyer had any right or ability to exercise the credit bid

15 without the agent's authorization.

16      Second, under Paragraph 2 of the Cleeton

17 declaration he makes clear that the equity in the company,

18 specifically 200,000 shares that have not yet been conferred

19 upon the prepetition lenders, hasn't been conferred because

20 it cannot be until there is an exchange of consideration for

21 the credit bid.

22      That leads me to the second reason why you should

23 find in favor of the lender's position here.  If Your Honor

24 finds the sales order on its face requires further clarity

25 the next step should be to look at the related documents.

1  That is specifically the credit agreement and the security

2  agreement.  Those documents are consistent with the ad hoc

3  group's position that the payment of the credit bid is a

4  closing condition that the buyer cannot satisfy because the

5  buyer cannot pay the purchase price until the credit bid has

6  been contributed by the agent acting at the direction of the

7  required lenders in exchange for consideration.

8        Specifically, if you look and -- Mr. Goldstein, if

9  you could turn to the next slide.  Actually that is the asset

10 purchase agreement in which total consideration is defined to

11 include the credit bid and the purchase price is defined to

12 include the credit bid.  That, of course, is referenced in

13 the sales order.

14       Now if we turn to Slide 5.  And Slide 5 makes

15 clear, under the asset purchase agreement, that as a

16 condition to the obligations to close the buyer will deliver

17 the purchase price which, pursuant to Section 2.3, includes

18 the credit bid.

19       Then if we look the next slide, which is the

20 credit agreement, at Section 12.10(a) of the credit agreement

21 and it limits the actions that binds all prepetition lenders

22 like credit bidding to the required lenders or the collateral

23 agent.  As a result, pursuant to Section 12.10 of the credit

24 agreement and Section 7.1 of the security agreement the ad

25 hoc term lender group has the power to direct the agent to

1  take action, exercise powers and seek to enforce the security

2  agreement and other security documents, as they're defined in

3  the security agreement, including to credit bid all or a

4  portion of the loans outstanding under the credit agreement.

5           In fact, the ad hoc term lender group, as the

6  required lenders and required secured creditors and the agent

7  acting at the direction of the ad hoc term lender group, are

8  the only party that can take actions or exercise powers like

9  credit bidding to bind all of the prepetition lenders or to

10  enforce the security agreement in each of the other

11  documents.  No party has this right including specifically

12  the purchaser.

13           Now, Your Honor, I will not turn to part three

14  which is to look beyond the terms.  And if you want to take

15  down the slides that's fine, Jason.

16           I will turn to my third argument unless Your Honor

17  wishes to hear additional evidence outside the scope of the

18  documents themselves, but suffice to say when this agreement

19  was entered the sales order that was agreed to and the

20  documents related to it including the asset purchase

21  agreement reflected the notion that now debtors and Peak seem

22  to have entirely rejected in an effort to close the sale

23  quickly, but they reflected the notion that there would have

24  to be a contribution of the credit bid in exchange for some

25  consideration.  That has not happened and, therefore, we

1  request that Your Honor clarify the sale order so that we can

2  move forward with a consensual sale.

3           At this time, because Peak and the debtors have

4  determined there is no such requirement to contribute the

5  credit bid for the agents who acted our direction, they are

6  going forward unilaterally.  We believe there is the ability

7  to have a consensual sale in which the term lenders will

8  receive the consideration that they had specifically

9  negotiated and contemplated under this deal, but that can

10  only happen if Your Honor gives us the clarification today to

11  allow us to move forward and to -- so that Peak and the

12  debtors don't continue to act unilaterally.

13           Thank you, Your Honor.

14           MS. GREENBLATT:  Your Honor, may I respond?

15           THE COURT:  Yes.

16           MS. GREENBLATT:  Thank you.  Nicole Greenblatt

17  from Kirkland & Ellis on behalf of the debtors.

18           A couple of things, Your Honor.  So, obviously,

19  our position is that the sale order is not ambiguous and it

20  is clear.  What Paragraph (x) does is say a couple of things.

