UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE: | . Chapter 11 |
|  | . |
|  | . Case No. 20-12168(CSS) |
| TOWN SPORTS INTERNATIONAL, | . |
| LLC, et al, | . |
|  | . 824 Market Street |
|  | . Wilmington, Delaware 19801 |
| Debtors. | . |
| . . . . . . . . . . . . . . . | . Monday, December 14, 2020 |

TRANSCRIPT OF TELEPHONIC HEARING RE:
DISCLOSURE STATEMENT APPROVAL AND PLAN CONFIRMATION
BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
CHIEF UNITED STATES BANKRUPTCY JUDGE

APPEARANCES VIA TELEPHONE:

| | |
|---|---|
| For the Debtors: | Robert S. Brady, Esq. |
| | Sean T. Greecher, Esq. |
| | YOUNG, CONAWAY, STARGATT |
| |  & TAYLOR, LLP |
| | |
| | Nicole L Greenblatt, Esq. |
| | Mark E. McKane, Esq. |
| | Joshua M. Altman, Esq. |
| | Derek I. Hunter, Esq. |
| | KIRKLAND & ELLIS, LLP |
| | |
| | Stuart Steinberg, Esq. |
| | STUART STEINBERG, PC |
| | |
| For the U.S. Trustee: | David L. Buchbinder, Esq. |
| | OFFICE OF THE U.S. TRUSTEE |

(Appearances Continued)

| | |
|---|---|
| Audio Operator: | Electronically Recorded |
| | by CourtCall and ECRO |
| | |
| Transcription Company: | Reliable |
| | 1007 N. Orange Street |
| | Wilmington, Delaware 19801 |
| | (302)654-8080 |
| | Email:  gmatthews@reliable-co.com |

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES VIA TELEPHONE:   (Continued)

For the Official Committee
of Unsecured Creditors:          Justin Alberto, Esq.
                                 Anthony De Leo, Esq.
                                 Jack Dougherty, Esq.
                                 Seth Van Aalten, Esq.
                                 COLE SCHOTZ, PC

For the District of
Columbia:                        Nancy Alper, Esq.
                                 OFFICE OF THE ATTORNEY GENERAL

For Shakir Yousif Farsakh:       Sarah M. Ennis, Esq.
                                 MORRIS JAMES, LLP

                                 Edward Averbuch, Esq.
                                 LEAV & STEINBERG, LLP

For Daxco:                       James B. Bailey, Esq.
                                 BRADLEY ARANT BOULT CUMMINGS, LLP

For Aetna Life Insurance:        Kate R. Buck, Esq.
                                 MCCARTER & ENGLISH, LLP

For Peak Credit, LLC:            Jeffrey Chubak, Esq.
                                 AMINI, LLC

For Kennedy Lewis Capitol
Partners Master Fund:            Mark D. Collins, Esq.
                                 Megan E. Kenney, Esq.
                                 RICHARD, LAYTON & FINGER, PA

                                 Kyle A. Lonergan, Esq.
                                 MCKOOL SMITH

For the Ad Hoc Group of
Term Lenders:                    Laura Davis Jones, Esq.
                                 James E. O'Neill, Esq.
                                 PACHULSKI, STANG, ZIEHL
                                  & JONES, LLP

                                 Mary Beth Maloney, Esq.
                                 GIBSON, DUNN & CRUTCHER, LLP

(Appearances Continued)

APPEARANCES VIA TELEPHONE:   (Continued)

For 429-441 86 St, LLC:      Matthew P. Ward, Esq.
                             WOMBLE BOND DICKINSON (US), LLP

                             Louis T. DeLucia, Esq.
                             Alyson M. Fielder, Esq.
                             Michael W. Ott, Esq.
                             ICE MILLER, LLP

For KRG Bayonne Urban
Renewal, LLC:                Mark L. Desgrosseilliers, Esq.
                             CHIPMAN, BROWN, CICERO
                              & COLE, LLP

                             James E. Morgan, Esq.
                             HOWARD & HOWARD ATTORNEYS, PLLC

For Oracle America, Inc.:    Amish R. Doshi, Esq.
                             DOSHI LEGAL GROUP, PC

For Motion Soft CSI:         Gregory Flasser, Esq.
                             BAYARD, PA

For 1221 Avenue Holdings,
LLC:                         Jason A. Gibson, Esq.
                             THE ROSNER LAW GROUP, LLC

                             Moshie Solomon, Esq.
                             GOLENBOCK EISEMAN ASSOR BELL
                              PESKOE, LLP

For Liberty Mutual:          Emily J. Holt, Esq.
                             CHOATE, HALL & STEWART, LLP

For Bank United:             Ericka Johnson, Esq.
                             WOMBLE BOND DICKINSON (US), LLP

For Blumenfeld Development
Group, LTD, et al:           Susan E. Kaufman, Esq.
                             LAW OFFICE OF SUSAN E.
                              KAUFMAN, LLC

For the Commonwealth of
Massachusetts:               Shennan Kavanagh, Esq.
                             OFFICE OF THE ATTORNEY GENERAL

For ASB:                     Robert Craig Martin, Esq.
                             DLA PIPER (US), LLP

(Appearances Continued)

APPEARANCES VIA TELEPHONE:   (Continued)

For Landmark Center Park
Drive, LLC, et al:          Vanessa V. Moody, Esq.
                            GOULSTON & STORRS, PC

For Federal Realty
Investment Trust:           Laurel D. Roglen, Esq.
                            BALLARD SPAHR, LLP

For 575 Lex Property
Owner:                      John Schneider, Esq.
                            LOWENSTEIN SANDLER, LLP

For Langston Retail, LLC,
et al:                      Lisa Solomon, Esq.

For Phillips
International:              Sean T. Wilson, Esq.
                            KELLEY, DRYE & WARREN, LLP

Also Appearing:            John Didonato
                            Laura Marcero
                            HURON CONSULTING GROUP

                            Stephanie Kjontvedt
                            EPIQ CORPORATE RESTRUCTURING, LLC

                            Jonathan Miller
                            FTI CONSULTING

                            Christopher Wilson
                            HOULIHAN LOKEY

INDEX

Page

PRESENTMENT/ARGUMENT BY MR. ALTMAN                    13

ARGUMENT RE:   OBJECTIONS
      By Mr. Buchbinder                              20
      By Ms. Kavanagh                                25
      By Mr. Averbuch                                33
      By Mr. Lonergan                                35
      By Mr. Greecher                                37
      By Mr. Van Aalten                              38
      By Mr. Altman                                  39

COMMENTS BY THE COURT                                43


EXHIBIT                                 IDENT.   EVID.

Didonato Declaration                                 11
Kjontvedt Declaration                                13

1          (Proceedings commence at 2:00 p.m.)

2               THE OPERATOR:  Recording has begun, we are now

3     live.

4               THE COURT:  Good afternoon, everybody.  This is

5     Judge Sontchi.  We're here in Town Sports, Case 20-12168.

6               Just a couple of quick matters, and I'll turn it

7     over to Mr. Altman on a day that's not a Friday, which is a

8     change.

9               All of the audio has been muted on Zoom, all of

10    your audio is through CourtCall.  Please mute your phones

11    when you are not speaking, that's very important, and try to

12    remember to un-mute them when you are speaking, which is also

13    important, but not as important as muting them in the first

14    place.

15              We are proceeding by Zoom, thank you for appearing

16    by Zoom.  Feel free to black out your screens, if you wish;

17    however, I do require that you have your screen and camera

18    turned on if you are addressing the Court or if you are

19    testifying, either through direct examination, introduction

20    of an affidavit, cross-examination, or a proffer, so that I

21    can make sure the witness is present.  If we have any

22    incidents, I will do my best to take care of them.  If I

23    can't resolve them, we will continue, but we'll do it by

24    CourtCall only, and we'll terminate the Zoom portion of the

25    hearing.

1    I think that pretty much takes care of it, and I'll

2    turn it over to Mr. Altman.

3    MR. ALTMAN:  Thank you, Your Honor.  Josh Altman of

4    Kirkland & Ellis on behalf of Town Sports International.

5    Your Honor, can you hear me okay?

6    THE COURT:  Yes, sir.

7    MR. ALTMAN:  Excellent.  Thank you.

8    Your Honor, the only item today on the agenda that

9    is up is approval of the debtors' disclosure statement on a

10   final basis and confirmation of the debtors' second amended

11   plan.  I'm just going to fix the screen here, Your Honor.

