# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>TOWN SPORTS INTERNATIONAL, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-12168 (CSS)<br><br>(Jointly Administered) |

**SUPPLEMENTAL DECLARATION OF JOHN C. DIDONATO IN SUPPORT OF CONFIRMATION OF THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF TOWN SPORTS INTERNATIONAL, LLC AND ITS AFFILIATED DEBTORS PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

I, John C. DiDonato, hereby declare that the following is true to the best of my knowledge, information, and belief:[2]

1. I am a Managing Director of Huron Consulting Services LLC ("Huron"), a financial consulting firm that specializes in, among other things, bankruptcy and restructuring consulting, interim management, and financial and operational consulting to financially troubled companies. Huron has been assisting the above-captioned debtors and debtors in possession (collectively, the "Debtors") since around September 24, 2020, and I was appointed Chief Restructuring Officer ("CRO") on September 29, 2020. Additional information regarding my background and qualifications is set forth in the *Declaration of John C. DiDonato in Support of Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and*

---

[1] The last four digits of Town Sports International, LLC's federal tax identification number are 7365. The mailing address for Town Sports International, LLC is 399 Executive Boulevard, Elmsford, New York 10523. Due to the large number of debtors in these jointly-administered cases a complete list of the Debtors, the last four digits of their federal tax identification numbers, and their addresses may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/TownSports, or by contacting the undersigned counsel for the Debtors.

[2] Capitalized terms used but not defined herein have the meaning ascribed to such terms in the Plan, Asset Purchase Agreement, or the Confirmation Order, as applicable.

*Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lenders, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 155].

2.  In my capacity as CRO, I am very familiar with the above-captioned Debtors' day-to-day operations, business affairs, and books and records, as well as the Debtors' restructuring efforts.[3] As CRO, I oversaw all aspects of the Debtors' restructuring. In my capacity as CRO, I report to the Debtors' board of directors, which consists only of two independent directors. *See* First Day Declaration ¶ 33.

3.  I submitted the *Declaration of John C. DiDonato in Support of Confirmation of the Second Amended Joint Chapter 11 Plan of Town Sports International, LLC and Its Affiliated Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 774] (the "Original Declaration"). Approximately one hour prior to the Confirmation Hearing, attorneys general for the District of Columbia (the "District") and the Commonwealth of Massachusetts (the "Commonwealth") filed the *Joinder of the District of Columbia and the Commonwealth of Massachusetts to the United States Trustee's Objection to Confirmation of the First Amended Joint Chapter 11 Plan of Town Sports International, LLC and Its Debtor Affiliates* [Docket No. 795] (the "Joinder"). Accordingly, I file this supplemental declaration (the "Supplemental Declaration") in response to the Joinder, including to correct the record with respect to certain statements in my view that required further clarification regarding postpetition conduct by the Debtors or their restructuring professionals, and to clarify the record and provide addition support

---

[3] A detailed description of the Debtors and their business, including the facts and circumstances supporting the Debtors' chapter 11 cases, is set forth in greater detail in the *Declaration of Phillip Juhan in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 12] (the "First Day Declaration") filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on September 14, 2020 (the "Petition Date").

2

for Confirmation. At all times, I believe the Debtors and Debtors' professionals conducted themselves in good faith and in the best interest of the estates, including with respect to the Plan Confirmation process.

4. All statements in this Supplemental Declaration are based on: (a) my personal knowledge of the Debtors' business operations, my review of relevant information provided to me by other members of the Debtors' management and the Debtors' professional advisors, including Kirkland & Ellis LLP ("K&E"), Young Conaway Stargatt & Taylor LLP ("Young Conaway"), and Houlihan Lokey Capital, Inc. ("Houlihan"); (b) my opinion based upon my experience, knowledge, and information concerning the Debtors' operations; and (c) my review of relevant documents. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

**DIP Sizing; Use of Funds for Consumer Claims**

5. Huron was retained by the Debtors ten days after the Petition Date. One of the first orders of business upon my appointment as CRO was to develop a DIP budget. When Huron was retained, the funding need for the case was thought to be less than $20 million. The final actual DIP that was funded totaled in excess of $38 million. Approximately $15 million of that difference was to account for estimates of increased chargebacks,[4] credits, and refunds that I determined would likely become due to customers on account of certain prepetition conduct. I was generally aware of the ongoing attorney general litigation or other consumer class actions in various jurisdictions, including the District and the Commonwealth. Specifically, customers and various attorneys general asserted that the Debtors improperly billed customers during the first few months

---

[4] A "chargeback" is when a customer disputes a charge with the company's credit card processor and the credit card processor refunds the customer. Given customer complaints and pending Attorney General Litigation, the Debtors' credit card processors were holding reserves of approximately $10 million to cover chargebacks, impairing the Debtors' liquidity.

of the COVID-19 pandemic when gyms were closed. Although the Debtors secured relief to honor refund and credit obligations in the Customer Programs Order [Docket No. 61], negotiations with the DIP lenders to secure incremental funding for these claims was extremely challenging given the circumstances. Ultimately, the DIP lenders, as a prospective purchaser, agreed to continue honoring the refund and credit programs in order to maintain customer loyalty in a competitive market.

