# Exhibit B

```
1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
2
                                     .   Chapter 11
3    IN RE:                          .
                                     .   Case No. 20-12168 (CSS)
4    TOWN SPORTS INTERNATIONAL, LLC, .
5    et al.,                         .
                                     .
6                                    .   Courtroom No. 6
                                     .   824 Market Street
7                                    .   Wilmington, Delaware 19801
                                     .
8                        Debtors.    .   April 20, 2021
     . . . . . . . . . . . . . . . . .   10:00 A.M.
9
```

```
10    TRANSCRIPT OF TELEPHONIC HEARING REGARDING MOTION TO ENFORCE
            BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
11                UNITED STATES BANKRUPTCY JUDGE
```

```
12

13   TELEPHONIC APPEARANCES:

14   For the Post Effective    Robert S. Brady, Esquire
     Date Debtors:            Sean T. Greecher, Esquire
15                            Travis G. Buchanan, Esquire
                              Allison S. Meilke, Esquire
16                            YOUNG CONAWAY STARGATT & TAYLOR LLP
                              Rodney Square
17                            1000 North King Street
                              Wilmington, Delaware 19801
18

19
     Audio Operator:          Leslie Murin, ECRO
20

21   Transcription Company:   Reliable
                              1007 N. Orange Street
22                            Wilmington, Delaware 19801
                              (302)654-8080
23                            Email:  gmatthews@reliable-co.com

24   Proceedings recorded by electronic sound recording,
     transcript produced by transcription service.
25
```

```
1  TELEPHONIC APPEARANCES (continued):

2  For Town Sports          William Sullivan, Esquire
   International Holdings:   SULLIVAN HAZELTINE ALLINSON LLC
3                           919 North Market Street
                            Wilmington, Delaware 19801
4
                            - and -
5
                            Massimo D'Angelo, Esquire
6                           Mark Lichtenstein, Esquire
                            AKERMAN LLP
7                           1251 Avenue of the Americas
                            37th Floor
8                           New York, New York 10020

9  For the New York         Christopher McCall, Esquire
   Attorney General:        OFFICE OF THE NEW YORK STATE
10                             ATTORNEY GENERAL
                            28 Liberty Street
11                          New York, New York 10005

12 For New TSI Holdings:    Jeffrey Chubak, Esquire
                            AMINI LLC
13                          131 West 35th Street, 12th Floor
                            New York, New York 10001
14

15

16

17

18

19

20

21

22

23

24

25
```

1  MATTERS GOING FORWARD:

2  2. Motion of Town Sports International Holdings, Inc. for
   Entry of an Order Enforcing the Terms of the Chapter 11 Plan
3  Releases and Injunction [Docket No. 987, 3/10/21]

4  **Ruling:  32**

5  3. Motion of Town Sports International Holdings, Inc. to
   Enforce Sale Order and Compel Turnover of Documents [Docket
6  No. 1018, 4/6/21]

7  **Ruling:  Matter Taken Under Advisement**

8

9  DEBTORS' WITNESS(s):

10   **PATRICK WALSH**

11     Direct Examination through Declaration

12     Cross Examination by Mr. McCall          10

13     Redirect Examination by Mr. Sullivan      19

14

15  EXHIBITS:                        ID    Rec'd

16  Declaration of Patrick Walsh              8

17  Declaration of Christopher McCall:

18        Admitted/Striking Paragraph 16      23

19  McCall Declaration Exhibits 1-26          23

20  Declaration of Nitin Ajmera              41

21

22

23

24

25

1      (Proceedings commenced at 10:01 a.m.)

2           THE COURT:  Good morning, everyone.  This is Judge

3    Sontchi.  We're here in the Town Sports International case;

4    20-12168.

5           We have a couple of contested matters that appear

6    on the agenda today.  I will turn it over to Mr. Greecher, I

7    think, for the post-effective date debtors, to go through the

8    agenda.

9           MR. GREECHER:  Thank you, Your Honor.  For the

10   record Sean Greecher for the post effective date debtors, the

11   plan administrative for the post effective date debtors.

12          As you mentioned, there are two matters that are

13   contested and scheduled to go forward today on the agenda.

14   They were filed by Town Sports International Holdings which

15   is represented by Mr. Sullivan.  So I will turn it over to

16   him to proceed with the contested matters.

17          THE COURT:  Thank you, Mr. Greecher.

18          Mr. Sullivan?

19          MR. SULLIVAN:  Good morning, Your Honor.  Bill

20   Sullivan from Sullivan Hazeltine Allinson on behalf of Town

21   Sports International Holdings, Inc.

22          Your Honor, during the presentation today, to

23   avoid confusion, I will generally refer to Town Sports

24   International Holdings as either Holdings or TSIH.

25          Your Honor, appearing with me is co-counsel from

1 the Akerman Firm, specifically Massimo D'Angelo and Mark

2 Lichtenstein.  Your Honor, we submitted motions that they be

3 admitted *pro hac vice* in this matter.  I don't know if those

4 have been granted, but they are on file.

5          THE COURT:  I don't know if they're granted either

6 because I don't touch those, but I'm certainly happy to hear

7 them today.

8          MR. SULLIVAN:  Okay.  Thank you, Your Honor.

9          Your Honor, there are two motions on the agenda

10 for today.  Mr. Lichtenstein is going to handle the turnover

11 of the books and records motion.  I am going to handle, in

12 the main, the motion to enforce the plan release and

13 injunction motion which is item number two on the agenda.

14          Mr. D'Angelo would be available in connection with

15 that motion to address any questions regarding the New York

16 State Court action, but we would propose to proceed, first,

17 with the motion to enforce that was filed first.

18          THE COURT:  Okay.

19          MR. SULLIVAN:  Your Honor, the motion to enforce

20 was filed on March 10th and it was filed a week after the

21 order at issue was entered by the New York State Court on

22 March 3rd.  With respect to the motion to enforce the court

23 granted shortened notice, which we appreciated.  The hearing

24 date that was given was not convenient for a counsel from the

25 Attorney General's Office.  The parties negotiated a

1  standstill agreement until today along with a briefing

2  schedule.

3          Your Honor, I'd like to provide a brief

4  introduction to the motion before we turn to the

5  declarations.  Your Honor, the motion to enforce seeks to

6  enforce the plan release and injunction provisions with

7  respect to what is labeled as a judgment and consent order

8  entered in New York State Court on March 3rd.

9          The debtor, Town Sports International LLC and TSIH

10  or Holdings are both defendants identified as approving the

11  consent order, but the stipulation on which it is based was

12  never presented to Holdings and Holdings never consented to

13  its submission to the court.