21           One is that it says NewCo was formed and it was

22  formed on behalf of all prepetition lenders.  That is the

23  direct lender control that the ad hoc lender group had was

24  used to direct the credit bid.  Ms. Maloney's argument, you

25  know, seem to ignore the intervening process where there was

1  an auction held, there was a NewCo formed and a sale order

2  approved that from our perspective completely trumps any

3  prior prepetition direct lender control over the credit

4  agreement.

5          So, they directed the credit bid in connection

6  with forming that entity.  It defines the credit bid

7  consideration that was contributed and it says that the

8  buyers agreed to contribute it and then it directs, by the

9  court, pursuant to the sale order which, again, we believe

10  trumps any prior prepetition agreement that the agent can do

11  whatever is necessary because the asset purchase agreement

12  was already approved.  There were no objections raised to

13  this order and we don't think it's appropriate to re-litigate

14  it at this time.  There is nothing to clarify.  You know,

15  Your Honor would simply be rewriting it.

16          You know, I think lastly, Your Honor, we're

17  sympathetic and we understand that the lenders are frustrated

18  and dissatisfied with what they're getting out of NewCo, but

19  with all of the issues cited by the ad hoc lender group there

20  is nothing we can do to solve the problem of their ongoing

21  dispute.  Right, this is a non-debtor third-party dispute

22  about what consideration they should be entitled to in the

23  NewCo capital structure.

24          It's not the case that they're not being given

25  consideration.  The requirement in the sale order and in the

1    APA is that this NewCo entity will be co-owned by the sponsor

2    and the prepetition lenders, again, for the benefit of all

3    prepetition lenders, not just this ad hoc group.

4            We have a declaration on file at Docket 713 from a

5    representative of the buyer representing that they have all

6    of the corporate authority necessary for the buyer to make

7    the reps in the asset purchase agreement that they have

8    sufficient wherewithal to close and to fund ongoing

9    commitments.  Again, this is supported by the debtor, the

10   credits committee, the buyer and the ad hoc lender group is

11   saying stop the sale, but they're not giving us a solution.

12   There is nothing that the court can do to solve for the

13   problem that they have with their co-investor.  So, this has

14   to be dealt with after the fact.

15           The alternative to the sale is likely an immediate

16   conversion of these cases to Chapter 7 to the detriment of

17   everyone including the ad hoc group where they will not only

18   get none of their equity consideration, but likely less.  So,

19   again, this attitude that we're getting a zero, everyone

20   should go down with us, that is simply not in the best

21   interest of these cases.  That is not consistent with the

22   objectives of the bankruptcy code.  Again, because there is

23   no solution that we can craft for their problem the debtors

24   are simply struggling to understand how we should hold a sale

25   up over this issue.

1          So, from our perspective, Your Honor, your sale

2  order is crystal clear, it trumps the prior lender, it

3  approved the APA and there is simply no condition in any of

4  those documents that there be a meeting of the minds between

5  the lenders and the sponsor with respect to take back debt

6  and equity.  There is a requirement that they co-own the

7  business.  It's been represented that they will have

8  ownership stake in the business.  If they're getting

9  consideration in NewCo how could it be for any reason other

10 than that, that they contributed the credit bid.  There is no

11 other consideration being put on the table by the ad hoc

12 lender group.

13         So, with that, Your Honor, we respectfully request

14 that injunctive relief is simply not appropriate and there is

15 no basis on the merits, it would harm the debtors, their

16 estates and all of the parties of interest in these cases.

17 We request that it be overruled.

18         THE COURT:  Okay.  Thank you, Ms. Greenblatt.

19         Does anyone else wish to be heard before I turn it

20 over for reply?

21    (No verbal response)

22         THE COURT:  Okay.  I did get a written response

23 from the committee which I have read.  I will turn it --

24    (Phone rings)

25         THE COURT:  Excuse me.

1          MR. DE LEO:  Your Honor?

2          THE COURT:  Yes.

3          MR. VAN AALTEN:  This is Seth Van Aalten from Cole

4  Schotz for the committee.  I was going to wait until after

5  the reply, but I'm happy to address the court now.