12   There we go.

13   Your Honor, with respect to evidence, the facts and

14   circumstances supporting confirmation of the plan are set

15   forth in -- first and primarily, in the declaration of John

16   Didonato filed at Docket Number 774.  Mr. Didonato is with us

17   on Zoom today.  I would ask that we move his declaration into

18   evidence.

19   THE COURT:  I don't see him.

20   MR. DIDONATO:  Your Honor, I am -- I apologize,

21   Your Honor.  John DiDonato.  I'm having difficulty with Zoom,

22   gaining access.  I will keep trying --

23   MR. BUCHBINDER:  Yeah, Your Honor, this is Dave

24   Buchbinder.  I have the same problem.  I keep getting an

25   invalid meeting ID.

1           MR. DIDONATO:  I do, as well.

2           THE COURT:  All right.  Well, then you might have

3   the wrong ID, so let's just make sure.  Give me just a

4   minute.  I'm doing this myself, so it takes a little longer,

5   so just give me a moment, please.

6        (Pause in proceedings)

7           THE COURT:  All right.  It should be Meeting 160

8   000 7545.  And the passcode is 237106.  We'll wait for a few

9   minutes.

10          MR. DIDONATO:  Your Honor, I had that instruction.

11  It actually said invalid before you get to that step, so I'm

12  going to restart my computer and attempt to get on.  I

13  apologize.

14          THE COURT:  It's okay.  We are going to wait --

15          UNIDENTIFIED:  John, check your -- John, check your

16  email, please.

17          MR. DIDONATO:  Yeah, I will.

18          MR. BUCHBINDER:  Your Honor, this is Dave

19  Buchbinder.  I've booted out and booted in twice and I've

20  used the original agenda and the amended agenda, and I get

21  the same problem every time.

22          THE COURT:  Huh.  Let me send you the link, Mr.

23  Buchbinder.  Do you have access to your work email?

24          MR. BUCHBINDER:  Yes, sir, I do.

25          THE COURT:  Okay.  I think I've got you in here.

1    After 15 years on the bench, if I haven't sent you and email

2    -- there you are, there we go.

3         MR. BUCHBINDER:  Let's see if there's someone else

4    -- let's see if it works this way.

5         THE COURT:  I'm sending you the email link, as

6    well.  That's the one right off my page as host.  We do have

7    33 people who made it on, so I'm not sure what the problem

8    is.

9         MR. BUCHBINDER:  Yeah.

10        (Pause in proceedings)

11        THE COURT:  Here you come.

12        (Pause in proceedings)

13        THE COURT:  All right.  Hello, Mr. Buchbinder.

14   Glad to have you.

15        Do we have the witness yet?

16        MR. DIDONATO:  I'm rebooting, Your Honor, and

17   hopefully we'll get there momentarily.  I apologize again.

18        THE COURT:  All right.  Certainly.  Look, if -- it

19   absolutely never ceases to amaze me that we're making this

20   all work for the last nine months, so this is nothing

21   compared to what I feared back in March.  So we will take our

22   time and get it done right.  It will give me a chance to read

23   the pile of documents that the debtors sent over 15 minutes

24   before the hearing.

25        MR. DIDONATO:  Your Honor, I apologize.  It's

1   coming up invalid meeting ID minus one in parenthesis.  I'll

2   keep trying, but --

3          THE COURT:  No, that's all right.  That's -- let's

4   do it this way.  Is there any objection to the witness

5   appearing solely by audio because of exigent circumstances,

6   for purposes of admission of his direct testimony by

7   affidavit and any supplemental direct or proffer or cross?

8          (No verbal response)

9          THE COURT:  All right.  I hear none.

10          I am going to allow that.  Generally speaking, I

11   really shouldn't, but I think, given the exigent

12   circumstances of the fact that we have 40 people on this call

13   ready to go forward with this hearing, an important hearing

14   for the debtor, and the gremlins of IT have struck, I am

15   going to allow it.

16          So, Mr. Altman, you can proceed as if your witness

17   were on the video.  I think, at that -- at this point, you

18   had offered his affidavit, I believe.  Wait, this might be

19   him.

20          MR. DIDONATO:  I might be able to -- I'll keep

21   trying, Your Honor (indiscernible)

22          THE COURT:  No, I think I see -- hang on.

23          MR. DIDONATO:  Okay.

24          THE COURT:  I'm letting you in.

25          MR. DIDONATO:  Okay.

1          THE COURT:  There you are, and you're sideways.

2          MR. DIDONATO:  Yeah, I made it.

3          THE COURT:  Perfect.  We'll take you --

4          MR. DIDONATO:  (Indiscernible)

5          THE COURT:  -- any way we can get you.

6          MR. DIDONATO:  I'll try getting --

7          THE COURT:  Don't touch anything.

8          MR. DIDONATO:  -- myself right-side up.

9          THE COURT:  No, no, no.

10          MR. DIDONATO:  Okay.

11          THE COURT:  Don't touch anything.

12          MR. DIDONATO:  All right.  All right.  Maybe I can

13   turn my computer sideways, Your Honor.  There we go.

14          THE COURT:  That's even better, now you're upside-

15   down.

16      (Laughter)

17          THE COURT:  All right.

18          MR. DIDONATO:  Thank you.  Thank you, Your Honor.

19          THE COURT:  You're welcome.

20          All right.  Our witness is here.  The -- any

21   objection to admission of the affidavit?

22      (No verbal response)

23          THE COURT:  It's admitted without objection.

24      (Didonato Declaration received in evidence)

25          THE COURT:  After all this, somebody really has to

1    ask him a question.  Does anybody wish to cross-examine the

2    witness?

3         (No verbal response)

4              THE COURT:  All right.  I hear none and I have no

5    questions.  So thank you very much.  And it's good to have

6    you here because it's good to follow the Federal Rules of

7    Evidence and the Federal Rule of Civil Procedure.  Very good.

8              Mr. Altman.

9              MR. ALTMAN:  Thank you, Your Honor.

10             Your Honor, the voting declaration of Ms. Kjontvedt

11   from Epiq Global Solutions was filed at Docket Number 775.

12   We do have -- as I'll address in just a moment -- a

13   supplemental declaration that is being worked on that will be

14   filed.  Not to steal the thunder from future me, but that

15   supplemental declaration is going to show that Class 4 did

16   vote to accept the plan.

17             For now, I propose that we move in the declaration

18   filed at 775.  And then, hopefully, that will be on file --

19   hopefully, the revised supplemental will be on file prior to

20   the end of the hearing, and we'll move that into evidence, as

21   well, at that time.

22             THE COURT:  All right.  And I see the witness here.

23             Any objection to the admission of the declaration?

24        (No verbal response)

25             THE COURT:  Okay.  I hear none.  It's admitted

1   without objection.

2         (Kjontvedt Declaration received in evidence)

3         THE COURT:  Does anyone wish to cross-examine the

4   witness?  Of course, all rights are reserved with the

5   supplemental declaration.

6         (No verbal response)

7         THE COURT:  I hear none, I have no questions.

8         MR. ALTMAN:  Thank you, Your Honor.

9         Your Honor, with respect to background, just to

10  level-set, we filed these cases 91 days ago, on September

11  14th.  If Your Honor recalls, we came in with a bit of a

12  messy situation.  We had two competing sale and DIP proposals

13  from different subsets of lenders, one that held a majority

14  of the term loan and one that did not.  We also had a

15  business that was obviously affected by COVID-19, in that it

16  was gyms, and people were not allowed into them or were

17  choosing to not go to them, for risk of COVID-19 infection.

18        As Your Honor is aware, we went with the group that

19  we've been calling the "term lender group" that held 50 --

20  more than 50 percent in amount.  And it was at that stage

21  that we really set out the deal and the settlement terms that

22  were the foundation of this case.  We implemented the going

23  concern sale and sold the business for an eighty-million-

24  dollar credit bid, along with an agreement by the purchaser

25  to provide $1 million to general unsecured creditors.  that

1    transaction saved over a thousand jobs, kept gyms open in the

2    company's main markets, and we believe was a good outcome for

3    all constituents.