6. My estimates of the incremental DIP need turned out to be accurate. The Debtors have issued more than $14 million in customer refunds or credits during the chapter 11 cases as follows:

- **$11.5 million**. In response to complaints that customers were improperly billed for the period when clubs were closed from mid-March through the end of April, the Debtors provided $11.5 million worth of credits to then-current members for the billing periods from October 1 through November 15, 2020. Customers that received cash refunds, as described below, also received this credit if they were still members.

- **$1.8 million**. Customers initiated approximately $1.8 million in chargebacks in the postpetition period with credit card processors. This is approximately 7 times the normal charge back rate. The Debtors did not bill or seek to collect any amounts from customers who requested chargebacks.

- **$847,000**. Pursuant to the Customer Programs Order [Docket No. 61], the Debtors honored all refund requests that were made (whether such request was made prepetition or postpetition) in any manner (by email, phone call, or in person). Such amounts were paid directly to customers.

7. All told, these amounts cover approximately 170,000 individuals. Approximately, $6 million is attributable to members in Massachusetts and the District of Columbia. As of the date hereof, approximately 70,180 refunds, credits, or chargebacks had been processed or were in process for members in Massachusetts. This amount is approximately 86% of the Debtors' total membership in Massachusetts. As of the date hereof, approximately 8,294 refunds, credits, or chargebacks had been processed or were in process for members in the District of Columbia. This amount is approximately 95.1% of the Debtors' total membership in the District of Columbia.

8. I am only aware of approximately 160 members who have requested, but not received, a refund. In all such instances, the members have not responded to the Debtors' efforts to reach them, which is necessary to correct errors in information preventing the refund from being processed (such as an expired credit card).

**Cancellation Policy**

9. One of the other issues raised by the attorneys general was with respect to the Debtors' cancellation policy. Specifically, the attorneys general asserted that under certain state laws, given the change in circumstances resulting from COVID-19, the Debtors' cancellation policy needed to be modified. On October 8, 2020, the Debtors updated their cancellation policy to allow for immediate cancellation (no prior notice or waiting period) for any reason without any cancellation charges. Members may cancel their memberships, or request a refund, in person, on the phone, or through email. I understand that this is what the attorneys general requested in the underlying litigation.

**Assumption of Customer Liabilities by Purchaser for Ongoing Operations**

10. In connection with the sale of the Debtors' assets, I worked with the Debtors' other professional advisors to ensure that the Debtors' members were treated appropriately. Where clubs were closed, the Debtors endeavored to transfer members to clubs that would remain open or to provide the members a refund or allow them to cancel their memberships. As part of the sale negotiations, the Debtors insisted that the Purchaser assume the Debtors' customer-related obligations. Accordingly, under the Asset Purchase Agreement, the Purchaser's "Assumed Liabilities" included "(c) all (i) shop or customer credits, sales promotions, rebates, coupons, gift cards and certificates or (ii) returns of Merchandise, customer prepayments and overpayments, customer refunds, credits, reimbursements and related adjustments with respect to Merchandise"

to the extent that such liabilities were not paid prior to closing.  *See* Plan Supplement, Ex. D § 1.1 [Docket No. 706].

11.     The sale closed on November 30, 2020.  The Debtors no longer control the operating business and have no ability to influence the Purchaser's business decisions or operations.  It is my understanding that the Purchaser now needs to comply with any applicable law.  To the extent they are not, it is my understanding that any applicable regulatory authority may seek to enforce applicable laws in the ordinary course.

**Plan Provisions:  Non-Released Claims Trust and Exculpation**

12.     Following extensive, good-faith negotiations with the Committee[5] and the Purchaser, the Plan also provides for the Non-Released Claims Trust to pursue the same or similar causes of actions as raised by the attorneys general.  *See generally* Plan Art. VIII.[6]  Accordingly, to the extent the attorneys general or any individual creditor has a valid prepetition claim against the estates not otherwise addressed postpetition or assumed by the Purchaser, such claim will recover as a Class 5 creditor under the Plan.

13.     Additionally, the Debtors negotiated for a $1.0 million payment from the Purchaser for the benefit of holders of unsecured claims, and the Non-Released Claims Trust may be able to increase recovery to such holders by pursuing the Non-Released Claims Trust Causes of Action.

---

[5]  On September 24, 2020, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Committee") [Docket No. 98] to represent the interests of all unsecured creditors.  Two class-action plaintiffs serve as members of the Committee.