14          The reason that Holdings objects to the settlement

15  and to it being submitted to the court is it would permit the

16  New York Attorney General's Office to liquidate a bond that

17  Holdings had posted as required by New York Law with respect

18  to sports clubs.  And the amount of that bond is $250,000.

19  Those proceeds will be used to satisfy claims for refunds

20  from members of the approximately 186 sports clubs that were

21  operated by various TSIH entities prior to the pandemic from

22  last year and prior to the bankruptcy case.  The refunds

23  would be available under New York Law for any team members

24  that were cancelled or where the gym was closed.

25          Presently, Holdings or TSIH still operates five

1 such gyms in New York, but the application of the bond would

2 primarily benefit the debtor which operated approximately 175

3 of the gyms at the time the pandemic struck.  And the

4 purchaser of assets of the debtor, who we refer to as new

5 TSI, who purchased approximately 80 locations nationwide and

6 appears to be operating at least 36 in New York currently.

7       Holdings did not make any agreement to pay the

8 obligations of either the debtors or new TSI for canceled

9 memberships or gym closures.  In fact, new TSI, as the buyer,

10 expressly assumed those obligations with respect to the

11 locations it purchased under Section 6.2 of the APA.

12       As a result the proposed forfeiture of the bond is

13 a violation of the injunction provisions of the plan and the

14 claims that the New York Attorney General seeks to satisfy

15 against the bond posted by Holdings were released by the plan

16 as confirmed on December 18th, 2020.

17       Your Honor, the motion raises the issue of the

18 factual issues relating to consent or lack thereof for entry

19 of the stipulation which was signed by Donald Derrico of the

20 Gordon Rees Firm on behalf of both the debtor, TSI LLC and

21 Holdings.  Attached to the motion is the declaration of

22 Patrick Walsh which also includes four exhibits and they were

23 circulated, again, this morning.

24       For purposes of evidence today we would ask that

25 the declaration of Mr. Walsh be admitted as his testimony.

1  Mr. Walsh, as he is on the Zoom call from his home in

2  Jupiter, Florida, and is available to address any questions.

3           THE COURT:  Well I don't see Mr. Walsh.

4           MR. WALSH:  Hi.  I am here.  Can you hear me?

5           THE COURT:  Yes.  Oh, you're Patrick's iPhone.

6  Okay.

7           Any objection to the submission of the declaration

8  into evidence?

9           MR. MCCALL:  Good morning, Your Honor.  This is

10  Christopher McCall on behalf of the New York Attorney

11  General.

12           We have no objection to hearing from Mr. Walsh

13  today, but I just want to note that we were first informed of

14  him possibly testifying today at approximately 8:15 this

15  morning.  So we do not object to Mr. Walsh being sworn and

16  testifying today. I just wanted to note that for the record.

17           THE COURT:  Alright, let me look at something.

18  Hang on, give me a second.

19       (Pause in proceeding)

20           THE COURT:  Alright, the declaration is admitted

21  without objection.  You're comments are noted for the record.

22       (Declaration of Patrick Walsh received into evidence)

23           THE COURT:  Would you like to cross-examine the

24  witness, Mr. McCall?

25           MR. MCCALL:  Yes, Your Honor.

1            THE COURT:  Ms. Murin, would you swear-in Mr.

2  Walsh, please?

3            THE ECRO:  Yes, Your Honor.

4             PATRICK WALSH, DEBTOR WITNESS, SWORN

5            THE ECRO:  Please state and spell your name for

6  the record.

7            THE WITNESS:  Patrick Walsh, P-A-T-R-I-C-K, W-A-L-

8  S-H.

9            THE ECRO:  Thank you.

10           THE COURT:  Mr. Walsh, before we get started I

11 have a few questions for you.  These actually should have

12 been disclosed in the agenda, but they were not.

13           In any event, where are you located today, sir?

14           THE WITNESS:  Jupiter, Florida.

15           THE COURT:  Alright, are you in your home?

16           THE WITNESS:  Yes, home office.

17           THE COURT:  Okay.  Are you alone in the room?

18           THE WITNESS:  Yes.

19           THE COURT:  I am instructing you to remain alone

20 in the room while you testify and, obviously, if we take a

21 break and you move around your house and there are other

22 people that's fine, but when you're testifying you need to be

23 alone in the room.

24           In addition, if you look at any documents in

25 connection with your examination you need to identify for us

 1  what you are looking at whether its paper or electronic on

 2  the screen in front of you or what have you; we need to know

 3  what you are looking at.

 4          Finally, I am instructing you not to send or

 5  receive any text messages, or emails, or any other kind of

 6  electronic device and not to talk to anyone about the

 7  substance of your testimony until you are completely done

 8  testifying.  Okay.

 9          THE WITNESS:  Yup.

10          THE COURT:  Alright.  Thank you.

11          Mr. McCall, you may proceed.

12          MR. MCCALL:  Good morning.  Thank you, Your Honor.

13          Your Honor, I realized that I (indiscernible)

14  applied for admission *pro hac vice* and as of this morning

15  that application had not been ruled upon.

16          THE COURT:  I'm happy to have you proceed.

17          MR. MCCALL:  Okay.  Thank you, Your Honor.

18                          CROSS EXAMINATION

19  BY MR. MCCALL:

20  Q    Good morning, Mr. Walsh.  I am going to ask you some

21  questions today about the declaration you submitted in this

22  proceeding.  You are familiar with that declaration?

23  A    Yup.

24  Q    And do you have that declaration in front of you, Mr.

25  Walsh?

1  A     I don't.  I can pull it up.

2  Q     If you could pull that up that would be helpful because

3  I'm going to ask you some questions about specific

4  paragraphs.

5  A     Okay.

6          THE COURT:  Let us know when you're ready, Mr.

7  Walsh.

8          THE WITNESS:  Yes.  Okay.  I think I have it.

9  BY MR. MCCALL:

10 Q     Okay.  If you could turn to Page 3 of your declaration,

11 Mr. Walsh, Paragraph 19.  You can see from Paragraph 19 of

12 your declaration that in late February 2021 I informed Gordon

13 Rees that I was retaining Akerman LLP as counsel for all

14 litigation matters including the NYAG action.  Do you see

15 that?

16 A     I just don't have it up.  I don't have the declaration

17 up. So why don't we just go from --

18          THE COURT:  You have to be able to look at the

19 document, sir.

20          THE WITNESS:  Okay.

21          THE COURT:  Mr. Sullivan, if your witness doesn't

22 have the declaration I'm not going to allow it into evidence.