6          THE COURT:  Why would you wait until after the

7  reply?

8          MR. VAN AALTEN:  I don't know.

9          THE COURT:  Why would I give you the last shot?

10          MR. VAN AALTEN:  Your Honor, the committee did

11  file a joinder to the debtor's opposition to the TRO and that

12  was at Docket No. 715.  We are here today, Your Honor,

13  fundamentally to address, as Ms. Greenblatt said, inter

14  creditor issues among the term lender group and Peak.

15          Given the stakes, Your Honor, none of that can or

16  should stand in the way of a sale closing.  It is not only

17  necessary to preserve jobs in a go-forward business for our

18  constituents, Your Honor, but one that I think is needed

19  immediately without any interruption in order to fund this

20  business in the near term including December rent

21  obligations.

22          To be honest, Your Honor, I'm not sure how these

23  inter creditor issues managed to go unresolved through the

24  final DIP and sale hearings, each of which was predicated

25  collectively on bridge financing to a sale from the buyer

1   group and a credit bid from the lender group.  It's unusual,

2   I think, for these inter creditor issues to go unresolved to

3   this point, but it's also something, as the debtors indicated

4   in their reply that we had no insight into.  That is because

5   whatever inter creditor terms are ultimately reached between

6   the buyer and lender groups it's really no moment to our

7   constituents.

8         What was a moment for the committee, Your Honor,

9   was that the sale order be entered permitting the buyer group

10  to purchase the business and the lender group to supply its

11  credit bid to reach that result.  That is what the sale order

12  provides, Your Honor.  And all conditions to closing were

13  thereafter satisfied.

14        To be clear, we are in no way thrilled by the fact

15  that NewCo won't be capitalized to the extent of previous

16  representations including adequate assurance packages that

17  went out to landlords.  What we have heard from the landlord

18  community, and this isn't a one size fits all response, Your

19  Honor, it's a response that is unique to the facts and

20  circumstances of this case, and I think the commercial

21  environment we have all had to endure over the past year.

22        The response is that we can't let perfect be the

23  enemy of good.  We don't have a buyer that is willing to

24  recapitalize this business with $47 million.  We do have a

25  buyer that is willing to capitalize it with $5 million.  And

1  in view of the significant DIP financing that has already

2  been provided I think we have a buyer with quite a lot to

3  lose here were this business not to be adequately capitalized

4  moving forward.

5         It's not perfect.  It's not even what was

6  represented.  I am certain this would be a far greater issue,

7  Your Honor, in a more competitive commercial environment, but

8  under the circumstances of today, from the committee's

9  perspective it's good enough because there is no other buyer

10 here and there is no alternative to this transaction.  So,

11 Your Honor, we would respectfully request the denial of the

12 TRO motion.

13        I am happy to answer any questions Your Honor

14 might have.

15        THE COURT:  No. I have no questions, Mr. Van

16 Aalten.  Thank you very much.

17        MR. VAN AALTEN:  Thank you, Your Honor.

18        THE COURT:  Ms. Maloney, would you care to reply?

19        MS. MALONEY:  Thank you, Judge Sontchi.

20        It seems to be that the creditors committee and

21 also the debtors would have you exercise your authority to

22 achieve the equities of completing the sales transaction and

23 removing this company from bankruptcy, but to do that while

24 ignoring a negotiated sale order that you entered and which

25 provides certain protections and certain closing conditions

1  that have simply not been satisfied is not appropriate.  We

2  do not disagree with the argument that this closing should go

3  forward, but it should go forward under the terms that were

4  agreed to under the sale order.

5          This point that Ms. Greenblatt made is the same

6  point that was the same point that was made in the debtor's

7  opposition and that is this rhetorical question that if the

8  ad hoc group has not contributed the credit bid consideration

9  what is the basis of their equity stake in the NewCo.  It

10  seems to be that in the debtor's mind the ad hoc group

11  contributed its credit bid at the time the APA was signed.

12  Of course, we're not parties to the APA and I don't

13  understand in what scenario we would have given up that

14  valuable private property right in exchange for nothing

15  because we didn't.  The credit bid is conditioned on a number

16  of closing conditions that Peak simply has not met.