4         After the committee was appointed, but prior to

5    solicitation, we resolved the committee's plan objections by

6    building in a non-released claims trust, resulting in a

7    global settlement with the committee, the debtors, and the

8    term lender group.  That non-released claims trust is with

9    respect to certain claims that were being brought by

10   Attorneys General in various states, so that the committee or

11   the liquidating trust could pursue those claims against

12   certain directors on a post-petition basis.  Those claims, or

13   at least the economic benefit of those claims or the economic

14   impact of those claims -- or the pre-petition claim because

15   all of the alleged wrongdoing or claims arose pre-petition.

16   And the committee filed a statement in support of the plan at

17   Docket Number 707, recommending all general unsecured

18   creditors to vote to accept the plan.

19        Your Honor, while the plan, at this stage, is, you

20   know, essentially a liquidation plan, I wanted to provide all

21   that background because what all the parties involved here

22   believe is that we did do a successful and complete a

23   successful going concern transaction in this case.  To that

24   end, I wanted to thank the various professionals that were

25   involved because that is no small feat in the current

1    situation:  The committee, represented by Mr. Van Aalten and

2    Mr. Alberto at Cole Schotz; Gibson Dunn, representing the

3    term lender group, Mr. Greenberg and Mr. Goldstein; DLA

4    Piper, who represented the purchaser Mr. Chesley and Mr.

5    Grant; and Mr. Chubak from Amini, LLC, who represented the

6    purchaser kind of in the closing stages.  We wanted to thank

7    all of them for their efforts getting us to where we are

8    today.

9         Your Honor, as we stand here today, as I alluded to

10   earlier, we did have an issue until about 45 minutes ago with

11   respect to Class 4 voting to accept and support the plan.

12   That -- what that issue was, we learned after filing our

13   brief, is that the lenders and Peak are still negotiating a

14   shareholders agreement.  So the lenders don't technically

15   have the 20 percent equity in the purchaser entity.  It was

16   that issue that was holding up them voting to support the

17   plan.

18        We included language at Paragraph 70, at Docket

19   Number 797, which is the revised form of order we filed just

20   a few moments ago you were alluding to.  That language

21   clarifies that the release in the plan is only as effective

22   as between the lender group and Class 4 and the purchaser and

23   DIP lenders after that equity is distributed and they've

24   reached a mutually agreeable shareholders agreement.  And the

25   release is otherwise effective as to all other parties.

1          With that, Your Honor, Mr. Goldstein, just

2     literally a minute or two before the hearing, sent over the

3     last ballots from members of his group that will, when put in

4     with all of the other ballots, show that we have a supporting

5     class by both numerosity and amount at Class 4 in all

6     debtors.  So that is going to resolve any issues with resent

7     to -- with respect to cramming up the Class 4 debtors and

8     will make today go, hopefully, a lot smoother, as soon as we

9     get that on file.

10          Your Honor, I just wanted to pause and ask if Your

11     Honor had any questions with respect to that issue.

12          THE COURT:  The last thing I'm going to do is ask

13     any questions about late-filed ballots in this case or any

14     other in the United States, but it sounds like it's a good

15     solution.

16          MR. ALTMAN:  Thank you, Your Honor.  And just to be

17     clear, we did accept all late-filed ballots; there's been no

18     picking and choosing on that front.

19          Your Honor, with respect to plan objections, as we

20     set out in the objection chart filed as Exhibit A to the

21     confirmation brief, we received very few substantive

22     objections.  And we believe that all of those, with the

23     exception of two objections from the United States Trustee,

24     have been resolved.

25          With respect to the unresolved UST issues, there

1    are two issues:  First is the inclusion of committee -- the

2    committee in the 9019 language, and the second is the debtor

3    being included as a released party, as that might implicate a

4    discharge.

5              I'll take the 9019 issue first.  I believe that

6    we've reached a resolution with Mr. Buchbinder and the United

7    States Trustee's Office by me just confirming on the record

8    that that settlement is with the committee.  That's the plain

9    language of what we wrote in the confirmation order.  We are

10   not saying that any individual creditor agreed to that,

11   although they did vote overwhelmingly in support of the plan.

12   But the actual 9019 is with the committee, who we, of course,

13   believe has the right to -- as a representative -- as an

14   estate fiduciary, has the ability to settle in this case.

15             With respect to the released party issue, Your

16   Honor, the crux of the argument, as we understand it, is that

17   the debtors are not entitled to a discharge under eleven

18   forty -- is that, because the debtors are not entitled to a

19   discharge under 1141, they can't be a released party as to a

20   consensual third-party release.

21             I'll note here that there was a very-late-filed

22   objection just about an hour ago from the Attorneys General

23   for Washington and Massachusetts, joining in the United

24   States Trustee's objection on this front.

25             Your Honor, we believe this is conflating issues.

1    We worked with Mr. Buchbinder prior to solicitation to remove

2    references from an 1141 -- with respect to an 1141 debtor

3    discharge, given that this plan is effectively a liquidation

4    plan.  That is a separate issue than if a third party chooses

5    to release the debtors as part of a consensual third-party

6    release.  That's their prerogative, that's their contract

7    right.  They could have opted out of the release; they chose

8    not to.

9         And the notion that third parties can't

10   consensually release debtors because the debtors are not

11   entitled to a discharge, frankly, misses the entire point of

12   a consensual third-party release.  Debtors have been included

13   as released parties in many plans confirmed by Your Honor and

14   in courts around the country.  I could list a ton of them, I

15   have several in front of me:  APC Automotive, Anna Holdings,

16   EB Energy, Charming Charlie, American Bank -- commonly

17   referred to as "Horsehead Holdings" -- those were just a few

18   in front of Your Honor in the last few years.

19        With that, Your Honor, we're going to respectfully

20   request that Your Honor overrules the United States Trustee's

21   objections, as we both -- we think that both of them, both of

22   the remaining objections, are not founded in law or find

23   support in the cases that Your Honor would find binding.

24        With respect to one other objection, Your Honor --

25   this is the objection filed at Docket Number 756, by the

landlord at the TSI Bayonne entity.  We have reached a
resolution with them.  It is a confirmation objection, but
it's really resolving their first omnibus rejection motion
and administrative claims motion they filed.

The resolution involves a post-petition rent
allowed administrative claim of $65,000 and payment within 5
business days of the effective date of a plan, an agreement
that the debtors can abandon property free and clear at their
-- at the leased premises.  And with respect to leased
treadmills at the property, the landlord is going to
cooperate in facilitating the retrieval of those treadmills;
or, alternatively, enter into an agreement with respect to
those treadmills.

We did file a revised confirmation order.  That
redline reflects, I believe, everything I just addressed, as
well as one revision -- or one modification in Paragraph 66
that was intended to address that we do not yet have the
Class 4 voting declaration on file.  And so we put in a
construct, whereby Your Honor can enter the confirmation
order, and then that declaration can prove to -- you know,
the filing of that declaration can implement the accepting
voting classes; or, alternatively, we can obviously wait
until that declaration is on file and then have the order
entered, and we'll remove that language at Paragraph 66.

Your Honor, with respect to the other 1129 factors

1    --

2            THE COURT:  Well, let's deal with the objections --

3    hang on.  Let's deal with the objections, Mr. Altman.

4            Mr. Buchbinder?

5            MR. ALTMAN:  Sounds great.

6            MR. BUCHBINDER:  Thank you, Your Honor.  Dave

7    Buchbinder on behalf of the U.S. Trustee.

8            I would agree that the remaining issues -- I would

9    go over them as twofold:  A, whether or not the debtor is

10   entitled to a discharge in a liquidating case; and B, whether

11   a debtor may be considered a released party for purposes of a

12   third-party release provision.

13           Let's start with Section 1141(d).  1141(d)(3)

14   specifically tells us how a non-individual debtor -- or how a

15   debtor receives a discharge in a Chapter 11 case, and it

16   reads:

17               "Except as otherwise provided in this subsection,

18               in the plan, or in the order confirming the plan,

19               the confirmation discharges the debtor from a debt

20               that arose" --

21           I'm going to skip (a) because I'll go to (d)(3):

22               "The confirmation of a plan does not discharge a

23               debtor if:

24               "(A) The plan provides for the liquidation of all

25               or substantially all of the property of the estate;

1        "(B) The debtor does not engage in business after

2        consummation of the plan;"

3        And:

4        "(C) The debtor would be denied a discharge under

5        Section 720(a) of this title if the case were a

6        case under Chapter 7 of this title."