[6]  The Non-Released Claims Trust Causes of Action are defined as "any Causes of Action that the Debtors or their Estates may have that are based on or related to the facts and circumstances giving rise to the Attorney General Litigation; *provided that* Non-Released Claims Trust Causes of Action shall not include any Claims or Causes of Action against any of the Independent Directors or any of the Chief Restructuring Officers." Plan Art. I.A.71.  And the Attorney General Litigation is defined "those certain complaints and lawsuits brought by the Attorneys General in Massachusetts, New York, Washington D.C., Pennsylvania, and Rhode Island asserting, among other complaints, certain alleged unlawful membership cancellations and continued collection of membership fees during prepetition COVID-related closures of gym facilities."  Plan Art. I.A.9.

Any recoveries will inure to the benefit of all unsecured creditors. Significantly, the Plan provides for funding for the Non-Released Claims Trust to pursue such claims. If the Plan is not confirmed, I do not foresee how creditors could easily organize to pursue those claims, and the value of this negotiated trust would be lost.

14. I further understand that the exculpation provision in Article IX.E of the Plan specifically excludes "the Non-Released Claims Trust Causes of Action and actions determined by Final Order to have constituted actual fraud or gross negligence . . . ." Accordingly, the Plan's exculpation provision does not exculpate the Exculpated Parties for fraud.

15. The Plan also provides for the satisfaction of any valid administrative-expense claims. *See* Plan Art. II.A. As of the date hereof, the Debtors have no revenue and approximately $3.0 million available to fund their wind-down costs. Given all the policies and protocols implemented postpetition, I believe this should be sufficient to cover the maximum estimate of potential administrative-expense claims related to customer refunds or credits. If the Plan is not confirmed promptly, however, I am concerned that the fees spent on resolving these matters may render the estate administratively insolvent. This would be value destructive for all parties.

**Communication with Attorneys General and Postpetition Conduct**

16. I understand that the state attorneys general in every state the Debtors operate in were served with notice of these chapter 11 cases, including the Plan-related pleadings. *See* Docket No. 46 (notice of bankruptcy filing); Docket No. 209 (notice of commencement); Docket No. 555 (notice of Plan, Disclosure Statement, and solicitation motion); Docket No. 656 (Combined Hearing Notice). At no point in these chapter 11 cases was I contacted by anyone from the offices of the attorneys general in the states where the Debtors operate. While I was aware that there was ongoing litigation being brought by the attorneys general and conversations regarding the terms of

a settlement that had started prepetition, to the best of my knowledge, no settlement with the District was approved by the Debtors' board of directors after the Petition Date. I also do not believe that any agreement was executed with the Commonwealth or the District.

17. I understand that after the Petition Date, both the District and the Commonwealth were informed that any agreement would require Bankruptcy Court approval, and I am not aware of any commitment by the Debtors to seek such approval, nor am I aware of any drafts of pleadings shared with (or requested by) the Commonwealth or the District.

18. Nonetheless, I believe all the actions of the Debtors taken postpetition, as described herein, address the matters raised by the Commonwealth and the District. On a postpetition basis, the Debtors complied with (or promptly modified policies to comply with) applicable state laws and addressed the police and regulatory issues raised by the Commonwealth, the District, and other attorneys general. This is in addition to the over $14 million in postpetition payments and credits provided to customers and the creation of the Non-Released Claims Trust in the Plan.

19. Following the Confirmation Hearing, the Debtors reached out to the Commonwealth and the District. The Debtors have provided a substantial amount of diligence in response to the requests from the attorneys general, including responses for customer complaints dating back to 2016 and over 78,000 records of postpetition refunds, credits, and chargebacks issued to the Debtors' Massachusetts and District members.

20. The Debtors requested information from the Commonwealth and the District in an effort to analyze and address claims made in the Joinder. Of the fewer than approximately 45 consumer complaints sent to the Debtors thus far and represented to be postpetition, the Debtors believe that fewer than 10 may be unresolved administrative claims. The Debtors are in the process

of analyzing and resolving these complaints to the extent they represent valid Administrative Claims.

21. Following conversations with the attorneys general, the Debtors have made several revisions to the proposed form of Confirmation Order, including (i) adding the attorneys general to the parties opting out of the Third Party Releases on Exhibit B to the Confirmation Order, (ii) adding a procedure allowing for members to submit administrative claims via email and providing that the Debtors will work with the attorneys general to resolve any consumer complaints received by the District or the Commonwealth, and (iii) adding language providing that the Debtors will not seek to collect from members on account of any chargebacks.  I understand that the attorneys general are discussing these modifications, but do not yet agree that they resolve their objections.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  December 16, 2020             Respectfully submitted,

*/s/ John C. DiDonato*
John C. DiDonato
Chief Restructuring Officer