23 He has to be able to be cross examined by the document.  You

24 have to have this available for him.

25          MR. SULLIVAN:  Your Honor, my understanding was

1  that he did have it available to him yesterday, but I'm going

2  to re-forward it if Your Honor could give me one minute.

3        (Pause in proceeding)

4             MR. SULLIVAN:  Mr. D'Angelo, do -- are you able to

5  forward it to him?

6             MR. D'ANGELO:  I am.  Your Honor, may I forward it

7  to Mr. Walsh?

8             THE COURT:  Yes.  You may break my rule against

9  looking at emails to (indiscernible) Mr. D'Angelo's email,

10  Mr. Walsh.

11             MR. SULLIVAN:  Thank you.

12        (Pause in proceeding)

13             MR. D'ANGELO:  Mr. Walsh, you should have it.  The

14  motion and your declaration starts on Page 16 of 99 of that

15  document.

16             THE WITNESS:  Hold on.  Okay.  I'm pulling it up.

17  BY MR. MCCALL:

18  Q    Let me know when you're on that page, Paragraph 19.

19             THE WITNESS:  Massimo, what page did you say of

20  it?

21             MR. D'ANGELO:  15 of 99 of the motion is where

22  your declaration starts.  Then it will be Page 3 that Mr.

23  McCall is going to ask you questions about.  So it will be

24  Page 19.

25             THE WITNESS:  Christopher, what section?

1    MR. MCCALL:  On Paragraph 19.  Do you see that?

2    THE WITNESS:  Yes, I do.

3  BY MR. MCCALL:

4  Q    Okay.  Paragraph 19 you say that in late February 2021

5  I informed Gordon Rees that I was retaining Akerman LLP as

6  counsel for all litigation matters including the NYAG action.

7  A    Yup.

8  Q    How did you inform Gordon -- well was there -- who did

9  you speak with at Gordon Rees?

10  A    I don't recall, but likely Don Derrico.

11  Q    Okay.  And was this a conversation or did this take

12  place over email or in letter?

13  A    I don't recall.

14  Q    Okay.  And what do you recall telling Gordon Rees in

15  this conversation or written correspondence?

16  A    I don't recall.

17  Q    Okay.  Well it says in your declaration that you

18  informed Gordon Rees that you were retaining Akerman LLP as

19  counsel for all litigation matters including the NYAG action.

20  Do you remember telling Gordon Rees that?

21  A    Yes.  I don't remember the specific conversation or

22  email.

23  Q    Okay.  Did you -- during that conversation or written

24  correspondence did you ask -- did you tell Gordon Rees that

25  it no longer had authority to represent TSI Holdings?

1  A     No.

2  Q     Did you ask Gordon Rees to withdraw as counsel for TSI

3  Holdings in the New York proceeding?

4  A     No.

5  Q     Did you, at any time in late February 2021, did you ask

6  for the Akerman law firm to file a notice of appearance in

7  these New York proceedings?

8  A     I don't recall.

9  Q     At any time in late February 2021 did you ask the

10 Akerman law firm to informally contact the New York Attorney

11 General's Office to inform us that they would be representing

12 TSI Holdings?

13 A     I don't recall.

14 Q     I just want to clarify that in late February of 2021

15 conversation or written correspondence you did not inform

16 Gordon Rees that it no longer had authority to act on behalf

17 of TSI Holdings.  Is that correct?

18 A     Yes.

19 Q     Okay.  And you also did not ask Gordon Rees to withdraw

20 as counsel for TSI Holdings.  Is that correct?

21 A     That is correct.

22 Q     And did you at any time in late February of 2021 ask

23 Akerman or Gordon Rees to file a notice of substitution of

24 counsel in the New York proceeding?

25 A     I don't recall.

1  Q      And, Mr. Walsh, you said you're not certain if this

2  took place, if this exchange took place in writing or in a

3  conversation. Is that correct?

4  A      That is correct.

5  Q      To the extent that this did take place in writing we

6  would request copies of all of that correspondence.

7         I now want to turn to --

8              THE COURT:  Wait a minute.  Wait a minute.  Hold

9  on.  This is the hearing.

10             MR. MCCALL:  Okay.  Your Honor, I'm just pointing

11 out that we -- to the extent that there is written evidence

12 supporting TSI Holding's allegations it hasn't been put

13 before the court.

14             THE COURT:  Fair enough.

15 BY MR. MCCALL:

16 Q      Mr. Walsh, in Paragraph 20 of your declaration -- do

17 you see that in front of you?

18 A      Yes.

19 Q      Okay.  I want to read that,

20        "It is my understanding, from Gordon Rees, that Gordon

21 Rees was going to keep Akerman LLP and myself apprised of all

22 significant developments in all the litigation matters

23 relating to TSI Holdings until Akerman LLP is able to be

24 substituted in as new counsel for TSI Holdings."

25 A      Yup.

1   Q      Do you see that?

2   A      Yes, I do.

3   Q      What was the basis for this understanding that you

4   refer to here?

5   A      Pretty basic how I would always understand any practice

6   in dealing with my lawyers.  They keep you apprised of what

7   is going on.

8   Q      So do you mean to say that Gordon Rees told you that

9   Gordon Rees would keep you apprised?

10  A      I don't remember any conversation, Chris, in

11  particular.  It's just common when I have a lawyer that is in

12  a case they typically will keep you updated if there is

13  anything material going on.

14  Q      Okay.

15          THE COURT:  Hang on.  Mr. Walsh, I'm sorry.  This

16  is a court proceeding.  You are speaking to Mr. McCall, okay,

17  not Chris.

18          THE WITNESS:  Yes, sir.

19  BY MR. MCCALL:

20  Q      Mr. Walsh, in Paragraph 22 of your declaration you

21  wrote,

22      "I never signed a stipulation or authorized anyone to

23  sign a stipulation, nor did I ever review the stipulation."

24      Is that correct?

25  A      Yes.

1  Q      Now, Mr. Walsh, at any time prior to -- well, I guess,

2  when did you -- according to your declaration you first

3  learned of this settlement agreement when you read a news

4  article in the New York Post.  Is that correct?

5  A      Yeah, it was a press release.  It was -- I came across

6  it (indiscernible), I think the post may have been the

7  official -- I'm not a journalist, but I saw it on my computer

8  in a headline.

9  Q      Okay.  And prior to your seeing that headline had you

10  ever -- had you asked Gordon Rees to withdraw as counsel in

11  the New York proceeding?

12  A      No.

13  Q      Did you -- prior to your seeing that press release did

14  you inform Gordon Rees that it no longer had the authority to

15  represent TSI Holdings?