17          It can't be true that the ad hoc group has

18  committed its credit bid on behalf of a transaction that is

19  now being changed midstream due to this tortured reading of

20  Paragraph (x) of the sales order.  And, in fact, in the

21  debtor's objection they admit as much.  They say that the ad

22  hoc group has not yet received the equity in the NewCo.  That

23  is Paragraph 21 where it discusses the "contemplated equity."

24  Paragraph 7 where they say twenty percent of the equity in

25  NewCo is being reserved for distribution of the prepetition

1   lender.

2          Our only request here is that Your Honor clarify

3   for all of the parties that, in fact, there has to be a

4   contribution of the credit bid at the direction of the ad hoc

5   group by the agent in exchange for consideration.  That has

6   not happened yet.  The credit bid is not currently part of

7   the purchase price that is required under the APA.  That fact

8   is acknowledged in the declaration of Peak's CFO.

9          So, Your Honor, we really appreciate your time and

10  I certainly appreciate your willingness to let us brief this

11  issue on such short notice and over the holiday.  I am happy

12  to answer any questions that you may have.

13          Thank you.

14          THE COURT:  Thank you, Ms. Maloney.

15          Thank you everybody.  A couple, sort of,

16  preliminary comments and then I will get into the meat of it.

17          First, dealing with Mr. Buchbinder's observation

18  which was certainly not lost on me when I read the documents.

19  I sort of set this up like this, maybe inappropriately by

20  basically asking for a TRO in what has mostly turned into a

21  motion for reconsideration or clarification of an order as

22  opposed to an injunction.

23          The debtor -- excuse me, the movants have relied

24  on 105(a) which is a tricky section and one to be dealt with

25  very carefully, generally speaking, to seek some sort of

1  injunctive/clarification relief with regard to the issues

2  before the court.

3          You know, 105 is interesting, and I could spend

4  all day about this, but I'm not going to bore you with it

5  because this is, really, I think a preliminary matter that

6  doesn't ultimately effect what I am going to do.  It is there

7  to make it clear that this court has equitable powers, but

8  equitable powers require enabling statutes and rules, and

9  Federal Courts which have combined law and equity for well

10  over -- well, maybe not well over a century, but very close

11  make it clear when exercising the equitable powers for

12  injunctive relief you have the follow the federal rules.

13          The federal rules of civil procedure set forth in

14  Rule 65 set forth the rules governing that and that's been

15  incorporated by 7065 and, of course, 7001 says that if you

16  are seeking injunctive relief you need an adversary

17  proceeding.  So, I think it is actually inappropriate to

18  proceed under 105 under an equitable argument without

19  complying with the other rules that address injunctive relief

20  in the exercise of those equitable powers which are 7001 and

21  7005.

22          If you were seeking something like a more

23  traditional equitable remedy, say, out of restitution like in

24  accounting I don't think you would necessarily need an

25  adversary proceeding to seek an accounting.  Obviously, a

1  declaratory judgment, which is also a quasi-equitable remedy,

2  is also -- it requires an adversary proceeding because its

3  7001, it specifies. That is how many angels there are on the

4  head of a pin.

5          Since I teach a class in remedies at the local law

6  school I could talk a lot about this, but I'm not going to

7  talk about it anymore because I am going to ignore it because

8  ultimately I am going to rule in favor of the debtors and

9  it's moot.

10         It is -- we've sort of got a conundrum here and I

11  think -- well, not sort of.  We have a conundrum here and I

12  think the parties, to a certain extent, are talking past each

13  other based on the fact that we're in a situation that I

14  don't think the plain meaning of the sale order or the APA

15  contemplates which is the term lender refusing to make the

16  credit bid.

17         So, we're not starting from zero here.  We have to

18  go way back.  This is a transaction that has developed over

19  time and a lot of things have happened relying on this

20  transaction that have affected parties in interest and the

21  debtor, and have put us in a place to allow the prepetition -

22  - I'm just going to say to allow the term lenders not to

23  credit bid at this point in the case would be extremely

24  detrimental to the interest of the debtors, its creditors and

25  its parties in interest.  I think it would be inconsistent

1   with the documents and the behavior of the parties going

2   forward.