7        Article 9.A of this plan is entitled "Final

8   Satisfaction of Claims and Termination of Interests" and

9   begins with the preamble, "To the maximum extent provided for

10  by Section 1141(d)."  Yes, the debtor removed the word

11  "discharge" from the substance of the text between the

12  original draft and the present draft, but did not change the

13  substance of the provision.

14       Section 1141(d)(3), let's work backwards through

15  it.  Would this debtor be entitled to a discharge if the case

16  were a Chapter 7?  No, the debtor would not because the

17  debtor is not an individual.

18       Second, did the debtor liquidate -- has the debtor

19  liquidated substantially all of its assets?  By admission, it

20  has.

21       Third, is the debtor going to engage in business

22  post-confirmation?  No, it is not.  It has admitted as much,

23  except to wind down the affairs of the estate, and that is

24  not sufficient to provide a discharge.

25       There is no provision in the Code to allow

1  creditors in a Chapter 11 liquidation plan, as opposed to

2  reorganization plan, a vote on whether or not the debtor gets

3  a discharge.  That is not one of the methods provided for by

4  Section 1141(d)(3).  And this debtor would not be entitled to

5  a discharge if the case were a Chapter 7 and creditors do not

6  get to vote on a discharge in a Chapter 7 case.

7       So that next raises the question of whether the

8  debtor can propose that creditors vote for a discharge

9  directly if they voted for the plan, or whether that can be

10  done indirectly in some way.

11      Let's deal first with the directly part.  Once

12  again, there's no provision for voting on it.  Section 105

13  does allow the debtor to propose provisions not inconsistent

14  with the Code.  Section 1123(b)(6) allows a plan to contain

15  provisions not inconsistent with the Code.  But proposing

16  that debtors can vote for a discharge in a liquidation plan

17  is not among the list of options provided for by the plain

18  language of the Code.

19      Recent Supreme Court history in commercial cases,

20  in the RadLAX case, and in consumer cases, in the Law v.

21  Siegal case, have unequivocally held that you can't do,

22  through indirection, what you can't do directly.  So you

23  can't use Section 1123(b)(6), and you can't use Section 105

24  to circumvent Section 1141(b)(3) or Section 727(a).  If it's

25  an issue that we haven't previously argued, it doesn't make

1    it carved in stone.

2           And the fact that counsel is contending that it

3    should have been raised at the disclosure statement stage?

4    Well, it was.  By agreement, everyone agreed it was a

5    confirmation issue.  And if that's not the case, then we have

6    to be resolving these matters at the disclosure statement

7    stage.

8           So let's move on to whether or not the debtor can

9    receive an indirect discharge.  One way is the debtors'

10   proposal that, gee, they got to vote for it.  But the plain

11   language of the Code doesn't permit that.

12          So now let's take -- next look at this:  Can the

13   debtor be a released party to benefit from a third-party

14   release clause?  Let's look at the genesis of third-party

15   release clauses.  They don't emanate because of the debtor;

16   they emanate because of nondebtors.  The entire bevy of

17   litigation and debate about third-party releases emanates

18   from Section 524(e) of the Code, which reads:

19               "Except as provided in Subsection (a)(3)" --

20               Which concerns itself with joint debtors in

21   individual cases.

22               "-- discharge of a debt of the debtor does not

23               affect the liability of any other entity on or the

24               property of any other entity for such debt."

25               Well, first of all, it should be rather obvious,

1    patent, and fundamental that the debtor is not a third party.

2    And to write your plan to simply define the debtor as if the

3    debtor were a released party, it's a fantasy.  It's as much a

4    fantasy as the loser of an election claiming to be the

5    winner.

6         So, by making the debtor a released party and

7    giving the creditors the opportunity to opt out or opt in, it

8    is, again, the equivalent of providing the debtor a discharge

9    in a way that the Code simply does not permit for the reasons

10   stated.  The Bankruptcy Code says what it means and it means

11   what it says.  It's improper to provide a debtor with a

12   discharge in a liquidating case.  Article 9.A should be

13   stricken and removed with a very simple paragraph that the

14   debtor is not entitled to a discharge, or 9.A simply be

15   removed.

16        With respect to the third-party release provision,

17   we have not objected to any other aspect of it that this

18   Court would, I think, consider deeply.  And if the word -- if

19   the debtors are removed from the definition of "released

20   parties," then the provision is acceptable.  Thank you, Your

21   Honor.

22        THE COURT:  You're welcome.

23        Does anyone else wish to be heard on this issue?

24        (No verbal response)

25        THE COURT:  All right.  Mr. Altman, reply?

1          MR. ALTMAN:  Yes, Your Honor.  Sorry, I'm just

2     having some technical difficulties myself here, Your Honor.

3          (Participants speak simultaneously)

4          UNIDENTIFIED:  It sounds like someone is speaking

5     through the Zoom from the Attorney General's Office of a

6     state that I didn't quite catch.

7          THE COURT:  I'm not hearing people.  We're not

8     hearing people through Zoom.

9          (Participants speak simultaneously)

10          (Participants confer)

11          MS. KAVANAGH:  Your Honor, this is Shennan Kavanagh

12     from the Massachusetts Attorney General's Office.  Can you

13     hear me?

14          THE COURT:  Yes, ma'am.

15          UNIDENTIFIED:  Go for it, Shennan.

16          MS. KAVANAGH:  Okay.  Nancy put together an

17     argument that I will read on her behalf.

18          Good afternoon, Your Honor.  Thank you for hearing

19     us.  My name is Shennan Kavanagh, I'm the Deputy Chief of the

20     Consumer Protection Division at the Massachusetts Attorney

21     General's Office.  And with me my CourtCall is my colleague

22     Sarah Petrie.  Also, from the District of Columbia's Attorney

23     General's Office, you have Nancy Alper, Senior Assistant

24     Attorney General.  And with her are Lindsay Marks and Naomi

25     Claxton, Assistant Attorneys General, representing the

1    District.

2          Due to the technological difficulties, I will

3    proceed.  Is that okay with you, Nancy?

4       (No verbal response)

5          MS. KAVANAGH:  Okay.  Thank you very much for

6    hearing us, Your Honor.  This morning, we filed a joinder to

7    the United States Trustee's objection of the confirmation of

8    the Chapter 11 plan for the same reasons that the U.S.

9    Trustee, Mr. Buchbinder, just articulated.  And if I might,

10   Your Honor, I will just review our argument with you.

11         Specifically, Your Honor, for the states and the

12   District, several states and the District of Columbia have

13   brought consumer protection actions in their own State Courts

14   against the debtors.  But the debtors' plan appears to be --

15   to use a term borrowed from the game Monopoly -- a "get out

16   of liability card," with respect to the exculpation and the

17   discharge and release provisions that the U.S. Trustee has

18   also objected to.

19         The plan has multiple provisions dealing with

20   releases and injunctions to protect the debtor and its

21   related parties -- including its officers, directors, and

22   managers -- from liability.  In essence, the Debtor TSI is

23   seeking a discharge of all potential liability for it and its

24   insiders.

25         As Section 9.A of the debtors' first amended joint

1    Chapter 11 plan provides:

2              "To the maximum extent provided for by Section 1141

3              of the Bankruptcy Code, and except as otherwise

4              specifically provided in the plan or in any

5              contract, instrument, or other agreement or

6              document created pursuant to the plan, the

7              distribution, rights, and treatments that are

8              provided in the plan shall be complete satisfaction

9              and release, effective as of the effective date, of

10             claims, interests, and causes of action of any

11             nature whatsoever."