16  A      No.

17         MR. MCCALL:  Your Honor, if you could just give me

18  one moment here.

19      (Pause in proceeding)

20  BY MR. MCCALL:

21  Q      Mr. Walsh, prior to your learning of the settlement

22  agreement did you ask the Akerman law firm to file a notice

23  of appearance in the New York case?

24  A      I don't recall.

25  Q      Prior to your learning about the settlement agreement

1  did you ask the Akerman and/or Gordon Rees law firms to file

2  a substitution of counsel in the New York proceeding?

3  A    I don't recall.

4  Q    Mr. Walsh, are you aware that your counsel at Akerman

5  informed our office that it would resolve this objection if

6  our office --

7           THE COURT:  Whoa, whoa, whoa; I don't want to hear

8  anything about settlement discussions.

9           MR. MCCALL:  Okay.  Your Honor, I don't think that

10  I have any further questions at this time.  We would submit

11  that given Mr. Walsh's testimony that he didn't ask for a

12  release or withdraw and that he didn't inform that they lack

13  the authority to represent TSI Holdings we believe that under

14  New York and Delaware Law that satisfies -- that TSI Holdings

15  has failed to meet its burden to demonstrate that Gordon Rees

16  lacked authority to enter the settlement agreement.

17           THE COURT:  Thank you, Mr. McCall.

18           Does anyone else wish to cross-examine Mr. Walsh?

19      (No verbal response)

20           THE COURT:  Alright, any redirect, Mr. Sullivan?

21           MR. SULLIVAN:  Your Honor, yes.  I would -- yes,

22  please.

23           THE COURT:  Okay.  You may proceed.

24                      REDIRECT EXAMINATION

25  BY MR. SULLIVAN:

1  Q     Mr. Walsh, this is Bill Sullivan.

2         Did you have any conversations with anyone from Gordon

3  Rees in 2021 regarding settlement of the New York action?

4  A     No, not that I recall.

5  Q     Would you have expected to have a conversation with a

6  lawyer at Gordon Rees if the New York action was going to be

7  settled on behalf of TSI Holdings?

8  A     Yes, of course. I thought I would be made aware that

9  there would be a settlement that would affect the company I'm

10 involved with.

11 Q     Is anyone else at TSI Holdings someone who would

12 communicate with Gordon Rees instead of you?

13 A     No.

14 Q     Did anyone else at TSI Holdings communicate with Gordon

15 Rees with respect to this New York action?

16 A     No, not that I'm aware of.

17 Q     And when you found out about the press release what did

18 you do?

19 A     I believe I sent it to Massimo and asked him to explain

20 it me what happened, what it was.

21 Q     You're referring to Mr. D'Angelo from the Akerman Firm?

22 A     Yes, sorry.  Mr. D'Angelo.

23 Q     Okay.  And has he been made aware of the settlement

24 that was filed with the New York Attorney General's Office?

25 A     I do not believe so, no.

1   Q     Well did he tell you that he was or it wasn't?  Did he

2   tell you either way?

3   A     He was not.  He's not aware.

4   Q     And what role, if any, was he playing with respect to

5   the various matters of dealing with Holdings?

6   A     Mr. D'Angelo?

7   Q     Yes.

8   A     He's been engaged in all different types of matters for

9   the company, different types of litigation ranging from

10  various different litigations.

11          MR. SULLIVAN:  No further questions, Your Honor.

12          THE COURT:  Okay.  Thank you.

13          Mr. Walsh, your testimony is completed.  Thank

14  you.  You can now recommunicate with the electronic world

15  (indiscernible).

16          THE WITNESS:  Thank you, Your Honor.

17          THE COURT:  You're welcome.

18       (Witness excused)

19          THE COURT:  Mr. Sullivan, any further evidence?

20          MR. SULLIVAN:  No, Your Honor.  We had -- I had

21  indicated, I think, that Mr. D'Angelo would be available to

22  discuss matters that were raised in the McCall declaration,

23  but Your Honor has indicated that he doesn't want to hear

24  anything about the settlement discussions so, therefore, I

25  don't believe Mr. D'Angelo would be necessary to address

1  those.

2          THE COURT:  Okay.

3          MR. SULLIVAN:  With respect to the McCall

4  declaration I believe that those discussions are in Paragraph

5  16 and I would ask that that be struck.

6          THE COURT:  It's not in evidence yet.  So let's

7  see what happens with that.

8          MR. SULLIVAN:  Okay.  I guess I'm getting ahead of

9  myself.

10          THE COURT:  It's okay.  So that's your case?

11          MR. SULLIVAN:  Yes.

12          THE COURT:  Very good.

13          Mr. McCall, would you like to present any

14  evidence?

15          MR. MCCALL:  Yes, Your Honor.

16          Your Honor, if I could first just address Your

17  Honor's statement earlier about settlement discussions.  Just

18  to state that our position is that these weren't settlement

19  discussions.  When I was contacted by the Akerman law firm,

20  which I had never dealt with, they hadn't appeared in the

21  case and the case was settled it's hard to understand how

22  those are -- how that conversation is inadmissible settlement

23  discussions when the case had been settled and --

24          THE COURT:  Well in their mind the case hadn't

25  been settled.  In their mind, at least, potentially it was

1   (indiscernible) without their authority.  Your position is it

2   was apparent authority.  But there was a dispute, so you

3   started your question with did -- were you aware that your

4   lawyer offered to resolve the issue by X and I cut you off.

5   If that's not a settlement offer I don't know what is.

6              MR. MCCALL:  Understood, Your Honor.

7              Your Honor, could I ask would it matter if the

8   substance was contained in a letter from Akerman to Gordon

9   Rees?

10             THE COURT:  No, because there's a potential

11  lawsuit here.  I mean this is where this is headed to be

12  frank.  There's a potential law suit here between Holdings

13  and Gordon Rees.  So they're in conflict.

14             MR. MCCALL:  Understood, Your Honor.

15             I guess if the proper procedure is for the NYAG to

16  move for its admission of my declaration then we so move.

17             THE COURT:  Any objection?

18             MR. SULLIVAN:  Your Honor, Bill Sullivan.  I renew

19  the objection to Paragraph 16.

20             THE COURT:  Okay.  Let me pull that up.  Read it

21  without reading it.

22             Any response to striking Paragraph 16, Mr. McCall?

23             MR. MCCALL:  No.  I would just reiterate what I

24  said previously and Your Honor stated the court's position.