3         Clearly there is a dispute between, and I'll call

4   it, Peak and the term lenders over the capitalization of the

5   buyer.  There were certainly, I don't know if they were

6   representations, but there were statements.  Ms. Maloney

7   didn't get into this and I didn't invite her too, but I am

8   aware of this generally speaking from reading the documents

9   that this is a disappointing result for the term lenders in

10  their minds that the capitalization is so thin.

11        This is certainly a time that I would understand

12  being very concerned about capitalization being thin in a

13  business like this and really any business.  We've come a

14  long way down this road to get here and to pull the rug out

15  from under the debtors at this point, and the creditors, and

16  parties in interest based on a view between non-debtors over

17  the capitalization structure of the buyer using a refusal to

18  make a credit bid that is clearly contemplated under the

19  agreement, the mechanism for undoing the transaction I think

20  is inappropriate.

21        Clearly the credit bid has been contemplated from

22  day one.  And I believe that Ms. Maloney is correct that the

23  document reads that a credit bid has to be made by the buyer

24  and her position is that the term lenders have never

25  transferred to the buyer the right to make that credit bid.

1 There is some support, at least from the buyer, saying look,

2 yeah, I don't have that authority right now.

3           I think it's too late not to grant that authority.

4 I think that the sale order makes it clear that the

5 preliminaries, i.e. the transfer of the right to credit bid,

6 have already occurred and we're not awaiting that happening.

7 I think it's actually quite reasonable to reach the

8 resolution that this happened at the APA.  Of course, it

9 could be undone if the APA never closed, but this was a

10 fundamental part of the bid that was the stalking horse bid

11 that went out for competing bids, the auction was canceled,

12 court had a sale hearing, nobody objected, nobody raised this

13 issue, I entered an order, we're going to closing and now all

14 of a sudden the term lenders say we never gave the authority

15 for the buyer to credit bid, it's just too late.

16           It's not contrary to my reading of the documents.

17 If they have that authority not to make that contribution.  I

18 think the documents made it clear that that contribution

19 already -- and to the extent that it didn't already occur

20 pursuant to some sort of documents being exchanged among the

21 parties I deemed it as a matter of law and to the extent I

22 have to exercise equitable power here it did occur.

23           So, I am finding that the buyer has the authority

24 to credit bid.  You can go to closing and the buyer can

25 credit bid the debt.  I think that is consistent with the

1   documents.  It's certainly consistent with the course of

2   dealing.  It's consistent with the fact that we all went down

3   a long road here and spent a lot of money and bet the future

4   of this company.

5           I mean it's simply inequitable, too late to allow

6   the term lenders to pull that out from under the debtors and

7   not to give that authority for the credit bid.  So, I am

8   going to deny the motion.  I will have to figure the order

9   out a little bit.  I will put a finding in the order to the

10  effect that the court order, not a finding, but an order that

11  the court order that the credit right -- the right to credit

12  bid has been transferred to the buyer and the buyer has

13  authority to make that credit bid and the closing can go

14  forward.

15          MS. MALONEY:  Thank you, Your Honor.

16          THE COURT:  Thank you.

17          I will get that order as soon as I can.  We're

18  slow because of COVID, of course, but we will get it on the

19  docket as soon as possible.

20          Thank you everybody for your efforts. I truly

21  appreciate it.

22          Any final questions or comments before we turn

23  off?

24          MS. GREENBLATT:  Nothing from the debtor, Your

25  Honor.

1    THE COURT:  All right.  We're adjourned.  Have a

2  great day everybody.

3    (Proceedings concluded at 10:38 a.m.)

4

5

6    CERTIFICATE

7

8  I certify that the foregoing is a correct transcript from the

9  electronic sound recording of the proceedings in the above-

10  entitled matter.

11

/s/Mary Zajaczkowski                    December 9, 2020

12  Mary Zajaczkowski, CET**D-531

13

14

15

16

17

18

19

20

21

22

23

24

25