12        Black-letter law, however, requires that such a

13   plan be denied confirmation on the grounds that a liquidating

14   corporate debtor is not entitled to a discharge.  Section

15   1141(d)(3) of the Bankruptcy Code makes clear that a

16   liquidating corporate debtor is not entitled to a discharge

17   in bankruptcy.  Section 1141(b)(3) of the Bankruptcy Code

18   provides, in pertinent part, that, quote:

19             "The confirmation of a plan does not discharge a

20             debtor if:

21             "(A) The plan provides for the liquidation of all

22             or substantially all of the property of the

23             estate;"

24             And:

25             "(B) The debtor does not engage in business after

1     consummation of the plan;"

2          Here, the debtor is not an individual.  It is a

3     corporate entity, which is ostensively liquidating its

4     assets, and which will not continue in business post-

5     confirmation.

6          In addition, Your Honor, the District and the

7     Commonwealth take the position that the Debtor TSI's plan was

8     filed in bad faith, in an attempt to avoid the outstanding

9     liability for which the District, the Commonwealth, and the

10    other states have filed consumer protection lawsuits.  In the

11    Attorneys General litigation, the states and the District of

12    Columbia uniformly have alleged the debtor has engaged in

13    false and misleading statements and misrepresentations

14    concerning members' rights to cancel their memberships, to

15    receive funds, and/or to transfer their memberships to gym

16    locations still open for business.

17         Membership dues and fees constitute the income

18    streams that provides Debtor TSI with the revenue necessary

19    for debtor to maintain its business operations.  As Debtor

20    TSI reported in its September 2020 filing with the Securities

21    and Exchange Commission, debtor needs this cash from its

22    operations to, quote, "fund the working capital needs of its

23    business."  By denying members their right to cancel or

24    modify their contract, debtor has received hundreds of

25    thousands of dollars in unearned revenue.

1          And Your Honor, this conduct of the debtor is

2     continuing to date.  The Offices of these Attorneys General

3     are receiving consumer complaints from constituents

4     complaining that, for example, they have either tried to

5     cancel their membership or are still being charged or that

6     they have to tried to transfer their memberships to locations

7     of the gym that are still open, but they are denied access.

8     The debtor is still charging them membership dues.

9          In Massachusetts, Your Honor, we have received over

10     2,000 complaints since April.  We've had 44 complaints come

11     in this month alone on these issues.  This is the highest

12     volume of consumer complaints in a short period of time that

13     we've received, that we've seen in recent history.

14     Accordingly, Your Honor, debtor is using unearned money to

15     fund its operation.

16          It should be noted, however, that, while debtor

17     continues to receive unearned revenue by illegally

18     maintaining club memberships, six days before it filed for

19     bankruptcy protection, the debtor entered into retention

20     agreements with two of its senior officers, including Patrick

21     Walsh, its CEO, who was paid $1.5 million by the debtor.  Mr.

22     Walsh has since left employment of the debtor in or around

23     October 15th.

24          I will note, also, Your Honor, that, during this

25     time period, at the end of September going through the middle

1    of October, Patrick Walsh and his bankruptcy attorneys

2    entered into an assurance of discontinuance with the

3    Commonwealth of Massachusetts to resolve these consumer

4    protection issues short of litigation, and then reneged on

5    the agreement after telling the Commonwealth that it was

6    going to move the Bankruptcy Court for approval of the

7    agreement.  And we were told that the lawyers that were

8    involved and the CEO Patrick Walsh were not, in any way,

9    armed with the authority to actually make the agreement that

10   it made with the Commonwealth.

11        And it was because of these settlement negotiations

12   and the agreement that we were promised that the Commonwealth

13   didn't sooner, with its colleague states, bring an objection

14   in this bankruptcy proceeding, either to the Chapter 11 plan

15   or the sale of the company to the new TSI.  And in fact,

16   Massachusetts didn't sue TSI until later, after TSI pulled

17   the carpet out from underneath us and reneged on the

18   agreement.

19        In addition, in the Chapter 11 plan, this theme

20   continues.  The debtor barely mention the Attorney General's

21   litigation.  As the District and the Commonwealth have set

22   forth in their objections, debtor in its plan makes no

23   mention of our litigation, other than in the definitional

24   section of the plan, which contains over 140 defined terms.

25   Meanwhile, the debtor continues to use the money from the

1    illegally maintained club memberships to fund the working

2    capital it needs to operate its business.

3         So, under Section 1129(a)(3) of the Bankruptcy

4    Code, a court shall not [sic] confirm a plan if, quote:

5         "-- the plan has been proposed in good faith and

6         not by any means forbidden by law."

7         The District and the Commonwealth maintain that the

8    Debtor TSI's plan was not proposed in good faith, that the

9    debtor failed to bring forth the involvement that it has had

10   in several -- with several State Attorneys General since it

11   filed for bankruptcy and before it filed for bankruptcy, and

12   it was not filed in good faith; and, therefore, the

13   confirmation of the plan must be denied.  Thank you, Your

14   Honor.

15        THE COURT:  What's your reason again for waiting

16   until the morning of the confirmation hearing to make an

17   appearance and do anything about these complaints you've been

18   hearing about since April?

19        MS. KAVANAGH:  Your Honor, we were relying on the

20   representations of bankruptcy counsel in this case.  I don't

21   -- I didn't see an announcement of the appearance of the

22   bankruptcy firm that we were speaking to.  The firms that

23   were speaking to us were the Olshan Frome Wolosky, LLP, and

24   Gordon Rees Scully Mansukhani.  And up until the very end of

25   October and into the beginning of November, we believed we

1    had an agreement with them, and that they were going to move

2    the Court to get approval from the Court in the bankruptcy

3    proceeding.

4         We have been told by various law firms that they

5    don't represent the debtors, that they don't have authority

6    to bind the debtor.  Everybody has been pointing their

7    fingers at each other, and we've been trying to work our way

8    through this long and lengthy bankruptcy proceeding to try to

9    figure out what is going on, who is in control, and who we

10   can speak to and how to be able to have a voice here.  So,

11   because we have not received clarity and commitments, it took

12   us a little while to figure out how to get involved, and we

13   do apologize for our belatedness.

14        THE COURT:  All right.  Does anyone -- thank you

15   very much.  And I apologize, Ms. Alper, I don't know what's

16   going on with regard to your connection.  So I'm glad that

17   your colleague was able to speak for you.

18        Does anyone else wish to be heard on these issues

19   before I turn it back to Mr. Altman for a reply?

20      (No verbal response)

21        THE COURT:  If you're trying to speak and I'm not

22   responding, just wave so I know where you are.  Yes, Mr.

23   Averbuch?

24        MR. AVERBUCH:  Your Honor (indiscernible) --

25        THE COURT:  Averbuch?

1          MR. AVERBUCH:  Yes, this is Edward Averbuch,

2     counsel for creditor Shakir Farsakh.

3          I'm not sure -- I got my audio working a bit late,

4     so I'm not sure if this would be an appropriate time to speak

5     in regards to my claim, or if this is just about the

6     Commonwealth of Massachusetts right now.

7          THE COURT:  Yeah, we'll get back to you.  Unless

8     your issue is related specifically to the discharge and the

9     release, we'll deal with you -- we will deal with you, of

10     course, but just not right this minute.

11          MR. AVERBUCH:  It is related to the release, but

12     obviously not with regard to the Commonwealth of

13     Massachusetts.  So I'll go back on mute, Your Honor.

14          THE COURT:  No, no, no.  Let me hear from you, let

15     me hear from you.

16          MR. AVERBUCH:  Okay.  Thank you.

17          My client is a personal injury plaintiff, and we

18     secured a verdict in his favor of $750,000 a little over a

19     year ago.  With interest, his claim is $823,000.  After the

20     verdict -- which, by the way, it was -- Town Sports was

21     represented by Gordon Rees.  They filed for -- they filed an

22     appeal.  And sometime throughout -- I think the appeal was

23     originally due in July, and they asked for an extension of

24     time.  They granted it.  And then, obviously, they filed for

25     bankruptcy.

1          I have a letter that I received from Kennedys,

2    which is the insurance company who -- which is the law firm

3    that represents the insurance company that insures Town

4    Sports, and I attached it as an exhibit to my objection,

5    which is Docket Number 764; the letter is 764-1.

6          In particular, that -- it states that Town Sports

7    refuses to tender the remaining portion of the five-hundred-

8    thousand-dollar self-insured retention contained in the

9    national casualty policy and relinquish control of its

10   defense in the underlying action; and therefore, the

11   insurance company denied coverage of this claim.