25             THE COURT:  Alright, it's admitted except for

1  Paragraph 16.

2         (Declaration of Christopher McCall received into

3  evidence)

4              THE COURT:  What about the exhibits.  Are they --

5  any objection, Mr. Sullivan, to the exhibits?

6              MR. SULLIVAN:  No, Your Honor.

7              THE COURT:  Alright, they're admitted as well;

8  Exhibits 1 through 26 just to be clear.

9         (McCall declaration exhibits received into evidence)

10              THE COURT:  I'll hear argument.

11              Mr. Sullivan?

12              MR. SULLIVAN:  Thank you, Your Honor.  Bill

13  Sullivan on behalf of TSI Holdings.

14              Your Honor, there is not a dispute here that TSI

15  Holdings was a release party under the plan as an affiliate

16  and equity holder of the debtor.  There is also not a dispute

17  that the solicitation process included an opt-out mechanism

18  for parties to opt-out of those releases.  Several attorney

19  general offices did that, but the New York Attorney General's

20  Office did not do that.  As a result, and because of the

21  releases, any action to liquidate the bond posted by TSI was

22  to satisfy claims against it in the New York actions *void ab*

23  *initio* as a violation of the injunction provisions of the

24  plan.

25              The reality is that there are several avenues of

1  recovery available to the New York Attorney General.  There

2  is recovery available through the plan.  There is also

3  recovery available from new TSI who assumed responsibility

4  for membership rated claims related to the locations where it

5  acquired -- that it acquired through the sale.

6          The settlement at issue here that allows the

7  attorney general to liquidate the bond and pay the claims

8  that others are responsible for is, in fact, an act to

9  liquidate claims against a release party.  The primary

10  response from the Attorney General's Office is that at all

11  times when Mr. Derrico represented TSI Holdings and TSI LLC,

12  the debtor, jointly in the New York action that at all times

13  relevant he had the authority to bind Holdings to the

14  settlement.

15          There are two areas of authority that have been

16  addressed in the papers.  One is the actual authority and one

17  is the apparent authority.  I think at this point it's

18  undisputed that there is no actual authority.  Mr. Walsh was

19  not aware of the settlement.  It was never presented to him

20  and he acted swiftly as soon as he saw that the matter had

21  been settled to address the fact that he had not been

22  advised.

23          You know, frankly, it may have -- I guess we don't

24  have information as to why Gordon Rees would have purported

25  to sign on behalf of TSI Holdings.  The statement submitted

1 by the debtor with respect to this motion indicates that

2 Gordon Rees was representing it, that Gordon Rees presented

3 the stipulation to the plan administrator, and the plan

4 administrator approved the stipulation; not surprisingly

5 because it didn't require any consideration from the debtor

6 to the plan.  That is a clear distinction from how the matter

7 was handled with respect to TSI Holdings who got no notice

8 and no opportunity to comment on the settlement and

9 stipulation.

10         There's reference in the papers to the fact that

11 there may have been some agreement back in October of 2020

12 before the sale had occurred, before the plan was confirmed,

13 but given the considerations, Your Honor, frankly, those -- I

14 think it's impossible to say that any authority on some

15 tentative resolution in October can't carry through to an

16 actual stipulation in February given the changed

17 circumstances.

18         So, you know, the last question, the questions by

19 Mr. McCall, go to the apparent authority that as far as they

20 were concerned and Mr. Rees still had -- or appeared to them

21 to have authority at all times to enter into the settlement

22 agreement.  Your Honor, I would say two things about that.

23         Number one, you know, from the record submitted in

24 the papers there wasn't anything happening in the case.  The

25 case had been continued and static since before plan

1  confirmation.  So I am not sure that much can be drawn from

2  the fact that there wasn't, you know, an attempt to

3  immediately replace Gordon Rees with the Akerman Firm

4  because, you know, it simply was a case that there was no

5  activity up until there was a settlement that lacked Holdings

6  consent.

7         The second thing is with respect to the parent

8  authority. The actual part of the settlement has not occurred

9  yet, that is the liquidating and the bond.  So, you know, I

10 think this is a situation where because the lack of authority

11 issue emerged immediately and there is nothing to unwind here

12 that the parent authority argument should hold.

13        Your Honor, the bottom line is that while this

14 deal may have been good for the debtor and the debtor

15 approved it, and that the consent and stipulation simply has

16 Mr. Derrico signing on behalf of all defendants doesn't

17 distinguish between the debtor and TSI Holdings.  The reality

18 is there isn't authority for that settlement from Holdings.

19 It impacts Holdings property for the benefit of others in

20 violation of a plan.  And, Your Honor, this court should

21 enforce those provisions to prevent the liquidation of the

22 bonds to satisfy the various claims.

23        THE COURT:  Thank you, Mr. Sullivan.

24        Mr. McCall?

25        MR. MCCALL:  Yes.  Thank you, Your Honor.

1           Your Honor, a couple of things in response.

2   First, as to Mr. Sullivan's argument that the courts December

3   confirmation order, you know, negated or voided a New York

4   proceeding or ongoing settlement discussions or ongoing --

5   the ultimate settlement agreement, we think that argument is

6   undermined by the statement filed by the debtor in this case

7   which makes clear that the settlement agreement was properly

8   reviewed and approved by the debtors, and that, you know,

9   implicitly that rights under the confirmation order can be

10  voluntarily waived which we believe is what happened in this

11  case that to the extent that TSI Holdings, the none-debtor,

12  (indiscernible) under the confirmation order it voluntarily

13  waived them.

14          I also want to respond to what Mr. Sullivan said

15  that "there wasn't anything happening in the case" from the

16  time period when the confirmation order was entered until the

17  settlement agreement was filed.  That simply is not the case.

18          In January of 2021 and in February of 2021 the

19  parties filed stipulations with the court that extended the

20  terms of the temporary restraining order among other things.

21  So it isn't the case that Mr. Sullivan is portraying these as

22  ministerial documents resetting hearing dates, they had a

23  substantive -- they substantively limited TSI Holdings and

24  TSI LLC's ability to charge certain consumers.  These

25  stipulations which, again, were publicly filed in open court

1  also made clear that the parties were engaged in ongoing

2  settlement discussions.

3          I also want to point out that Mr. Sullivan

4  referred earlier to an October 2020 email exchange between

5  Mr. Walsh and Gordon Rees in which Mister -- in which Gordon

6  Rees described the settlement agreement as the only

7  consideration being the TSI bond, and Mr. Walsh respond to

8  congratulate Gordon Rees.  It is true that that was a

9  preliminary version of the settlement agreement, but the

10 substantive terms remains the same that the $255,000 bond was

11 the only consideration and, again, there was no -- there were

12 no individuals included in the release provision and it was

13 never raised at any point in the proceeding.