12         So I'm in the position here, where my client -- who

13   is severely injured -- has, it sounds like, very little

14   recourse in bankruptcy, if the plan is approved, because most

15   of his claim will be wiped out.  And there's now no insurance

16   coverage, through no fault of my client.  I believe that --

17   you know, and by the way, Your Honor, this letter is dated

18   July 9th, 2020, I think, you know, at a time when the debtor

19   certainly knew that this bankruptcy was impending.

20         I did reach out to counsel for the debtors in an

21   attempt to kind of work this out a little bit, and they

22   advised -- I was advised that they were not going to go back

23   to their insurance carrier and try and resolve this issue and

24   get coverage for my claim.  So, because of this, I would

25   request that, you know, this plan not be approved; or,

1    certainly, at least not with regard to my client's claim of

2    $823,000.

3         THE COURT:  Did you -- did your client vote in

4    connection with the plan?

5         MR. AVERBUCH:  We did not vote in.  And I believe

6    there was no affirmative vote required.

7         THE COURT:  Okay.

8         MR. AVERBUCH:  And so my understanding is we are

9    opted out.

10         THE COURT:  Okay.  All right.  A lot going on here.

11         Mr. Altman, if you could address, first -- oh, I'm

12    sorry.  Someone else.  Yes, mister -- I'm sorry --

13         MR. LONERGAN:  Yes, it's Kyle --

14         THE COURT:  -- Lonergan.

15         MR. LONERGAN:  -- Lonergan, Your Honor.

16         THE COURT:  Yep.  Not Anna Lonergan?  That might be

17    your spouse or --

18         MR. LONERGAN:  Yes, that's my wife's computer, it's

19    (indiscernible) but it's me, Kyle Lonergan, representing the

20    Kennedy Lewis parties in the proceeding, who are creditors

21    and pre-petition lenders.

22         And I only want to comment on these last-minute

23    changes to the confirmation order, which we had not seen

24    until now.  And so I'm looking at the blackline here on the

25    fly.  But you know, the one thing that I need to be sure of

1    is that my party -- my clients are opt-out parties, are not

2    releasing claims in connection with the plan.

3         And previously, the form of the confirmation order,

4    I believed was pretty clear about that, in having an Exhibit

5    B and identifying my clients and stating that,

6    notwithstanding anything in the confirmation order or the

7    plan, they -- my parties would not be considered opt-out

8    parties.

9         There's new language in the confirmation order,

10   talking about various releases that are going to take place

11   in connection with the transaction, the distribution of

12   equity that was just mentioned by debtors' counsel, and that

13   the receipt of that equity wouldn't constitute a release for

14   parties who have timely objected.  And then there's

15   discussion -- that's in Paragraph 70.

16        And then, in Paragraph 73, there's reference to a

17   resolution between various parties.  It's unclear to me if

18   there's a -- if there's a contention here that somehow my

19   clients are a party to that resolution, and whether they're

20   deemed to have released anything.

21        But the bottom line is the new confirmation doesn't

22   have an -- there's nothing listed on Exhibit B anymore.  I'm

23   not sure if those have been deleted or that's an oversight.

24   But I think the language needs to be clear in here, at least

25   with respect to my parties, the Kennedy Lewis parties, that

1      nothing in this confirmation order is releasing their claims

2      because they have validly and timely opted out.

3              And we're not going to have, you know, arguments

4      after the fact, about whether my clients validly or timely

5      did anything.  We just needed that to be clear.  We have an

6      agreement with the debtor about that, and I just don't want

7      there to be any ambiguity.  That's really it.

8              THE COURT:  All right.  No problem.

9          (Participants speak simultaneously)

10             THE COURT:  Thank you.

11             MR. VAN AALTEN:  Your Honor, this is Seth Van

12     Aalten for the committee.  May I be heard?

13             THE COURT:  Hang on.  Mr. Greecher wanted to -- Mr.

14     Greecher?

15             MR. VAN AALTEN:  Oh, okay.

16             MR. GREECHER:  Sorry.  I wanted to just clarify.

17     We did file a redline earlier today.  It did not include the

18     list of the opt-out parties.  But to counsel's point, the

19     opt-out party exhibit has not changed.  Kennedy Lewis Capital

20     Master -- Capital -- Kennedy Lewis Capital Partners Master

21     Fund, LP, and Kennedy Lewis Capital Partners Master Fund 2,

22     LP are both included on the Exhibit D of opt-out parties.

23             THE COURT:  Thank you, Mr. Greecher.

24             Yes, Mr. Van Aalten?

25             MR. VAN AALTEN:  Thank you, Your Honor.  For the

1    record, Seth Van Aalten from Cole Schotz, counsel to the

2    committee.

3        Your Honor, the committee supports confirmation of

4    the plan today.  We filed a statement to that effect at

5    Docket Number 707.  The plan incorporates our settlement,

6    Your Honor, with the debtors and the term lender group,

7    through which $1 million will be funded into the non-released

8    claims trust, for the purpose of investigating and then, if

9    appropriate, pursuing certain estate causes of action, to the

10    extent of available insurance.

11        And it's through that vehicle, Your Honor, where we

12    hope to furnish meaningful recoveries to unsecured creditors.

13    And that required concessions on the part of the debtors

14    through curtailments to certain release and injunction

15    provisions that were provided in the initial plan, as well as

16    from the term lender group, who agreed to remove its

17    approximately $87 million in deficiency claims from the

18    unsecured creditor pool.  That represented no less than 40

19    percent, and possibly as high as 80 percent of the unsecured

20    claims pool, Your Honor.

21        I did have a chance to read the late-filed joinder

22    to the U.S. Trustee's objection from the State AGs, Your

23    Honor.  The committee joins in the debtors' reply to these

24    objections.

25        With respect to the State AGs objection, these are

1   pre-petition claims against the debtors, and the claims that

2   the committee was very mindful in negotiating its settlement

3   with the debtors and the term lender group to provide for the

4   non-released claims trust, Your Honor.  It is the conduct

5   underlying the State AGs' claims that the non-released claims

6   trustee will be investigating and, if appropriate, commencing

7   litigation for the benefit of all unsecured creditors,

8   including customers, including personal injury claimants,

9   landlords, et cetera.  And consequently, Your Honor, the

10  committee does not view the plan as an attempt to disregard

11  the AG litigation.  It's certainly not an attempt to evade

12  liability.

13          This is, no doubt, the best possible result under

14  the circumstances, Your Honor, for the debtors' stakeholders.

15  The committee believes the debtors have satisfied all

16  requirements for confirmation of the amended plan today, and

17  I'd be happy to address any questions Your Honor may have.

18          THE COURT:  All right.  Thank you.  I'm trying to

19  deal with the objections, Mr. Van Aalten, that have been laid

20  before the Court.  All right?  We haven't even gotten to 1129

21  factors yet.

22          Mr. Altman, do you have any response?

23          MR. ALTMAN:  Yes, Your Honor.  I'm going to start

24  by saying this was an incredibly challenging case.  We sold

25  all of the company's remaining assets, and there is just a

very small amount left, and that amount was negotiated with

the lenders, it's a million dollars.  And as Mr. Van Aalten

said, the committee actively represented the interests of

unsecured creditors.

So, to the issue with -- raised by the Attorneys

Generals, these claims are not disappearing.  They're pre-

petition actions that give rise to pre-petition claims.

Parties were able to file pre-petition claims and would

preserve their right.  Their -- the recovery --

THE COURT:  Well, I heard --

MR. ALTMAN:  -- for those --

THE COURT:  -- allegations of post-petition

conduct.

MR. ALTMAN:  So we (indiscernible)

MS. KAVANAGH:  That's correct, Your Honor.  There

is post-petition conduct at issue here.

THE COURT:  All right.  Please don't interrupt.

I'll interrupt, but don't interrupt.  All right?  Mr. Altman

didn't interrupt you.

MR. ALTMAN:  Your Honor, with respect to the post-

petition conduct allegations -- I won't speak for Mr.