14         I also want to point out that the equitable

15 argument that we raised, Your Honor, which is that, you know,

16 if TSI Holdings is correct that Gordon Rees acted improperly

17 here we think as between the people of the state of New York

18 and TSI Holdings that TSI Holdings should bear the

19 consequence of Gordon Rees's alleged misconduct if there was

20 any.

21         We would note in that regard, you know, that TSI

22 Holdings has a number of options available to it.  It could

23 move to vacate the settlement agreement in the New York Court

24 and it could also file suit against Gordon Rees for money

25 damages.  We don't think under the circumstances, given that

1  it's absolutely undisputed that we had no idea of any of this

2  dispute until after the settlement agreement was filed, we

3  don't think that that fairness should allow TSI Holdings to

4  walk away from the settlement agreement and leaving, you

5  know, our office with few options.

6          THE COURT:  Thank you very much.

7          Mr. Sullivan, brief reply if you wish.

8          MR. SULLIVAN:  Thank you, Your Honor, yes.  Bill

9  Sullivan on behalf of TSI Holdings.

10          Your Honor, the waiver argument doesn't work

11  because waiver is a voluntary relinquishment of a known

12  right.  And the issue of this case is that TSI Holdings had

13  no idea that a settlement was being approved or submitted

14  post-confirmation of the plan.  That also goes to the

15  argument from the New York Attorney General's Office about

16  the activity in January and February of 2021.

17          Your Honor, the exhibits that were attached to the

18  McCall declaration that we reviewed indicated, as far as we

19  could tell, that the monthly stipulations were simply kicking

20  out the deadlines as they had from back in October.  So it

21  wasn't a sign that -- it's not apparent, from those

22  stipulations, that that involved significant discussions.

23          To the extent that there were significant

24  settlement discussions, again, it's a real problem from

25  Holdings point of view because nobody informed TSI Holdings

1   about those discussions at any time in January or February up

2   to the submission of the stipulation.  So, Your Honor, the --

3   I don't think the record is disputed that as to Holdings it

4   was completely unaware that this stipulation was going to be

5   entered.

6           And then as to the argument that other avenues of

7   relief are available, Your Honor, I would say that that sort

8   of relates to the argument as to apparent authority.  There

9   hasn't been any reliance here at this point.  The stipulation

10  as submitted.  It hit the docket, (indiscernible), and the

11  press release was issued, the parties conferred and said we

12  don't know anything about that.  So we're not to appoint

13  where the, you know, law would say tough luck, we'll sue them

14  because there hasn't been an implementation.

15          So that is the reason why we believe Your Honor

16  should enforce the plan provisions.

17          MR. MCCALL:  Your Honor, may I just have one

18  minute to respond very quickly?

19          THE COURT:  Yes.

20          MR. MCCALL:  I just want to point out -- so,

21  again, it was referred to the court that stipulations had

22  been filed and are part of the record in the case.  They were

23  not ministerial picking out dates.  Again, they extended the

24  terms of the temporary restraining order.

25          I also think under -- you know, based on the cases

1  cited in our objections that Mr. Walsh's testimony is

2  insufficient to meet TSI Holdings burden and his inability to

3  recall anything specific about the conversations.  I

4  (indiscernible) credibility in doubt and I just want to

5  reiterate that the arguments that TSI Holdings is making

6  (indiscernible).

7         We're hearing for the first time their arguments

8  about the bonds, and subrogation rights, and things of that

9  nature.  All of those could have and should have been raised

10 in the New York proceeding, and they weren't, and ultimately

11 that case settled for a bond that we think is not part of the

12 bankruptcy estate.

13        THE COURT:  Thank you, Mr. McCall.

14        Alright, I'm going to deny the motion.  You're in

15 the wrong court. This has nothing to do with the confirmation

16 order or the release provisions with one proviso.  So you can

17 grant a release, you can have a confirmation order with an

18 injunction, but a party that is a beneficiary of that release

19 or injunction can raise that.  That happens.

20        What purportedly happened here is that a lawyer

21 that had entered an appearance and was appearing on behalf of

22 Holdings signed a stipulation waiving, in effect, that

23 release.  Whether that was authorized or was due to apparent

24 authority and is, thus, binding, really isn't my issue.  The

25 issue -- that is an issue for the court in New York.

1        If you have a problem with the settlement

2   agreement based on lack of authority or lack of apparent

3   authority take it up with the court that signed the order.

4   Now if that court decides that, yes, this was not an agreed

5   settlement, there was insufficient apparent authority, there

6   wasn't actual authority, there is no settlement agreement

7   here, and New York were to try to enforce it anyway that is

8   when I get a call.  That is when you have a situation where

9   you actually have a violation of the confirmation order and

10  the releases.

11       Right now you don't because right now, at least,

12  on its face, as far as I'm concerned, unless you prove

13  otherwise, there is a signed settlement agreement that

14  Holdings is a party to, that is binding on Holdings, that

15  waves its rights under the confirmation order and the release

16  provisions.  So if you have a problem with that that's fine,

17  you got to take it up with the New York Court.

18       If you lose there I agree with Mr. McCall, you

19  might have various remedies.  One is to come back and prevent

20  the settlement from, sort of, being enforced on you when

21  there's a court order that says, (A) you released it, and (B)

22  there's a separate court order that says you haven't agreed

23  to waive that release then you come back to me, or if the

24  judge in New York holds you to the settlement sue Gordon Rees

25  for acting beyond its authority.  Nobody likes to do that,

1  that's not a great result, but those are your options.

2       The option to come to me to enforce a confirmation

3  order and the release provisions where the record indicates

4  that an agent released those protections when you haven't

5  proved otherwise or undone that release in the State Court

6  where that purported happened it's premature to be here.  So

7  I'm going to deny the motion.

8       Mr. Greecher.

9       MR. SULLIVAN:  Thank you, Your Honor.

10      THE COURT:  Put out another order denying it for

11 the reasons I put on the record.

12      Mr. Greecher, sorry.

13      MR. GREECHER:  Your Honor, I think the next matter

14 up is a motion filed by (indiscernible) with respect to

15 access to documents that are in the custody of the buyer.

16 Mr. Lichtenstein is going to handle that.

17      THE COURT:  Okay.

18      MR. LICHTENSTEIN:  Thank you, Mr. Greecher.  Good

19 morning, Judge Sontchi.  It's nice to see you.

20      We're here this morning on the motion for turnover

21 of certain critical documents that Holdings, Inc., needs to

22 conduct its business including SEC reporting and tax returns.