Didonato, he can testify to this -- but the company granted

$11.5 million in credits during the case, $850,000 in pre-

petition cash refunds, $1.8 million of chargebacks, which is

seven times their normal run rate -- "chargebacks," meaning a

1    credit card processor charged back an amount and the credit -

2    - the company honored that.  And right now, to the best of

3    the company's knowledge, there is no one that has requested a

4    refund that has not been provided for.  Your Honor, I'm not

5    trying to testify here.  Mr. Didonato is on.  Those are just

6    the facts that he will testify to.

7            The economic claims that are post-petition, to the

8    extent they are, they can be filed as administrative claims,

9    and they will be sorted out.  We don't believe there are any

10   administrative claims from this alleged misconduct.  And so

11   there is no additional incremental estimate for that in the

12   administrative claims pool because we believe that we have

13   spent -- I'm just rounding here -- but 12.5, 13 -- almost $15

14   million during the case for the benefit of parties that were

15   harmed during this time period.

16           With respect to the non-economic elements of the

17   Attorneys General's claims, the entity has been sold, so the

18   police and regulatory issues are now with purchaser.  To the

19   extent current purchaser is not following any laws, that is

20   not something that the debtor entity can have anything to do

21   with.

22           I believe the last main point that was raised kind

23   of encapsulating these issues is the discharge.  It's just

24   simply not a discharge, Your Honor.  Indy Downs is clear that

25   the release is (indiscernible) party contract, and parties

1    can contract.  Parties have the right to opt out.  We have an

2    opt-out list.  As counsel for Kennedy Lewis, you know,

3    explained, they did opt out.  We've actually been more

4    generous in this case with allowing people to opt out than in

5    most cases because of the circumstances.  Those parties that

6    sought to opt out did so by voting -- by reaching out to us

7    or objecting to the plan.

8             THE COURT:  You think you've been generous with

9    allowing people to opt out?  People have a right to opt out,

10   if they don't agree to the contract.  They are -- it's not a

11   consensual release.

12            MR. ALTMAN:  That's correct, Your Honor.  I

13   misspoke in terms of generosity.  With respect to time lines

14   and deadlines is what I was referring to.

15            THE COURT:  All right.  Well, let's deal with --

16   oh, I'm sorry.  I thought you were done.  I apologize.  Keep

17   going.

18            MR. ALTMAN:  Those -- I were just going to address

19   the other side issues, but we can handle those after this

20   one, if you want, Your Honor.

21            THE COURT:  No, no, no.  Why don't you give a full

22   response?

23            MR. ALTMAN:  So, with respect to -- I believe with

24   Mr. Averbuch, the personal injury plaintiff, it sounds like

25   everything he's alleging -- the letter, I heard, was I

1    believe July 9th, 2020.  That was obviously pre-petition.  To

2    the extent he filed a claim, it sounds like they did not

3    vote.  I'm not sure if they submitted a ballot to opt out.

4    If they did submit a ballot and elect to opt out, they would

5    be on the opt-out list.  But other than that, his -- it's

6    obviously a pre-petition injury, pre-petition damages, and

7    they can pursue the claims process and insurance, if they

8    want to seek to lift the injunction following confirmation.

9            As Mr. Greecher noted, with respect to Mr. Lonergan

10   and Kennedy Lewis, that was just a redlining issue.  The

11   Exhibit B will include Kennedy Lewis.

12           I believe I have addressed all of the issues, Your

13   Honor, that were raised, hopefully succinctly.  If I missed

14   anything, I reserve my right to go back to them.

15           THE COURT:  Okay.  Thank you.  Okay.  Thank you.

16           So let me just offer some comments and tell you

17   what we're going to do.  First of all, you know, Article 9 --

18   and I glanced at it as we were all having these discussions,

19   I'm certainly not as familiar with it as the parties --

20   appears -- I mean, it clearly, as revised, doesn't say

21   discharged.  But it says, to the extent possible, under the

22   discharge provision.

23           I don't quite see the point in invoking the statute

24   -- invoking a section of the statute (indiscernible) that

25   gives a discharge or says when you can't get a discharge if

1    you're clearly not entitled to a discharged.  Now I'm not

2    actually sure you're not clearly entitled to a discharge, but

3    I'm a little worried that the language in there might

4    preserve the right for debtors' successors or -- well,

5    debtors' successors to argue they did get a discharge and --

6    based on the fact that this language is still in the order.

7    So I kind of want to throw that out there.

8           I don't have, generally, a problem with somebody

9    saying, you know, to the extent a -- to the extent -- to the

10   greatest extent under applicable law, I'm granted a release.

11   And then we can negotiate -- we can litigate, if we have to,

12   20 years down the line, what the "greatest extent of

13   applicable law" means.  And 9,999 time out of 10,000, that

14   never happens.  But I am a little worried about putting

15   something in there that invokes a section that, at least

16   facially, doesn't appear to even be applicable.

17          With regard to consensual releases, I'm actually --

18   I have to say -- well, "offended" is the wrong word -- but

19   taken aback by this argument that people cannot consent to

20   give another party a release because the Code doesn't give a

21   discharge.  I don't care what the Code gives.  Individuals

22   have a right to contract, they have a constitutional right to

23   contract.  And if they want to contract in a way that allows

24   them to give a release, that's up to them.  It's not my job

25   to make sure that they're not giving away what they didn't

1    have to give away in the first place.

2          Now, using the mechanisms of the Bankruptcy Code as

3    a vehicle to achieving that release, that -- it's -- that

4    might be a little trickier, and I think maybe that's the

5    point of the argument.  It's not that people don't have the

6    right to contract and give a release, but it's that we

7    shouldn't invoke, you know, the plan mechanism to provide for

8    that release when there's not going to be a discharge.  I

9    think that's a tenuous argument.  It's the only argument, I

10   think, that holds any water at all, possibly, under Mr.

11   Buchbinder's approach, and his other government, you know,

12   colleagues.

13         I am very worried about the allegations of the

14   Attorneys General today with regard to both pre, but more

15   importantly post-petition activity, and misrepresentations,

16   perhaps, by parties that they had the right to bind the

17   debtors while they were speaking to the Government.  To say

18   that's serious is quite the understatement.

19         So -- and of course, I'm -- not -- well, I'm a

20   little flummoxed by the late appearance.  But it is what it

21   is, as my colleague Judge Shannon likes to say.  It is what

22   it is, we are where we are, let's eat lunch.  We're not going

23   to eat lunch, but we are going to do something because I

24   don't like where we are and I don't like what it is.  So

25   we're going to need some time to figure this thing out.  And

1    also, I want to think about it, frankly, in the context of

2    Mr. Buchbinder and the Attorneys General's objection.

3         Now with regard to the personal injury claimant,

4    I'm a little -- sort of little -- I don't know quite what to

5    do with it.  It's clearly a pre-petition claim.  You might

6    have a claim against the insurance company, you might have a

7    claim against the debtor.  If you have a claim against the

8    debtor, it's a pre-petition unsecured claim.  And if you got

9    notice of the bar date, you needed to -- well, excuse me, not

10   the -- yeah -- no, excuse me, not the bar date.  If you got

11   notice of the confirmation, you needed to do something.

12        Now you did object.  I don't know about voting.  Of

13   course, you're not constitutionally required to vote.  You

14   don't have to vote if you don't want to vote.  But if you

15   want to opt out, the way this all works, you need to take

16   some sort of affirmative action to opt out.  So, if you

17   haven't opted out, it may be the case that your client is

18   potentially in a position where he or she -- and I apologize,

19   I don't know your client's gender.  It doesn't really --

20        MR. AVERBUCH:  He.

21        THE COURT:  -- but -- he -- whether he may have --

22   he may have waived that claim, but we're not going to deal

23   with that.

24        So here's what we are going to do because there are

25   a couple of things going on here.  There are some latecomers

1  that need to be engaged.  There needs to be some due

2  diligence done by the debtors on what exactly happened or

3  they alleged -- was alleged to have happened.  And I think

4  there needs to be some negotiation.  And I'm speaking about,

5  specifically, the Attorneys General, a little less Mr.

6  Buchbinder, and maybe even a little more less Mr. Averbuch.

7         It sounds like, Mr. Lonergan, that your issues --

8  and I know the frustration of getting a last-minute redline.

9  I'm sure it's not the first one you've ever received, but it

10  sounds like your issues are preserved.