23 As Your Honor may have seen in the moving papers the debtor,

24 who effectively pre-sale shared documents on an Oracle

25 database which were intertwined with Holdings, Inc., supports

1  the motion in so far as (indiscernible) that the documents

2  get turned over directly to Holdings.

3          Notably, and we conferred with Mr. Greecher before

4  filing the papers, the implementation of the turnover he's

5  taking no position with respect to some of the arguments

6  about how it was to be done in an equitable, and appropriate,

7  and non-invasive manner.  Generally, the debtor with whom we

8  have privity and whose rights were derivative of, under the

9  sale order, specifically a definition of excluded assets in

10  the sale order and the provisions of 6.2 and 2.8 of the sale

11  order which, of course, on Page 4 of our motion.

12          Then in our reply give rise to an obligation by

13  the buyer to either deliver to the debtor certain excluded

14  assets at their own expense, but also to the extent documents

15  are needed by the debtor and a priority needed by Holdings

16  which Holdings is the consolidated reporting entity and all

17  the affairs were inseparable that proper payments by the

18  debtor, in this case Holdings, those documents would be

19  produced.

20          Afterwards, Your Honor, without getting into

21  settlement discussions because I'm mindful of your prior

22  admonition, although perhaps it might be relevant because it

23  was the buyer who opened the door, but I will

24  (indiscernible), Your Honor, but we may not have to even go

25  there.

1          Efforts were made prior to filing this motion to

2    establish a protocol for the turnover of those documents and

3    the access to certain employees of new TSI.  And the sessions

4    ensued and on new TSI stated certain preconditions for

5    turnover, three of which are (indiscernible) and then

6    actually agreed to even before the opposition was filed.  The

7    (indiscernible) and we don't need to get into that for

8    purposes of this matter unless Your Honor deems it

9    appropriate.

10          At the end of the day it seems to me not to be a

11   dispute over we don't want to do this; although, new TSI does

12   allege some jurisdictional arguments and a possessory lien

13   and other sorts of, what we portray in our reply as sort of,

14   unnecessarily obstructed behavior.  We think at the end of

15   the day it comes down to new TSI doesn't want its business to

16   be interrupted unduly by a document turnover protocol or

17   access to its people for (indiscernible) questions.  We get

18   that.

19          So (indiscernible) initially, sort of, in a

20   perfect world access to twelve of their employees for

21   questions, not for work product, but merely, Your Honor, for

22   questions.  We dialed that back to only four.  We took their

23   points that we could get some of this information from third-

24   party sources and we're certainly willing to do that.

25          We significantly scaled down our asks to just talk

 1  about the Oracle database, the (indiscernible) and the motion

 2  environments where we would just get access through August

 3  15th.  We don't see this as a (indiscernible).  We deem it as

 4  next year.  We just want to get our reporting and tax returns

 5  and stuff done.

 6        Now if there are matters after that we would agree

 7  to do it on a very limited basis with a lot of advance

 8  notice.  And we will pay for everything that we -- every

 9  service that we obtained.  In fact, we have agreed to put up

10  a retainer and make it (indiscernible) to the extent we need

11  more assistance from the new TSI.

12        As our exhibit to our reply we tried to

13  (indiscernible) with our outside accounting experts to the

14  lease that we would really need and, frankly, Your Honor,

15  it's not that much of an ask given the fact that the debtor

16  has these rights under the sale order.  It was the one that

17  routinely shared documents.  Unfortunately, because of the

18  way things are organized, the entire Oracle database is now

19  turned over to new TSI and we're sort of being a little rough

20  about it in terms of leverage you get or other consideration;

21  possessory lien for all the, sort of, alleged obligations and

22  other things that are really making life very difficult for

23  us.

24        Holdings needed these documents yesterday.  We're

25  under immense pressure, as you can imagine, Your Honor, in

1  the public reporting company and its tax time now.  And we

2  never anticipated, unfortunately, perhaps, this situation,

3  but as Your Honor well knows in lots of cases involving 363

4  sales this is, sort of, very common to talk about

5  transitional document access and transitional

6  responsibilities on each side as long as it's fair.

7         And so it's, frankly, a bit disheartening that we

8  had to bring this before Your Honor because this seemed to be

9  the kind of thing that could settle without your judicial

10 intervention.  That being said, (indiscernible) as you can

11 tell in our papers, you know, we know all about compromising

12 and cooperating because our need for the documents is so

13 incredibly urgent.

14        It's of a critical importance and threatens the

15 company with irreparable harm by virtue of interruption of

16 the business, but also more importantly issues with our

17 lenders, issues with the SEC, issues with the taxing

18 authorities and respectfully submit, Your Honor, that given

19 the rights under the sale order that, essentially, are

20 derivative of the debtors' rights, the debtors support, as I

21 indicated, the motion.

22        The fact that we are willing to (indiscernible)

23 work to ameliorate any undue burden or allegations of undue

24 burden by new TSI we would respectfully request that Your

25 Honor direct the turnover and to the extent necessary try to

1 bring the parties together to a protocol for the turnover.

2          Finally, Your Honor, what we would propose in

3 order to alleviate any concerns of sharp play by new TSI and

4 Holdings for that matter after the fact would create some

5 paranoia or discomfort that Mr. DiDonato has been very

6 constructive and a force for resolution here.  We appreciate

7 it.  He be a point of contact since the debtors and Holdings

8 actually have the privity and share the documents, but he and

9 his team be the first point of contact for any disputes or

10 difficulty and only after a process ensues for Mr. DiDonato

11 and (indiscernible) would we, as a last resort, come back to

12 Your Honor --

13          THE COURT:  I'm sorry, you're asking me to enforce

14 this protocol you proposed?

15          MR. LICHTENSTEIN:  Your Honor, not exactly.  Not

16 enforce the protocol.  We're asking Your Honor to rule that

17 the documents -- that we must -- we haven't gotten access to

18 the documents under reasonable and appropriate matters.  We,

19 obviously, think our protocol is very fair and appropriate.

20          We're not asking you, Your Honor, to specifically

21 line by line issue this protocol, but we do need some

22 judicial (indiscernible) to force the parties together

23 because right now we're at a very damaging stalemate although

24 we felt like things were very promising and we've given in on

25 three of the four conditions not permitted to what they are

1  specifically.  And we are even open to a fourth one on some

2  basis, but, frankly, new TSI indicated to us that unless we

3  withdrew this motion they won't even engage with us anymore.

4          THE COURT:  What is wrong with you people?  I

5  don't want to hear that.  Stop.