11         What I'd like to do -- and we may -- there may be

12  more we can do before this hearing is over, I'm not saying

13  the hearing is over.  But these issues are going to get

14  continued, which means this portion of confirmation at least

15  is going to get continued, to allow me to think more

16  carefully on the issues, and hopefully, you guys to try to

17  figure out a path forward on a consensual basis.  But if you

18  don't, you don't, and I'll make my rulings.

19         I haven't even -- you know, look, I haven't even

20  read the Attorneys General's objections, so I'm just acting

21  off of what I heard orally, or I guess aurally -- a-u-r-a-l-

22  l-y.

23         Thursday, at -- well, I hate to do this to Mr.

24  McKane on the west coast, but Thursday, at 9:30 would work

25  the best for me.  I have a very full day that day, but if we

1    start early, or what I consider early, I think we'll be all

2    right.  Now I know this might mess with -- does this mess

3    with -- hang on.  I'm putting it on my calendar, so I don't

4    forget what I just said.

5            To the extent this messes with any deadlines or,

6    you know -- I'm not -- my head is not coming up with the

7    word, but the things lenders -- milestones.  To the extent

8    this disagrees with any or interferes with any milestones, I

9    don't know what to say.  That's just going to have to be what

10   it is.  It's only three days, so ... all right.  So that's

11   all preserved.

12           MR. ALTMAN:  Your Honor --

13           THE COURT:  And Mr. Altman, you're going to -- or

14   your coll -- some of your colleagues are going to engage, I

15   hope, with all the people we were speaking with, maybe

16   further with Mr. Buchbinder, further with the Attorneys

17   General, and further with Mr. Averbuch, and we'll see what we

18   have.

19           MR. ALTMAN:  Yes, Your Honor.

20           THE COURT:  And if you don't reach an agreement,

21   that's fine, I'll make the decision.  But I'll be more

22   prepared to make a decision on Thursday.

23           MR. ALTMAN:  Yes, Your Honor.  My email is on all

24   of the pleadings, so if the Attorneys General group wants to

25   shoot an email to Ms. Greenblatt and myself, we will set up a

1      call this afternoon.

2              (Participants speak simultaneously)

3              THE COURT:  Hang on, hang on.  Mr. Buchbinder, yes.

4      I think I heard your voice, did I note?

5              MR. BUCHBINDER:  This is Dave Buchbinder.  I was

6      actually not speaking, Your Honor.

7              THE COURT:  Oh, all right.

8              MR. BUCHBINDER:  Thank you.

9              (Participants speak simultaneously)

10             THE COURT:  I don't know what -- I don't know what

11     that's like.

12             (Laughter)

13             (Participants speak simultaneously)

14             THE COURT:  Hang on, hang on, hang on.  Yes, Mr.

15     Lonergan.

16             MR. LONERGAN:  Yes, just quickly.  Listen, I'm

17     happy to hear we're still on Exhibit B and that it still

18     exists.  There are these new -- and I appreciate that things

19     get done at the last minute in these proceedings.  I just --

20     I do want to be part of the continued engagement with the

21     debtor, just about the new language, just to make sure that

22     we can get comfort that, you know, our rights are being

23     preserved and we are opted out of the releases.  But I think

24     it will be easy to do.  I would like to use that time you're

25     giving us to do that.

1          MR. ALTMAN:  Your Honor, we'll make sure to call

2     Mr. Lonergan and coordinate.

3          MR. LONERGAN:  Thank you.

4          MR. CHUBAK:  Your Honor, this is Jeffrey Chubak of

5     Amini, LLC, on behalf of Peak Credit.

6          We second the concerns (indiscernible) and we're

7     hopeful that it will reach agreement (indiscernible) also

8     (indiscernible) confirmation hearing and have an issue with

9     some of the terms articulated that the release be

10    conditioned, entry into a mutually agreeable (indiscernible)

11    agreement (indiscernible) equity is (indiscernible)

12    referenced (indiscernible) equity to the pre-petition

13    lenders, as indicated in the declaration, but do believe that

14    it should -- that the release should be conditioned on entry

15    into a shareholders agreement (indiscernible) Gibson Dunn in

16    its absolute discretion.

17         We've actually (indiscernible) advised Gibson Dunn

18    that we are going to providing a draft.  I -- Your Honor, I

19    see that there's -- I'm raising --

20         THE COURT:  Well, I'm --

21         MR. CHUBAK:  -- this issue because

22         THE COURT:  First of all, I'm having a hard time

23    hearing you.  But second of all -- who do you represent

24    again?

25         MR. CHUBAK:  Peak Credit, LLC, which is --

1          THE COURT:  You're the buyer.

2          MR. CHUBAK:  -- (indiscernible) owner.  Yes.

3          THE COURT:  All right.  So you're not an objector.

4          MR. CHUBAK:  There are provisions in the

5   confirmation order that affect us, and we learned that was

6   added 15 minutes before the hearing.

7          THE COURT: All right.  All right.  Well, I have --

8          MR. CHUBAK:  (Indiscernible) put it over.

9          THE COURT:  Yeah, absolutely, absolutely.  Not a

10  problem.

11         Is there anything else, Mr. Altman?  I don't

12  require you to go through the 1129 factors, you know, you

13  filed your memo, so that's more than enough.  I think the --

14         MR. ALTMAN:  That's all --

15         THE COURT:  -- open issue --

16         MR. ALTMAN:  -- I was going to say, Your Honor.

17         THE COURT:  Okay.  So I think the open issues for

18  Thursday are, I guess, the unresolved objections or comments

19  from Mr. Averbuch's client, Mr. Chubak's client, Mr.

20  Lonergan's client, and the Attorneys General and Mr.

21  Buchbinder.  And of course any changes you've made to the

22  order right before the hearing, I think parties should have a

23  fair opportunity to comment on and object to, if they think

24  it's appropriate.

25         And maybe you'll be able to work these all out; if

1    not, I'm going to spend some time, probably tonight,

2    actually, getting up to speed.  I'm going to read the

3    objections again because it's an interesting issue.  If I can

4    stomach it, I'll read Indianapolis Downs again.  But that's

5    kind of where I'd like to go.  Does that sound okay to you?

6    I guess you don't really have a choice, you need to say yes.

7         (Laughter)

8              MR. ALTMAN:  Your Honor, that is a -- that is a

9    great solution for us.

10             THE COURT:  All right.  Anything further for today?

11   I think that was the only motion on, if I -- the only item on

12   the agenda.

13             MR. ALTMAN:  That's right, Your Honor.  Everything

14   else was resolved, including the cure objections --

15             THE COURT:  Yes, I say that.

16             MR. ALTMAN:  -- I believe (indiscernible)

17             THE COURT:  Thank you very much.  And Mr. Greecher,

18   thank you for your update over the weekend, that was very

19   helpful.

20             MR. GREECHER:  Of course, Your Honor.

21             THE COURT:  (Indiscernible)

22             MR. GREECHER:  And if I could, Your Honor --

23             THE COURT:  Sorry to contact you so late.

24             MR. GREECHER:  I'm always available for Your Honor.

25             One question -- or one note just as to Mr.

1    Averbuch's client.  Again, apologies for not including the

2    exhibit list with the redline line that we filed this

3    afternoon.  But Mr. Farsakh is included on the list of the

4    opt-out parties, so I think that that should assuage the

5    concern with Mr. Averbuch that they are a non-released/non-

6    releasing party under the plan.

7            THE COURT:  Okay.  Well, engage in a conversation,

8    but that's good to hear.

9            For Thursday, we're going to use the same Zoom

10   information -- sorry, Mr. Didonato -- the same ID and same

11   passcode.  All right.

12           Thank you.  We're adjourned.

13           COUNSEL:  Thank you, Your Honor.  Thank you, Judge.

14   Thank you, Your Honor.

15       (Proceedings adjourned to 12/17/20)

16       (Concluded at 3:10 p.m.)

17                              *****

1

CERTIFICATION

2        I certify that the foregoing is a correct

3   transcript from the electronic sound recording of the

4   proceedings in the above-entitled matter to the best of my

5   knowledge and ability.

6

7

8

9

10

11   _____        December 15, 2020

12   Coleen Rand, AAERT Cert. No. 341

13   Certified Court Transcriptionist

14   For Reliable