6          Response?

7          MR. CHUBAK:  Your Honor, this is Jeffrey Chubak

8  from Amini LLC on behalf of new TSI, the purchaser under the

9  asset purchase agreement.

10          I am not going to get into settlement discussions

11  except to say that there has -- I know (indiscernible) motion

12  was brought and that we've made a proposal to turn over the

13  Oracle database.  We stand by the statements and objections

14  that the (indiscernible) payment of severance to NewCo's CFO.

15          THE COURT:  You know what, the next person that

16  tells me what the discussions were between the parties will

17  be sanctioned.  I don't want to hear it.  That is the fourth

18  time that I have said that on this hearing.

19          MR. CHUBAK:  We have made --

20          THE COURT:  You've been in settlement

21  negotiations.  You have been unable to reach a resolution and

22  now you're in front of me, fine.  That is what always

23  happens.  Deal with the merits.

24          MR. CHUBAK:  Okay.  Mr. Lichtenstein has said that

25  the debtor supports the motion.  Mr. Greecher can speak for

1  himself.  We have been advised that the debtor

2  (indiscernible).  TSIH has stated that it is seeking to

3  enforce the asset purchase agreement.  It is not a party to

4  nor a third-party beneficiary of the asset purchase

5  agreement.  Furthermore, it's perhaps a little too cute

6  because it wants to be able to enforce the asset purchase

7  agreement, but doesn't want to be bound by the non-solicit

8  provisions at Section 6.7(b).

9          We admit that TSIH doesn't even have the right to

10 be heard under (indiscernible) and that subject matter

11 jurisdiction is lacking.  No response to that argument was

12 made in the reply.  And, finally, TSIH -- the only other

13 basis for the relief sought is the turnover provision that

14 Bankruptcy Code Section 542.  Those can only be asserted by a

15 trustee. It is undisputed that TSIH is not a trustee or

16 anyone standing in the shoes of the trustee, as mentioned

17 before, and is not even a party of interest in this case.

18         We submitted a declaration of Nitin Ajmera in

19 support of the motion.  He is on the line.  We request that

20 it be admitted into evidence.

21         Thank you, Your Honor.

22         THE COURT:  You're welcome.

23         Any objection to the admission of Mr. Ajmera's

24 declaration?

25         MR. LICHTENSTEIN:  No, Your Honor.  That's fine.

1              THE COURT:  Okay.  It's admitted.

2          (Declaration of Nitin Ajmera received into evidence)

3              THE COURT:  Would you like to cross-examine him?

4              MR. LICHTENSTEIN:  No, Your Honor.

5              THE COURT:  Mr. Greecher, what is the debtors'

6   position?

7              MR. GREECHER:  Thank you, Your Honor.

8              I feel like we're in the middle of a dispute that

9   we've been trying to help the parties resolve, but they're

10  unresolved.  And unfortunately the debtors don't have the

11  documents.  As indicated, the documents requested are part of

12  the Oracle server.  That is part of the asset purchase

13  agreement.

14             We, the debtors, the plan administrator does not

15  presently (indiscernible) records.  We don't take any

16  position with respect to where any specific items

17  (indiscernible) excluded assets.  As Holdings motion ordered

18  we (indiscernible) motions and we're in support of the motion

19  for what we think is the non-controversial position that the

20  buyer did not purchase and inquire excluded assets as part of

21  the sale.

22             Outside of that, Your Honor, the plan

23  administrator has no position because the (indiscernible) not

24  need the documents as TSIH.

25             THE COURT:  Thank you, Mr. Greecher.

1          Mr. Lichtenstein, any response?

2          MR. LICHTENSTEIN:  Yes, Your Honor.

3          First of all, apologies to the court. It was my

4    intent not to get into anything.  I apologize for that.

5          With respect to the relief sought, Your Honor, we

6    point out that because of the nature of the way the group's

7    records, and accounting, and SEC filings are done that the

8    debtors and the Holdings Inc., books and records are

9    inseparable.  So because of the -- I don't think it benefits

10   Your Honor for me to read into the record the definition of

11   excluded assets or the provisions in the sale order that give

12   the debtor rights to these very important excluded assets.

13         Because the debtors are in liquidation mode the

14   entity, the entity desperately would have access to these

15   books and records which are Holdings books and records is

16   Holdings.  So unless the matter is resolved consensually,

17   which as Your Honor noted has not yet occurred, or Your Honor

18   provides a court order directing the parties to cooperate in

19   a turnover since we are the (indiscernible) as Mr. Greecher

20   acknowledged, Holdings is a true party in interest here that

21   means we are really in a terrible stalemate and I can see us

22   flailing around in State Court for a very long time.

23         That is one of the -- I know it's another

24   imposition on your post-confirmation jurisdiction, but we're

25   here to help our (indiscernible) be the catalyst to bring the

1  parties together and respectfully, all of the technical

2  (indiscernible) are our adversary really speak to a situation

3  where we're just a stranger to the transaction and have

4  nothing to do with anything that we're not a party in

5  interest, but we would indicate its very clear that because

6  of our inextricably intertwined previous relationship with

7  the debtors that we are very much a (indiscernible) invested

8  party here before Your Honor and appropriately are seeking

9  the assistance of the court in resolving the stalemate in a

10  fair and equitable matter.

11          We do not want to see proprietary information from

12  new TSI.  We don't want to put new TSI and its people through

13  the ringer and create a very difficult situation for them as

14  they integrate their businesses and move forward.  That is

15  why, in our papers, we indicated the various reasonable

16  nature of our approach.

17          THE COURT:  Okay.  Thank you.  Thank you very

18  much.

19          I am going to take the matter under advisement,

20  but I will rule very shortly in the form of an order.  I want

21  to go back and trace through the documents a little more

22  carefully, frankly, given, you know, the argument that has

23  been made this morning.  So you will get a decision before

24  May 17th which I think is the tax deadline, but you will get

25  a decision as soon as possible and it won't be an opinion or

1  anything.  It will be an order and I will get on that as

2  quickly as I can.

3          Anything else for today?

4          MR. GREECHER:  Nothing else from the

5  administrator, Your Honor.  Thank you.

6          THE COURT:  Alright, we are adjourned.  Have a

7  great day.

8      (Proceedings concluded at 11:11 a.m.)

9

10

11                          CERTIFICATE

12

13  I certify that the foregoing is a correct transcript from the

14  electronic sound recording of the proceedings in the above-

15  entitled matter.

16
   /s/Mary Zajaczkowski                    April 20, 2021
17  Mary Zajaczkowski, CET**D-531

18

19

20

21

22

23

24

25